UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:00-CR-217 (EBB) |
| | : | |
| v. | : | |
| | : | |
| CHARLES B. SPADONI | : | August 5, 2005 |

UNITED STATES' RESPONSE TO
DECLARATION OF RUSSELL M. GIOIELLA, ESQ.

The United States respectfully submits this response to a Declaration of Russell M.

Gioiella, Esq. [doc. # 933, filed June 21, 2005, hereinafter "Decl."], in support of defendant

Spadoni's pending motion for acquittal or new trial [doc. #681], and a previous Declaration in

Support of Motion for New Trial [doc. #865].  In his newest filing, the defendant claims that

Paul Silvester "prior to the Indictment in this case, provided the Government with proffers

which completely and unreservedly exonerate Mr. Spadoni from any wrongdoing."  Decl. At 1.

In support of his claim, Spadoni points to handwritten notes given by Silvester to his

own attorney -- which were undisputedly never provided to the Government either in their

original or transcribed form -- as well as vague assertions about testimony that Paul Silvester

would supposedly be prepared to give.

Spadoni claims that Silvester's notes reflect that Spadoni's first response to Silvester's

request to make a corrupt payment was that to do so would constitute an illegal act or a "quid

pro quo."  However, had Silvester told the Government of that response, or testified to it either

before the grand jury or at trial, which he did not, that evidence would have established

conclusively, for example, that when Spadoni arranged for the execution of a "consultant

contract"  between Stack and McCarthy on November 11, 1998, in New York, Spadoni knew he

was breaking the law.  Had the Government known of this information, it would have used the information to highlight Spadoni's guilty knowledge in arguing against defense counsel's trial claim that there was no connection between "consultant contracts " and the $200,000,000. Triumph investment.

As set forth in more detail below, this latest variant of a *Brady* claim fails for at least four reasons -- one factual and three legal in nature -- each of which individually defeats Spadoni's claim.

*First*, as a factual matter, it is undisputed that Silvester's handwritten or transcribed notes (which were protected by the attorney-client privilege) were never provided to the Government, and the defendant proffers no evidence that Silvester or his attorneys ever relayed that information to the Government in the words used in those notes.  Indeed, Attorney Gioiella's most recent Declaration does not claim that Silvester or his then attorneys would testify that they ever did so.  For the Court's benefit, the Government submits as an attachment herewith an excerpt of Special Agent Urso's handwritten notes of the attorney proffer provided by Silvester's lawyers. *See* Attachment A.  These notes show that, as one would expect, Silvester's attorneys did not read aloud his notes to the Government, but instead paraphrased the information Silvester could himself provide.  Likewise, Silvester gave substantially the same information as in his notes, but used different words -- which were faithfully reported in the Forms 302 which were disclosed to the defense. All of this is entirely consistent with the testimony that Silvester is now supposedly prepared to give: that his attorneys told him that they had provided the information contained in his notes to the Government, and that he later provided the information to the Government himself.  For the Court's benefit, the Government

2

submits Form 302s dated July 12, 2000, March 30, 2001, April 20, 2001, and December 13, 2001; Silvester's grand jury testimony dated June 13, 2000; as well as the handwritten notes of Special Agent Urso dated August 29, 1999 and September 18, 2001 and Special Agent McTague dated August 29, 1999. *See* Attachments B-I. Of significance is the Form 302 dated April 20, 2001, in which Silvester personally reviewed his prior interview statements, as well as his grand jury testimony, and had an opportunity to amend or clarify them however he wished. As the Court can readily see, Silvester's description of his conversations with Spadoni was consistent, and at no point did he describe to the Government his conversation with Spadoni in the words contained in his handwritten notes. Because the statements in Silvester's notes were never in the Government's possession, they could not have been suppressed.

*Second,* the information contained in Silvester's handwritten notes *was not materially different* from that relayed by Silvester during interview sessions as reflected in FBI Form 302s, in his grand jury testimony, and in his trial testimony in the present case, such that there no reasonable probability that they could have altered the outcome of this case. Silvester's story remained unchanged: He had asked Spadoni to have Triumph pay finder fees to Stack and Thiesfield; after checking with Fred McCarthy, Spadoni replied that Triumph could not pay them as finders (for legal reasons) while Silvester was in office, but could work out an arrangement with them once Silvester was out of office; and most importantly, that Silvester understood Spadoni's latter response to be essentially a "yes." Silvester's understanding was proved entirely correct by how events unfolded: Rather than draft an agreement to pay Stack and Thiesfield as finders in connection with the Connecticut investment, in November 1998, Spadoni drafted "consultant agreements" dated January 1999 which included compensation

3

equivalent to a finder fee or 1% of the Connecticut investment. Spadoni and McCarthy arranged to have Stack's contract signed in New York on November 11, 1998, within a matter of days after Silvester's request. However, under the "consultant contracts," payments to Stack and Thiesfield were not to begin until shortly after Silvester left office in January 1999. Because the Government disclosed this information well before trial, Spadoni did not lack any material information that could conceivably have changed the outcome of the trial.

*Third,* to the extent that Silvester's notes describe the post-election conversation between Spadoni and Silvester using different phrasing than that used in his 302 or his testimony, these additional details are *inculpatory* rather than exculpatory. Two years after a jury found him guilty, having curiously enlisted the support of Paul Silvester -- his primary accuser -- defendant Spadoni produces information which, if introduced at trial, would have established beyond all doubt that Spadoni knew he was breaking the law when he arranged for Stack and Thiesfield to enter into "consultant contracts" valued at 1% of the Connecticut investment. The notes reflect (as did the evidence presented at trial) Spadoni's knowledge that acceding to Silvester's request that Triumph pay millions of dollars to Stack and Thiesfield would constitute a corrupt arrangement -- or in the words of Silvester's handwritten notes, a "quid pro quo." The fact that Spadoni went forward to disguise the finder fees as "consultant payments" through contracts, fraudulently post-dated after Silvester left office, *despite his open acknowledgment that they would constitute a quid pro quo,* only buttresses the conclusion that Spadoni acted with intent to influence Silvester.

*Fourth*, the information supposedly suppressed were Spadoni's own statements to Silvester, and hence by definition were available to Spadoni. Because Spadoni knew very well

4

what he did or did not say to Silvester, as a matter of law his own statements could not have

been "suppressed" by the government for *Brady* purposes.

For all of these reasons, as set forth in more detail below, the Court should deny the

defendant's latest motion.

## I. Statement of Facts

Special Agent Urso's notes reflect a meeting with Attorney Santos and Seeley on August

16, 1999.  The notes reflect that the following information was provided with regard to the

Triumph investment:

> Triumph CT.  CBO- Nov. 98-
> 200,000.00-PS told CS -told
> pay Stack + Lisa T.-fees-
> CS would not pay finder-
> Employee- MM-EW-
> CS told could pay related to a deal.
> McCarthy sympathetick [sic] to staff-
> arms length needed to make sense-
> wk after deal   McCarthy favorably to
> hire Stack/LT as consultants-hired
> before-CS made apt for EW-
>  MM had revolving door problem-....

Excerpt of Handwritten Notes, Attachment ("Att.") A.

These notes clearly do not reflect that the attorneys read verbatim the notes prepared by

Silvester, nor do they reflect that they used the phrase "quid pro quo."

Silvester signed a proffer agreement on August 27, 1999, and subsequently met with the

Government on many occasions.  The Form 302 dated July 12, 2001, which was disclosed to the

defense, states that Silvester gave the following information related to the Triumph deal:

> Silvester stated after the election, Spadoni approached him and wanted him to do
> a deal with Triumph before he left office.  Silvester was influenced to do another deal

with Triumph because of their support during the election. Silvester stated he wanted to view the proposed deal more closely because it was a unique investment, a hybrid bond issue. Silvester stated the collateralized bond concept for Triumph was new and they needed help. Silvester stated they were running out of time. Spadoni was concerned about the timing of the deal. Silvester stated Spadoni was concerned about the perception and wanted the deal done quickly to have it appear the deal was in the works for weeks. Silvester proposed to Spadoni that he would like Stack and Thiesfield to be paid as finders and he thought the conversation may have occurred in his office. Silvester told Spadoni he wanted them to be paid a point, split between the two. Spadoni said he would take it up with McCarthy.

Spadoni related that it was a problem (legal reasons) when Silvester was in office but he would be glad to sit with them after he was out of office. Silvester understood that Spadoni would start the process of hiring Thiesfield and Stack during the negotiations. Silvester expected the contract would be done. Silvester also tried to get Triumph to hire Elisabeth Ward from his office. Silvester said he was influenced to raise the State commitment from $100,000,000. or $150,000,000. to $200,000,000. to insure Triumph would honor the agreement to pay Stack and Thiesfield.

Form 302 Dated July 12, 2000, at 14, Att. B.

Handwritten notes dated August 29, 1999 of Special Agents Urso and McTague were likewise disclosed to the defendants as part of the discovery in this case. The handwritten notes of Special Agent Urso reflect on page 6, the following with respect to Silvester's conversation with Spadoni about fees: "[c]onversation CS-finder fee take up with FM- problem at time legal reasons not comfortable but when out of office-glad to sit with ok after..." Special Agent McTague's notes at page 7-8 reflect in relevant part:

Charlie- I want you to pay a finders fee
to these people
we want to work with them after your
out of office
Finders fee wouldn't work
Couldn't give job to Elizabeth Ward
Trouble with his structure ill advised
for legal reasons.
He would work something out with

6

Lisa +Stack
100 million deal-
split 1 point between the two of them
He wanted to buy goodwill-insurance
policy-he wanted her to get a payday...

Agents' Handwritten Notes Dated August 29, 1999, Att. C and D respectively.

Paul Silvester testified in the Grand Jury on June 13, 2000, and this testimony was

disclosed to the defense.  He described the following with respect to the Triumph deal:

Q    Did you, Mr. Silvester, when Charlie Spadoni brought the idea of
an investment to you after the election propose that in return for the investment
that Triumph hire Christopher Stack and Lisa Thiesfield as finders?

A    Yes, I did.

Q    Did Charlie Spadoni tell you that he would have to check with
Fred McCarthy?

A    Yes.

Q    Does Charlie Spadoni make a decision regarding Triumph-related
matters without checking with Fred McCarthy from your experience?

A    No.

Q    Did Charlie Spadoni at some point tell you that he had checked
with Fred McCarthy, that Fred McCarthy said he was favorably inclined toward
the arrangement or words to that effect, but it would be ill-advised to hire them
while you were in office, but that they would sit with them after you were out of
office?

A    Yes.  Those words were said over, I believe, two meetings.

Q    Do you want to explain?

A    Yes.  The -- I had asked him to pay a finder's fee to Lisa and to
Christopher Stack.  He said he would check with Fred McCarthy, came back,
said that they would rather sit with them separately after I was out of office and
work it with them at that time.  I proceeded with the investment, thinking that
they would work it out after I was out of office.  Sometime later, Charlie Spadoni

7

told me that based on discussions he had had with Fred McCarthy, that Fred McCarthy, he believed, was favorably inclined to proceed, and that everything should go fine after I'm out of office.

      Q     This second part of the discussion, was that again during the course of the negotiations of the deal?

      A     No.  The second discussion, I think, came up a week or two later where he told me that Fred McCarthy was favorably inclined to do so.  The first discussion, he said he was going to sit with them after I was out of office, which I took to mean after I got out of office.  Sometime later, maybe a week or so, I don't know, sometime later, he said that everything was going to work out, Fred McCarthy was favorably inclined.

Silvester Grand Jury Testimony 6/13/2000 at 58-59, Att. E.[1]

      On March 17, 2001, the Government provided Paul Silvester and his attorney with a copy of his grand jury testimony and asked him to read and comment on any issues.  Silvester noted typographical errors and made other very specific and detailed changes or clarifications. He never supplemented or clarified his conversation with Charles Spadoni as reflected in his grand jury testimony.  See Form 302 dated April 20, 2001, Att. F.  On March 24, 2001, Silvester was provided with pages 1-20 of his Form 302 dated July 12, 2000.  He made comments and corrections to those pages and again did not amend or supplement the conversation between him and Spadoni which appears on page 14 of the Form 302.  On April 3, 2001, he was provided with pages 20-40 of his Form 302 dated July 12, 2000.  Again he was given an opportunity to review, correct and/or clarify any parts of the report.  On April 10, 2001, he was given pages 41-49 of his Form 302 dated July 12, 2000 to review, correct and/or clarify.  He made specific changes and at no time supplemented the conversation between him and Spadoni as reflected in

---

[1] Silvester's grand jury testimony underscores that he knew how to use the phrase "quid pro quo" and did so in connection with his testimony about a conversation between John Droney and him; not in connection with a conversation between Spadoni and him.  See Att. E at 74.

the Form 302.  *See* Att. F at 3-6.  On April 11, 2001, Silvester was provided a copy of his Form

302 dated March 30, 2001 (Attachment G) to read in order to correct or supplement the report.

The report contains information about whether Stack and/or Thiesfield intended to perform any

work under the consultant contracts.  Again, he made specific comments but at no time

informed the Government that Spadoni had used the words "quid pro quo" when describing

Triumph's reluctance to enter into a finder fee arrangement with Stack and Thiesfield.  See Att.

F at 6-8.

On September 18, 2001, Silvester was shown pages of the July 12, 2000, Form 302

related to the TriConn II placement with the State of Connecticut.  He also reviewed expenses

relating to the election night party at the Goodwin Hotel. He recounted his conversation with

Spadoni about his request to pay Stack and Thiesfield a finder fee and the mechanics of splitting

a point between the two.  In this conversation with the Government, Silvester again never used

the term "quid pro quo."  See Form 302 dated December 13, 2001, Att. H at 2-3 and Special

Agent Charles Urso's handwritten notes dated September 18, 2001, Att. I.

At trial, after testifying that Spadoni approached him after the election to make a speedy

investment with Triumph, Silvester continued:

> [MR. BOYLE] What did you say?
>
> [SILVESTER]  I asked him to pay Lisa and Chris a finder's fee.
>
> . . . .
>
> Q    Did you identify for him how much of a  finder's fee you wanted
> them to get?
>
> A    I did.

Q    What did you tell them?

A    A point.

. . . .

Q    What was Mr. Spadoni's response when you made that request for them to get the finder's fees?

A    He said he would discuss it with people in Boston.

Q    Now, had either Ms. Thiesfield or Mr. Stack acted as finders for that?

A    No.

Q    Why did you ask to have them cut in?

A    Well, I wanted them to get paid.

. . . .

Q    Okay.  At some point did you have a follow-up conversation with Mr. Spadoni regarding your request that Chris Stack and Lisa Thiesfield be paid?

A    Yes.

Q    *And what was that conversation?*

A    *Well, Charlie came back to me and said that he had discussed it and they did not want to pay the fee as a finder's fee; they wanted to wait until I was out of office and then sit with those folks and work it out at that point.*

. . . .

Q    What was your understanding when you had that conversation with Mr. Spadoni of the status of your request that Stack and Thiesfield be paid?

A    *Well, he said after I was out of office he'd sit with these folks and work it out.*

Q    And what was your understanding --

10

      A   Exactly that, that they would sit and work it out on terms similar to the economics that we had discussed.

      Q   And as a result of that, were you influenced to do anything?

      A   Yes.

      Q   What were you influenced to do?

      A   I needed to increase the deal.

6/19/03 Tr at 126-30 (emphasis added).

When cross-examination began, counsel began by confirming with Silvester that his testimony was the "sum and substance of things that were said and that [he] didn't remember the exact words." 6/20/03 Tr. at 7. Silvester was then asked to review his 302, and he re-affirmed the sequence of events recounted therein:

      [MR. GIOIELLA]  And is it a fair characterization that after you requested of Mr. Spadoni to check with Triumph to see if they would pay finder's fees, he came back to you and he said that they were not going to pay finder's fees but that Triumph would sit down with Chris and Lisa after you left office and see what they could do?

      A   Yes.

    . . . .

      Q  Now, do you recall that sometime after that conversation with Mr. Spadoni, you had a further conversation where Mr. Spadoni indicated to you that he had spoken to Fred and that Fred was inclined to enter into some kind of contract with Chris and Lisa?

      A   Yes.

      Q  And isn't it true that when that conversation occurred --

      A   Yes.

Q    -- that Fred was inclined, it was after you had already made the investment in Tri-Conn II?

A    Uh . . .

Q    If you're not sure, I may have something that would refresh your recollection.

A    Why don't you provide me with that.

. . . .

A    Yes.  I believe that the second conversation came after the deal closed.

Q    Okay.  So first Charlie says, We're not going to pay finder's fees; we'll try to work it out after the deal is over.  I think you said, We'll see what we could do -- see what they could do; right?

A    Yes.  That's not exactly.

Q    No.  That was what we just went through before. I showed you something --

A    Okay.  But it's the sum and substance.

Q    Right.  And then after that conversation, there's a second conversation which occurs after the investment is made?

A    That's correct.

Q    Where Mr. Spadoni gets back to you and says, Fred is inclined to do it?

A    That's correct.

6/20/03 Tr. at 9-11.  And yet again on re-direct, when asked in an open-ended question to

describe this second conversation with Spadoni, Silvester testified as follows:

Q    And in the second conversation, what happened?

12

> A   The second conversation is when he told me that they would prefer not to do a finder's fee arrangement.  They would prefer that I wait -- that they wait until I was out of office, then they would sit with these folks and work something out.

6/20/03 Tr. at 114.

The Government introduced evidence at trial to establish that, despite Spadoni's statement that Triumph would prefer to wait until after Silvester was out of office, Spadoni and Triumph did not wait.  Stack testified that he remembered receiving a draft contract on his home fax machine. 6/16/03 Tr. at 47-48.  He also recalled signing the contract on November 11, 1998 -- the same day that Silvester signed the investment papers -- at the law offices of Laboeuf Lamb in New York.  *Id.* at 48, 50.  Records from Triumph Capital confirm that a fax was sent from Triumph to Stack's fax machine on November 9, 1998 (Monday). *See* Gov. Ex. 18.  Similarly, the evidence seized from defendant Spadoni's computer confirmed that Spadoni accessed documents named "Stack contract.doc" and "LAT contract.doc" on November 10, 1998 (Tuesday). *See* Gov. Ex. 156.  Finally, the fact that Stack met with Spadoni and McCarthy and others at Laboeuf Lamb in New York on November 11, 1998 (Wednesday), was confirmed by Maryanne Leonard.  6/19/03 Tr. at 10-11.

Special Agent Jeff Rovelli of the Federal Bureau of Investigation testified that he examined a laptop computer assigned by Triumph Capital to defendant Spadoni.  Agent Rovelli testified that documents, named "LAT Contract" and "Stack Contract," had been accessed from the computer as early as November 10, 1998, and existed on floppy diskettes as late as December 31, 1999, and May 31, 1999, respectively.  Neither of these files were on the

computer when seized, and no floppy diskettes with those files were ever produced to the Government.

## II.  Discussion

As the Government explained in its initial response to Spadoni's first new trial motion, he bears the burden of proving three things in order to establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963): (1) the evidence in question was favorable to the defendant because it was exculpatory or impeaching; (2) the evidence was "suppressed" by the government; and (3) the suppressed evidence was so material that there is a reasonable probability that it would have produced a different verdict and, therefore, its suppression caused prejudice to the defendant.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A *Brady* violation occurs only where the government suppresses evidence that "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict."  *In re United States (United States v. Coppa)*, 267 F.3d 132, 144 (2d Cir.2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "'Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v. Zackson*, 6 F.3d 911, 917 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted)).

Moreover, when seeking a new trial, a defendant bears the burden of producing evidence that, as a threshold matter, shows at least that material facts are in doubt or dispute. *See United States v. White*, 972 F.2d 16, 20-21 (2d Cir. 1992).  This rule applies equally to *Brady* claims, so that a court need not hold an evidentiary hearing if a defendant fails to make a prima facie

showing of a harmful violation. *United States v. Colon-Munoz*, 318 F.3d 348, 358-59 (1st Cir. 2003); *United States v. Slocum*, 708 F.2d 587, 600 (11th Cir. 1983); *see also Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (requiring "substantial preliminary showing" of knowing falsity and materiality antecedent to evidentiary hearing in suppression context). A district court has discretion to rule on a motion for new trial without holding an evidentiary hearing. *See United States v. Sasso*, 59 F.3d 341, 350-51 (2d Cir. 1995); *Colon-Munoz*, 318 F.3d at 358-59.

A.    **The Government Was Never Provided the Notes Which Silvester Prepared for His Lawyers, Nor Did Silvester or His Lawyers Provide That Information Other Than as Recorded in the Agents' Notes, in FBI 302s, and in Silvester's Grand Jury Testimony**

In his latest motion, Spadoni relies on notes prepared by Paul Silvester and given to his attorneys in preparation for a proffer session with the Government, in anticipation of entering a plea and cooperation agreement. He claims Silvester is prepared to testify that the information contained in the notes was provided to the Government by Silvester's attorneys at this proffer, and later by Silvester himself in interview sessions with the Government. Decl. at 2-3. Even more important, however, is what he does *not* claim. He does not claim Silvester would say that he or his attorneys ever read, showed, or produced these notes to the Government. He does not claim that Silvester would testify that his attorneys, upon returning from the proffer which he himself did not attend, reported that they had done anything other than summarize the information in Silvester's notes for the Government. Nor does he claim Silvester would testify that he provided this information in any form *other than as set forth in Silvester's 302s and grand jury testimony*.

15

*The Attorney Proffer*.  In response to the fourth-hand hearsay offered by Spadoni about

what Attorney Gioiella says Paul Silvester says about what Attorney Santos said he said at the

proffer, the Government provides as Attachment A an excerpt of the handwritten notes of FBI

Special Agent Charles Urso, who attended the proffer.  The notes contain the following with

respect to the post-election conversations between Silvester and Spadoni about paying Stack and

Thiesfield:

> Triumph CT.  CBO- Nov. 98-
> 200,000.00-PS told CS -told
> pay Stack + Lisa T.-fees-
> CS would not pay finder-
> Employee- MM-EW-
> CS told could pay related to a deal.
> McCarthy sympathetick [sic] to staff-
> arms length needed to make sense-
> wk after deal   McCarthy favorably to
> hire Stack/LT as consultants-hired
> before-CS made apt for EW-
>  MM had revolving door problem-....

As the Court can readily see, the notes reflect that Attorney Santos did not mechanically

read aloud from Silvester's notes, but instead summarized the events at issue.  Most notably, the

notes do not contain the phrase "quid pro quo." That phrase certainly would have attracted the

agent's attention if one of the participants to a corrupt transaction had been reported as using it

to discuss the transaction itself.  In short, given that Paul Silvester did not attend the attorney

proffer session and did not have first-hand knowledge as to what was said; that all Silvester is

supposedly prepared to state is that his attorneys provided "the information" in his notes to the

Government, but not that his attorneys claimed to have read aloud from Silvester's notes rather

than having paraphrased them; and that the agent's notes do not reflect any mention of the "quid

pro quo" language -- or, indeed, of any information that differs from anything Paul Silvester later told the Government and which was duly disclosed to the defense well in advance of trial -- the vague fourth-hand hearsay offered by Spadoni does not warrant this Court's holding an evidentiary hearing regarding what was said by Silvester's attorneys at the proffer session.

In a super-abundance of caution, the Government has contacted former AUSA Joseph Hutchison who confirms that he likewise had no access to the proffer notes in question when, in October 1999, he conducted an independent investigation to determine whether there had been any leak of sensitive information arising from the Silvester matter.  By way of background: On September 23, 1999, Paul Silvester pleaded guilty in open court.  Prior to this date, Silvester had met on several occasions with federal authorities.  (Silvester's statements in these and other meetings are summarized in the various Forms 302 which were disclosed pretrial to the defendant.)  On October 3 and 5, 1999, two articles appeared in the *Hartford Courant* which contained statements about information purportedly being provided by Silvester to the Government as part of his cooperation.  *See* Attachments J and K hereto.  In order to ensure that this information had not been leaked by a government employee, AUSA Hutchison was assigned to conduct an independent investigation.  As part of his inquiry, AUSA Hutchison was able to determine that the probable source of the information was a privileged confidential document prepared by attorneys for Paul Silvester, rather than government records or employees.  *See* Hutchison Affidavit at ¶¶ 2-3, Attachment L hereto.

This conclusion was based, in part, on an interview by AUSA Hutchison with Silvester's attorneys, Hubert Santos and Hope Seeley.  *Id.* at ¶ 4.  In speaking with Ms. Seeley, AUSA Hutchison focused on comparing the content of the *Courant* articles with the materials that Mr.

17

Santos and Ms. Seeley had developed in preparation for their interactions with the government. *Id.* AUSA Hutchison "did not look at or obtain copies of the privileged materials in the possession of Silvester's counsel." *Id.* Instead, he reviewed with Ms. Seeley the information contained in the *Courant* articles and simply "asked her about the degree to which that information was similar to the information presented in her privileged documents." *Id.* Based on this review, Ms. Seeley and AUSA Hutchison concluded that the information in the *Courant* articles "closely resembled the content, language and organization of the information presented in the attorney notes prepared in anticipation of a proffer session with the government." *Id.* At the time of this inquiry, AUSA Hutchison was particularly "sensitive to the need to avoid compromising the privileged status of these attorney notes," due in part to his exposure to such questions in other unrelated cases at the time, and he employed this procedure to avoid implicating such privilege issues. *Id.* at ¶ 5.

Importantly, because the *Courant* articles contained no mention of Triumph Capital or Charles Spadoni, AUSA Hutchison had no occasion to discuss such issues with Silvester, his counsel, or the prosecution and investigation team, nor did he have any reason to inquire into such matters during his inquiry. Att. L at ¶ 7.[2] Moreover, AUSA Hutchison "did not become aware of any information of investigative value, exculpatory or incriminating, that was not already in the possession of the government team." *Id.* at ¶ 6.

---

[2]The Government also appends an affidavit from FBI Special Agent Jeff Rovelli, who examined the "properties" of one or more computer files maintained at Attorney Seeley's office, to ascertain the dates on which the file was created or modified. He did not review the contents of that file, nor did he copy or print out such file(s). Rovelli Affidavit, Attachment M.

In short, even during the leak inquiry, the Government was never saw or possessed Silvester's proffer notes, nor did it ever even learn whether those notes contained any information that related to Triumph Capital or Charles Spadoni.

***Silvester's Interviews and Grand Jury Testimony***.  As described in detail above, Paul Silvester met numerous times with the Government throughout the course of his cooperation, accompanied by his counsel, and these debriefings were recorded in the agents' notes and FBI Form 302s.  As the Court is well aware, the Government produced all of this material -- agent notes and 302s -- to the defense before trial.  In none of these statements did Silvester ever report to the Government that Spadoni had used the words "quid pro quo" when discussing the Triumph deal.  *See* FBI Forms 302 dated July 12, 2001 (Attachment B),  March 30, 2001 (Attachment G) and December 13, 2001 (Attachment H); SA Urso's handwritten notes dated August 29, 1999 (Attachment C) and September 18, 2001 (Attachment I) and SA McTague's handwritten notes dated August 29, 1999 (Attachment D).

Moreover, on five separate occasions (March 17, March 24, April 3, April 10, April 11, 2001), Silvester had an opportunity to review both his prior 302s and his grand jury testimony, and to correct or amplify them as needed.  Special Agent Urso memorialized each of Silvester's comments in an eight-page Form 302 dated April 20, 2001, Attachment F, which was disclosed to the defense well before trial.  As a review of this Form 302 readily discloses, Silvester never expressed the need during any of these sessions to correct or amend any of his statements or grand jury testimony regarding his conversations with Spadoni.

At a subsequent interview, Silvester was asked to reconstruct in detail the events of the week of Election Day 1998.  Upon doing so, Silvester was able to recall that it was on the

morning of November 5 that he had a conversation with Spadoni in the Grant Room of the Treasurer's Office regarding whether Triumph would take care of Thiesfield and Stack. Att. H at 2. Silvester recalled several additional details about this conversation, including how he explained to Spadoni what he meant by asking that Triumph "split a point" between Thiesfield and Stack, and how he demonstrated the arithmetic to Spadoni on a scrap of paper, in a way that made it clear that the more money Triumph invested, the higher the fee to Stack and Thiesfield. Att. H at 2-3. At no point, however, did Silvester say that Spadoni had used the words "quid pro quo" as appears in his handwritten notes.

Indeed, at Spadoni's trial, Silvester was asked with open-ended questions to describe what he and Spadoni had said to each other during the post-election conversations, and again he did not describe them in the particular terms recited in his handwritten notes -- nowhere stating, for example, that Spadoni had described the finder's fee proposal as a "quid pro quo." 6/19/03 Tr. at 119-30 (direct examination); 6/20/03 Tr. at 7-11 (cross); 6/20/03 Tr. at 112-15 (re-direct).

In short, the defendant has offered no evidence whatsoever that Silvester's handwritten or transcribed notes were ever produced to the Government, or that Silvester ever relayed the information contained in those notes in any way *other than* as Silvester consistently related his story in his grand jury testimony, 302s, and trial testimony. Against this complete absence of evidence in support of Spadoni's claims, the Government has demonstrated that Silvester *never* relayed the information in the words contained in those notes, as shown by reliable and consistent evidence: the agent's contemporaneous notes of the proffer and interview sessions, as well as the 302s and grand jury testimony which Silvester himself reviewed and amended, and his trial testimony. For this reason alone, the defendant's most recent *Brady* claim must fail.

20

**B.    The Information in Silvester's Handwritten and Transcribed Notes Is Not Materially Different from What He Relayed to the Government in Pretrial Interviews, in the Grand Jury, and at Trial.**

Throughout his interviews, grand jury testimony (and later his trial testimony), Paul Silvester gave consistent information about the substance of his conversations with defendant Spadoni in the immediate aftermath.  The version of events remained unchanged throughout: Almost immediately after Silvester lost the election in November 1998, Spadoni approached him to quickly do a Triumph deal; Silvester asked Spadoni to have Triumph pay finder fees to Stack and Thiesfield; after checking with Fred McCarthy, Spadoni replied that Triumph could not pay them as finders while Silvester was in office, but could work out an arrangement with them once Silvester was out of office; that Silvester understood Spadoni's response to be essentially a "yes"; and that Silvester's understanding was proved entirely correct by how events unfolded, as Spadoni and McCarthy arranged to have Stack's contract signed within a matter of days, in November 1998, with payments to begin shortly after Silvester left office in January 1999.  Because the Government disclosed this information well before trial, Spadoni did not lack any material information.

For example, in Silvester's 302, he explained that after he asked Spadoni for Triumph to hire Thiesfield and Stack as finders, Spadoni came back from McCarthy and explained that "it was a problem (legal reasons) when Silvester was in office but he would be glad to sit with them after he was out of office."  Att. B at 14.  The interview notes of both case agents Charles Urso and Joseph McTague reflect that Silvester simply adverted to "legal reasons," without mentioning that Spadoni described Silvester's proposal as a "quid pro quo."  *See* Attachment C at 6 and Attachment D at 7-8.  The relevant portion of the 302 reads as follows:

21

Silvester stated after the election Spadoni approached him and wanted him to do a deal with Triumph before he left office. . . .Silvester proposed to Spadoni that he would like Stack and Thiesfield to be paid as finders and he thought the conversation may have occurred in his office. Silvester told Spadoni he wanted them to be paid a point, split between the two. Spadoni told him he would take it up with McCarthy.

Spadoni related that it was a problem (legal reasons) when Silvester was in office but he would be glad to sit with them after he was out of office. Silvester understood that Spadoni would start the process of hiring Thiesfield and Stack during negotiations. Silvester expected the contracts would be done.

Form 302 dated 7/12/2000, Att. B at 14.

Silvester confirmed this account during his grand jury testimony, during which he

described his conversations with Spadoni in response to two open-ended questions:

Q      Did Charlie Spadoni at some point tell you that he had checked with Fred McCarthy, that Fred McCarthy said he was favorably inclined toward the arrangement or words to that effect, but it would be ill-advised to hire them while you were in office, but that they would sit with them after you were out of office?

A      Yes. Those words were said over, I believe, two meetings.

Q      Do you want to explain?

A      Yes. The -- I had asked him to pay a finder's fee to Lisa and to Christopher Stack. He said he would check with Fred McCarthy, came back, said that they would rather sit with them separately after I was out of office and work it with them at that time. I proceeded with the investment, thinking that they would work it out after I was out of office. Sometime later, Charlie Spadoni told me that based on discussions he had had with Fred McCarthy, that Fred McCarthy, he believed, was favorably inclined to proceed, and that everything should go fine after I'm out of office.

Q      This second part of the discussion, was that again during the course of the negotiations of the deal?

A      No. The second discussion, I think, came up a week or two later where he told me that Fred McCarthy was favorably inclined to do so. The first discussion, he said he was going to sit with them after I was out of office, which I

took to mean after I got out of office.  Sometime later, maybe a week or so, I
don't know, sometime later, he said that everything was going to work out, Fred
McCarthy was favorably inclined.

Silvester Grand Jury Testimony 6/13/2000 at 58-59, Att. E.

At trial, Silvester again recounted his post-election discussions with Spadoni about

paying Stack and Thiesfield in connection with the Triumph deal.  After testifying that Spadoni

approached him after the election to make a speedy investment with Triumph, Silvester

continued:

> [MR. BOYLE] Okay.  At some point did you have a follow-up
> conversation with Mr. Spadoni regarding your request that Chris Stack and Lisa
> Thiesfield be paid?
>
> [SILVESTER]  Yes.
>
> Q    *And what was that conversation?*
>
> A    *Well, Charlie came back to me and said that he had discussed it and
> they did not want to pay the fee as a finder's fee; they wanted to wait until I was
> out of office and then sit with those folks and work it out at that point.*
>
> . . . .
>
> Q    What was your understanding when you had that conversation with
> Mr. Spadoni of the status of your request that Stack and Thiesfield be paid?
>
> A    *Well, he said after I was out of office he'd sit with these folks and
> work it out.*
>
> Q    And what was your understanding --
>
> A    Exactly that, that they would sit and work it out on terms similar to
> the economics that we had discussed.
>
> Q    And as a result of that, were you influenced to do anything?
>
> A    Yes.

Q   What were you influenced to do?

A   I needed to increase the deal.

6/19/03 Tr. at  129-30.

When cross-examination began, counsel began by confirming with Silvester that his

testimony was the "sum and substance of things that were said and that [he] didn't remember

the exact words."  6/20/03 Tr. at 7.  Silvester was then asked to review his 302, and he re-

affirmed the sequence of events recounted therein:

> [MR. GIOIELLA]  And is it a fair characterization that after you
> requested of Mr. Spadoni to check with Triumph to see if they would pay
> finder's fees, he came back to you and he said that they were not going to pay
> finder's fees but that Triumph would sit down with Chris and Lisa after you left
> office and see what they could do?
>
> A   Yes.
>
> . . . .
>
> Q   Okay.  So first Charlie says, We're not going to pay finder's fees;
> we'll try to work it out after the deal is over.  I think you said, We'll see what we
> could do -- see what they could do; right?
>
> A   Yes.  That's not exactly.
>
> Q   No.  That was what we just went through before. I showed you
> something --
>
> A   Okay.  But it's the sum and substance.

6/20/03 Tr. at 9-11.  And yet again on re-direct, when asked in an open-ended question to

describe this second conversation with Spadoni, Silvester testified as follows:

> Q   And in the second conversation, what happened?
>
> A   The second conversation is when he told me that they would prefer
> not to do a finder's fee arrangement.  They would prefer that I wait -- that they

24

wait until I was out of office, then they would sit with these folks and work
something out.

6/20/03 Tr. at 114.

As all of these excerpts demonstrate, Silvester consistently stated that Spadoni and
Triumph had balked at his initial request that Stack and Thiesfield be paid as finders, indicating
instead that they would sit down with Stack and Thiesfield *after* Silvester left office. As
Silvester explained at trial, it was Spadoni's statement that Triumph would sit down with Stack
and Thiesfield afterwards that influenced his decision to increase the Triumph investment, and
which constituted the corrupt act on the part of Triumph. Silvester's notes do not differ
materially from his other statements on this point, and therefore they could not constitute *Brady*
or *Giglio* information.

### C.     To the Extent Silvester's Notes Contain Additional Details Not Previously Disclosed to the Government or Defense, They Are Inculpatory

To the extent that Silvester's notes describe the post-election conversation between
Spadoni and Silvester in slightly different terms from those used in his 302 or his testimony,
these details are *inculpatory* rather than exculpatory, and hence could not give rise to a *Brady*
claim. The key point here is that the notes emphasize Spadoni's knowledge that acceding to
Silvester's request to funnel money to Stack and Thiesfield would be a "quid pro quo," and that
Triumph "would not pay any finder or offer employment to anyone connected to [Silvester] in
exchange for the deal." Decl. Ex. B at 2. These statements must be measured against the
critical fact that Spadoni and Triumph proceeded not to enter a into an explicit finder fee
arrangement with Stack and Thiesfield but rather to draft "consultant contracts" with a payment
fee equivalent to 1% of the Connecticut deal and to execute the contract with Stack on

November 11, 1998, to insure that Silvester was locked into the investment.  Spadoni knew the

arrangement was illegal or a quid pro quo but went forward anyway to disguise the relationship

as a "consultant contract" and arranged for Stack to sign it as soon as possible so that Silvester

could not back out of the deal.  That is, the trial evidence showed (1) that Triumph *did* "offer

employment to anyone connected to" Silvester -- namely, Stack and Thiesfield, (2) that the two

consulting contracts were not entered "after [Silvester] left office" but were instead entered

beforehand -- indeed, Spadoni sprang into action and arranged for Stack's contract to be signed

in New York on November 11, 1998, (3) that the contracts were not negotiated at "arms length

and [made] sense for Triumph" but instead were no-show contracts designed to funnel $2

million (1% of the Connecticut investment)  to Silvester's cronies.  (The evidence on these

points is summarized in the Government's original response [doc. # 684, filed July 7, 2003] to

Spadoni's new trial motion at pp. 12-14.)

     Moreover, Spadoni's statement -- that Triumph could only be helpful to Silvester's

associates *after* he left office -- highlights the obstructive character of his later efforts to conceal

that Silvester's associates had received contracts *while Silvester was still in office*. For example,

he falsely postdated Stack and Thiesfield's contracts to January 1999, even though they had

been signed long before -- in Stack's case, the contract was signed on November 11, 1998, on

the same day that Silvester signed the Triumph deal in the week after his election loss.  And he

destroyed electronic copies of the Stack and Thiesfield contracts which would have reflected

their creation and modification in the days immediately preceding the Triumph closing.

Because the description of Spadoni's statements contained in Silvester's notes only reinforces his guilt, it cannot constitute "exculpatory" evidence that could give rise to a *Brady* claim.

> **D.**    **Because Spadoni Had Actual Knowledge of Whatever Statements He Made to Silvester, the Government Cannot Have "Suppressed" Those Statements for *Brady* Purposes.**

*Fourth*, the information supposedly suppressed were Spadoni's own statements to Silvester, and hence by definition were available to Spadoni.  Because Spadoni knew very well what he did or did not say to Silvester, as a matter of law his own statements could not have been "suppressed" by the government for *Brady* purposes.

The Second Circuit has ruled that "[e]vidence is not 'suppressed,'" *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), or stated differently, "no *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi*, 811 F.2d. 47, 59 (2d Cir 1987). *Accord United States v. Zackson*, 6 F.3d 911, 917 (2d Cir.1993); *United States v. Brown*, 582 F.2d 197, 200-01 (2d Cir. 1978); *United States v. Purin*, 486 F.2d 1363, 1368 (2d Cir. 1973) (finding that even where evidence qualifies as *Brady* material, the Government need not *sua sponte* give notice to the defense where the accused has knowledge of the evidence).

Most instructive in this regard is *United States v. Robinson*, 560 F.2d 507, 518 (2d Cir. 1977) (en banc).  In that case, the defendant claimed that the Government had violated its *Brady* obligations by failing to disclose that a witness, who testified that he did not "know" a person named Otis Brown, had in fact been introduced to Brown as "Hakim" by the defendant himself. *Id.*  The Second Circuit quickly dispatched this *Brady* claim, explaining that the information

was obviously already known to the defendant because he was the one who had made the introduction.  *Id.*  Likewise, in the present case, the statements contained in Silvester's notes are those of defendant Spadoni himself.  Because knowledge of his statements was just as available to Spadoni as to Silvester, they could not have been "suppressed" for *Brady* purposes.

Similarly, in *LeRoy*, for instance, the Second Circuit found no *Brady* violation where the Government had not disclosed the grand jury testimony of three witnesses who never testified at trial.  The court explained that the Government had disclosed the grand jury testimony of a fourth witness, and that this testimony should have put the defendant on notice that the three individuals "might have testified before the grand jury and that their statements might have supported his defense."  687 F.2d at 619.  That was enough notice, the court found, "of the facts necessary for him to take advantage of such exculpatory testimony as [the three witnesses] might conceivably furnish."  *Id.*  If there was no *Brady* violation in *LeRoy*, where the defendant was on notice that *other people* might have relevant testimony, there was certainly no *Brady* violation where the *defendant himself* was involved in the conversation at issue.

Along these lines, other courts have likewise held that the government does not have to disclose information that the defendant has or can obtain with reasonable effort.  For example, in *United States v. Maloof*, 205 F.3d 819, 827 (5th Cir. 2000), the Fifth Circuit found no *Brady* violation based on the Government's failure to disclose a witness's statements during FBI interviews, where the witness's attorney had provided defense counsel with the witness's own version of those statements.  As in *Maloof*, Spadoni was aware of whatever he might have told Silvester during their post-election conversations; there could be no *Brady* claim arising out his lack of access to Silvester's recollection of that same conversation.  *See also Allen v. Lee*, 366

F.3d. 319, 325 (4th Cir. 2004) (finding no *Brady* violation in nondisclosure of defendant's

medication history, because defendant "had personal knowledge of any medication he might

have received").[3]

## III.     Conclusion

This case has been pending for more than two years since a jury unanimously found

Spadoni guilty in June 2003 of racketeering, racketeering conspiracy, mail fraud, wire fraud,

bribery, and obstruction of justice charges.  As discussed above, the defendant's latest argument

in support of a new trial fails for four independent reasons, none of which requires an

evidentiary hearing for its resolution.  The Government respectfully submits that the Court

should deny the defendant's motion for a new trial and schedule a sentencing date as soon as

possible.

Respectfully submitted,

JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY


NORA R. DANNEHY
ASSISTANT U. S. ATTORNEY
Fed. Bar No. ct01942

---

[3]Indeed, as this Court is well aware from information provided during the sentencing of defendant McCarthy, Spadoni finally attempted to cooperate with the Government only after he was fired by McCarthy on the day that McCarthy plead guilty.  As the Court will also recall, during proffer sessions with the Government, the defendant Spadoni had no problem recalling in great detail the specific conversations at issue here, as well as numerous other conversations he had with Silvester and others (such as defendant Andrews) during the precise time period charged in this indictment.  These facts are entirely consistent with the commonsense rule, endorsed in the cases described in the text, that a defendant is charged with knowledge of his own actions for *Brady* purposes.

WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET
Fed. Bar No. ct16012
NEW HAVEN, CT 06510
TEL. (203) 821-3700
FAX.(203) 773-5377
william.nardini@usdoj.gov

CERTIFICATION OF SERVICE

_____THIS IS TO CERTIFY that a copy of the foregoing motion was sent by U.S. mail on this 5th day of August 2005 to:

Richard Brown, Esq.                          Russell M. Gioiella, Esq.
Brown, Pandiris & Scott                      Litman, Asche & Gioiella, LLP
100 Pearl Street, 11th Floor                 45 Broadway Atrium
Hartford, CT 06103                           New York, NY 10006

_____
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY

31