FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    07/12/2000

      Paul J. Silvester, date of birth: August 24, 1962, Social Security Number 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.

      On August 27, 1999, Silvester signed a proffer agreement. On September 23, 1999, Silvester signed a plea and cooperation agreement.  Silvester provided the following during meetings in the period  August 27, 1999, through July 10, 2000.

      Present during the various sessions were Attorneys Hubert Santos and/or Hope Seeley, representing Silvester.  Assistant United States Attorneys, District of Connecticut, Nora Dannehy, Thomas Daily and Michael Runowicz; Assistant United States Attorneys, Department of Justice, Public Integrity Section, Eric Glover and Scott Dahl; Special Agents IRS Criminal Investigation Division, Joseph McTague and Thomas Mulligan; and Special Agents FBI, Tim Egan, Susan Bouchard, Joseph Nates, Edward Cugell, William Reiner, Michael Clark and Charles Urso were also present at various meetings.

      Silvester stated he believes he met Christopher Stack at an election event in 1994.  Stack was a bond counsel at a law firm in New York called Whitman Breed.  Silvester stated as the senior member of the Treasurer's staff on the Connecticut Housing and Finance Administration (CHFA) Board, he would see Stack at various functions and meetings.  Silvester valued Stack's advice and knowledge of the CHFA process.  Around the time Christopher Burnham had stopped the college saver bond program and the Treasurer's office was looking for an alternative, Silvester stated Stack was looking to get out of his law firm and looked at the opportunity as a good alternative.  Silvester and Stack lobbied Washington including U.S. Senators D'Amato and Roth for tax advantages for college savings.  Silvester stated Stack's efforts culminated in 1997, with Connecticut passing legislation for the Connecticut Higher Education Trust (CHET) bill.  This bill represented the first education trust bill in the country.  Stack's company, Collegiate Capital, was selected to administer the program.

      Silvester stated in early 1997, Stack also became involved as a finder representing a private equity entity called

---

Investigation on ___Various___ at _Meriden/Hartford, CT_

File # _194A-NH-39127_                          Date dictated _07/12/2000_

by ___SA Charles E. Urso/tfr___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.          Page 1

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page __2__

Veritas. Silvester and Stack were becoming very close on a
personal level. As a finder Stack would receive a sizeable fee if
the placements were successful. Silvester stated after a CHFA
meeting, he and Stack met at a pizza place in Rocky Hill.
Silvester and Stack had a conversation about the day when he would
be out of the Treasurer's Office. Silvester stated he wanted to
receive one half of the amount Stack received after taxes of the
Veritas fee. The initial idea was that the money would be received
when he left office. Silvester stated Stack was eager to get the
deal done and suggested Silvester had the power to push it through.
Silvester reminded Stack that his law firm was already receiving a
lot of bond business. Silvester stated Stack agreed to share some
of the proceeds. Silvester stated Stack had a problem with the
finder fee related to the Veritas placement because he had referred
the owner, Bob McKeon, to his own law firm. Silvester stated a
lawyer at the firm, Buddy Polk, knew of the consulting fee and
Stack's partnership agreement at the firm did not allow side deals.
Silvester stated McKeon, the head of Veritas, used the situation
against Stack and forced Stack to revise the agreement. Silvester
stated although Stack knew McKeon growing up, McKeon had a tough
business reputation. McKeon changed the structure of the deal for
Stack. Initially Stack was to receive a fee including a percentage
of carried interest and management fee. Stack wanted Silvester to
help him. Silvester approached Christopher Burnham and explained
the situation. Burnham had a meeting in the Sky Club in New York
with Silvester and McKeon. Burnham told McKeon not to leave Stack
hanging. McKeon asked if he needed to pay Stack a percentage of
carried interest. Silvester told McKeon that he didn't have to pay
Stack the carried interest. Silvester explained Burnham had signed
the deal but because of Connecticut's significant position (super
majority) the deal could have been canceled. Burnham told McKeon
to pay Stack. McKeon included a no-fault divorce clause giving the
limited partners the power to fire the general partner with a
majority vote. Stack was aware of the contract change. Silvester
stated he went to bat for Stack with the law firm. Silvester spoke
with Jim Normile at Whitman Breed. He told Normile the law firm
did a lot of business with the State (bonding issues) and it would
not be in the law firm's best interest to sue Stack. Silvester
stated the law firm backed off the law suit.

After the election, Silvester stated he had a discussion
with Stack about the second Veritas placement. Stack was upset, he
didn't think McKeon would pay him a fee. Silvester stated he

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On __Various__ , Page __3__

didn't care if Stack was paid because McKeon always did what he
said he would do and it was a good deal for the State.   Silvester
did not attempt to contact McKeon to accommodate Stack's request to
address his contract.

        Silvester and Stack had a number of discussions about
their agreement.   Due to the reduction in compensation as a result
of the Treasurer's salary, he was anxious to receive his share.
Silvester was aware when payments were due from the fund and it
would usually prompt his questions.   Silvester was annoyed he
wasn't getting paid so he suggested Stack do a business deal with
his father or brother, George, on some type of retainer.   He
suggested that Stack pay his father a legal fee around $8-10,000
per month that would get the money to him.   Silvester believes
Stack even sent a check to his father but his father ripped it up
and wanted nothing to do with Stack.   Silvester stated his father
didn't like Stack and told him not to deal with him.

        Silvester explained that during the summer of 1997, he
was having problems at home.   His wife was stressed at work and
needed a break.   Silvester's wife stopped working.   He stated her
family had a place at Cape Cod and she and the kids spent some time
there.   Mark, his brother, had committed to help support him
financially after losing his wife's salary and taking a significant
pay cut when he became the Treasurer.   Silvester stated Mark wrote
two checks totaling around $15,000 to help him get through.
Silvester stated Mark had a conversation around Christmas 1997,
about running for Treasurer.   Around January or February 1998,
Silvester asked Mark for some additional money.   Mark Silvester did
not give Silvester money at this time but their father gave him
around $15,000.   Silvester also spoke with Stack about receiving
money.   Silvester spoke with Mark about collecting from Stack.
Silvester and Mark discussed using the Stack money for the
campaign.   Mark suggested rather than using the money for the
campaign it should be used to pay their father back.   Silvester
believed Mark would get money later for the campaign.   Silvester
stated Mark paid his father from money he received from Stack.   He
stated he is not sure how much money Stack gave Mark.   Silvester
stated he believed the amount was roughly the amount he owed his
father.

        Silvester had a number of conversations with Stack to
receive money, at one point even to buy a beach house and just give

Page 3

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __4__

    it to him.  He also discussed Stack doing some business with Mark but he doesn't believe it happened.  Silvester didn't want to deal with these side deals to raise money and he just wanted the cash.  Silvester had a number of discussions with Stack about the amounts.  Silvester called Mark a couple or three times to make the arrangements.

    Around October 1998, Silvester was desperate for cash for his campaign because the Connecticut Republican Committee reneged on a deal for Silvester's campaign to receive a percentage of money raised for the Committee.  Silvester explained that he was responsible for raising campaign funds for both the Governor and Republican Committee.  Silvester stated he had an agreement to split the money he raised for the Republican Committee at a rate of 70% - 30%.  Silvester stated the committee only wanted to give him a lower amount and it caused him a problem because he had committed to television advertising that would be expensive.  He stated it was a close race and he put pressure on Mark to raise funds.

    Silvester remembers another occasion when his brother gave him cash.  Silvester was with Lisa Thiesfield when they went to a municipal dock in October 1998, to meet Mark.  Silvester stated Mark gave him an envelope with about $16,000.  He took out about $6,000 from the envelope.  He gave $3,000 to his wife to reimburse her for campaign expenses.  Silvester gave $3,000 to Peter Hirschl to send Hirschl's brother in Florida to pay campaign contributions.  The remainder of the cash was given to Thiesfield to give George Gomes to maximize some campaign contributions.  Silvester explained that maximizing campaign contributions was a customary practice where contributors are provided money to make their contributions to the maximum amount of the established campaign limits.  Silvester stated Thiesfield, his campaign manager, was aware of the practice as was Gomes.  Silvester did not have a specific conversation with Thiesfield about these funds other than requesting she give the cash to Gomes.  Silvester stated Christopher Rixon, his campaign treasurer, was not aware of the practice.  Silvester believed the money he received was from his brother.  He learned later it was from Stack.

    Silvester stated when the campaign was over he had about $50,000 in surplus.  Silvester stated Stack wanted to give the funds back to selected donors he solicited.  Silvester disagreed and gave the money to charity.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of     Paul J. Silvester            , On  Various      , Page    5

      Silvester stated Stack also received a fee for the
placement by the State of Connecticut in a fund named Walton
Street.  Silvester stated officials from Walton Street were
prohibited from contributing because they did business with the
Treasurer's Office and he could not solicit.  Silvester believes a
portion of Stack's fee was set aside to cover campaign
contributions from people related to the Walton transaction because
Stack's agreement allowed Walton to retain a certain amount of
funds as expenses.

      After the election, Silvester went to his father to
inquire if he would do business with Stack.  His father declined.
Silvester then went to Peter Hirschl and his sister, Lisa, to see
if, when he was out of office,  Hirschl would do business with
Stack and channel money through to him.  Silvester stated they were
told Stack wanted to be helpful to him.  It was their opinion that
ethics laws didn't prohibit the business relationship to a brother-
in-law.  It was proposed that Stack was interested in developing a
down state parking garage.  Silvester stated Hirschl was told it
would be the biggest retainer of his life and there would be no
heavy lifting.  It was explained to Hirschl that Stack wanted a tax
deduction in the current year and the money that remained would
funnel through to Silvester.  Silvester stated Hirschl didn't know
the work relationship between Stack and Silvester.

      During December 1998, Stack told Silvester he would not
let him down.  Stack told him that he had put aside approximately
$500,000, assuming the deals paid out.  Stack always had concerns
about the contracts.  The conversation took place in the
Treasurer's office.

      During a discussion at Stack's NYC office, Silvester
asked Stack to see the contracts with the funds to determine his
share.  He stated after the first payment of $100,000 in January he
was to be paid $130,000 in March and then about $300,000 in August.
Silvester agreed with Stack on the funds that would be included,
specifically Walton, Veritas, Triumph and Landmark.
Silvester was puzzled by calls he was getting from people like Pat
Sullivan regarding Stack's finances.  Silvester stated Sullivan had
an agreement with Stack's company, Collegiate Capital, and he
wasn't getting paid.  Silvester also tried to get Stack's company
to sign Park Strategies.  Silvester thought he could generate leads
for Collegiate in other states.

Page 5

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On __Various____ , Page __6__

     Silvester heard from Lisa Thiesfield on a cell phone call sometime in 1999, that the word on the street in Boston (from Charles Spadoni) was that Stack was attempting to do business in Boston.  Stack was working with Sandy Tennant, a prominent Republican, linked to the Governor of Massachusetts to do a CHET deal.

     Silvester stated Stack pursued the CHET program in Rhode Island. Silvester stated Jim Thorsen, the number two man in the Rhode Island Treasurer's Office, was opposed to Stack getting the deal.  Silvester stated Stack told him he gave Jerry Harrington a bunch of money to get his company approved.  Silvester stated Harrington was a well-wired friend of Stack.  Silvester stated Stack did not say how the approval was handled.

     Silvester did introduce Stack to Joseph Grano of PaineWebber at a breakfast meeting in NYC in hopes of raising $1,000,000 for Collegiate Capital.  Silvester stated Grano was interested but the idea died internally in the company.  Silvester told Stack of the relationship between Grano and William DiBella.

     Silvester also spoke with Robert Fiondella, the Chairman of the Phoenix Insurance Company, about the prospect of raising money for Collegiate Capital.  Stack called the person at the Phoenix pension program and told him the Phoenix would get pension funds if they went through him.  Silvester heard what Stack said and he told Stack that he did not represent the State and he should stop.

     Silvester remembers the March 1999, payment by Stack to Hirschl.  Stack was in Hartford so he came by his office at Park Strategies and gave him the check.  Silvester stated Hirschl wanted to build a file and told him that he called Stack about his responsibilities.  Silvester stated Hirschl was told by Stack he was busy.  Silvester told Stack to meet with Hirschl.  Silvester told Hirschl to put the money he received from Stack in a municipal bond fund.  Silvester stated the amount he was to receive would have been after Hirschl paid taxes.  Silvester called Stack after the checks bounced and asked why they bounced.

     Silvester stated Stack gave him $12,000 in February 1999, because he needed some cash to get on his feet.  He stated Stack said the $12,000 represented $20,000 minus taxes.  Silvester made

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of        Paul J. Silvester                          , On   Various       , Page    7

        clear to Stack that he couldn't get the Hirschl money and needed
        cash to get on his feet.  He was paid at the restaurant Effies the
        same day of the Governor's State of the State address.

                Silvester told Stack during his campaign to hire Pat
        Sullivan to promote Collegiate Capital.  Silvester stated Sullivan
        acted as a campaign manager for strategy on his campaign.
        Silvester stated Sullivan would hold campaign meetings at his house
        weekly.  At the same time Sullivan, through his company, Sullivan
        and LeShane, would promote the CHET program through Silvester's
        campaign appearances.  Since Collegiate Capital was the sole
        manager of the CHET program there was mutual benefit.  Silvester
        estimated the ratio of services provided to Collegiate and his
        campaign were probably 50/50 and his campaign was able to receive
        maybe $50,000 in services from Sullivan without paying.  Silvester
        stated after the election, Sullivan was not getting paid by Stack.
        Sullivan complained to him and he called Stack and told him to pay.

                Silvester stated there was also a story involving the
        passing of the CHET legislation in 1997.  Silvester stated he was
        told by Steve Casey, a legislative aide, that Tom Ritter, the
        Speaker of the House, a Democrat, was not interested in the
        legislation.  Silvester stated Connecticut was on the leading edge
        of this effort and he considered the legislation important and
        worthwhile.  Silvester stated he had a meeting at Ritter's office
        where it was discussed.  Silvester stated they (the Democrats)
        could take credit for its passage.  Silvester stated Bernie
        Sullivan, a Ritter aide, said show us the money.  Silvester
        explained to Sullivan how the program was managed.  The legislation
        did not allow the State expenses.  Silvester sent Casey to Ritter
        to find out who Ritter wanted taken care of to get the legislation
        passed.  Casey came back with an envelope with a request from
        Ritter through Sullivan.  Silvester stated there was a list of
        names to take care of.  Silvester stated the requests involved
        matters that the Treasurer's Office handled.  Specifically, he
        remembers a request for a company named First Albany be given a
        contract to handle bonding for UCONN 2000.  Silvester could not
        remember the person's name.  An individual named Jim Crowley, a
        Democrat close to Barbara Kennelly and a stock broker at Smith
        Barney was to be given increased trades from the Treasurer's Office
        to increase his commissions.  Silvester stated there were other
        names on the request list.  Silvester believes Gomes and Casey
        might remember the request.

                                        Page 7

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __8__

     Silvester stated the CHET legislation allowed deferral of interest from taxes in 1997.  New legislation in 1998, for the CHET program allowed tax exemption for contributions and the 1999, proposal for legislation on CHET was to include a tax credit.

     Silvester stated after the election or when he was out of office, Stack became more friendly with Jerome Wilson from the law firm Rogers and Wells.  Silvester learned that Stack told Wilson he was taking care of Silvester.  Silvester learned from Thiesfield who was told by Ben Andrews who learned from Wilson.  Thiesfield was aware of his deals with Stack.  Silvester stated Thiesfield told him Andrews was mad Stack was put in the Landmark deal.

     Silvester was familiar with the Landmark Fund.  He explained that the State had invested heavily in real estate.  The investments were very cyclical and the State wanted to get rid of some of the investments while Silvester was Deputy Treasurer.  Silvester stated the State also wanted to make the management of the investments more efficient and effective.  He stated they took the under performing assets and bundled them in an attempt to sell them.  Landmark was one of the funds interested in the package.  Silvester stated Landmark was represented by Rogers and Wells, a New York law firm, in the negotiations around December 1996.  Silvester recalled a trip he made to New York when he bumped into Pat McCabe.  They found out they were both going to Rogers and Wells.  McCabe worked for Rogers and Wells and Silvester had State business regarding a Landmark deal involving real estate.

     Silvester stated during mid-1997, the State Investment Advisory Committee (IAC) agreed to increase the State investments in private equity and real estate to 15% of the invested funds.  The changes were publicized and there became interest in private equity funds doing business with Connecticut.

     Silvester stated he had known Ben Andrews for some time.  During 1997 and 1998, Andrews was employed by Smith Whiley, a minority investment firm.  Silvester, as Treasurer, was not bound by CHRO (Commission on Human Rights and Opportunities) quotas, but he tried to make a good faith effort to place investments with minority firms.  Lisa Thiesfield, Andrews' sister-in-law, was excited about Andrews running for Secretary of State.  She encouraged Silvester to do a deal with Andrews at Smith Whiley.  Andrews had brought a number of bad deals to the Treasurer's Office

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various_____ , Page ___9___

for consideration. One involved a marina and the other involved an
individual who had a checkered past, named Mary Ann Spragins.
Another individual who Andrews promoted was an individual named
Allan Bond. Silvester stated Bond was recently indicted in New
York on securities related violations. Silvester made an
investment with Smith Whiley in June 1998. Silvester was told by
Andrews that he may get a bonus for the placement but he didn't
want to work for Smith Whiley anymore. Andrews needed to continue
to get paid and he couldn't rely on Smith Whiley. Silvester stated
he gets an idea to hook up Andrews with a fund. Silvester tells
Andrews he will figure something out. He tells Andrews not to
worry about the small deals and to sit tight. Silvester wanted to
take care of Andrews because they were running on the same ticket;
Silvester owed Andrews for his help in becoming Treasurer and
because Silvester believed he needed support in the minority
community.

Silvester was aware Michael MacDonald had a number of
conversations with Landmark regarding a placement. He was aware
that Rogers and Wells had represented Landmark previously. He knew
Jerry Wilson from a prior deal with a fund named Apollo.
Silvester remembers sitting in his office thinking how to get
Andrews into the Landmark deal and decided to meet with Wilson
personally to make sure it was done right. Silvester believed
Wilson would be in tune to Andrews placement in the deal.
Silvester had called ahead to set up the meeting and determine if
Wilson was receptive. Silvester indicated Wilson was very
receptive. On May 5, 1998, after he had breakfast with Joseph
Grano and Chris Stack at Lemongellos in New York, Silvester went to
see Wilson. Silvester stated Wilson inquired why he was there.
Silvester explained that Landmark was interested in doing a deal
with Connecticut and he was aware Rogers and Wells had a
relationship with Landmark. Silvester told Wilson he wanted to do
the investment but Andrews needed to be put in the deal. Silvester
informed Wilson that Andrews was a national leader in the NAACP and
was running for office in Connecticut. Silvester told Wilson he
wanted to do a deal like Apollo and he would like Andrews to be
paid as a finder for Landmark. Wilson indicated to Andrews that he
understood and would look into the matter. Silvester told Wilson
he needed to speak to Stan Alfeld at Landmark. Silvester stated
the entire conversation lasted about 15 or 20 minutes. As
Silvester was leaving Wilson asked him why he was there. Silvester
told Wilson that because he was running for office he needed the

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various____ , Page __10__

advice of an old sage and he was picking Wilson's brain.  Wilson
acknowledged he understood.  Silvester stated Wilson was aware that
the proposal was improper.  Wilson was aware that Silvester had
sole fiduciary responsibility for the State pension funds.

        Silvester stated he was called by Wilson after the
meeting.  Silvester was informed by Wilson that he had a discussion
with the appropriate people and they were amenable with the deal
with Andrews.

        Around May 8, 1998, he had a breakfast meeting with
Landmark officials and indicated he liked the fund.  There was no
mention of Andrews.

        Andrews met with Wilson shortly after.  Silvester stated
he had numerous conversations with Andrews about the deal.
Silvester stated Andrews even came to him and asked him how he
should get paid.  Silvester told him he should get a percentage
like 1% paid over a couple of years.  Silvester told Andrews to
work out the details with Wilson.  During a later discussion
Andrews informed Silvester he was in.  Andrews wanted to know how
much Silvester was going to commit.  Silvester was thinking in the
$100 million range.  Silvester explained it was around the time he
was having disagreements with a fund called Crossroads.  He
believed Landmark fit a similar investment role.  Silvester
informed Andrews of his position of the investment amount.  Andrews
wanted a larger investment.  Andrews asked him how he wanted his
share?  Silvester stated after he didn't respond, Andrews suggested
his boy in New York (who Silvester believed was Mark Silvester).
Andrews knew Silvester's brother; they had socialized in New York.
Silvester stated around the same time Stack was pushing a deal in
Miami that he didn't like.  So he decided that he could get a share
through Stack.

        At the Bush dinner on June 2, 1998, Silvester had
Thiesfield tell Stack and Andrews he wanted to meet with them after
the Bush dinner.  Silvester stated after the dinner, Stack, Jim
Normile, Stack's law partner, and Andrews met at a local
Southington bar.  Silvester remembers bumping into an old college
friend, Doug Bailey, who recognized Ben Andrews.  Silvester spoke
to Stack and Andrews.  Silvester informed Andrews that Stack would
be a full partner, a half share, in the Landmark deal.  Silvester
was aware Stack was familiar with Rogers and Wells but not Wilson.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On __Various____ , Page __11__

     Stack was informed Andrews had already worked out the deal and
Andrews would fill him in.  Silvester knew Andrews and Stack were
friendly.  Silvester believed Andrews was fine with Stack's
inclusion in the deal because Andrews had offered to kickback
Silvester's share.

     Silvester stated he received a telephone call from Wilson
on June 3, 1998.  Wilson told Silvester that Stack wanted a letter
from the client even though it would be an unenforceable document.
Silvester informed Wilson that is the way he wants the deal.
Wilson said he was just checking to make sure.  Silvester indicated
you know what I want to happen, split a point make it happen.
Silvester did the deal because he considered it a good investment
for the State and because both he and his friends would benefit.
Silvester would not have done a fund of funds investment in
Landmark if Stack and Andrews were not getting paid.  Silvester
viewed Landmark as competent but not outstanding, he could have
gone elsewhere.

     Silvester stated Stack complained later because there was
no contract with Landmark and the agreement letter with Rogers and
Wells would not be binding.  Andrews also complained that Stack was
being too forward and making demands.  Silvester did not get
involved as to how it was worked out.  Silvester does not know
Landmark was aware of the sharing agreement with Stack.  Silvester
believes Andrews tried to bring other deals for Landmark.
Silvester did have another conversation with Andrews about the
deal.  Andrews questioned Silvester about Stack's involvement
because it would cost Silvester money.  Silvester indicated to
Andrews it was alright.

     Silvester remembers when Andrews threw a fund-raiser for
Silvester at the Wadsworth Atheneum.  Andrews indicated about
$5,000 or $6,000 had been raised but an additional $3,000 would
come from his people.  Silvester understood Andrews would give
people cash to funnel into his campaign.  Silvester stated Andrews
was prohibited from donating to his office because he did business
with the Treasurer's Office.  Silvester told Thiesfield that she
was going to get money from Andrews,  Silvester believed Andrews
made the contributions through individuals named Jill Chmieleski
and Ron Shelton.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On _Various_ , Page __12__

      Silvester stated Stan Alfeld did a fund-raiser for
Governor Rowland at his house.  Silvester told Dave O'Leary that
Alfeld did business with the Treasurer's Office.  O'Leary
acknowledged he understood what Silvester was saying and spoke with
Alfeld.  Alfeld assured O'Leary it was alright, the event would be
planned with his wife.

      Silvester stated after he lost the election, Andrews came
to him and asked if he would approve an additional $50,000,000
placement with Landmark.  Silvester tells Andrews okay, same
arrangement as before.  Silvester was receptive because he wanted
to do a favor for Michael MacDonald and he thought he would be a
good fit for a job at Landmark and because he knew it would benefit
Andrews, Stack and he.  Silvester told Andrews he wanted MacDonald
to get a job.  Andrews got back to Silvester and told him he spoke
to Alfeld and MacDonald was not a problem.  Silvester had a
conversation via cell phone with Stan Alfeld about an additional
placement and anything he could do for MacDonald.  After the
election, Alfeld expressed support for Silvester.  Alfeld offered
to be helpful to Silvester.  Silvester indicates he agreed to place
more money in Landmark.  Silvester tells Alfeld he would appreciate
it if Landmark would hire MacDonald.  Alfeld tells Silvester
everything is fine and good luck.  Silvester was mindful and agreed
that Andrews and Stack would get fees and it would help his staff.
Silvester stated Stack complained that his letter agreement may not
be binding but Silvester would not get involved.

      Silvester stated after the blow-up of this case, Andrews
came to his house and told him Landmark wasn't paying.  Silvester
told Andrews to get a criminal attorney and get to work to set up
meetings to make it appear Andrews did work on Landmark.  Silvester
stated Andrews concocted a story that he knew Wilson for a long
time.  Andrews represented he knew Wilson through boating.
Silvester stated the story was untrue, they met through Silvester.
Silvester stated Lisa Thiesfield was aware of the cover story.

      Silvester has known Fred McCarthy from Triumph Capital
(Triumph) through his reputation in investment banking.  Silvester
stated he worked with Triumph to take a restriction from a
Connecticut only investment fund (1993) to allow Triumph to invest
outside Connecticut.  The amendment may have also increased the
placement.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On __Various__ , Page __13__

        Silvester stated there was a second deal with Triumph
that closed around July 1997.  Silvester stated Triumph had done a
good job and the consensus of the staff was an additional placement
was a good idea.  Silvester became close to Triumph as a result of
their hiring Charles Spadoni, a close friend, who had previously
worked for Shipman and Goodwin.  Silvester stated he approached
McCarthy to hire Spadoni.  Silvester dealt with McCarthy and
Spadoni on Triumph issues.  During 1997 and 1998, Silvester had
many conversations with McCarthy on the status and success of the
investments and future investments.

        Silvester stated in Spring 1998, Spadoni offered to help
his campaign.  Spadoni was aware that Silvester could not receive
or solicit funds directly from Triumph because of State Election
laws.  Silvester made clear that he would be taken care of by the
party and he was expecting money to come back in some form or
fashion.  Silvester did not tell Spadoni of the specific
percentage.  Silvester asked Spadoni how much he could count on.
Spadoni stated he checked with McCarthy and he indicated Triumph
would raise approximately $100,000 for the Connecticut Republican
Party.  Silvester also had discussions with McCarthy with the
understanding Triumph would help Silvester but they expected him to
also be helpful.  There were general discussions of a possible fund
of funds investment.  Spadoni was aware that Silvester was to
receive a percentage of the funds raised by Triumph.  Silvester
stated Spadoni would usually give the contribution checks to Gomes.

        Silvester stated Spadoni brought in his mother-in-law to
the Treasurer's Office.  Silvester was told she wanted to meet him
because it was the first time she had ever given or was going to
give to a campaign.  Silvester believed she donated the maximum
amount.

        Silvester stated Spadoni told him at some time during the
campaign that $75,000 was in the campaign and $25,000 was still
coming.  Spadoni indicated Triumph had not forgotten.

        Silvester stated Triumph agreed to pay his campaign
manager, Lisa Thiesfield, a $25,000 contract to compensate her for
working on the campaign and to replace the wages she would have
received had she stayed a State employee.  Silvester doesn't
remember if the idea was his, Thiesfield's or Spadoni's. Thiesfield
was concerned about her rent and they didn't know if the campaign

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of    Paul J. Silvester    , On  Various    , Page    14

could support the expense.  It was decided that the contract would
provide for Thiesfield to introduce Triumph to the Mashantucket
Pequots because she knew Pedro Johnson, the treasurer.  Silvester
stated Johnson knew Andrews and had previously been a security
guard at UCONN.  Thiesfield believed she knew Johnson well enough
to get a meeting.  Silvester stated he knew of the contract but he
never saw it.  He believes the contract was written to LAT LLC
which stood for her initials.  Silvester stated either his father
or Spadoni did the paperwork to form the company.

        Silvester stated he, Andrews and Thiesfield met with
Johnson during the campaign to solicit a contribution.  There was
no discussion of Triumph Capital.

        Silvester stated after the election Spadoni approached
him and wanted him to do a deal with Triumph before he left office.
Silvester was influenced to do another deal with Triumph because of
their support during the election.  Silvester stated he wanted to
view the proposed deal more closely because it was a unique
investment, a hybrid bond issue.  Silvester stated the
collateralized bond concept for Triumph was new and they needed
help.  Silvester stated however, he rushed the deal through because
they were running out of time.  Spadoni was concerned about the
timing of the deal.  Silvester stated Spadoni was concerned about
perception and wanted the deal done quickly to have it appear the
deal was in the works for weeks.  Silvester proposed to Spadoni
that he would like Stack and Thiesfield to be paid as finders and
he thought the conversation may have occurred in his office.
Silvester told Spadoni he wanted them to be paid a point, split
between the two.  Spadoni said he would take it up with McCarthy.

        Spadoni related that it was a problem (legal reasons)
when Silvester was in office but he would be glad to sit with them
after he was out of office.  Silvester understood that Spadoni
would start the process of hiring Thiesfield and Stack during
negotiations.  Silvester expected the contracts would be done.
Silvester also tried to get Triumph to hire Elizabeth Ward from his
office.  Silvester said he was influenced to raise the State
commitment from $100,000,000 or $150,000,000 to $200,000,000 to
insure Triumph would honor the agreement to pay Stack and
Thiesfield.  Silvester stated that because of Triumph's campaign
support he would have done a deal with Triumph at a lower amount
whether or not Stack and Thiesfield were hired.  Silvester did not

Page 14

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of    Paul J. Silvester    , On  Various    , Page    15

tell McCarthy and Spadoni of his intention.  Silvester believed the
deal with Triumph that involved a collateralized buyout option with
high yield bonds was a good investment for the State.  Silvester
told Stack and  Thiesfield they needed to get to Boston to get the
deal done.  Silvester was not present when Stack and Thiesfield
signed their contracts.  He told Stack to make sure Thiesfield has
the same legal protection.  Silvester indicated to Stack before the
Tortola trip, that he wanted Stack to review the Triumph paperwork
because Thiesfield was getting the same contract.  Silvester stated
Stack informed him when he signed his contract although he is not
sure of the date.  Silvester believed Thiesfield signed her
contract before Stack.  Initially Silvester believed the contracts
were signed and he was notified when he was out of office.  But
during later debriefing sessions upon reviewing calendars and
telephone records, Silvester advised he was unclear when the
contracts were signed.  He remembers sitting in a chair he brought
home from the Treasurer's office when discussing Stack's contract.
Silvester saw Stack's contract in Stack's office in New York around
February 1999.  Silvester stated the deals with Triumph would be
unusual if their contracts were not success based and allowed
compensation for additional referrals.  Silvester would not have
given the commitment for $200,000,000 to Triumph if Thiesfield and
Stack did not receive the contracts.  Silvester understands
Thiesfield and Stack would not have received contracts if he had
not done the investment.  He stated neither Spadoni nor McCarthy
had any idea of the arrangement between Stack, Thiesfield and him.
Silvester intended to share in the Triumph money with Stack and
Thiesfield.  Silvester stated he also wanted to take care of
Thiesfield.  Silvester admitted during the time he was Treasurer he
was romantically involved with Thiesfield.

          Silvester stated Spadoni preferred to deal with Stack.
Spadoni was reluctant to deal and hire Thiesfield because she was
Silvester's campaign manager.  Silvester indicated Spadoni
suggested initially that Triumph hire Stack and Stack hire
Thiesfield.  Thiesfield would not go along with the idea. Silvester
stated on the Tortola trip Stack complained about Thiesfield being
involved in the Triumph deal.  Silvester indicated Stack and his
brother Mark disliked Thiesfield because they thought she did a bad
job on the campaign.  Silvester stated both Stack and his brother
wanted to discuss business during the Tortola trip.  Silvester
stated Stack was pushing Chicago and Miami deals and his brother

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various____ , Page __16__

wanted other deals pushed.  He told them both he just wanted to be
left alone.

Silvester stated it was his idea to have Triumph draw
down on the entire $200,000,000 commitment.  Initially, McCarthy
and Spadoni had wanted to draw down some of the money after the
closing to make it more difficult for the new treasurer to rescind
the deal.  Silvester discussed the idea of drawing down the entire
amount with Spadoni and McCarthy with the belief the new
administration would have changed the deal.  Silvester does not
believe a no-fault divorce clause was included in the contract to
allow the State to cancel.

Silvester remembers going to sign the Triumph deal.
Silvester met Elizabeth Ward and they went to the law firm of
Updike, Kelly.

Silvester remembers Thiesfield purchasing a lease on a
new car after the election.  He helped negotiate the deal.
Silvester believes Thiesfield used the money she received from the
campaign to purchase the lease.

Silvester remembers that Thiesfield visited him at Cape
Cod during the weekend of November 7 and 8, 1998.

Silvester had a couple conversations with Thiesfield
after he was out of office about the Triumph contract.  After
Thiesfield received the first payment in mid January 1999, he
reminded her that life was a two-way street and she should
understand his role in getting her the contract.  Thiesfield
understood the conversation.  Silvester also told Thiesfield she
should save for college.  Silvester admitted he did see one of the
LAT contracts in her apartment but he didn't read it.

Silvester stated the second conversation with Thiesfield
occurred during a trip to Rhode Island to see an accountant that
did their taxes.  Thiesfield was aware of Silvester's deal with
Stack.  Silvester requested that Thiesfield have a similar
arrangement and deal with Hirschl, the same as Stack.  Silvester
stated although she agreed originally, she then resisted.
Thiesfield informed him that she was aware what he wanted to do but
it was a mistake to do it now.  Thiesfield suggested they wait a
year before she gave him any money.  Silvester understood that the

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___ Paul J. Silvester ___ , On _Various_ , Page __17__

idea of a one year wait was the result of a conversation he had
with John Droney and shared with Thiesfield. Thiesfield didn't
like Stack and thought he was no good, she was not comfortable.
Silvester expected that he would receive money at a later date like
the next year. Silvester stated in Spring 1999, Thiesfield did
give $5,000 to him. Silvester stated he put some of the money, not
the entire amount, in the bank the same day as he wrote checks for
the George Bush for President campaign. Silvester gave the
contribution check to Yvonne Davis. Silvester indicated Thiesfield
may have owed him $1,000 at the time for money he lent her when she
went to Florida. Silvester believes Thiesfield did introduce
Andrews to Triumph.

Silvester stated during December 1998, he had a
conversation with Droney. Silvester told Droney he had a
relationship with a person in a finder fee like the Droney/Spreng
deal. Silvester stated he told Droney the person had a couple
hundred thousand to half a million dollars for him. Droney told
Silvester it looked like a quid pro quo and he told him not that
way. Silvester did not identify Stack. Silvester told Droney
there was not a job or a consulting arrangement. Silvester stated
Droney told him to be patient and wait a year. Droney told
Silvester after a year you can do whatever you want. Silvester
believed he could trust Droney because he thought he was speaking
to him as an attorney and he believed it would be a protected
conversation. Silvester may have also asked Droney for a job.
Silvester told Thiesfield, Droney's opinion was to wait a year.

Silvester stated that before the investigation was
public, he attempted to have Park Strategies do business with
Triumph Group. There was even a draft contract with Triumph and
Park Strategies. McCarthy was reluctant to hire Park Strategies
directly because of Silvester's relationship to Triumph. It was
decided to use Ben Andrews as an intermediary. Triumph would have
a contract with Andrews and Andrews would have an agreement with
Park Strategies. There was a draft of this contract prepared. The
contract outlined a $15,000 monthly fee paid to Andrews and $12,000
of it would be forwarded to Park Strategies. By structuring the
agreement in this matter, Silvester's relationship to Triumph would
be disguised. Silvester believes there was a meeting with Triumph
in Boston that Wayne Berman came from Washington to attend.
Silvester stated the contract was never executed.

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various_____ , Page __18__

        Silvester discussed his problems in a series of
conversations with Spadoni after he heard the FBI was investigating
his activities as Treasurer.  Silvester described a meeting with
Spadoni on the Saturday of Memorial Day weekend of 1999.  Spadoni
told him that there was a big problem.  Triumph had received a
Federal Grand Jury subpoena.  Silvester was informed that Triumph
had retained counsel named Robert Popeo.  Spadoni told Silvester
that he and McCarthy did not believe Stack and Thiesfield's
contracts were related to the subpoena request.  Spadoni said it
was Popeo's opinion that there would be more subpoenas that would
be broader.  Spadoni told Silvester according to the subpoena, he
was not to disclose the request but it was alright to talk to
Silvester because he had at times acted as an attorney for him.
Spadoni believed that he had not done anything wrong.  Silvester
told Spadoni his problems were deeper, and told him of the
Stack/Hirschl deal.  Spadoni asked if it was after he left office.
Spadoni asked Silvester about any arrangement with Thiesfield.
Silvester stated Spadoni assured him it was alright as long as
Thiesfield hadn't given him any money.  Silvester told Spadoni,
Thiesfield gave him $5,000.

        Silvester and Spadoni discussed getting a good attorney
and Spadoni told him not to tell his wife.  Silvester would not
agree and he and Spadoni went back to Silvester's house to speak to
his wife, Christine.  Spadoni told Silvester that Popeo was putting
a list together of attorneys of the right ilk, and a joint defense
would be important.  Spadoni told Christine that Triumph had been
subpoenaed and Silvester would get the best lawyers.  Spadoni said
it would be a difficult time and they should be prepared to defend
themselves and batten down the hatches.  Silvester stated  he had
previously informed his wife that he had been helpful to Billy
DiBella, Chris Stack, Lisa Thiesfield and George Gomes.  During
Spadoni's Saturday visit, Silvester's sister, Lisa, came to the
house and Spadoni spoke to her about the Triumph subpoena.
Silvester later spoke privately with his sister and provided
details.

        On Sunday of Memorial Day weekend of 1999, Silvester
called Spadoni and told him he wanted to speak to him and see the
attorney list.  Silvester also wanted to get an attorney for
Thiesfield.  Silvester drove to Triumph's Hartford office and
picked up Spadoni.  They spoke of the names on the attorney list.
Silvester remembers the names Hubert Santos, Jim Wade and Hugh

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On _Various_ , Page __19__

Keefe from Connecticut and a number of Boston attorneys whose names
were unrecalled.  While Silvester dropped off Spadoni he told
Spadoni he was going to jail.  Spadoni appeared depressed.
Silvester told Spadoni he had a strong inclination not to prolong
the inevitable and go to the authorities and tell the truth.
Spadoni quoted Popeo by saying cooperation means conviction and
Silvester needed a good lawyer to defend him.  Spadoni told
Silvester, Popeo wanted everybody to get a lawyer from the list.
Either the same day or Memorial Day, Silvester was attempting to
contact Thiesfield to get an attorney, when he learned Spadoni was
reaching out for Thiesfield to hire George McMahon.

Silvester visited Ed Daly, either Sunday or Monday of the
same weekend.  He saw Thiesfield after he met with Daly.
Thiesfield and Daly maintained apartments in the same building.
Thiesfield had already met with Spadoni.  Thiesfield told Silvester
he was in a lot of trouble, particularly with the Stack situation.
She told Silvester to get a good lawyer and they would get through
it.  Although Thiesfield had previously known about the
Stack/Hirschl arrangement she did not know the amount of money
until now.

During June 1999, Spadoni would stop by Silvester's house
about every other night.  During this time, Silvester recalls a
conversation with Spadoni one evening on his porch.  Silvester told
Spadoni that he had information on his computer about financial
planning for Thiesfield's retirement and the Stack/Hirschl money.
Silvester told Spadoni he reformatted the computer to get rid of
the information.  Spadoni told him that according to Popeo, the
best way to get rid of stuff was to buy a particular program to
blow out the program.  Silvester could not remember the program
except it had a catchy name.  According to Spadoni, Popeo had said
that more subpoenas were likely and documents that could be made to
look or that the government may say is incriminating should be
purged if there was no business purpose.  During this same time
period and before he had retained Hubert Santos and Hope Seeley to
represent him, Spadoni totally debriefed him about the Triumph
deal, Peter Hirschl, Mark Silvester and Stack.  Silvester relied on
Spadoni as an attorney and Spadoni told him it would be necessary
for a joint defense.  Silvester was told everything was being
shared with Popeo.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page __20__

        Silvester stated he and Spadoni discussed during their discussion about the destruction of documents, an unsigned contract Triumph had with Park Strategies and/or Ben Andrews.  Spadoni requested Silvester get rid of his copy.  Silvester told Spadoni he had discarded his copy.  Silvester didn't have his copy, he believed he forwarded it to Wayne Berman.  Silvester stated the contract was a result of his efforts to introduce Triumph and Ben Andrews to Park Strategies and Berman.  The proposal was never finalized.  Triumph wouldn't hire Park Strategies because of the FBI investigation.  Silvester believes Triumph lent Andrews $25,000.  Silvester stated there was a meeting at the end of March 1999, where Wayne Berman flew to Boston to discuss Park Strategies doing business with Triumph. Silvester indicated he viewed the information on the computer at Park Strategies and threw the disc away.  Silvester gave Thiesfield a hard copy of her transactions.

        During another discussion in June, Spadoni informed Silvester he had purged information.  Silvester was not sure if Spadoni purged information from his computer or a Triumph computer in Boston or Hartford.

        Silvester stated Spadoni's secretary in Hartford is Therese Sperry.  Sperry was previously employed by the Boy Scouts. Silvester stated Spadoni shares a secretary in the Boston office. Spadoni spends about half his time in Hartford with the remainder in Boston.  Silvester doesn't remember what kind of computer Spadoni uses.

        During one of the conversations after the grand jury subpoenas were served, Spadoni told him it was a good time to put Thiesfield to work and Triumph needed to tell Stack to do the same. Silvester stated it was around the time Thiesfield was going to leave Park Strategies but she had promised to help Alphonse D'Amato at the New York office for a week in June.

        Silvester believes Thiesfield may have issued an inflated bill during the campaign for T-shirts.  Silvester stated Thiesfield pocketed the $3,000 from the T-shirt guys, although he believes the money may have been a rebate.

        Silvester stated Thayer Capital (Thayer) started promoting the fund with the State of Connecticut around August 1998.  Silvester doesn't believe he returned calls to Fred Malek

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On _Various_ , Page __21__

until after the election, if so the calls would have been minimal.
Silvester stated MacDonald was familiar with Thayer.

Silvester explained that he has known DiBella his entire
life.  Silvester stated DiBella introduced him to Joseph Grano the
president of PaineWebber in approximately the fall of 1997, and
Silvester developed a personal and professional relationship with
Grano.  DiBella was also a childhood friend of Grano.  Before he
met Grano, Silvester knew Grano was interested in having
PaineWebber handle the State short term investment fund.  Under
Burnham's administration, a meeting was held, which was attended by
Grano where a proposal was made but rejected.  It just wasn't a
good fit.  Silvester stated he told DiBella and Grano he would make
up for not attending the presentation and he went to New York to
personally meet with them.  Silvester stated Grano was a very
impressive guy.

On another occasion when he visited Grano, Silvester
stated he was introduced to the Chairman of PaineWebber, Don
Merrin.  Silvester stated Merrin was familiar with private equity
deals and it was not Grano's specialty.  It was proposed to him to
consider a placement in a real estate type private equity deal.
Silvester had a half dozen conversations with Grano about the deal.
Grano also wanted him to do a small deal in the Sterling fund but
it was not done.

On July 16, 1998, Silvester had lunch with DiBella, Grano
and another PaineWebber executive to discuss the real estate
private equity deal.  Silvester believes DiBella set up the meeting
but was not involved in the substance of the private equity deal.
Grano provided a placement memo which Silvester gave to Michael
MacDonald.  It was at this meeting where Silvester referred Grano
to Jeb Byrum.  Grano inquired how to get other states' pension
investments.  Silvester suggested that he hire a respectable firm
such as Potomac Investments.  Grano asked if he needed to pay Byrum
for the Connecticut investment.  Silvester told Grano "no."
DiBella would call occasionally to check the status.  Silvester
stated due to the election the placement was not a high priority.

Shortly after the July 16, 1998 meeting, Silvester
discussed with DiBella the appropriate fees for finders.  Silvester
told DiBella the fee is usually a percentage of funds placed and
paid by the fund.  Bigger, well-known firms get a higher

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On ___Various___ , Page __22__

  percentage.  Silvester does not believe he told DiBella of anyone
else receiving finder fees, although he may have been aware of the
Finley, Droney, Kelly fee in the Biggler Crossroads fund.
Silvester stated there were published reports about the attempt to
reduce the fees.

    Silvester was going to do a $100,000,000 deal with
PaineWebber that Silvester believed was a good investment.  Since
DiBella had made the introductions Silvester believed he was
deserving of a fee.  Silvester learns in the fall around election
time that DiBella was not going to get a fee.

    On Tuesday November 10, 1998, Silvester, Grano and
DiBella met at the Meadowlands horse racing track in New Jersey for
dinner.  Grano was an avid horse racing fan.  Silvester initially
believed he drove to the Meadowlands from Connecticut with DiBella.
Based upon a review of telephone, hotel and other records,
Silvester had a refreshed memory that he had driven from
Connecticut to New York with Thiesfield.  He met DiBella in New
York and they drove to the Meadowlands.  DiBella later dropped
Silvester in New York where he stayed with Thiesfield.  He
remembers it was bad weather and was raining.  DiBella and
Silvester were meeting Grano to discuss DiBella's deal with
PaineWebber.  DiBella was pushing to get paid by PaineWebber.  He
wanted to sew up the deal and because of the election results there
was a sense of urgency.  It became clear from the meeting that
DiBella was not going to receive any fees from PaineWebber.
Silvester told Grano, when DiBella was not present, that he would
take care of DiBella.  Grano indicated that he had previously
helped DiBella.

    Silvester had learned previously PaineWebber's attorneys
objected to DiBella getting a fee because DiBella had not gone
through the approval process, and because they didn't want
association with DiBella's past problems.

    Silvester states that Grano also brought a small LBO deal
called Sterling in 1998.  The deal never reached investment grade
before he left office.  DiBella was pushing to do the Sterling deal
with the hope he would receive a fee for the placement.

    Silvester decides that he will take care of DiBella for
various reasons.  He thought he should have been paid for the

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ____Paul J. Silvester____ , On __Various__ , Page __23__

PaineWebber deal; wanted to help DiBella because he would need him
in the future; DiBella had tried to neutralize Nappier in the
election by not raising money for her campaign despite being a
prominent powerful democrat; and DiBella's partner, Anthony
Autorino had held a fund-raiser for Silvester.  At this same time,
Silvester was getting telephone calls regarding Thayer and he
decided to put DiBella in the deal.

        Silvester recounted a series of phone calls on November
11, 1998, regarding the Thayer transaction.  Silvester stated he
believes he received a call from Burnham about the need to call
Malek.  Silvester stated the call prompted him to get the idea to
use Thayer to solve the Grano/DiBella problem. Silvester came up
with the idea to introduce DiBella to the Thayer fund as a finder.
He knew DiBella didn't find the investment or provide any services.
Silvester stated the Thayer deal was being considered so it seemed
like a good way to take care of DiBella.  On November 11, 1998,
Silvester called Malek and apologized for not calling.  He informed
Malek of the election results and he was probably going to invest
in the Thayer investment in the $50,000,000 range.  Silvester told
Malek that the deal was going forward but no promises.  Silvester
apologized in advance for the legal hoops, particularly the way
Connecticut papers the deals. Silvester told Malek it would be
helpful to have a local representative to help with the new
administration.  Silvester told Malek it would be helpful to him if
he hired William DiBella. Malek stated he understood.  Silvester
told Malek he would check with MacDonald and since he was going to
Washington in a couple of weeks they could meet.  Silvester stated
the entire conversation was pretty short.

        Silvester then called DiBella and told him how he could
take care of the Grano problem.  Silvester indicated to DiBella
that he would act as a local representative for Thayer.  DiBella
needed to call Malek and work out a deal as a placement agent or
finder.  Silvester told DiBella he had made the introduction call.
It was clear to DiBella that he would pick up a fee because
Silvester was putting him in a deal.  DiBella understood there was
no work to do because Silvester made it clear that he was going to
do the deal and he never suggested to DiBella there was any work to
be done.  Silvester believes he may have told DiBella the amount
they were considering ($50,000,000).  DiBella asked Silvester how
to get paid.  Silvester tells DiBella to ask for a point or a
percent of the deal.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page __24__

     Silvester stated DiBella tells him later that he went to
New York on November 12th to meet Malek and to negotiate his
arrangement.  DiBella tells Silvester that Malek didn't want to pay
a reasonable fee and that he told Malek that he didn't think the
deal was worth it for us to do the deal at one half point.
Silvester was upset and he tells DiBella it puts the Treasurer's
Office in a bad light.  Silvester tells DiBella not to be so
forward.  DiBella was also pushing Silvester to raise the amount of
the State investment to $75,000,000.  Silvester understood it would
mean more money for DiBella.

     On November 23, 1998, Silvester meets with Malek for
lunch at the Occidental Grill.  The primary reason he went down to
Washington was to insure the DiBella deal was done.  They discussed
that Thayer already had a placement agent, Merrill Lynch (ML).
Malek indicated ML didn't do much.  Silvester asked if DiBella
could be paid from the ML portion.  Malek indicated ML had an
exclusive.  Silvester suggested ML might cut their fee because a
portion was better than nothing.  Silvester stated he felt very
comfortable discussing this with Malek.  He considered Malek to be
very political.  Silvester indicated he really wanted the DiBella
deal done.  Silvester told Malek if you could use DiBella fine, if
not fine, but it would be very helpful to me.  Silvester stated he
made it very clear in his tone, he wanted the DiBella deal done.
Silvester indicated a commitment would be there, the only question
was the size.  Malek nodded that he understood.  Silvester stated
many other subjects were discussed at the lunch.

     Silvester stated by the November 23rd meeting, he had
decided to increase the commitment from $50,000,000 to $75,000,000.
Silvester stated he increased the commitment so that DiBella would
get a larger fee, DiBella was encouraging him to commit
$75,000,000.  Silvester stated that without DiBella the commitment
would only have been $50,000,000.  Silvester stated even though he
was reluctant to go to $75,000,000 because of the election, he
wanted to stay on the good side of DiBella and Grano.

     Silvester stated he believes he would have made calls
around November 18, to firm up the Washington trip to meet Malek.

     Silvester stated he had no input in the agreement between
DiBella and Thayer.

Page 24

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various_____ , Page __25__

        Silvester explained that Thayer is a well established fund that would not negotiate the management fee.  He stated due to favored nation status any adjustments would normally be given to all limited partners.  Silvester stated the level of commitment was not decided until the end of the process.  Silvester never told Malek that DiBella could be helpful with the documents.

        Silvester stated during June 1999, at a charity golf outing, he had a discussion with DiBella.  Silvester stated DiBella asked what was going on with the FBI investigation.  He heard they're beating hard on him.  DiBella asked Silvester if there were any kickbacks?  Silvester stated there were no kickbacks. Silvester told DiBella if they see your name it is going to blow up.  DiBella stated the only thing you did was go from 50 to 75 million.  Silvester remembered that DiBella had gone through his briefcase when he left it in the car during the process.  Silvester stated there would have been paperwork on the range being considered for the investment.  Silvester stated DiBella pushed for the higher amount knowing that he would get more.  Silvester knew DiBella was getting 70 basis points.  Silvester stated DiBella also mentioned that he made inquiries with the new Treasurer regarding the desire by Denise Nappier to reduce commitments.  Silvester was aware that Malek did not use DiBella to renegotiate the deal.

        After the election, Silvester stated the one favor he asked DiBella was to hire Thiesfield as a lobbyist.  She had appropriate background and had lobbied previously.

        Silvester stated he remembers a situation where Burnham referred Andrews to a fund manager in Baltimore named Brown Capital Management.  Silvester stated Andrews had presented a number of bad deals to Burnham and Burnham wanted to support minority involvement. Burnham had initiated a program to review all of the fund managers. The review was conducted by a consultant group named Rogers Casey.  The analysis reflected Brown Capital had a very good track record. Silvester stated Brown Capital had a very good reputation and Burnham had restructured a fund and thought Andrews would be a good fit.  Silvester stated Burnham had Andrews contact Brown Capital and negotiate a contract.  Andrews gave Silvester a copy of his contract with Brown Capital.  Andrews told Silvester to tell Burnham it was all set.  Silvester discussed with Burnham, Ben Andrews' contract.  They joked that Andrews had a real client. Burnham indicated with our help.  Silvester left Andrews' contract

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __26__

on Burnham's desk or chair.  He does not know what happened with the contract.

Silvester believes Andrews approached him to give Brown Capital a bonus for outperforming an index.  Andrews wanted the payments expedited.  Silvester referred the request to Greg Franklin to determine if an adjustment was appropriate.  Silvester is not sure an adjustment was made.

Silvester stated Andrews also had a deal with PaineWebber that involved a Connecticut bond fund that he received during the Borges administration.  Andrews showed his contract and wanted Silvester to help resolve his dispute with PaineWebber.  Silvester contacted Andy Gurley with PaineWebber and told him if PaineWebber owes the money then pay Andrews.  Silvester is not sure of the final resolution but he believes Andrews was paid something.

Silvester remembers his introduction to the Carlyle Group as good business people with good politics.  Silvester stated after one of the early meetings, he was informed that Wayne Berman, who was involved in the presentation, was the ultimate Republican insider.  He learned that Berman hired Christopher Healy with the law firm Updike, Kelly to handle local stuff.  Silvester is not familiar with Precinct 13, LLC.  Silvester believed Berman previously worked with Peter Kelly and hung around the same circles.  Silvester stated Berman flew to Hartford to get the first Carlyle deal together.  Silvester stated he received a call from David O'Leary from Governor Rowland's staff that told him Berman was our kind of people, look to get the deal done.  Silvester assumed Berman must have called the Governor's Office.

Silvester stated after he attended a March 2, 1998, fund-raiser he realized the political benefits of being friendly to Berman.  He would be a source of advice and money.  Silvester stated Berman was pushing for as much as $100,000,000 on the Carlyle European fund.  Silvester wouldn't commit until he had assurances that financial and legal issues were worked out. Silvester suspected Berman was getting some type of fee for the placement.

Silvester stated after he lost the election, Armondo Paolino from the law firm Updike, Kelly told him that the Carlyle Asia documents are on his desk and encouraged him to do the deal.

Page 26

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __27__

Silvester was puzzled because he couldn't figure out what
relationship Paolino had with Carlyle.  Silvester told him he would
review the package.  Silvester stated shortly after he received the
package, he received a couple calls from Berman expressing a strong
interest in the Carlyle Asia deal getting done.

Silvester believes that he discussed the deal with Berman
on a trip to Washington in late November 1998.  Silvester stated
since he lost the election, they also discussed his employment
prospects. Silvester told Berman he had a couple job opportunities
possibly with Joseph Grano in Chicago.  Berman stated Silvester
should stay in touch because Berman had some ideas.  As a result
Silvester called him later.  Silvester stated Berman was interested
in doing a deal with former U.S. Senator Alphonse D'Amato.
Silvester expressed interest in the new venture as he believed it
would be a good fit.  Silvester stated in one conversation Berman
told him it was extremely important to him that the Carlyle deal be
approved.  Silvester had agreed to the job before the deal was
approved.  However, after the agreement on the job offer Berman
made clear that Carlyle Asia needed to be done.  Silvester believed
the job offer was contingent on the approval of the deal.
Silvester even discussed with Berman that Denise Nappier was
troubled by some of the deals.  Silvester indicated Berman insisted
the Carlyle Asia deal was important to him and get done.  This
conversation was held during the job and salary negotiations.
Silvester was influenced by the conversation.  Silvester stated he
would not have done the deal if he wasn't going to work for Berman.
Silvester does not know if he would have lost the job but believes
it would have impacted the salary had he not done the deal.

Silvester told a number of people before he left office
of his intention to work for Berman and D'Amato.  They include
Richard Mulready, Nappier, John Droney, DiBella, Lisa Thiesfield
and other family members.  He even obtained an ethics opinion from
Mike Botelo.

Silvester believes Berman found out from Grano about his
willingness to work for $200,000.  Silvester stated that amount was
previously discussed when he spoke to Grano about a position.
Silvester explained that PaineWebber is a Republican firm that has
ties to Berman.  Berman may even have attempted to have PaineWebber
contribute toward his salary.  Silvester remembers a telephone call
he had with Berman when he told him the deal was signed while

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of    Paul J. Silvester _____ , On Various _____ , Page ___28___

Berman was at his second home in Rochester, New York.  Silvester
stated Berman had told him the fee on the Carlyle Asia deal was
complex.  Silvester remembers when David Rubenstein from Carlyle
called about Nappier's desire to reduce the commitment and the
possibility of hiring Mary Phil Guinan.  Silvester stated Berman
was upset because it would mean less money for him.  Berman's
advice was to dig in and have Carlyle make Connecticut honor the
commitment.  Silvester stated around April 1999, he had a
discussion with Berman about the investigation that was heating up.
Berman indicated that they didn't even discuss the job until he
left office.  Silvester stated Berman knew this wasn't true.
Berman even hired Attorney Fred Fielding to look into the hiring.
Fielding found four phone calls between he and Berman before he
left office.

        Silvester outlined his relationship with the law firm
Tobin, Carberry.  Silvester stated Glenn Carberry wanted to be
helpful in his campaign and Christopher Rixon, a partner at the
firm, became his campaign treasurer.  Silvester was familiar with
the firm because they had represented clients in front of the CHFA
 meetings regarding tax credits for low income housing.  Silvester
stated the CHFA responsibilities were under the Treasurer's Office.
Silvester believed Rixon used to work at CHFA.

        Silvester met Kerry Dale or a representative of Keystone
at a fund-raiser at a restaurant called the Red Barn in Westport.
Silvester stated the Keystone representative stated he wanted to
get a deal done.  Silvester was not aware that Advest may have
introduced Keystone to the State.  Silvester is unaware how
Keystone met and hired Carberry.  Silvester stated the referral may
have gone to Michael MacDonald.  Silvester believes Keystone must
have realized that because Rixon was doing his campaign, the law
firm may have an introduction to the Treasurer's Office.

        Silvester had a discussion with Carberry about hiring
Elizabeth Ward and George Gomes.  Silvester stated Carberry was
interested in doing the Keystone deal.  Silvester told Carberry
that he was going to do the Keystone deal but that it was important
that Gomes be hired.  Carberry stated he understood but that Gomes
had to go through a process.  Carberry was concerned how the hiring
would be viewed and he would not make any promises before the deal
was done.  Silvester stated Carberry indicated the law firm has a
process and they would be considered.  Silvester stressed how

Page 28

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ____Paul J. Silvester_____ , On _Various___ , Page __29__

important hiring Ward and Gomes was to him.  Silvester believed
Gomes would be a good fit and he wanted to support him.  Silvester
stated Ward met with the firm but decided to go elsewhere.
Silvester stated Gomes was hired.

        Silvester stated in prior conversations, Carberry asked
him how to charge Keystone.  Silvester told him not to charge as an
attorney but as a finder and told him to negotiate as much as he
could get.  Silvester explained to Carberry the fee is usually a
percentage of the deal i.e. 1% over time.  Silvester was never told
the law firm represented Keystone as a lobbyist and he is not aware
how they got paid.  Silvester had a number of conversations with
Rixon and Carberry regarding election issues.  One of the reasons
he did the Keystone deal was to thank Rixon for his help on the
campaign.

        Silvester used some of the money from the campaign to
bonus people.  Silvester stated at the end of the campaign he had
$35,000 to $40,000 remaining.  He felt bad about what he did with
the campaign funds so he gave the balance to three charities.
Silvester stated Rixon was not aware of the bundling of donations.
Rixon did throw him a fund-raiser on a rented boat during the
campaign.

        Silvester formed the company Future Value LLC in January
1999.  He is certified as a chartered financial analyst and he
wanted a company that he could use to do business.  Silvester
stated the company was never active and no business was conducted.

        Silvester related a situation involving Mark Levine and
Arthur Anderson.  Silvester stated Levine, who is a partner with
Anderson in a number of ventures, had an application pending in
CHFA regarding tax credits on a large property in Newington,
($8,000,000).  Silvester stated Thiesfield had lived in a
Levine/Anderson property and owed back rent.  Silvester stated
Levine was suing Thiesfield for the back rent through Attorney Ray
Devlin.  Silvester told Levine to stop suing Thiesfield and he
would help on the tax credit issue.

        Silvester was familiar with the transactions involving
Crescendo Ventures.  Silvester has known John Droney and Peter
Kelly for a long time.  Droney had even represented his father in a
law suit.  Silvester doesn't remember the first time he met George

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On ___Various___ , Page ___30___

Finley but believes it was after he entered government service
(1995).  Silvester was aware that even though he was a long time
Democrat and currently a Republican, he needed to stay friendly
with Droney and Kelly.  Droney and Kelly controlled Democratic
campaign funds and could be very helpful.  Silvester didn't want to
get on Droney and Kelly's bad side.  Kelly's law firm Updike, Kelly
and Spellacy handled a number of matters involving the Treasurer's
Office.  Silvester was also aware Finley and Kelly received some
fee from a previous Connecticut investment in a fund called
Crossroads.  Finley had a relationship with Burnham and this
established his relationship.

Silvester stated Finley, Droney and Kelly were involved
in the company that marketed Crescendo.  Silvester stated he is not
sure how Finley met IAI Ventures, Inc., the investment advisor for
Crescendo.  Silvester stated that he, Finley and Droney had lunch
during 1997, at the Hartford Club and discussed the placement.
Droney indicated that they would like Silvester to consider the
investment, because it would be very important to them.  Silvester
was told Kelly was a partner in the venture and would be very
thankful.

Silvester stated he traveled to Minneapolis to check out
the investment.  Crescendo was managed by a large entity, IAI,
which had a distinguished and strong track record.

Silvester stated the State became a limited liability
company in the deal versus a limited partner because IAI had a
corporate relationship as general partner.  Silvester explained
that there were some international issues to the transaction that
made it unique.  Silvester stated Elizabeth Ward worked out the
legal issues with the law firm Shipman and Goodwin.

Silvester stated that David Spreng was good at investing
in other funds.  Silvester stated Crescendo was basically a fund of
funds.  Silvester indicated the investment was sound and made good
political sense.  Silvester was unaware of the fee until Finley
disclosed it to him.  He was surprised at the large percentage,
which was much higher than what he believed normal.  Silvester
understood because of the legal issues, the State was tough on IAI.
Silvester received calls from Finley and Droney (mostly Droney) to
check the status.  They wanted to know whether the issues were deal
breakers or just the State playing hardball.  Silvester indicated

Page 30

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On _Various_ , Page __31__

     it was not a deal breaker but there were some fine points that
related to fees.  Silvester discussed with Droney and Finley
lowering the management fees in return for the State passing on a
no-fault divorce clause.  Silvester explained that the removal of
the clause would help Crescendo if a new Treasurer wanted to
restructure the deal. Droney said no.  Silvester understood that
the harder he negotiated the more money would come from Finley and
Droney's fee.  Silvester believed he could have pushed harder to
lower the fees for the State.  Silvester remembers signing the deal
for $100,000,000 and calling Droney.  Droney thanked him for his
support.

          As a favor, after the investment, Silvester asked Spreng
to consider an investment in a Connecticut based venture capitalist
named John Booth.  He spoke to Spreng on a couple of occasions.
Silvester explained Booth had approached him to consider an
investment.  Silvester stated Booth was active in the Republican
Party.  He believes Booth's daughter ran Nancy Johnson's campaign.
Silvester stated Booth's investment didn't really fit with State
investments but he thought Crescendo may invest.  Booth invested in
health care  companies that may be a good match with Crescendo.
Silvester stated Spreng made a $2,000,000 investment in Booth's
venture even though it didn't fit exactly.  Silvester stated that
when Finley learned he dealt directly with Spreng on the Booth
investment he became angry.

          Silvester stated in 1998, he was approached by Spreng who
was doing another deal that was not affiliated to IAI.  Spreng
wanted to do a direct investment fund but his strength was in
managing a fund of funds. Spreng asked if he needed to use those
guys again.  Silvester understood Spreng meant Droney and Finley.
Silvester informed Spreng it would be best, it would hurt the good
will established.  Silvester  spoke to Finley about Spreng's desire
to go separate.  Finley was upset Spreng didn't call him.
Silvester stated Finley requested time to sign up the fund.  Finley
didn't have Crescendo signed up until very close to the closing
date.  He remembers even pushing the closing back to allow Finley
the time to execute a contract.  Finley came to Silvester's office
and showed him the signed contract.

          Silvester stated on April 23, 1998, at the Fernwood
Restaurant,  he had lunch with Finley and Droney about the deal.
Silvester was told Kelly was not part of the second deal because he

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of    Paul J. Silvester    , On Various    , Page    32

was getting piggish.  Silvester is not sure Kelly was even aware of
the deal.  Silvester stated they discussed 1) Silvester's campaign,
2) the Governor's race, and 3) the Crescendo deal.  Droney and
Finley made it clear that they wanted  the Crescendo deal done at
$100,000,000.  Spreng was coming to Hartford in May 1998.
Silvester considered Spreng good at fund of funds type deals but he
also showed a proficiency in doing direct investments.

        Droney told Silvester having Ben Andrews on the
Republican ticket with him would be a disaster.  Droney believed
Andrews was a horrible candidate and it would probably help
Nappier.  Droney also suggested Andrews shouldn't be on the GOP
ticket next to him on the party line.  Droney had his own candidate
in the Democratic race for Treasurer, Frank Lecce.  Silvester
preferred to run against Lecce because it was believed Lecce was a
less formidable candidate than Nappier.  Silvester tells a story
about how Droney ran a convention as an example of how someone
needs to keep other Democrats, Kennelly from supporting Nappier.
Droney represented he would support Lecce through the primary
because the survivor would be significantly drained of financial
resources.  A few days after the convention, Pat Sullivan and
Silvester called Droney to discuss a primary.  Droney advised
against having Lecce primary Nappier because it would give her
increased exposure.

        Silvester understood Droney would help the Republicans in
the race for Governor.  Silvester understood in discussions with
David O'Leary that O'Leary and Droney had discussed inside
information from the Barbara Kennelly camp.  Silvester stated there
was bad blood between Droney and Kennelly going back to both
wanting their brothers to become United States Attorney in
Connecticut.  Droney who was a major backer of Clinton won out.

        Droney had two people close to him in the Kennelly camp,
his daughter and Marilyn Cohen, the West Hartford Democratic Town
Chairwoman.  Silvester stated Cohen was very loyal to Droney, he
made her career.  Silvester understood Droney would get information
from Kennelly's campaign and provide it to Silvester and David
O'Leary.  Silvester stated Finley was friendly with David O'Leary
and Brendan Fox.

        Silvester stated during the campaign he had a number of
conversations with Droney regarding the Kennelly campaign.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of    Paul J. Silvester    , On Various    , Page    33

Silvester believes Gomes, Thiesfield and Pat O'Neal may have been
aware of his conversations with Droney.  Silvester and Droney
discussed Kennelly's inside polling information, her healthcare
proposal and environmental proposals.

Silvester stated the Second Crescendo Venture deal closed
on October 19, 1998, for $100,000,000.  Silvester stated since the
Crescendo investment was a fund of funds, he was in position to
negotiate a better fee arrangement on behalf of the State.
Silvester stated Droney did what was requested, he supported Frank
Lecce in a primary against Nappier which cost her dollars in her
campaign and he provided information from the Kennelly election
camp.  Silvester stated MacDonald and Ward from his office
recommended $25,000,000 to $50,000,000 as a placement.  He may have
mentioned the deal could help some friends.  Silvester would not
have done the Crescendo investment without Finley and Droney's
investment because of the political influence they can exert

Silvester had a conversation with Finley to get Spreng to
donate to the Connecticut Republican Party.  Finley and Spreng
would not have been aware of Silvester's arrangement with the
Republican Party.

Silvester went on a fishing boat with Finley on August
22, 1998.

Silvester stated after the commitment was made, he
received a call from Finley.  Finley told him it was a home run for
him and if he could help him let him know.  Finley offered to
introduce Silvester to a friend at the Mass Bay Transit Authority
regarding interest in Apollo.

Silvester stated when he heard of the FBI interest in the
case he spoke with Droney.  Droney informed him he couldn't
represent him because he had to represent Finley.  Silvester
confided to Droney a couple times as an attorney.  Droney stated
Silvester should speak to Ed Daly.

Silvester had no contract with Park Strategies.  He was
hired for $200,000 per year and the employment would be reassessed
after one year.  Silvester stated in early June he received a call
on his car phone from Wayne Berman while he was going to a Rock
Cats baseball game.  Berman told him because of the bad publicity,

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various___ , Page __34__

Park Strategies could lose business.  Silvester stated Berman
wanted him to tender his resignation.  Silvester just said fine
whatever I have to do.  Silvester stated either the next day or
shortly after he reconsidered and called Berman and told him what
is fair is fair.  Silvester told Berman he had a year deal and felt
they have an oral contract.  Silvester believed he developed good
deals for Park Strategies where Berman would make at least
$500,000.  Silvester stated before Berman's lawyers became involved
they agreed to have Silvester receive $50,000 and continued health
care as settlement.  Silvester never saw a draft of a severance
agreement.

        Silvester stated while he was working at Park Strategies,
he  learned of Berman being involved in another shady deal.
Silvester stated Berman held a position with the Republican
Governors' Association.  In that position Berman would recommend
that the Governors refer insurance coverage for State projects like
bridges called wrap insurance to a brokerage company called AON.
Silvester stated AON is one of the largest brokerage houses in the
country and would be represented as capable of getting the lowest
insurance bids.  Silvester stated AON would consistently use AIG, a
large insurance company for the coverage.  Silvester stated both
AON and AIG are large GOP supporters that have a relationship with
Berman through Berman Enterprises and Park Strategies.  Silvester
didn't quite understand what was going on so he asked Berman.
Berman told him,"look don't be so fucking stupid, we get paid from
both ends."  Silvester stated he believes AON/AIG did a deal in
Michigan where they may not have been licensed.

        Silvester knew Jeb Byrum as a well regarded placement
agent who helped Michael MacDonald get his job.  He was also
friendly with Christopher Stack.  Byrum doing business as Potomac
Investment Services (Potomac) acted as the placement agent on a
fund named SCP Private Equity Partners.  Silvester stated Byrum was
upset when he heard MacDonald only wanted to commit $25,000,000 to
the fund when they were seeking a $75,000,000 placement.

        Silvester is familiar with Andrew Moses.  Moses is
related to a wealthy New York based real estate family named
Manochurian.  Silvester was aware of the family because he had
meetings to determine if they were interested in managing some
substantial real estate investments in the Connecticut portfolio.
They never reached an agreement.  Silvester stated his brother,

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page _35_

Mark, also had some business dealings with the family and believed
they could be helpful in raising money for the campaign.  Silvester
stated Moses was interested in marketing venture deals.  Silvester
stated Moses proposed a number of poor quality investment deals, so
he introduced him to Byrum, to help him get established.  Silvester
told Byrum to teach Moses, d.b.a. New York Capital Partners, the
business by involving him in the Wellspring deal run by Marvin
Davis. Silvester could understand how Byrum would take on Moses at
his request but it wasn't Silvester's intent to force him.  It came
to Silvester's attention that Moses was having a dispute with Byrum
over fees.  Silvester wouldn't get involved and couldn't understand
why Moses, who he sent over as a student, would be upset over
anything he would receive.  Silvester stated Wellspring was a good
deal for the State and he committed funds.

        Silvester stated he jammed Moses into a deal involving
Larry Landry d.b.a. Westport Senior Living.  Silvester stated
Landry, from the McArthur Foundation, was having trouble raising
funds for Westport.  Silvester suggested to Landry he needed a
finder and told him to use Moses on a Connecticut deal.  Silvester
stated Landry understood he needed to use Moses to get the deal
done.  When Landry asked how much to pay Moses, Silvester told him
not a nickel more than he is worth.  Silvester stated Westport was
a good deal and he committed funds.

        Silvester stated that during the Westport deal an issue
arose with the State and the fund.  Moses called Silvester and
requested that he accommodate the fund's position.  Silvester told
Moses the change (legal issue) would not be in the State's interest
and he would not consider the request.  Silvester received a call
from his brother, Mark, on the same matter.  Silvester told his
brother it was inappropriate for him to be involved.  Silvester
started to question the relationship between Mark and Moses and he
wasn't sure if they were partners.  Silvester stated his suspicions
were confirmed on Christmas Day when Mark told him there would be a
lot of money for him if he did a deal involving New York Capital
Partners.  Silvester was mad and he killed the deal.

        Silvester stated Mark Silvester messed up a number of
things.  He pointed to a fund-raiser that Mark was to sponsor in
the Mystic area where he didn't even show up.  Silvester stated
near the election when he lost the funds he was supposed to receive
from the Connecticut Republican Committee, he called Mark to raise

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page __36__

money.  Silvester believes the funds he received from New York were
coming from Mark or the practice of Mark maxing contributions in
the name of other individuals.

        Silvester remembers the events surrounding the Pioneer
Ventures deal with the State.  Silvester stated in the summer of
1997, State Treasurer Christopher Burnham received a private
placement memo regarding Pioneer with the notation, "Please look
into," JGR.  Silvester stated Burnham talked to him about the deal
and said it was a piece of shit.  It was not investment grade.
Silvester told him if the Governor requests it you have to do it.
Silvester stated it was right around the time Burnham was going to
leave office.  Burnham did not have a very good relationship with
Rowland, they didn't get along.  Burnham was mad at Rowland due to
his resignation as the Treasurer.  Silvester stated Rowland
criticized Burnham's decision after it was blasted in the press.
Burnham was taking a job at Columbus Circle, and investment firm
that had a subsidiary, Pimco, which had about $500,000,000 in State
investments.  Burnham thought Rowland should support him.
Silvester stated there was an investment advisory committee meeting
to terminate Pimco's contract.  Burnham told him he wasn't going to
do the deal.  He remembers Burnham keeping the note when he left
office.  Burnham told Silvester he was going to keep it.

        Silvester had a conversation with Pat Sullivan about
Pioneer.  Sullivan told him the 2nd floor (Governor's Office) wants
it done.  Silvester tells Sullivan of the Rowland note to Burnham.
Sullivan tells Silvester to shred the note.  Sullivan didn't know
Silvester didn't have the note.  At some time he is told by
Sullivan that a Mengacci was the hook.  Silvester stated he wasn't
sure which Mengacci  brother was involved but he knew the Mengacci
family was close to the Governor and Kathy Mengacci was the
Governor's secretary.  Silvester stated it took a while but they
were able to get the fund and deal better structured for the State.
Silvester did the deal because he believed the governor wanted it
done.  Ward handled the legal matters for the State.  Pioneer used
Bob Lerman's son, the owner of Pioneer, to handle legal matters.
It created other problems in the legal process and Silvester didn't
press Pioneer for the increased legal costs incurred by the State.
The deal was closed in January 1998, for $50,000,000.

        Silvester was unfamiliar with some of the principals in
the Pioneer group.  Specifically he did not know Jeffrey Roundtree,

Page 36

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of _____Paul J. Silvester_____ , On _Various_ , Page __37_

William Collins, John Peters, Tom Cadden and James Mengacci.
Silvester thought Collins and Roundtree were friends of Pat
Sullivan.   Silvester doesn't remember the relationship of Allied
Capital LLC and Ventures Management to Pioneer.

Silvester stated he has known Pat Sullivan for some time
and relied on his political advice.   Sullivan and his wife ran a
public relations firm named Sullivan and LeShane.   Sullivan helped
handle Silvester's campaign.   Sullivan had previously handled
clients in issues before the Treasurer's Office.

Silvester stated sometime after the first Pioneer
placement, while he was at the Governor's Office in the secretary's
area, the Mengacci that was an attorney, thanked him.   Silvester
described Mengacci as older than him with salt and pepper hair and
a stocky build.

Silvester stated Lerman would call him often and ask for
revisions to the Pioneer deal.   Silvester remembers Ward referring
to the request as very unusual.   Silvester stated it was customary
to have the general partner on a deal to invest similar to the
State.   Silvester explained it showed support for the venture if
the general partners also invested their money in the investment.
Silvester would require a disclosure if they withdrew their
investment and allow the State the right to withdraw.

Silvester stated after the election Sullivan approached
him and requested that he increase the commitment in Pioneer.
Sullivan told Silvester it would be helpful to him.   Sullivan
indicated to Silvester that the guys were good to the Governor and
they wanted a $25,000,000 increase.   Silvester understood that
Sullivan was helpful on the campaign.   Silvester resisted because
it was not a five star deal and he made up his mind he was not
going to increase the commitment.   He told Sullivan no.

Silvester went to see the Governor at his residence about
issues after the election.   Silvester remembers New England
television news being there for a live broadcast relating to the
Patriots.   Present during his meeting with the Governor was his
Chief of Staff, Sid Holbrook and Peter Ellef.   Silvester stated
Governor Rowland greeted him and expressed disappointment over his
election loss.   Silvester stated Rowland offered to help him.   He
asked Rowland to hire 15 people from the Treasurer's office, many

Page 37

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __38__

of which had been hired at Rowland's request.  Included was a loyal
guy named Steve Casey who had severe medical problems and needed
the insurance coverage.  Silvester stated Rowland told him he
couldn't help him.  Rowland told Silvester he did not have the jobs
available to place.  Silvester stated he was taken aback by the
response and referred to Rowland as John, a practice Silvester
understood the Governor disliked.  Silvester stated a number of the
15 people he wanted to place, were previously hired as a favor for
Rowland.  Many of which were from Waterbury.  Silvester also
requested Rowland's support for his brother, George, for a
judgeship.  Rowland stated he would not lobby for the brother.
Silvester reminded Rowland how much money he raised for him during
the campaign.  Silvester also requested a favor for Santo Mendoza
and a three digit license plate for himself.  Silvester stated
Rowland did not change his position.  Silvester thanked Rowland for
the time and left.

          Silvester spoke to George Gomes, his wife and his
brother, George, about Rowland's position.  Silvester believes he
also spoke to Rich Grey.

          Silvester stated a couple days or a week after his
conversation with Rowland, his secretary, Arlene Watson, received a
call from a Mr. Mengacci who wanted a meeting.  Silvester doesn't
remember the first name but it wasn't the lawyer.  This Mengacci is
younger, lankier and taller than his brother.  Mengacci represented
that he had a relationship and represented Pioneer.  He was
interested in having the State investment in Pioneer increased.
Mengacci told Silvester he was sorry about the election and Lerman
was making a lot of money for the State.  Silvester had the
impression Mengacci may have been the finder on the deal.
Silvester indicated the jury was still out on how good a job
Pioneer was doing.  Silvester stated he explained to Mengacci
because of the election he was under a lot of pressure but he would
look into it.  Mengacci mentioned the jobs and the judicial review
process for Silvester's brother's judgeship.  Mengacci stated
nothing will happen until the deal is done.  Mengacci told
Silvester it was a two-way street.  Silvester stated he was taken
aback because it became clear to him the reason for the meeting.
Silvester doesn't know how Mengacci learned that he wanted the jobs
and the judgeship handled.  Silvester stated he nodded that he
understood and he would get back.  Mengacci never mentioned Rowland

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various_____ , Page __39__

nor Silvester's meeting with the Governor.  It was a very brief
meeting.

        He told both Sullivan and Gomes of the Mengacci visit.
Gomes advised Silvester to do the deal.  Silvester stated Sullivan
was asked if he could rely on the offer.  Sullivan told Silvester
yes that Silvester's request was not difficult.  Sullivan also told
Silvester he was not getting a fee for Connecticut but Pioneer
business in Rhode Island.

        Silvester considered the request a lay up and he approved
the $25,000,000 additional commitment.  Silvester stated he would
have told Thiesfield and his wife he had to do the deal.  He would
have told Ward to start the process to amend the deal.

        Silvester stated Rowland asked Larry Alibozek and Peter
Ellef with resolving the staffing problem.  Silvester stated Rich
Grey, his deputy, was also involved in the placement.  Silvester
does not believe either knew of the Pioneer deal.  Silvester stated
the jobs were given to the involved employees.

        Silvester stated during spring 1999, his brother George
spoke with Mengacci, the attorney, about the judgeship.  He was
told to recontact Mengacci before the interview so that he could be
there.  He was later interviewed by the judicial committee.

        Silvester stated Tom and Christine Powers, close friends,
ran a fund-raiser in Boston for him.  Silvester stated Powers was
involved with the New Boston Fund, which was controlled by the
Rappaport family.  The Rappaport family are influential Republicans
in Massachusetts and one ran against John Kerry for U.S. Senate in
1990.  Christine Powers signed as a finder for New Boston, a fund
in Boston.  Tom Powers asked Silvester if Connecticut could invest
in New Boston.  AEW was managed by an individual named Renny
Merritt.  Silvester instructed New Boston to use Merritt and AEW
and make it work.  AEW invested a portion of the money they
received from the State in New Boston.  Silvester stated he had a
meeting with the elder Rappaport, two sons, wife, Tom and Christine
Powers, Lisa Thiesfield and Gomes where it was discussed that the
Rappaports would contribute $20,000 to Silvester's campaign.  The
Rappaports were aware they could not contribute to Silvester's
campaign directly.  They agreed to send $20,000 to the Republican
National Committee with the understanding the entire amount would

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of    Paul J. Silvester    , On  Various    , Page    40

    be forwarded to the Connecticut Republican Committee and then
credited to Silvester's campaign.  Silvester later had a telephone
conversation with Tom Powers and the political member of the
Rappaport family to firm up the deal.  Silvester received a call
later from Chris DePino, Connecticut Republican Party (CRP)
Chairman, who acknowledged understanding of the arrangement.
Silvester stated with AEW involved in the New Boston deal he felt
comfortable, it was a good investment.

        Silvester stated there was also another campaign deal
with the Connecticut Republicans.  Silvester discussed around the
start of the campaign with Gomes and Stack ways to circumvent
campaign regulations.  Silvester went to New Haven with Gomes and
Stack to meet with Chris DePino.  They came at the end of a monthly CRP
meeting held at a restaurant near the water close to where DePino
lives.  Silvester, DePino, Gomes and Stack went to a side table and
discussed Silvester raising funds for the party.  Silvester told
DePino that he would be willing to raise money for the CRP but he
wanted a percentage in return.  Silvester stated DePino spoke about
the expenses of the CRP and fund-raising.  Silvester stated he and
DePino agreed that the CRP would return 70% of the money raised.
Silvester stated the meeting was very short maybe one half hour.
Gomes and Stack said very little.  It was Silvester's understanding
that Gomes, George Gallo and Michael Argento would keep track of
the amount raised.

        Silvester had a conversation with Pat Sullivan after a
golf outing where Sullivan told Silvester that it was alright to
raise money for the republican party but Silvester should keep it
quiet because of his agreement.

        Silvester stated the original budget for his campaign was
around $400,000.  It was believed that he would raise approximately
half through normal fund-raising and the remainder through the
agreement with the Connecticut Republican Party.

        Silvester stated there was a fund-raiser in Puerto Rico
that DePino attended.  The fund-raiser was held the end of February
1998.  Silvester stated an individual named Bill Howell from New
York also attended.  Howell was active in Republican politics in
New York.  He was a friend of Stack.  The Puerto Rico events were
sponsored by George Gomes and William Ramarez.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of _____Paul J. Silvester_____ , On __Various__ , Page __41__

     Silvester believed he could raise up to $250,000. During the campaign, on a number of occasions, Silvester would check with Gallo about the status of the fund. Gallo would usually tell Silvester he would check with Argento and get back. Silvester stated he would use the phrase "How much is in the kitty?"

     Silvester stated DePino called him during the campaign and asked him to supply a listing of all the contact numbers for companies that did business with the Treasurer's Office. Silvester stated he gave DePino a copy of the annual report. DePino stated the annual report was no good, he wanted the telephone number. Silvester declined to give DePino the internal contact numbers.

     Silvester stated toward the end of the campaign, he committed to significant television time with the expectation of a certain amount he was to receive. Silvester stated around September/October 1998, during different discussions with DePino, Gallo and Patrick Sullivan, he was receiving indications he may not be getting the money he expected. Specifically in a discussion with DePino, Silvester told him he needed $180,000 and expected a big check. Silvester was told by DePino they didn't want to give a large amount. Because of the election filing dates it could become an election issue. Silvester had already had campaign filing problems when occupations of contributors were not listed. Silvester was told there may be problems and they couldn't give all the money. Silvester stressed how much money he raised versus other candidates and it wasn't his problem.

     Silvester had a meeting at DePino's office with Jay Malcynsky, Brendan Fox, Dave O'Leary, DePino, George Gallo, Charles Spadoni and an attorney from Reid and Reige. Silvester invited Spadoni because he was a friend and he respected his judgement and also wanted a lawyer present. Silvester was told they would not honor the agreement of the split. Malcynsky did the most speaking. It was explained to him that the fund-raising split could be misconstrued and if he received the money it would be open to questions. Malcynsky stated the deal may be illegal. The party's lawyer pointed out that the fact some of Silvester's contributors were prohibited from contributing to the Treasurer's campaign. Therefore it was just a conduit. It was suggested that the money Silvester raised could be used to do joint advertising with the Governor. Silvester believed the argument was absurd because if giving him the money was illegal then what difference did it make

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____, On _Various____, Page __42__

how much he was given.  Silvester was upset because he was planning
on using the money for a concentrated television campaign and he
had already booked the time in choice slots which would be lost if
they were rebooked .  Silvester stated the party had to keep track
of the amount raised because they were aware he had raised about
$200,000.

       Silvester walked out of the meeting with Spadoni.
Spadoni indicated Triumph had done their share with the
understanding their contributions would benefit his campaign.
Spadoni stated Triumph held up their part of the agreement.
Spadoni told Silvester if the CRP is concerned with the criminality
of the prearranged split, they should just get rid of the
percentage.

       A short time later at a meeting at Rowland's campaign
headquarters, it was suggested that Silvester get $100,000 -
$130,000 in the form of a loan that could be forgiven later.
Present during the meeting was Patrick Sullivan, Malcynsky, Fox and
O'Leary.  Silvester is not sure if DePino or Gallo was present.
Silvester was informed that even the loan was at a lower rate,
possibly 50-50.  Silvester told them don't come looking for him to
repay any loan.  He stated he had probably received $30,000 before
they reneged on the deal.  During this meeting, Silvester had a
telephone call with Rick Reed, an advertising guy, and Malcynsky.
Silvester stated Reed agreed that the party should give him the
money because his election was close.

       Silvester also spoke with Bill Howell after he was told
the CRP was not going to honor their agreement.  Howell agreed that
Silvester was not treated right.  Silvester stated Howell gave him
approximately $10,000 in donations to his campaign at the Hi Ho
Diner.  Silvester explained Howell was capable of raising funds in
New York.

       Silvester stated he also remembers a conversation he had
with Howell where Howell acknowledged he had spoken to DePino about
the arrangement, where money was going back to Silvester.
Silvester believes Stack was present during the conversation.

       Silvester remembers having a discussion with George Gomes
about fund-raising while they were in Washington.  Silvester

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On __Various__ , Page __43__

believed Gomes raised about $10,000. Gomes had connections in
Waterbury that he went to raise campaign contributions.

Silvester remembers giving bonuses to people who worked
on his campaign. Specifically Thiesfield, Gomes, Arlene Watson and
Doug Moore. The amounts were disclosed appropriately on the
election filing. Silvester stated he had a surplus of
approximately $50,000 at the end of the campaign that he donated to
various charities.

Silvester remembers the placement with RFE Investment
Partners, a New Canaan fund managed by Robert Williams. Silvester
received a call from Jay Malcynsky who took him golfing.
Malcynsky, who was close to Governor Rowland, wanted Silvester to
commit to the RFE fund. Silvester was receptive because it seemed
to be a good investment and he didn't mind doing a favor for
Malcynsky. Silvester and Malcynsky discussed how Malcynsky should
get paid. Silvester explained finder fees to Malcynsky and told
him the fee is usually a percent of the commitment paid over time.
Silvester didn't tell RFE to hire Malcynsky and he is unaware of
the amount and method of the compensation.

Silvester offered that the following funds were straight
deals: Garmark, Green Equity, Greenwich, Grotech, Kelso and
Lexington.

Silvester was aware of another deal where William DiBella
was involved that attracted attention. Silvester stated DiBella
and his partner, Anthony Autorino, were involved in the state
purchase of Colt Firearms. Silvester advised the State overpaid
for the assets. Silvester later initiated a lawsuit against Bear
Stearns, who sanctioned the deal. Silvester stated a deal was
negotiated for the State to receive four or five million.

Silvester stated his first introduction to the Apollo
deal came from a telephone call from Pat McCabe, a lawyer with
Rogers and Wells and a West Hartford Councilman. McCabe told
Silvester he had a deal he wanted him to look at. Silvester held a
meeting at his office where McCabe, Bill Mack, the owner of Apollo,
Lee Keighbard and Jerome Wilson from Rogers and Wells attended.
Another individual from Apollo and the Treasurer's office may also
have attended. Silvester learned that Apollo was a global company

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___ , On __Various__ , Page __44__

      with a good track record.  Mack was very accomplished and Wilson
coordinated Apollo's efforts with the finders.

      McCabe set up a lunch after the meeting at the
Polytechnic Club.  Dave O'Leary, from the Governor's campaign, and
Jim O'Brien joined the lunch.  Silvester was surprised that O'Leary
and O'Brien were present.  The topics of the lunch were business,
politics and fund-raising for Governor Rowland.  O'Leary commented
that the election with Barbara Kennelly was going to be a tough
election cycle.  Mack indicated that he could be helpful and has
been to Republicans.  Silvester was told that Bill Mack was close
to Alphonse D'Amato.

      McCabe followed up the lunch with a call to see how
Silvester liked the deal.  McCabe explained to Silvester that if
the deal was done Mack would hold a huge fund-raiser for the
Governor.  Silvester stated it was fine with him because he had a
responsibility to raise money for the Governor.  Silvester told
McCabe and Wilson to pass the word on to Mack.  He was informed
that Mack agreed and would get working on the fund-raiser.
Silvester stated O'Leary confirmed he was aware of the deal.
Silvester stated the fund-raiser was pushed back a couple times.
Silvester stated it became clear to Silvester that the completion
of the investment by the State of Connecticut was linked to the
fund-raiser.

      Silvester stated two fund-raisers were held on March 31,
1998, for the Governor.  Silvester stated he remembers the day was
very hot.  He received a call from O'Brien on behalf of O'Leary who
suggested he not show up at the events because it may not look
appropriate.  Silvester told him no and he showed.  Silvester
stated he was in his hotel room when he received the call.  Both
Lisa Thiesfield and George Gomes were present.  Silvester may have
called back on his cell phone.  Silvester stated the first event
was held at the Sky Club.  The event was attended by mostly bond
traders who donated around $5,000 each with a total amount of
$50,000.  The second fund-raiser was at Mack's Park Avenue
apartment and another $50,000 was raised.  O'Leary told Silvester
that night at Mack's house, maybe they could go west for a fund-
raiser.

      Silvester stated the Governor called him the next day or
shortly after and thanked him for his efforts.  Silvester remembers

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___, On _Various_, Page __45__

returning the call to Rowland's private number in the 523 exchange.
He remembered the telephone exchange because it was his growing up.
Silvester stated the Governor told him he hit the cover off the
ball.   Silvester stated the Governor also asked him to look into a
deal proposed to him at the fund-raiser.   Silvester explained the
Governor met a guy named Dey from the Trust Company of the West.
Rowland wanted him to tap into that pipeline.   Silvester stated
nothing came of the referral.

        Silvester learned later, after he left office, from
Wilson, at a breakfast in New York, that McCabe had received a
lobbyist fee on the Apollo deal to lay the ground work.

        Silvester stated in September or October 1998, he had a
meeting with Mack at his New York office.   Silvester stated he was
attempting to raise money for his campaign.   Thiesfield was present
during the meeting.   Two other individuals may also have been
present.   Silvester stated he spoke to Mack alone about raising
money.   Mack was looking to sell another fund and Silvester was
expected to win the election.

        Silvester remembers that George Gomes was interested in
doing business with Kneeland Youngblood, who wanted to start a fund
named Pharos Capital Partners (Pharos).   Silvester was very
impressed with Youngblood, who was on a number of pension fund
boards like Texas Instruments and American Airlines.   Youngblood
wanted to start his own private equity fund which would concentrate
on investments in the medical field.   Silvester had hooked up
Youngblood with a couple guys from Goldman Sachs on election night.
Youngblood had flown up from Texas.   Youngblood also had a number
of political connections like Bill Bradley and Ann Richards.
Silvester stated Gomes had arranged a meeting to do a deal with
Youngblood's fund, Pharos, in the $20,000,000 to $30,000,000 range.
Silvester stated Gomes was pushing Silvester hard to do the deal.
Silvester told Gomes he should run the details by Charles Spadoni,
a good attorney.

        Silvester stated on the day he was leaving office he had
a conversation with Spadoni about some job, contract assignment, or
Stack type contract with Gomes.   Silvester learns from Spadoni that
Gomes shouldn't do the deal with Youngblood.   Spadoni tells
Silvester that Gomes should relax because Triumph was doing well

FD-302a (Rev. 10-6-95)


194A-NH-39127


Continuation of FD-302 of ___Paul J. Silvester___ , On _Various_ , Page __46__

and in one year after the revolving door prohibition, something
could be done.

Silvester meets with Gomes at Max Bibos after he is out
of office.  He tells Gomes that he is responsible for the Triumph
connection and he wants to have Gomes use certain lawyers and
accountants.  Silvester tells Gomes he wants five percent or ten
percent of the transaction.  Gomes tells Silvester alright.

Silvester stated a couple of months later when Gomes came
to his office, they discussed Gomes' options.  Silvester tells
Gomes to sit tight at Carberry because he was aware of Gomes having
other potential deals with Youngblood and Triumph.

Silvester was shown a Spadoni assignment to Gomes of
$400,000.  Silvester stated he had never seen the documents
previously.

Silvester acknowledged he told Michael MacDonald to back
date a memo relating to the reports on Pioneer, Veritas and
Landmark.  Silvester stated he was sensitive to the criticism he
was receiving after the election and he wanted the files to appear
the investments were under review earlier.

Silvester stated Pauline Kezer, the former Secretary of
the State was hired to handle unclaimed property.  Silvester stated
the unclaimed property is the second largest source of untaxed
income to come into the Treasury behind the lottery.  Silvester
thought Kezer did a good job, the items unclaimed were listed on
the Internet.  If the unclaimed property was stock it would be
liquidated.  If a claim was made the funds would be paid in a cash
equivalent.

Silvester stated there was a deal involving Morgan
Stanley during the early part of Burnham's administration.
Silvester believed the transaction was around April 1996.
Silvester stated Burnham had liquidated a book of business handling
equities and Burnham had a close friend at Morgan Stanley named
Cole Lyons.  Lyons was a former Marine.  Silvester stated Morgan
Stanley was selected by Burnham without a request for proposal
(RFP).  An individual by the name of Sheldon (LNU) was the trader.
Gary Carter, an employee at the Treasurer's Office brought
attention to the transaction.  Gary Draghi and Ernie McNeil were

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ____Paul J. Silvester_____ , On __Various____ , Page __47__

also aware of the arrangement.  Silvester stated the auditors cited
the contract because of the magnitude.  It should be noted on the
1996 YE notes.  Burnham told Silvester to bury it.  Silvester
stated Morgan Stanley handled a disproportionate share of that book
of business.

        Silvester stated Burnham also gave preference to Columbus
Circle.  Taggen Goddard told Silvester that Columbus Circle didn't
do an RFP on their book of business.  Silvester stated Goddard, who
graduated from Harvard, wrote a book, "You Won, Now What", which
takes a position on making government efficient.  Silvester stated
it was a joke because Goddard wrote the book on State time and he
took the State laptop computer with him when he left government.
Silvester stated Goddard went to work at Pimco with Burnham.

        Silvester stated he met Jeb Bush during the 1994 election
that Bush lost.  Bush went to work for a wealthy Miami businessman
named (FNU) Cadina.  Cadina had significant South American
connections.  Silvester stated he received a call from Bush around
1996 or 1997 involving a property that the Connecticut pension fund
invested in south Florida.  Connecticut had one half interest in a
mall.  Silvester stated the management was a disaster and Cadina,
Bush and Klein were hired to manage the property.  They did a good
job.

        Silvester stated Cadina, Bush and Klein also became
involved in the State handling a property in Atlanta.  Silvester
stated Connecticut was a partner with the State of Alaska.
Silvester stated Cadina, Bush and Klein were working on a deal to
sell the property when he lost the election.  Silvester stated he
authorized the contract being amended so that the broker would get
one half the fee if the State backed out.  Silvester stated he
amended the contract to protect the broker.  Silvester doesn't know
what happened to the deal.

        Silvester is aware Cadina and Bush made contributions to
the Connecticut Republican Party (CRP).  Cadina and Bush were not
aware of any relationship he had with the CRP.

        Silvester stated after Frank Lecce lost the primary
against Denise Nappier, he went to Lecce to see if he would support
him.  Lecce had sold his business to Dominick Antonelli, who did
business as Roosevelt and Cross.  Silvester told Lecce he would put

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester___, On _Various_, Page _48_

differences aside if he supported him. Silvester stated Lecce
raised a lot of money through Italian groups and sheriffs.
Silvester stated he used Roosevelt and Cross on a deal. The deal
made sense and they did a good job. After the election Silvester
was considering another deal with Roosevelt and Cross. Lecce asked
Silvester to speak to Antonelli about using Lecce. Antonelli
declined but Silvester did the deal anyway. Silvester stated
Antonelli didn't support him during the campaign but he did support
charity events.

On October 4, 1999 and October 6, 1999, Silvester was
asked about recent disclosures in the Hartford Courant. Silvester
stated he was not the source in the article relating to the Apollo
nor the Thayer deals.

Silvester stated no one person would be aware of the
details of the stories. Silvester stated Gomes was aware of the
facts in the Pioneer deal. He knew of the meetings and the hiring
issues. Silvester stated he had spoken to Gomes to give him
support. Gomes thought he was being railroaded. Gomes was fired
by the law firm Tobin, Carberry on July 3.

Silvester stated Pat Sullivan was aware of the Pioneer
deal but not the others.

Silvester stated that Lisa Thiesfield and Charles Spadoni
were familiar with the Mark Silvester and Christopher Stack
relationship.

Silvester stated he learned that Thiesfield's attorney
George McMahon received a call from John Lender the Courant
reporter, for comment on the Pioneer story. Silvester later
learned that Lender told McMahon that McIntyre, another reporter at
the Courant, received the information through a source with the
FBI. Lender told McMahon that the bureau owed McIntyre a
favor because of work he did on the Martin Frankel case.

Silvester described how he prepared for the initial
proffer session. Silvester stated he never gave anybody the
handwritten proffer notes. Silvester stated he did not get a copy
of the proffer outline.

Page 48

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of ___Paul J. Silvester_____ , On _Various_____ , Page __49__

     Silvester stated he did discourage everyone he spoke to from talking to the press.  He again stated he did not speak to the press.

     Silvester recalled an incident at the 1998 republican convention.  Silvester stated Larry Cafano a house minority leader wanted to run for Congress in the Fifth District.  Mark Nielsen was the supported candidate.  With a 15% vote Cafano could trigger a primary against Neilson.  Silvester and his wife were present during a conversation with Rowland, Malcynsky and Cafano about running.  Cafano was offered a job if he didn't run.  Silvester doesn't know how the issue was resolved.

     Silvester stated the Securities and Exchange Commission (SEC) would have jurisdiction over G37 violations.  Silvester explained rule G37 prohibits anyone who sells bonds from making contributions to or soliciting for political campaigns.  Silvester stated the regulation extends to consultants and relatives of bond sellers.

     Silvester stated that Wayne Berman's contribution to his campaign would be an example of a G37 violation because Berman had a contract with PaineWebber.

     Silvester remembers a conversation he had with William DiBella regarding the hiring of Mary Phil Guinan for PaineWebber. Guinan had made a contribution to the Treasurer campaign which would have had to be returned before the final filing.  Silvester discussed the G37 issue with Andrew Gurly at PaineWebber.

     Silvester stated Thiesfield didn't want a G37 problem so her contribution to the Silvester and Rowland campaigns were returned.