1          UNITED STATES DISTRICT COURT
           DISTRICT OF CONNECTICUT
2

3    IN RE:                        }
                                   }
4       GRAND JURY PROCEEDINGS     }    H-99-1
                                   }
5                                  Federal Building
                                   150 Main Street
6                                  Hartford, Connecticut

7                                  June 13, 2000
                                   11:28 a.m.
8

9              TESTIMONY OF PAUL SILVESTER

10

11
A P P E A R A N C E S:
12

13      For the Government:

14         OFFICE OF THE UNITED STATES ATTORNEY
           150 Main Street
15         Hartford, Connecticut
              BY:   NORA R. DANNEHY, ESQ.
16                  Assistant U.S. Attorney

17         Also present:   THOMAS V. DAILY, ESQ.
                           Assistant U.S. Attorney
18

19

20

21

22

23              FALZARANO COURT REPORTERS
24              117 North Saddle Ridge
                West Simsbury, CT 06092
25                 860.651.0258

```
1                    (Examination commenced:  11:28 a.m.)

2

3                    PAUL SILVESTER, Witness, having been sworn

4               by the Grand Jury Foreperson, was examined and

5               testified under oath as follows:

6

7                              EXAMINATION

8

9   BY MS. DANNEHY:

10       Q    Could you state your full name for the record?

11       A    Paul J. Silvester.

12       Q    Mr. Silvester.  How old are you?

13       A    37.

14       Q    Are you the former treasurer for the State of

15   Connecticut?

16       A    Yes.

17       Q    Could you tell the Grand Jury a little bit about

18   yourself; where did you grow up?

19       A    Hartford, Connecticut.  I'm married.  I have two

20   children.  I live in West Hartford.  Currently I'm

21   unemployed.  I spend most of my time raising two young

22   children.

23       Q    Mr. Silvester, were you the state treasurer from

24   July of 1997 through January 6 of 1999?

25       A    I was.
```

1    Q    Were you originally appointed by Governor Rowland

2    to the position of state treasurer?

3        A    Yes.

4        Q    Prior to becoming treasurer, did you work in the

5    treasurer's office?

6        A    I did.

7        Q    Who did you work under?

8        A    Christopher Burnham.

9        Q    What was your position under then treasurer

10   Burnham?

11       A    I started out as chief of staff and was

12   redesignated deputy treasurer.

13       Q    Did Mr. Burnham step down as treasurer during his

14   term?

15       A    Yes.

16       Q    Do you know, Mr. Silvester, originally, was it your

17   understanding that Vincent Chase was Governor Rowland's first

18   choice to take Mr. Burnham's place?

19       A    He was.  That was my understanding, correct.

20       Q    Was it Governor Rowland's appointment?

21       A    It was.

22       Q    Ultimately, you received the appointment by

23   Governor Rowland; is that right?

24       A    I did.

25       Q    Were there certain people who were helpful to you

1    regarding the appointment to become treasurer of the State of
2    Connecticut?

3         A    There was.

4         Q    Who were those people?

5         A    I would say Ben Andrews is probably the most
6    helpful; George Gomes, (phonetic) to some degree; Pat
7    Sullivan was also helpful.

8         Q    Could you tell the Grand Jury how Ben Andrews was
9    helpful to you?

10        A    When Vincent Chase was named as the designee to be
11   appointed, George Gomes came to me and told me he was upset
12   by this appointment.  I asked him why.  He said he didn't
13   think very much of Vincent.  We spoke about it at length.
14   And the bottom line was that he felt that Vincent was racist
15   and had said things of a racist nature.  I told him that I
16   thought he should bring it to the attention of Ben Andrews,
17   who at the time was a close friend of mine and also a
18   confidante of the governor's, and Ben would be able to talk
19   to the governor about this concern.  I knew full well that
20   the result of that would be Vincent would be disqualified
21   because of what I considered to be the sort of explosive
22   nature of the comments he made, and that being the case, I
23   would be in a better position to get the position myself.

24        Q    Do you know that Ben Andrews did go to the governor
25   and speak to him about Vincent Chase?

1    A    Yes.

2    Q    Based on that, is it your understanding that you

3    then became Governor Rowland's choice for --

4    A    I think at that time, there was a some discussion

5    in the governor's office between himself and his advisors

6    about who the suitable replacement would be, and they came to

7    the conclusion that I would be the best person for the job.

8    Q    Mr. Silvester, did you run for election to the

9    position of state treasurer in 1998?

10   A    I did.

11   Q    Did you run on the Republican ticket?

12   A    Yes.

13   Q    Were you defeated in that election?

14   A    I was.

15   Q    By who were you defeated?

16   A    Denise Nappier.

17   Q    And Denise Nappier is currently the treasurer of

18   Connecticut; is that right?

19   A    Yes.

20   Q    I want to focus for a few minutes, Mr. Silvester,

21   on this treasurer's office and its role in the investment of

22   Connecticut pension funds.

23        During your time as treasurer, did the Connecticut

24   pension fund consist of approximately $18 billion in assets?

25   A    By the time I left, it was approximately $18

1    billion.

2         Q    Did it increase under your tenure?

3         A    Considerably.

4         Q    Under your tenure, did the treasurer for

5    Connecticut -- was he the sole fiduciary for the pension

6    fund?

7         A    Yes.

8         Q    Did that mean, then, that you had the unilateral

9    authority to make decisions about the investment of pension

10   funds?

11        A    Yes.

12        Q    And if you would tell the Grand Jury what really

13   does that mean?

14        A    Well, the whole purpose of the pension funds is to

15   pay for retirement benefits of all the state employees, some

16   municipal employees throughout the state, and all  the

17   schoolteachers throughout the state.  In order to fund that,

18   the state deposits money into the pension fund every year,

19   and the state treasurer's job is to invest it in stocks and

20   bonds and other assets so that they will grow and be there to

21   pay for those benefits when people retire.

22        Q    By sole fiduciary, was it simply your signature,

23   the only signature required to make an investment of a

24   pension funds?

25        A    Correct.  It was solely my decision subject to

1    certain restrictions.

2         Q    Is one of the assets that the treasurer's office

3    manages is alternative investment portfolio?

4         A    That's correct.

5         Q    Is that managed under what is the Pension Fund

6    Management Division of the office?

7         A    Yes.

8         Q    Is part of the alternative investment portfolio the

9    so-called private equity investment?

10        A    Yes.

11        Q    Can you tell the Grand Jury what a private equity

12   investment is?

13        A    A private equity is an alternative to typical stock

14   and bond investments.  Typically, it comes in the form of a

15   limited partnership whereby the State acts as a limited

16   partnership, and we find companies to be the general partner.

17   And the State or the pension fund commits a certain amount of

18   cash to a particular partnership.  The general partner then

19   has the responsibility to make investments with that money,

20   and they draw it down as the investments become available to

21   them.

22             The difference -- one of the main differences

23   between private equity and investments in stocks and bonds is

24   that they're not as liquid.  Stocks and bonds you can sell by

25   picking up the phone and calling the broker, and then within

1    a few hours you can liquidate a huge multimillion-dollar

2    portfolio.  Private equity, no such market exists for those

3    types of assets.  They're privately-held companies, and you

4    have to wait to liquidate them at the appropriate time when

5    buyers become available.

6         Q    During your time as treasurer, Mr. Silvester, who

7    in the treasurer's office were principally involved in

8    reviewing and negotiating private equity investments?

9         A    Three people, principally.  Myself, Elizabeth Ward,

10   and Michael McDonald.

11        Q    What was generally Michael McDonald's function?

12        A    Michael would do what we call due diligence on the

13   general partner's responses of the funds, look at their track

14   record to determine whether they are an appropriate type of

15   company for us to invest with, and make sure that the type of

16   investments they make fit with our portfolio.  For example,

17   if we had a desire to invest in European LBO funds, there was

18   a need for that kind of diversification, Michael would try to

19   find the best European LBO funds for us to invest in.

20        Q    What was Elizabeth Ward's role?

21        A    Elizabeth is an attorney.  Her role was to make

22   sure that the partnership agreement contained all the

23   provisions that were necessary to protect the State and

24   provide the State as a limited partner with the rights that

25   every limited partner should have in case the general partner

1   started doing things that it shouldn't do.

2       Q     Elizabeth Ward, was she the interface between the

3   treasurer's office and outside counsel for Connecticut on

4   these private equity deals?

5       A     She was.

6       Q     You said you were also involved in the private

7   equity as well as all pension investments.  Prior to joining

8   the treasurer's office under Treasurer Burnham where you

9   worked?

10      A     I worked for a regional investment banking firm

11  known as Advest.

12      Q     What did you do for Advest?

13      A     I was an investment banker involved in advising

14  corporations on mergers and acquisitions and in the field of

15  initial public offering.

16      Q     Is that where you met Christopher Burnham?

17      A     It is.

18      Q     What is your education, sir?

19      A     I have an undergraduate degree from the University

20  of Connecticut and an advanced degree in business

21  administration.

22      Q     Mr. Silvester, in September of 1999, did you plead

23  guilty to a RICO count and one count of money laundering?

24      A     Correct.  Conspiracy to launder money.

25      Q     Did you admit that with other associates you

```
 1   engaged in various criminal activities, including bribery and
 2   wire fraud?
 3       A    I did.
 4       Q    Did you also admit that it was the object of your
 5   activity to solicit bribes and corrupt rewards for yourself
 6   and others?
 7       A    Yes.
 8       Q    Did those bribes, Mr. Silvester, include cash,
 9   lucrative consulting contracts, and jobs?
10       A    Yes.
11       Q    In so acting, do you admit today that you deprived
12   the State of Connecticut of your honest services?
13       A    Yes.  I do admit it today.
14       Q    In connection with the conspiracy to money
15   laundering, Mr. Silvester, did you admit that from
16   approximately November of 1998 through May of 1999, that you
17   conspired with Christopher Stack and Peter Hirschl as well as
18   others to commit certain offenses against the United States?
19   That is, that property involved in a financial transaction
20   that was proceeds of an unlawful activity that you conspired
21   with those individuals to conduct a financial transaction
22   through interstate commerce?
23       A    Correct.
24       Q    And in essence, Mr. Silvester, did you admit that
25   with Peter Hirschl and Christopher Stack you conspired to
```

1    have Christopher Stack make payments to Peter Hirschl

2    allegedly as legal fees and that those payments were, in

3    fact, to ultimately go to you?

4        A    That's correct.

5        Q    And that those payments from Christopher Stack were

6    corrupt payments?

7        A    They were.

8        Q    That as of May of 1999, Christopher Stack had paid

9    Peter Hirschl $230,000?

10       A    Yes.

11       Q    And that you had an agreement that that money

12   eventually was to come to you?

13       A    I did.

14       Q    And in addition, it was part of the agreement that

15   at some future date, Christopher Stack would pay

16   approximately $300,000 more to Peter Hirschl?

17       A    I believe so, yes.

18       Q    Mr. Silvester, have you entered into a cooperation

19   agreement with the Government?

20       A    I have.

21       Q    As part of that cooperation agreement, have you

22   been meeting with the Government and discussing various

23   transactions that you were involved in as state treasurer?

24       A    I have.

25       Q    And today, Mr. Silvester, I'm not going to ask you

1   about all the information that you've provided to the

2   Government, and I'm not going to go through all of the

3   discussions that we've had, what I want to focus on today is

4   a very limited portion of what we've discussed.  I will not

5   ask you all the discussions and all the information that

6   you've provided on even these topics.  With respect to your

7   cooperation, Mr. Silvester, you have no agreement with the

8   Government as to what your sentence will be.

9       A    That's correct.

10      Q    And part of your cooperation is the hope that at

11  some point the Government will make it known to the court

12  that you cooperated and provided information that assisted in

13  its investigation.

14      A    That's correct.

15      Q    With regard to the RICO count, Mr. Silvester, that

16  you pled to, I want to go through and delineate the specific

17  acts.  Did you admit that you engaged in bribery concerning

18  the investment of funds with an entity known as Landmark

19  Partners, Inc.?

20      A    I did.

21      Q    Did you admit that you engaged in bribery

22  concerning the investment of funds with Thayer Capital

23  partners?

24      A    I did.

25      Q    Did you admit that you devised a scheme to deprive

13

1    the State of your honest services in connection with the

2    investment of pension funds with a fund known as Keystone?

3         A    I did.

4         Q    Did you admit that you engaged in bribery in

5    connection with the investment funds with a firm known as

6    Carlyle Asia?

7         A    I did.

8         Q    Did that concern a job that you obtained after your

9    election defeat?

10        A    It did.

11        Q    Did you also admit that you engaged in a scheme to

12   deprive the State of your honest services regarding a $200

13   million investment with Triumph Capital?

14        A    Yes.

15        Q    Finally, that you also deprived the State of your

16   honest services regarding your arrangement with Christopher

17   Stack.

18        A    I did.

19        Q    And, Mr. Silvester, I want to ask you a little bit

20   about the job that you had after you left office in 1999.

21             Did you work at a company called Park Strategies?

22        A    I did.

23        Q    What is Park Strategies?

24        A    It's a business development consulting firm.

25        Q    Who owned Park Strategies?

1         A     To the best of my knowledge, Wayne Berman and

2     Alfonse D'Amato.

3         Q     Do you recall, Mr. Silvester, your title when you

4     went to work for Park Strategies; what your position was?

5         A     I think my title was managing director.

6         Q     Were you the head of the then Hartford office for

7     Park Strategies?

8         A     Yes.

9         Q     Was your salary approximately $200,000?

10        A     It was.

11        Q     Because of this investigation, was your position

12    with Park Strategies terminated?

13        A     Yes.

14        Q     Did Lisa Thiesfield also work with you at Park

15    Strategies?

16        A     She did.

17        Q     Did you hire her as your office administrator?

18        A     I did.

19        Q     Did she have general secretarial duties at Park

20    Strategies?

21        A     She did.

22        Q     Lisa Thiesfield was also your campaign manager

23    during your 1998 campaign?

24        A     She was.

25        Q     She worked under you at the treasurer's office?

1        A        Yes.

2        Q        When she left the treasurer's office to work on

3    your campaign, what was her position in the treasurer's

4    office?

5        A        She was the director of a program, Connecticut

6    Higher Education Trust.

7        Q        Did you appoint her to that position?

8        A        I did.

9        Q        And, Mr. Silvester, during your time as treasurer,

10   did you have a personal relationship with Lisa Thiesfield?

11       A        I did.

12       Q        What I want to talk first with you about,

13   Mr. Silvester, is your arrangement with Christopher Stack.

14               Did you devise a scheme with Christopher Stack

15   relating to his receipt of consultant fees in connection with

16   certain pension investments?

17       A        I did.

18       Q        Did you reach an understanding with him that he

19   would kick back to you half of the monies that he was going

20   to make as a consultant on certain pension investments?

21       A        I did.

22       Q        When you made that initial demand for half of the

23   monies that Stack was going to get or receive from pension

24   investments, did Christopher Stack simply have one investment

25   pending with the treasurer's office?

```
1          A      He did.

2          Q      What was that investment?

3          A      Veritas Capital.

4          Q      Do you recall, Mr. Silvester, where it was when you

5   initially made the request that Stack pay you half of the

6   monies he was going to get from the Veritas Fund?

7          A      It was at a pizza restaurant in Rocky Hill,

8   Connecticut.

9          Q      Was that approximately February or March of 1997?

10         A      Yes.

11         Q      Christopher Stack didn't object or walk away from

12  that request for half of the monies?

13         A      I'm not sure it wasn't his idea.

14         Q      So you both came to a mutual understanding that

15  half of the monies that he was going to get were going to

16  eventually come to you?

17         A      Exactly.

18         Q      Based on certain activities that we'll go into more

19  detail, Mr. Silvester, eventually did Christopher Stack come

20  to have a stream of income from various pension fund

21  investments?

22         A      He did.

23         Q      Was it your arrangement with him you were going to

24  receive half of the money from all of the consulting

25  contracts he had in connection with Connecticut investments?
```

1          A     Yes, it was.

2          Q     Was it your intention, Mr. Silvester, that you were

3    going to receive most of this money after you left office?

4          A     Yes.

5          Q     In the course of your arrangement with him, did you

6    arrange for Christopher Stack to obtain monies from two funds

7    -- Landmark Partners and Triumph Capital?

8          A     I did.

9          Q     Did you direct certain contracts to him?

10         A     Yes.

11         Q     From those two funds?

12         A     Yes.

13         Q     Mr. Silvester, you knew that your actions with

14   regard to directing those contracts to Mr. Stack was wrong?

15         A     Yes.

16         Q     Did you with Christopher Stack discuss through the

17   spring and summer of 1997 various ways for Mr. Stack to

18   provide money to you?

19         A     Yes, I did.

20         Q     Ultimately, did Christopher Stack make certain cash

21   payments to you between 1997 and 1999?

22         A     He did.

23         Q     And sort of working backwards, in February of 1999,

24   did Mr. Stack pay you $12,000 in cash?

25         A     He did.

1    Q    And between late 1997 and approximately October of

2    1998, did he make cash payments to you of approximately

3    $34,000?

4    A    My understanding was that the $34,000 came in two

5    payments, both in 1998.

6    Q    Okay.  Those two payments that you understand were

7    two payments, those were made through your brother Mark

8    Silvester?

9    A    Correct.

10    Q    Mark Silvester picked up the cash from Christopher

11    Stack?

12    A    Yes.

13    Q    And you're not certain as you sit here today,

14    Mr. Silvester, of the timing of those payments?

15    A    I'm not.

16    Q    Did you use a portion of the money that you

17    received from Christopher Stack that your brother picked up

18    to pay off a family debt?

19    A    I did.

20    Q    Was that at the suggestion of your brother, Mark

21    Silvester?

22    A    It was.

23    Q    Was it your original intention that the first

24    payment that you understand to be the first payment, that

25    that was money you were going to put into your campaign?

```
1          A     Yes.

2          Q     Rather than do that, did you use it to pay off a

3    debt that you had to your dad?

4          A     Yes.

5          Q     Did you tell your brother, Mark Silvester, though,

6    that you were still going to look to him for some money for

7    your campaign?

8          A     Yes.

9          Q     We'll come back to that, Mr. Silvester.

10          Did you also use a portion of the $34,000 to make

11   illegal campaign contributions?

12         A     Yes.

13         Q     In the fall of 1998, did Mark Silvester give you

14   approximately $16,000 in cash?

15         A     Yes.

16         Q     And he gave that to you where, Mr. Silvester?

17         A     In Groton, Connecticut.

18         Q     Did your brother have a home in Groton at the time?

19         A     Yes.

20         Q     Did you originally think that that money was from

21   Mark Silvester?

22         A     I did.

23         Q     Did you learn a couple weeks later that, in fact,

24   Mark Silvester had gotten it from Christopher Stack?

25         A     Yes.
```

1          Q      Did you use the majority of that money to arrange

2     for illegal campaign contributions?

3          A      I did.

4          Q      Did you first take out approximately $3,000 and

5     provide it to Peter Hirschl?

6          A      I did.

7          Q      What did you direct Peter Hirschl to do with that

8     money?

9          A.     He was going to give it to his brother who was

10    going to make campaign contributions.

11         Q      Did you take about approximately $3,000 out to

12    reimburse your wife who had spent the money on your campaign?

13         A      I did.

14         Q      What did you do with what we'll call approximately

15    $10,000?

16         A      I gave it to Lisa Thiesfield.

17         Q      What was she to do with the money?

18         A      I told her to give the envelope to George Gomes,

19    and he would know what to do with it.

20         Q      Had you had previous discussions with Gomes about

21    the fact that he was going to take cash and find people to

22    make contributions to your campaign?

23         A      Yes.

24         Q      Is it your understanding that George Gomes did

25    that?

1    A    Yes, it is.

2    Q    Mr. Silvester, when you received this money from

3    Christopher Stack in 1998 -- let's talk about the total of

4    $34,000 -- is it fair to say that Christopher Stack never

5    gave you as much as you were asking for from him?

6    A    He would always tell me that there was more in

7    there than there was.

8    Q    Mr. Silvester, at the end of your campaign, did you

9    ironically have extra money in the campaign?

10   A    I did.

11   Q    What did you do with the money?

12   A    I donated it to the Children's Hospital to the

13   cancer fund, into a charity that helps people with cancer.

14   Q    Thank you.

15   A    About $50,000.

16   Q    Now, Mr. Silvester, I'm going to focus on the

17   State's investment with Landmark Partners Fund 8.

18        Did you authorize a $100 million investment with a

19   private equity fund called Landmark Partners Fund 8 in July

20   of 1998?

21   A    I did.

22   Q    Did you invest an additional $50 million with

23   Landmark in December of 1998?

24   A    I did.

25   Q    Did you solicit a payment for Ben Andrews in return

1    for doing that first Landmark investment?

2        A    Yes.

3        Q    Was part of your consideration for investing in

4    July of 1998 with Landmark Partners the fact that Ben Andrews

5    and then later Christopher Stack were going to get paid in

6    this deal?

7        A    Yes.

8        Q    And you knew that was wrong, Mr. Silvester?

9        A    I did.

10       Q    Would it be fair to say that you had a personal

11   interest in making sure that this Landmark investment got

12   done?

13       A    I did.

14       Q    Did you disclose to anyone in state government your

15   full motivation behind the decision to invest in Landmark?

16       A    I did not.

17       Q    Mr. Silvester, just so the Grand Jury understands,

18   in addition to your personal motivation, prior to making the

19   investment with Landmark Partners, did you have individuals

20   in the treasurer's office insure that Landmark was a quality

21   investment for the pension fund?

22       A    I did.

23       Q    Who were those individuals?

24       A    Michael McDonald and Elizabeth Ward made sure the

25   documents contained all the normal provisions that protect

```
 1   the State's interests.

 2        Q    Let's discuss a little bit the chronology of the

 3   Landmark investment with the state.

 4             In the spring of 1998, did you learn that Landmark

 5   was marketing a private equity fund?

 6        A    I did.

 7        Q    Did you become aware of that through Michael

 8   McDonald?

 9        A    Yes, I believe so.

10        Q    Did you also become aware that individuals from

11   Landmark had talked to Michael McDonald?

12        A    Yes.

13        Q    Did you also yourself receive literature about the

14   Landmark fund in approximately April of 1998?

15        A    I did.

16        Q    During this same time period, was an individual by

17   the name of Ben Andrews bringing deals to you that he wanted

18   you to invest pension money with -- that were not of very

19   good quality?

20        A    Yes, that's accurate.

21        Q    Could you tell the Grand Jury, Mr. Silvester, who

22   Ben Andrews is?

23        A    He's a friend of mine who has made a reputation for

24   himself as a civil rights leader.  He was the local head of

25   the National Association for Colored People for many years.
```

Falzarano Court Reporters

1    He's a Republican politician, active, and has been employed
2    by various investment firms over the years. And at one time,
3    acted as a city councilman in the City of Hartford.

4         Q    In 1998, was he running on the Republican ticket
5    with you?

6         A    Yes.

7         Q    Was he running as secretary of state?

8         A    He was.

9         Q    Was it also Ben Andrews that you felt you owed for
10   your appointment to the treasurer's position?

11        A    Yes.

12        Q    Is Ben Andrews also Lisa Thiesfield's
13   brother-in-law?

14        A    Yes.

15        Q    Just get the sort of family history; is Lisa
16   Thiesfield's sister married to Ben Andrews?

17        A    Yes, she is.

18        Q    Did you, Mr. Silvester, have a motive in the spring
19   of 1998 to take care of Ben Andrews?

20        A    Yes.

21        Q    Was that because you owed him for helping you
22   receive the appointment as treasurer from Governor Rowland?

23        A    Yes.

24        Q    Was it also because he was running for secretary of
25   state on the same ticket, and you knew that the money would

1    assist him?

2         A    Yes.

3         Q    Was it also because politically he could help you

4    in your campaign?

5         A    Yes.

6         Q    And, finally, was it because he was a prominent

7    activist black Republican, a relationship that you wanted to

8    nurture for the future?

9         A    Yes.

10        Q    Would it be fair then to describe the Landmark

11   July investment as not just a quality investment that made

12   financial sense for the State of Connecticut, but a way to

13   get money to Ben Andrews?

14        A    Yes.

15        Q    Did you use Jerry Wilson as a way to help you

16   structure the payment to Ben Andrews?

17        A    I did.

18        Q    Who is Jerry Wilson?

19        A    He is an attorney in New York City who is both

20   politically active and has been over the years active in

21   raising money for pension funds for various clients of his.

22        Q    Was he in 1998 at a law firm called Rogers and

23   Wells in New York?

24        A    Yes.

25        Q    Did you want to use Jerry Wilson to arrange for the

Falzarano Court Reporters

1    payment to Ben Andrews?

2        A    I did.

3        Q    Could you, Mr. Silvester, just explain to the Grand

4    Jury your reasons for going to Jerry Wilson to use him in

5    this way?

6        A    Jerry had represented another firm that the pension

7    fund had invested with.  His law firm, Rogers and Wells is a

8    very prestigious law firm in New York City, and they arranged

9    to introduce this investment firm to me.  And it became clear

10   to me that Jerry was very political during that process

11   because as part of that, that investment firm had agreed to

12   raise a tremendous amount of campaign contributions on behalf

13   of  certain politicians that I had asked them to raise money

14   for.

15       And it was also clear to me that the law firm that

16   he worked for had an existing relationship with Landmark

17   Partners because a deal I had done several months or years

18   earlier with Landmark, Jerry's firm represented Landmark.  So

19   he was at a firm that already had an existing business

20   relationship with Landmark, plus he was also very political.

21       Q    You knew Rogers and Wells represented Landmark in

22   connection with -- was that a real estate transaction that

23   you had been involved with?

24       A    Yes.

25       Q    When you say that you knew Jerry Wilson was

1    political and involved in helping raise pension funds, let's
2    focus on that a little bit.

3           Did you know that Jerry Wilson worked for a fund
4    called Apollo?

5       A    I did.

6       Q    Through your dealings with Apollo, did you come to
7    know that Jerry Wilson was familiar with the idea of using
8    finders for private equity deals?

9       A    Yes, I did.

10      Q    Did you also come to understand that Jerry Wilson
11   was comfortable with the idea that a deal may be done in
12   return for taking care of political affiliates?

13      A    Yes.

14      Q    And by that, Mr. Silvester, did you invest in
15   Apollo with the understanding that the chairman of the funds
16   would hold a fund-raiser for Governor Rowland?

17      A    I did.

18      Q    Was Jerry Wilson present when there were
19   discussions about the fact that you were making an investment
20   with the understanding that the fund-raiser was going to be
21   held in return?

22      A    Yes, he was present.

23      Q    Did you also, Mr. Silvester, feel that using a law
24   firm such as Rogers and Wells added an appearance of
25   legitimacy to the demands you were going to make that Ben

1    Andrews get paid in the deal?

2         A    I did.

3         Q    Did you meet with Jerry Wilson in his office in New

4    York?

5         A    I did.

6         Q    Based on a review of records, Mr. Silvester, before

7    today, did you refresh your recollection that the meeting

8    happened on May 5 of 1998?

9         A    Yes, it did.

10        Q    Did you tell Wilson when you met with him that you

11   were interested in doing a deal with Landmark Partners?

12        A    I did.

13        Q    Did you tell him who Ben Andrews was?

14        A    Yes.

15        Q    Did he know Ben Andrews prior to your coming to him

16   on that May 5th?

17        A    No.

18        Q    Did you then tell Wilson that you wanted to do a

19   deal like Apollo, and that you'd like Ben Andrews to be paid

20   as a finder?

21        A    I did.

22        Q    Did you make it clear to Mr. Andrews that you

23   wanted the deal to be with Landmark?

24        A    I made it clear to Jerry Wilson that I wanted the

25   deal to be with Landmark.

```
1        Q      Thank you.  Did Jerry Wilson tell you that he
2   understood your request, or words to that effect?
3        A      Yes, he did.
4        Q      Did you tell Jerry Wilson that he needed to speak
5   to Stan Alfeld?
6        A      Yes.
7        Q      Who is Stan Alfeld?
8        A      He's the chairman of Landmark Partners.
9        Q      As you were leaving this meeting or discussion, did
10  Jerry Wilson ask you -- what did he ask you?
11       A      He said, why were you here?
12       Q      What did you say to him?
13       A      I said I came here to ask your advice about running
14  my political campaign.
15       Q      What did you understand his asking you why were you
16  here?
17       A      That we needed an excuse for the meeting.
18       Q      Was it your understanding that he recognized that
19  your proposal was improper?
20       A      Yes.
21       Q      Did Jerry Wilson ever ask you the type of role Ben
22  Andrews was going to play in the transaction?
23       A      Yes.
24       Q      What was that role?
25       A      As a finder.
```

1      Q    Did he ever ask you the qualifications of Ben

2  Andrews to be a finder?

3      A    Yes.  He asked me who he was, and I explained that

4  he had been involved in the investment industry, and he had

5  done business with the treasurer's office, and that -- I

6  explained to him that I wanted him to be paid a placement fee

7  for that.

8      Q    Did he ever inquire why you needed a finder in the

9  deal?

10     A    I explained to him that Ben Andrews was politically

11  very active, that I felt indebted to him for political

12  reasons, and that he was going to be on the ticket with me,

13  and he needed extra money.  I also explained to him that his

14  law firm had represent Landmark in the past.

15     Q    Based on Jerry Wilson's experience with

16  representing Apollo, did you -- was he aware that you sold

17  fiduciary responsibility to invest state pension funds?

18     A    Yes.

19     Q    Mr. Silvester, is a finder in the industry

20  generally an individual who provides access to parties and

21  makes introductions between a seller and an investor?

22     A    Yes.

23     Q    Did you need a finder in the Landmark deal?

24     A    No.

25     Q    You had a relationship already with Landmark; is

1    that right?

2         A    Yes.

3         Q    In fact, you yourself had around this same time

4    period set up a meeting to talk with Stan Alfeld.

5         A    Correct.

6         Q    Around the same time period that you met with Jerry

7    Wilson to put Ben Andrews in a deal, you met with Stan Alfeld

8    and Tim Havlin (phonetic) from Landmark.

9         A    Correct.

10        Q    What did you discuss in your meeting with Stan

11   Alfeld and Tim Havlin?

12        A    The nature of the investment in terms of the

13   investment.

14        Q    Did you tell Stan Alfeld and Tim Havlin that you

15   wanted Ben Andrews as the finder?

16        A    No, I did not.

17        Q    Were you leaving that for Jerry Wilson to do?

18        A    I was.

19        Q    Did you during your meeting with Stan Alfeld and

20   Tim Havlin in your mind consider bringing up Ben Andrews?

21        A    I did.

22        Q    What made you not ultimately bring that up at that

23   meeting?

24        A    I just felt it would be better if Jerry did it.

25        Q    Again, was it for the reasons that we've discussed

```
 1   previously, that use of an attorney to make this arrangement
 2   would add a layer or appearance of legitimacy to it?
 3        A     That's correct.
 4        Q     After you had met with Jerry Wilson, did you have a
 5   series of conversations with Ben Andrews about the Landmark
 6   investment?
 7        A     Yes.
 8        Q     Did you initially tell Ben Andrews to meet with
 9   Jerry Wilson and get signed as a finder for Landmark?
10        A     Yes.
11        Q     At some point after Andrews had met with Jerry
12   Wilson, did Ben Andrews come to you and ask you how you
13   wanted to -- how to get paid, how he was to get paid?
14        A     Yes.
15        Q     Did you tell him to get paid a percentage, like, 1
16   percent over a couple of years?
17        A     Yes.
18        Q     Did you also tell him that he should work out the
19   details of the payment with Wilson and Landmark?
20        A     Yes.
21        Q     At another time or in this same time period, did
22   Ben Andrews also ask you how much you were going to invest
23   with Landmark?
24        A     Yes.
25        Q     What did you tell him?
```

```
1      A      I told him I could invest upwards of $100 million.

2      Q      Did he also ask you how you wanted your share?

3      A      Yes.

4      Q      Did Ben Andrews offer to pay your boy in New York?

5      A      Yes.

6      Q      What did you understand he meant when he was

7   offering to pay your boy in New York?

8      A      That he wanted to pay my brother.

9      Q      Your brother is who?

10     A      Mark Silvester.

11     Q      Did you decide ultimately that you were going to

12  get a share of this finder's fee through Christopher Stack?

13     A      I did.

14     Q      Did you ultimately at another point in time tell

15  Ben Andrews this?

16     A      I did.

17     Q      Let's turn to the events that led you to tell Ben

18  Andrews how you wanted your share.

19            Did you attend, Mr. Silvester, in 1998 the Prescott

20  Bush dinner?

21     A      Yes.

22     Q      What is the Prescott Bush dinner?

23     A      It's annual fund-raiser for the Connecticut

24  Republican party.

25     Q      Do you recall in 1998 where it was held?
```

1    A    At the Astroturf Restaurant in Southington,

2    Connecticut.

3        Q    Did you ask Lisa Thiesfield to notify Christopher

4    Stack and Ben Andrews that you wanted to meet with them after

5    the dinner?

6        A    Yes.

7        Q    Was Lisa Thiesfield aware, Mr. Silvester, that you

8    had arranged for Ben Andrews to get a contract for Landmark?

9        A    She may have been.

10       Q    What did you tell her?

11       A    I don't recall telling her.

12       Q    When you say you don't recall, just to make sure my

13   question is clear, I was asking, was she aware of it in the

14   late spring, early summer of 1998?  Is that where you think

15   she may have been at that time?

16       A    I don't know.  I don't recall explaining to her

17   that I was doing this with Jerry Wilson and putting together

18   the deal.  I think she may have come to know it through

19   gleaning information from conversations that she may have

20   heard me have over the telephone or conversations she may

21   have overheard with Ben Andrews.  I don't know what she knew

22   or didn't know.

23       Q    Did you meet with Ben Andrews and Christopher Stack

24   at a bar after the Prescott Bush dinner?

25       A    I did.

Falzarano Court Reporters

1      Q      Was a fellow named Jim Normile (phonetic) with

2  Christopher Stack?

3      A      Yes.

4      Q      Did he stay at the bar while you and Ben Andrews

5  and Christopher Stack went off and had a conversation?

6      A      I believe he did, yes.

7      Q      Did you tell Ben Andrews at that time that he was

8  to take Christopher Stack on as a partner and that Stack was

9  to receive half of Ben Andrews' fee from Landmark?

10     A      I did.

11     Q      What did Ben Andrews do?

12     A      He said, fine.

13     Q      Did you think he was okay with it because he had

14 offered, in fact, to pay you?

15     A      Yes.

16     Q      Did you tell Stack and Andrews to work out the

17 details with Jerry Wilson?

18     A      I did.

19     Q      In fact, did Jerry Wilson call you the next day to

20 inquire about Stack being put in the deal?

21     A      Soon thereafter, he called me.

22     Q      Was the purpose of the call to insure that you were

23 okay with the arrangement of putting Stack in the deal?

24     A      It was.

25     Q      In essence, what did you tell Jerry Wilson when he

```
 1   called about that?

 2       A    That I was fine with it, to work out the details

 3   with Chris Stack.

 4       Q    Did you say that he knew what you wanted to happen

 5   and have him split a point, or any words to that effect?

 6       A    Yes.  I told him to split it evenly.

 7       Q    Were you aware, Mr. Silvester, that there were

 8   discussions between Ben Andrews, Jerry Wilson, Christopher

 9   Stack about the contract arrangement with Landmark?

10       A    Yes.

11       Q    Did you leave it primarily to those three to work

12   out the details?

13       A    Yes.

14       Q    Were you aware from Christopher Stack that he had a

15   concern about whether the deal would be binding?

16       A    He didn't like the nature of the agreement.  He

17   felt it wasn't properly documented.

18       Q    Was it your intention, Mr. Silvester, that

19   Christopher Stack would kick back a portion of the Landmark

20   fees to you?

21       A    It was.

22       Q    And that goes back to the original arrangement that

23   ultimately you wanted to get half of what Chris Stack made on

24   these deals?

25       A    Yes.
```

1    Q    Did it ultimately, Mr. Silvester, become very clear
2    to you that Ben Andrews understood you were getting money
3    from Christopher Stack?
4         A    Yes, he understood that.
5         Q    What did Ben Andrews say to you about the
6    arrangement at one point that made it clear to you he knew
7    what was happening?
8         A    He told me that it was just going to cost me more
9    money to go through Christopher Stack.
10        Q    Mr. Silvester, did you ever have any substantive
11   conversations with Ben Andrews about the Landmark investment?
12        A    No.
13        Q    Did Ben Andrews have any role to play from your
14   point with the Landmark investment?
15        A    No.
16        Q    Landmark already had an introduction to the state
17   and had access to you without Ben Andrews?
18        A    Correct.
19        Q    You arranged for Ben Andrews to be put in the deal?
20        A    I did.
21        Q    Based on your understanding of how Ben Andrews came
22   to be paid from the Landmark investment and his role in the
23   Landmark investment, were Ben Andrews' fees bona fide fees
24   paid in the usual course of business?
25        A    No, they were not.

```
1     Q     Turning to Christopher Stack, you put Christopher
2   Stack in the Landmark investment.
3     A     I did.
4     Q     Did Christopher Stack do any substantive work in
5   connection with the Landmark investment?
6     A     No.
7     Q     Were your conversations with Stack regarding
8   Landmark limited to basically when the deal would close, when
9   you would sign the papers?
10    A     Yes.
11    Q     And this fee that Christopher Stack received were
12  not bona fide fees paid in the usual course of business?
13    A     They were not.
14    Q     Mr. Silvester, you were influenced to do the
15  Landmark investment because Ben Andrews and Christopher Stack
16  were getting paid?
17    A     I was.
18    Q     You had a personal motivation in making that deal?
19    A     I did.
20    Q     And that was not disclosed to anyone other than
21  Christopher Stack, Ben Andrews, and Jerry Wilson?
22    A     Correct.
23    Q     Did you scheme with Jerry Wilson to structure the
24  payments and make the arrangements with Landmark regarding
25  Christopher Stack, Jerry Wilson, and Ben Andrews?
```

```
1        A      I discussed with him on a number of occasions
2    subsequent to the original telephone call after the
3    Southington meeting.  Jerry called me to say that Christopher
4    Stack was being somewhat forward and demanding that the
5    documents be drawn in the way that he felt were appropriate.
6    And I repeated over the course of a few conversations that I
7    just didn't want to be part of it.  Ultimately, just to work
8    it out.
9        Q      After your election and defeat in 1998,
10   Mr. Silvester, did Ben Andrews approach you to increase the
11   Landmark investment?
12       A      Yes.
13       Q      Did the increase in the Landmark investment mean
14   any more money for both Ben Andrews, Christopher Stack, and
15   for you?
16       A      Yes.
17       Q      Was that one of your motivations for increasing
18   Landmark?
19       A      Yes.
20       Q      Did you also want to help Michael McDonald get a
21   job at Landmark?
22       A      I did.
23       Q      Are those the reasons that you increased the
24   investment?
25       A      Yes.
```

1    Q    When you made that decision to increase the amount

2    of the Landmark investment, you were not conflict free.

3    A    Correct.

4    Q    Did Ben Andrews come to you and ask you if you

5    could do another 50 in Landmark?

6    A    Yes.

7    Q    Did you say you would think about it and then tell

8    Ben Andrews that you would do it, but you wanted Landmark to

9    hire Michael McDonald?

10   A    I did.

11   Q    Did Ben Andrews agree he would talk to Landmark

12   about that?

13   A    Yes.

14   Q    For various reasons, did Michael McDonald not go to

15   work for Landmark?

16   A    That's correct.

17   Q    Did you also tell Ben Andrews that you would do the

18   increase but it would be under the same conditions as before,

19   that he would share his money with Christopher Stack?

20   A    Yes.

21   Q    And he didn't object to that?

22   A    Not to me, no.

23   Q    Who did he object to about that?

24   A    Lisa Thiesfield.

25   Q    What did Lisa Thiesfield tell you at one point that

```
 1   Ben was --
 2        A    She told me that Ben was complaining that he had to
 3   split the incremental increase in the fee under the
 4   additional 50 million with Christopher Stack.
 5        Q    Did she tell you that around the time you were
 6   planning to do the $50 million increase?
 7        A    Yes.
 8        Q    So at that point in time, she was aware that you
 9   had -- that Christopher Stack was getting a fee from
10   Landmark?
11        A    Yes.
12        Q    Was she aware that you had put Chris Stack in the
13   deal?
14        A    She may have been.
15        Q    Again, is that because of the conversations you had
16   around her?
17        A    Yes.
18        Q    Did Lisa Thiesfield ever say anything to you that
19   she understood you had arranged for Ben Andrews to get the
20   Landmark contract?
21        A    No.
22        Q    During your campaign, did Ben Andrews agree to make
23   illegal campaign contributions to your campaign?
24        A    He did.
25        Q    Did that come about after a fund-raiser that he
```

1  held for you?

2      A    Yes.

3      Q    What did he tell you after the fund-raiser?

4      A    That there would be more money coming, something to

5  the effect that he had to work with his people to get the

6  money into my campaign.

7      Q    Was Ben Andrews himself prohibited because of his

8  business dealings with the treasurer's office from giving to

9  your campaign?

10     A    Yes, he was.

11     Q    And that's what he understood also, that he

12  couldn't give himself?

13     A    Correct.

14     Q    Did you understand, then, when he said he had to

15  work with his people, that he was going to provide cash to

16  people to make contributions to your campaign?

17     A    Yes.

18     Q    Was Lisa Thiesfield when Ben Andrews made this

19  statement he was going to work with his people to get money

20  to your campaign?

21     A    Yes.

22     Q    She again was your campaign manager during this

23  time?

24     A    Yes.

25     Q    Had you and she discussed the use of so-called

1   straw contributors to get money into your campaign?

2       A      Within the context of them, yes.

3       Q      When you say, "within the context of them," what do

4   you mean?

5       A      Only within that case.

6       Q      So, you had discussed with her that Ben Andrews was

7   going to give cash to others to make campaign contributions

8   to you?

9       A      She was there when he said that to me.  At a future

10  point, I asked if we had ever collected that money.  She said

11  she would look into it.

12      Q      Did she tell you that you had gotten some money

13  that way?

14      A      Yes.  She told me that the additional money that

15  Ben Andrews promised had been contributed.

16      Q      Do you recall who it was that contributed through

17  Ben Andrews' money?

18      A      I learned at a much later date that one of the

19  individuals was Jill Chmieleski, who was then secretary of

20  the campaign.

21      Q      Mr. Silvester, after this investigation began, did

22  you have a conversation with Ben Andrews where he complained

23  to you that Landmark had stopped paying him?

24      A      Yes.

25      Q      Did you at that point advise him that he should get

```
1    a good criminal attorney and make it look like he did some
2    work?
3         A    I told him he needed a lawyer.
4         Q    Did you also advise him that he should make it look
5    like he had done work for Landmark?
6         A    I don't recall saying that.
7         Q    Did Ben Andrews make any statements to you at this
8    time when he was complaining about Landmark stopping paying
9    him, that -- regarding a story how he met Jerry Wilson?
10        A    Yes.
11        Q    What was that?
12        A    That they kept their boat in the same marina, and
13   that's how they came to know one another.
14        Q    Was that a true story?
15        A    No.
16        Q    Did you understand that Ben Andrews was trying to
17   devise a cover story to explain how he came to hook up with
18   Jerry Wilson?
19        A    Yes.
20        Q    Was Lisa Thiesfield aware that Ben Andrews was
21   concocting this story about meeting Jerry Wilson through
22   boating?
23        A    Yes.
24        Q    How do you know that?
25        A    Well, prior to the investigation, in the beginning,
```

1    there was a number of people asking why Ben Andrews had

2    become so close to Jerry Wilson, because when Jerry Wilson

3    first came to Hartford, he didn't come through Ben Andrews,

4    he came through Apollo, one of the local representatives to

5    arrange, for example, the fund-raiser for the governor.  Then

6    suddenly, rather than using those people, he came to use Ben

7    Andrews at my direction.

8            I think a lot of the people on the street and some

9    people even within Landmark were asking Ben Andrews how he

10   got to know Jerry Wilson, and that was basically the story he

11   always told people, they kept their boats at the same marina.

12   I believe he told that to Lisa so she would tell that to me

13   so I would be aware of what he was talking about.

14       Q    Let's switch gears a little bit.  I want to now

15   talk to you a little bit about Triumph Capital, Fred

16   McCarthy, and Charlie Spadoni.  Is Triumph Capital an

17   investment company in Boston?

18       A    They are.

19       Q    Who is Fred McCarthy?

20       A    He is the chairman.

21       Q    Who is Charlie Spadoni?

22       A    He is general counsel.

23       Q    Did you during your time as treasurer have a

24   business relationship with both Fred McCarthy and Charlie

25   Spadoni?

Falzarano Court Reporters

```
1         A     Yes.

2         Q     Did you also for a number of years prior to ever

3    becoming treasurer have a personal relationship with Charlie

4    Spadoni?

5         A     I did.

6         Q     In fact, he's a lawyer.

7         A     Yes.

8         Q     Did you turn to Charlie at times for advice when a

9    legal issue arose?

10        A     I did.

11        Q     Throughout your time as treasurer, Mr. Silvester,

12   did you develop a relationship with Triumph Capital?

13        A     I did.

14        Q     Had the State of Connecticut over a number of years

15   invested in several of Triumph Capital funds?

16        A     Yes, the state did.

17        Q     Had those funds performed very well?

18        A     They did.

19        Q     Even before you became treasurer, did you advocate

20   certain actions to assist Triumph Capital like lifting

21   certain restrictions and increasing the amount of an

22   investment?

23        A     I did.

24        Q     In November of 1998 after your election,

25   Mr. Silvester, did you invest $200 million in a Triumph
```

1    Capital investment?

2         A    I did.

3         Q    Was that Triumph-Connecticut II?

4         A    It was.

5         Q    Mr. Silvester, to understand fully your motivation

6    in making the $200 million investment, do you have to explain

7    to us some of the assistance that Fred McCarthy and Charlie

8    Spadoni provided to you during your campaign?

9         A    They were very helpful in raising money.

10        Q    Let's talk about that.

11             Early in the campaign, Mr. Silvester, approximately

12   March of 1998, did you have a discussion with Chris DiPino

13   about your raising money for the state Republican party?

14        A    Yes.

15        Q    Is Chris DiPino the chairman of the state

16   Republican party?

17        A    He is.

18        Q    Could you tell the Grand Jury what your motivation

19   was for working for the state party to raise money as opposed

20   only to your campaign?

21        A    Well, there was a new state law passed, I believe,

22   in 1996 which prohibited people who are in the investment

23   business from contributing to the campaign of anyone running

24   for state treasurer.

25        Q    That meant funds like Triumph and officers within

```
 1   Triumph couldn't donate to your campaign?

 2        A     That's correct.

 3        Q     Did you express to Chris DiPino that you were

 4   willing to raise money for the state Republican party from

 5   prohibited sources that couldn't give to your campaign, but

 6   that you wanted a percentage of that money back?

 7        A     Yes.

 8        Q     Did you and he agree that you would get 70 percent

 9   of the money back that you raised for the state Republican

10   party?

11        A     We did.

12        Q     And the purpose of this agreement was to get around

13   the state prohibition?

14        A     Correct.

15        Q     Did you discuss with Lisa Thiesfield that you were

16   going to raise money through the state Republican party to

17   circumvent the law and that you had an arrangement to get

18   back a portion of the money?

19        A     I discussed with Lisa Thiesfield that we were going

20   to raise money for the Republicans in the hopes that we were

21   going to get a significant contribution from the state

22   Republicans.

23        Q     Mr. Silvester, was it you had more than a hope that

24   you were going to get the money back --

25        A     An expectation, an understanding, an agreement.
```

Falzarano Court Reporters

1    Q    Did you tell Lisa Thiesfield, you know, not the

2    percentage, but that you had an arrangement or agreement that

3    you were going to get back a portion of the money you raised?

4         A    Correct.

5         Q    Was Christopher Stack aware of this agreement?

6         A    Yes.

7         Q    Was George Gomes aware of it?

8         A    Yes.   They were both present when the agreement was

9    reached.

10        Q    In fact, did you, George Gomes, and Chris Stack go

11   to New Haven to talk to Chris DiPino at one point about this

12   arrangement?

13        A    Yes.

14        Q    Did you have discussions with Charlie Spadoni about

15   the fact that you needed financial assistance from Triumph in

16   your campaign?

17        A    Yes.

18        Q    Was Charlie Spadoni aware of the fact that neither

19   he nor Triumph folks could give directly to your campaign?

20        A    Yes.

21        Q    How do you know that he was aware of that?

22        A    He was very closely connected with the treasurer's

23   office during the time that the new law was passed that

24   prohibited contributing to the campaign.

25        Q    In fact, in the course of your discussions with

1   Charlie Spadoni, did you say to him that, look, you know, you

2   can't give to me, but you were looking for him to give to the

3   state Republican party, and that that would be very helpful

4   to you?

5         A     Yes, I did.

6         Q     Did you tell Charlie Spadoni that you would take

7   care of it yourself, you, Mr. Silvester, to get money back

8   from the party?

9         A     I did.

10        Q     Did you make it very clear to Charlie Spadoni that

11  the money that was raised for the Republican party would

12  benefit you?

13        A     Yes.

14        Q     Did you make it clear in your discussions with

15  Charlie Spadoni that you would work with the party to get a

16  portion of the money back?

17        A     Yes.

18        Q     When you were talking to Charlie Spadoni about the

19  fact that it would be helpful to raise money through the

20  state Republican party for you, did you ask him how much you

21  could count on from Triumph?

22        A     Yes.

23        Q     Did he tell you that he would check with Fred

24  McCarthy?

25        A     Yes.

```
 1        Q     Did he, to your knowledge, check with Fred
 2   McCarthy?
 3        A     Yes.
 4        Q     How do you know that?
 5        A     He came back and told me the answer.
 6        Q     What was the answer?
 7        A     $100,000.
 8        Q     Did he tell you he had checked with Fred McCarthy
 9   and that Triumph would raise $100,000 through the party?
10        A     Yes.
11        Q     Did you have discussions during your campaign with
12   Fred McCarthy where you thanked him for his support?
13        A     Yes.
14        Q     Was your arrangement with Charlie Spadoni and Fred
15   McCarthy to raise money through the state Republican party an
16   arrangement to circumvent the state law that prohibited them
17   from giving to your campaign?
18        A     Yes.
19        Q     And through that arrangement, Mr. Silvester, were
20   the citizens of Connecticut deprived of your services and an
21   honest election?
22        A     Yes.
23        Q     Ultimately, though, Mr. Silvester, did the state
24   Republican party renege on its agreement to give you 70
25   percent of the monies you had raised?
```

1       A       Yes.

2       Q       Did you attend several meetings regarding that

3    decision not to give you the money you expected?

4       A       Yes.

5       Q       I'm not going to go into the details of those

6    meetings at this time, but as to one meeting, did you bring

7    Charlie Spadoni with you?

8       A       Yes.

9       Q       What was the reason for bringing Charlie Spadoni?

10       A       Because they called me and told me they had some

11    legal issues they wanted to discuss with me, so Charlie

12    Spadoni in his capacity as my counsel joined me in that

13    meeting.

14       Q       Was it at that meeting that various individuals

15    made it clear that they weren't going to give you the monies

16    you expected to get from the state Republican party?

17       A       Yes.   At least not in the form or time that I had

18    hoped.

19       Q       When you were leaving the meeting, did Charlie

20    Spadoni tell you that Triumph had raised the money for the

21    state Republican party with the understanding that the

22    contributions would benefit your campaign?

23       A       He did.

24       Q       Did he tell you words to the effect that Triumph

25    had held up its part of the agreement, and if the state

1    Republican party was concerned about the criminality of the
2    prearranged split, it should just get rid of the percentage?

3         A    He said, in fact, that that's what they had done,
4    and therefore the -- that it absolved anyone of any
5    criminality, if indeed, any existed.  That's what he said.

6         Q    Did he tell you that Triumph had held up its part
7    of the agreement?

8         A    Yes.

9         Q    Was it your understanding, Mr. Silvester, that the
10   support that Fred McCarthy and Charlie Spadoni showed you
11   during your campaign was that there would be -- because of
12   that support there was an expectation that you would return
13   the favor by investing additional pension monies at some
14   point with Triumph Capital?

15        A    Yes.  We had a relationship, and they were
16   expecting to even further solidify that relationship by
17   making large political contributions.

18        Q    In addition to agreeing to raise money for you
19   through the state Republican party, did Charlie Spadoni
20   arrange for Lisa Thiesfield to get a contract with Triumph
21   Capital during your campaign?

22        A    Yes.

23        Q    Let's talk about that a little bit.

24             In approximately May of 1998, was Lisa Thiesfield
25   still at the treasurer's office?

```
1         A     Yes.

2         Q     And she was the director of CHET?

3         A     Yes.

4         Q     What was her salary, approximately?

5         A     $50,000 a year.

6         Q     Did she want to work on your campaign?

7         A     She did.

8         Q     Now, at the time -- if we take that $50,000 annual

9    salary, she's worked almost six months, so the thought

10   process would be if -- she's made from the State about

11   $25,000?

12        A     Yes.

13        Q     Did you want to be able to cover her with another

14   $25,000 if she worked on your campaign so she wouldn't lose

15   out on her salary?

16        A     That's correct.  Or slightly more because of she

17   would have to provide health insurance and that sort of

18   thing.

19        Q     At the time in May of 1998, approximately May, that

20   springtime period, were you unsure whether you would have the

21   money in your campaign to cover her to pay that kind of

22   salary to her?

23        A     Yes, exactly.

24        Q     And you discussed this concern of yours with her?

25        A     Yes.
```

```
 1          Q      Did you also discuss with Charlie Spadoni that Lisa
 2     Thiesfield wanted to work on your campaign?
 3          A      Yes.
 4          Q      Did you also discuss with him that you wanted Lisa
 5     Thiesfield to work as your campaign manager, but you didn't
 6     know if you could cover her for about $25,000?
 7          A      Yes.
 8          Q      At some point, did Charlie Spadoni come back to you
 9     and report that he had solved some of Lisa Thiesfield's money
10     problems?
11          A      Yes.
12          Q      How had he done that?
13          A      He told me that he had hired her to do some work
14     for Triumph.
15          Q      Did he tell you how much he was going to pay her?
16          A      Yes.
17          Q      What was that?
18          A      $25,000.
19          Q      Did you inquire of him about the ethics of this
20     arrangement?
21          A      Yes.
22          Q      What was your concern?
23          A      That a state employee of the treasurer's office was
24     going to go to work for a firm that the treasurer's office
25     had done so much business with.  There are numerous laws in
```

1    the state ethics code that relate to that type of activity.

2    And I was inquiring as to the ethics of that within the

3    framework of those laws.

4        Q    Did Charlie Spadoni tell you he had checked out the

5    ethics laws in that?

6        A    Yes.

7        Q    And that it was okay?

8        A    Yes.  He told me that she was not an investment

9    professional and was not involved in any particular

10   relationship with Triumph, therefore, the laws wouldn't apply

11   to her.  He told me that it was within the framework of the

12   ethics statutes because she was not an investment

13   professional and the division that she was the director of

14   had nothing to do with the pension funds.

15       Q    Did you understand, Mr. Silvester, that the purpose

16   of the contract was to cover her to work on your campaign?

17       A    Yes.

18       Q    Did you ever see the contract?

19       A    I may have seen it, yes.  I never read it.

20       Q    When you say you may have seen it, what --

21       A    I may have seen it lying on the table.

22       Q    But you never read it?

23       A    Correct.

24       Q    Did you know that she was under the contract

25   supposed to make an introduction to the Mashantucket Pequot?

1      A     I believe that was one of the expectations they had
2    of her.
3         Q     Do you know how you came to know that that was an
4    expectation?
5         A     I think either she told me or Charlie Spadoni told
6    me.  I don't remember.
7         Q     Are you aware whether she ever made an
8    introduction?
9         A     I'm not.
10        Q     Did she receive the money from Triumph under that
11   contract?
12        A     Yes.
13        Q     Days after the election in November of 1998, did
14   Charlie Spadoni approach you about doing an investment with
15   Triumph?
16        A     He did.
17        Q     Did he express a desire to get an investment done
18   quickly so it would appear that it had been pending in the
19   treasurer's office for some time?
20        A     Yes.
21        Q     Was the investment with Triumph ultimately done
22   very quickly?
23        A     It was.
24                   MS. DANNEHY:  Does anybody need a break, a
25                   five-minute break?

```
1    BY MS. DANNEHY:

2         Q    Did you, Mr. Silvester, when Charlie Spadoni

3    brought the idea of an investment to you after the election

4    propose that in return for the investment that Triumph hire

5    Christopher Stack and Lisa Thiesfield as finders?

6         A    Yes, I did.

7         Q    Did Charlie Spadoni tell you that he would have to

8    check with Fred McCarthy?

9         A    Yes.

10        Q    Does Charlie Spadoni make a decision regarding

11   Triumph-related matters without checking with Fred McCarthy

12   from your experience?

13        A    No.

14        Q    Did Charlie Spadoni at some point tell you that he

15   had checked with Fred McCarthy, that Fred McCarthy said he

16   was favorably inclined toward the arrangement or words to

17   that effect, but it would be ill-advised to hire them while

18   you were in office, but that they would sit with them after

19   you were out of office?

20        A    Yes.  Those words were said over, I believe, two

21   meetings.

22        Q    Do you want to explain?

23        A    Yes.  The -- I had asked him to pay a finder's fee

24   to Lisa and to Christopher Stack.  He said he would check

25   with Fred McCarthy, came back, said that they would rather
```

1   sit with them separately after I was out of office and work

2   it with them at that time.  I proceeded with the investment,

3   thinking that they would work it out after I was out'of

4   office.  Sometime later, Charlie Spadoni told me that based

5   on discussions he had had with Fred McCarthy, that Fred

6   McCarthy, he believed, was favorably inclined to proceed, and

7   that everything should go fine after I'm out of office.

8        Q    This second part of the discussion, was that again

9   during the course of the negotiations of the deal?

10       A    No.  The second discussion, I think, came up a week

11  or two later where he told me that Fred McCarthy was

12  favorably inclined to do so.  The first discussion, he said

13  he was going to sit with them after I was out of office,

14  which I took to mean after I got out of office.  Sometime

15  later, maybe a week or so, I don't know, sometime later, he

16  said that everything was going to work out, Fred McCarthy was

17  favorably inclined.

18       Q    You understood from Charlie Spadoni representing

19  that Fred McCarthy was agreeing to sit down with them

20  separately and work it out, that they, Triumph, would, in

21  fact, hire Lisa Thiesfield --

22       A    Yes.

23       Q    -- and Christopher Stack.  During the time you were

24  working on the investment with Triumph, did you remind

25  Charlie Spadoni on a couple of occasions at least that you

1    wanted Lisa Thiesfield and Christopher Stack taken care of?

2         A    Yes.

3         Q    Were you involved in the negotiations of the

4    contracts with Christopher Stack and Lisa Thiesfield?

5         A    No.

6         Q    Did Charlie Spadoni ever express to you that he

7    didn't want you involved in that?

8         A    Yes.

9         Q    What did he say?

10        A    He said that he would sit with them separately.

11   And I asked that -- because Chris Stack and Charlie Spadoni

12   are lawyers, I asked that Charlie Spadoni meet with Chris

13   separately and review, have Chris review the documents

14   because Chris was always particular about the documents and

15   how they were worded, rather than getting into a shouting

16   match, arguments, and so forth about discussions that took

17   place on earlier deals, I thought it best Chris meet with

18   Charlie Spadoni and work it out.  I asked him to look at

19   Lisa's contract as well.

20        Q    You asked Chris to --

21        A    -- do that.

22        Q    Did you in essence ask Stack to review this

23   contract for Lisa too, because she was getting a similar

24   contract?

25        A    Yes.

1      Q      Was there a point during this where Charlie Spadoni

2   expressed a reluctance for Triumph to hire Lisa Thiesfield

3   directly?

4      A      Yes.

5      Q      What was the reason he hesitated to hire Lisa

6   Thiesfield directly?

7      A      Well, he told me he felt it might look a little

8   unseemly because she was my campaign manager.  That's what he

9   told me.

10     Q      What did Charlie Spadoni suggest?

11     A      That she go work for Chris Stack.

12     Q      Was Lisa Thiesfield unwilling to work for Chris

13  Stack?

14     A      Exactly.

15     Q      Did that idea of Lisa working for Chris as opposed

16  to getting her own contracts fall by the wayside?

17     A      I asked her if she would go work for Chris Stack,

18  and she said she had no interest in working for Christopher

19  Stack.

20     Q      Did you tell Charlie Spadoni that, that -- report

21  back to him that that idea wasn't going to work?

22     A      Yes.  I said she doesn't have any interest in

23  working for Christopher Stack.

24     Q      Was this discussion about how to structure a

25  contract with Lisa -- did it come very early on in your

1    initial request to Charlie Spadoni that they hire these two

2    folks?

3         A    Yes.  I believe it did.

4         Q    Mr. Silvester, you ultimately invested $200 million

5    in a Triumph fund; is that right?

6         A    Yes.

7         Q    Would it be fair to say because of the fund-raising

8    support that you received from Charlie Spadoni and Fred

9    McCarthy that you were going to do an investment with Triumph

10   after the election?

11        A    Yes.

12        Q    Also, however, would you have done an investment at

13   the $200 million amount?

14        A    Probably not.  Certainly not.

15        Q    Was it because of the agreement from Charlie

16   Spadoni and Fred McCarthy that they would give Lisa

17   Thiesfield and Christopher Stack consulting contracts or hire

18   them as finders that you did the deal at $200 million?

19        A    That, and because of their support during the

20   campaign.

21        Q    Originally, Mr. Silvester, did you tell the

22   Government that you believed that both Lisa Thiesfield and

23   Christopher Stack had signed their contracts after you left

24   office?

25        A    Yes, I did.

1    Q    And you left office on January 6 of 1999?

2    A    Yes.

3    Q    Based on a review of telephone records and your

4    calendar, is it fair to say that you are not sure when they

5    signed their contracts?

6    A    I have no idea.

7    Q    You were not present when either Lisa Thiesfield or

8    Christopher Stack signed their contracts.

9    A    I was not.

10   Q    Let's discuss a little bit about the contracts.

11        Now, as you testified, Mr. Silvester, you did ask

12   Christopher Stack to review the contract because Lisa was

13   getting a similar contract, so to review it for two, in

14   essence.

15   A    Yes.

16   Q    At some point, did Christopher Stack tell you that

17   he had reviewed a draft and that the contract looked fine?

18   A    Yes.

19   Q    Did you then at that point tell Lisa Thiesfield to

20   sit with Charlie Spadoni?

21   A    Yes.

22   Q    Did Christopher Stack report to you that at some

23   point he signed his contract?

24   A    Yes.  He told me that he met with them and

25   everything was all set.  I took that to mean that he had

Falzarano Court Reporters

```
 1    executed the deal.

 2         Q    Can you tell us, Mr. Silvester, when that was that

 3    he told you that?

 4         A    It was either late '98 or early '99.

 5         Q    Did Lisa Thiesfield tell you at some point that she

 6    had signed her contract?

 7         A    Yes.

 8         Q    Again, can you tell us when that was?

 9         A    I believe January of '99.

10         Q    What makes you believe it was January of 1999?

11         A    Well, I've spent a lot of time thinking about this.

12    I think that the earliest it was around Christmas of '98.  I

13    think they were very cautious about the execution of that

14    document with Lisa; they had expressed concern about

15    executing that document with Lisa.  And the whole point of

16    waiting until I was out of office was a precaution.  So I

17    believe that's what they did.  I have no evidence either way.

18    I know that she went on vacation to California, and I think

19    she got back in late December, and sometime after that

20    vacation, she signed her contract.

21         Q    Again, is that based on discussions with Lisa or

22    just your recollection of the events?  I'm just trying to get

23    where this belief is coming from.

24         A    Well, at the time this investigation began, I did

25    not know at all when the contract was signed.  Subsequent to
```

1  the investigation, I've had discussions with her, and I'm led

2  to believe it was around Christmas or shortly after.

3       Q    Okay.  Have you ever seen Christopher Stack's

4  contract he had with Triumph Capital prior to this

5  investigation?

6       A    I think he gave me a copy of it.

7       Q    You think he gave you a copy of it in his office in

8  February of 1999?

9       A    I believe so.

10      Q    Did he give you a copy to keep or just to see?

11      A    I think I may have left with it and later discarded

12  it.  I think he gave me a copy of all his contracts.

13      Q    Let's talk about that a little bit, and we'll come

14  back to the contract.

15           In February of 1999, did you have a meeting with

16  Chris Stack in his office in New York?

17      A    I did.

18      Q    Did you review with him all the contracts that he

19  had for investment deals with the Connecticut treasurer's

20  office?

21      A    I did.

22      Q    And those contracts were with the fund Veritas?

23      A    Yes.

24      Q    With the fund Walton?

25      A    Yes.

1    Q    With the fund Landmark?

2    A    Yes.

3    Q    With the fund Triumph Capital?

4    A    Yes.

5    Q    Did you and he perform some computations to

6    determine how much money over the long term he was going to

7    pay to you?

8    A    Yes.

9    Q    Do you recall approximately how much you --

10   A    I think half a million dollars.

11   Q    Those payments were going to be made through Peter

12   Hirschl as we've discussed?

13   A    Yes.

14   Q    He made a couple payments prior to this

15   investigation started?

16   A    Yes.

17   Q    Getting back to the contracts, and now we

18   understand where you saw Christopher Stack's contract, did

19   you ever see Lisa Thiesfield's contract that she has with

20   Triumph Capital that we'll call the second contract?

21   A    I'm not sure whether that contract I saw on that

22   table was either the first one or the second one.

23   Q    So you may have seen it, but you didn't read it?

24   A    I did not.

25   Q    Do you remember reading Christopher Stack's

1    contract with Triumph Capital?

2        A    Yes, I do remember reading it.

3        Q    Do you remember or recall that it provided for a

4    base salary regardless of any success in placing an

5    investment?

6        A    Yes.

7        Q    Is that an unusual provision in a consulting

8    contract?

9        A    Yes.

10       Q    Are the more typical consulting contracts in this

11   area --

12       A    They have a modest retainer with most of the

13   compensation based on the performance.

14       Q    Mr. Silvester, and as you've told us, you intended

15   to share in the money that Christopher Stack got from

16   Triumph.

17       A    Correct.

18       Q    And you yourself intended to share in the money

19   that Lisa Thiesfield got?

20       A    Yes.  At a much lesser level.

21       Q    Was Fred McCarthy aware that Christopher Stack was

22   a close friend and business associate of yours?

23       A    Yes.

24       Q    How was he aware of that?

25       A    Probably through Charlie Spadoni.  Chris sat with

```
1    me at the Bush dinner.  I think he chatted with Fred McCarthy
2    at that time, and I think many people were aware that
3    Christopher Stack was someone who I confided in as an
4    attorney over the years.
5         Q    In fact, unrelated to this contract that
6    Christopher Stack got from Triumph in 1998, the 1998, 1999
7    period, had you referred Chris Stack up to try -- in
8    connection with a business he had called Collegiate Capital
9    (phonetic)?
10        A    I did.
11        Q    Was Charlie Spadoni aware of your relationship with
12   Christopher Stack?
13        A    Yes.
14        Q    Was Charlie Spadoni aware that Lisa Thiesfield was
15   a close friend and your campaign manager?
16        A    Yes.
17        Q    And the same for Fred McCarthy, was he aware from
18   his dealings in your activities --
19        A    Yes.
20        Q    -- of Lisa being your campaign manager?
21        A    Yes.
22        Q    And a close friends of yours?
23        A    Yes.
24        Q    Mr. Silvester, you never told Charlie Spadoni that
25   you expected to get a portion of either Christopher Stack's
```

```
1    or Lisa Thiesfield's money, did you?

2         A    I did not.

3         Q    Did you ever tell Fred McCarthy?

4         A    No.

5         Q    In making the decision to invest with Triumph

6    Capital in November of 1998, were you motivated by the fact

7    that your personal friends were being --

8         A    Enriched, yes.

9         Q    Did you disclose at the time to anyone that you had

10   arranged for Lisa Thiesfield and Christopher Stack to get

11   contracts from Triumph Capital in return for the investment?

12        A    No.

13        Q    Mr. Silvester, would you say that when you made the

14   decision to invest, you were personally motivated because

15   your friends were being enriched?

16        A    Yes.

17        Q    And you deprived the State of your honest services

18   in making that decision.

19        A    Yes.

20        Q    Mr. Silvester, were you also satisfied that the

21   investment with Triumph Capital was a sound, financial

22   investment?

23        A    It is a sound, financial investment.

24        Q    Did you, Mr. Silvester, scheme with Charlie

25   Spadoni, Fred McCarthy, Lisa Thiesfield, and Christopher
```

1    Stack to deprive the State of your honest services by

2    arranging for these associates of yours to get paid?

3        A    Yes.

4        Q    After the election and right after the deal with

5    Triumph Capital was closed, did you go to Tortolla with

6    several of your friends, including Christopher Stack, Lisa

7    Thiesfield, George Gomes, and your brother, Mark

8    Silvester?

9        A    Yes.

10       Q    At Tortolla, did you have discussions with

11   Christopher Stack about sharing in the money from Triumph?

12       A    Yes.

13       Q    Was Stack, in fact, complaining about the fact that

14   Lisa Thiesfield had gotten a contract from Triumph?

15       A    Yes.

16       Q    Did you in some way to quiet him down tell him that

17   you wouldn't ask for half from him and you would get a

18   portion from Lisa?

19       A    No.   I would more accurately phrase that that he

20   was complaining about her being treated the way she was being

21   treated in terms of the level of enrichment that she was

22   going to get.  He had seen that contract.  And I think he

23   expressed that if she had not been involved in it, it would

24   have been $2 million split between two people.  So rather

25   than get a million, he was going to get half a million.   He

1   was upset that she was involved in this because that was less

2   money for him.  My response was, Chris, if you don't want to

3   pay me a half, you can pay me a third or fourth or fifth or

4   nothing at all.  I have no gun to your head.  I can't sue you

5   for the money.

6       Q    Did you in January, in early 1999, have a couple of

7   discussions with Lisa Thiesfield about her contract with

8   Triumph?

9       A    I did.

10      Q    When she got her first payment from Triumph in

11  January of 1999, did you remind her that life was a two-way

12  street and that you had arranged for her to get this

13  contract?

14      A    Yes.  I told her that it didn't happen by accident,

15  and she should remember where it came from.

16      Q    Did she acknowledge that she understood that?

17      A    She was grateful for what I did for her.

18      Q    Around this time period, were you making several

19  sort of off-the-cuff remarks to her about the fact that you

20  had gotten her this contract?

21      A    Yes.

22      Q    She never disagreed with you on that score, did

23  she?

24      A    No.

25      Q    Did you have a conversation again with her about

```
 1   the contract when you were traveling together to your
 2   accountant in Rhode Island?
 3        A    Traveling back from the accountant?
 4        Q    Yes.
 5        A    Yes.
 6        Q    At this time when you were traveling back from the
 7   accountant, had Lisa Thiesfield become aware of the fact that
 8   Chris Stack was making payments to your brother-in-law, Peter
 9   Hirschl, for you?
10        A    Yes.
11        Q    And she didn't know the amount of the payment?
12        A    She wasn't aware, right.
13        Q    When did you tell her that Chris Stack was making
14   payments for you through Hirschl?
15        A    I don't recall exactly.  I think when I told him --
16   what I did tell her, was that Chris had hired Peter as
17   counsel on a number of matters.
18        Q    And that the money was for you?
19        A    The money ultimately, would benefit me.
20        Q    And this trip from the accountant, did you suggest
21   to Lisa Thiesfield that you and she have a similar
22   arrangement and that she use Peter Hirschl?
23        A    Yes.
24        Q    Did she suggest to you in response that it would be
25   better to wait a year?
```

1      A    Yes.  She -- there was a meeting between myself and
2    another attorney by the name of John Droney.  He told me that
3    any arrangements whereby people I had done business with when
4    I was treasurer should be postponed a year.  Lisa was aware
5    of the substance of that discussion with Mr. Droney.  When I
6    told her that I thought she should hire Peter as her counsel,
7    she told me that she was hesitant to do that until the year
8    had passed.
9      Q    Let's take this one step at a time.
10          At some point, were you still in office when you
11   went to visit Mr. Droney?
12     A    Yes.
13     Q    So at some point when you were in office, you
14   visited John Droney.
15     A    Yes.
16     Q    John Droney is an attorney in this area?
17     A    Yes.
18     Q    Is he active in the Democratic party?
19     A    Yes.  He's the former chairman.
20     Q    Did you tell John Droney that you had a friend who
21   had gotten consulting work through pension investments who
22   had approximately $500,000 for you?
23     A    Yes.
24     Q    Was it in response to that that Droney said it
25   would be better to wait a year before you take that money?

1          A     Yes.

2          Q     Why did he say to wait a year?

3          A     He said that the statutes require that I wait a

4     year, and that I -- by waiting a year I would have insulated

5     myself from an accusation that it was a quid pro quo.

6          Q     You made Lisa Thiesfield aware of what Mr. Droney

7     had advised you?

8          A     Yes.

9          Q     And John Droney also has consultant contracts with

10    some funds in Connecticut?

11         A     Yes.

12         Q     So, when you made this proposal to Lisa Thiesfield

13    that she hire Peter Hirschl in a situation similar to

14    Christopher Stack, that's when she said to wait a year?

15         A     She said that it was -- her comments, I believe,

16    amounted to that she would like to wait a year.  She was

17    uncomfortable, certainly, at that the time with any

18    arrangements such as what I had suggested.

19         Q     Again, you understood the year to be based on the

20    discussion you had related to her from Mr. Droney?

21         A     She said remember what Droney said.  He said that

22    it could be construed as illegal at this time.

23         Q     Mr. Silvester, the investment that the State made

24    with Triumph in November of 1998, that provided that Triumph

25    Capital could draw down the full $200 million at once; is

```
 1   that right?
 2        A    Yes.
 3        Q    Is that a usual contract provision?
 4        A    No.
 5        Q    Did it come about because Spadoni told you that
 6   Fred McCarthy thinks that they should be able through the
 7   documents to immediately draw down some of the money?
 8        A    Yes.
 9        Q    And that was in order to ensure that the next
10   administration couldn't undo this deal?
11        A    That's correct.
12        Q    In response to Charlie Spadoni mentioning to you
13   what Fred McCarthy wanted done on this deal, what did you
14   suggest?
15        A    I suggested that we should draw down the entire
16   amount because we had the cash available.
17        Q    Was that part of the document?
18        A    Yes.
19        Q    That they could draw down at once?
20        A    Yes.  It was agreed to within the documents that
21   that's exactly what would happen.
22        Q    And your motivation for doing that was to ensure
23   that Denise Nappier's administration couldn't undo the
24   investment with Triumph?
25        A    Yes.
```

```
1        Q    Did you explain or discuss with Charlie Spadoni

2    that that was the motivation for including this in the

3    contract?

4        A    Well, the motivation for me to draw down at any

5    level was to make it more difficult for the next

6    administration to undo the contract.  So my thinking was if

7    you're going to draw down a portion of it, draw down on all

8    of it.

9        Q    You explained that to Charlie Spadoni?

10       A    Yes.

11       Q    Mr. Silvester, was Lisa Thiesfield aware that you

12   were soliciting the contract for her in connection with the

13   Triumph investment?

14       A    I don't believe she was.

15       Q    Did she know that you arranged for her to get the

16   contract?

17       A    Yes.  Subsequently I made clear to her that that

18   didn't happen by accident.

19       Q    Was she aware that you were doing an investment

20   with Triumph after the election?

21       A    Yes.

22       Q    So she was aware you were doing an investment with

23   Triumph after the election.  She was aware that you arranged

24   for her to get a contract from Triumph?

25       A    Yes.  I told her to sit with Charlie Spadoni.  And
```

1  then after that got signed, I said you realize that didn't
2  happen by accident.

3      Q      Did you discuss with her that she should sit with
4  Charlie Spadoni at some point while you were in doing the
5  Triumph contract, negotiating the Triumph deal?

6      A      Either I think in that time frame or shortly
7  thereafter.  I think she sat with him after getting back from
8  Tortolla.

9      Q      Are you aware whether Christopher Stack knew you
10  negotiated the contract or solicited the contract for him in
11  connection with the Triumph investment?

12     A      Yes.

13     Q      How was he aware of that?

14     A      I asked him to review the contracts and asked him
15  to review the one for Lisa as well.

16     Q      How was he aware that it was done in connection
17  with the Triumph investment, though, that you were also at
18  the same time as arranging for these contracts doing a deal
19  with Triumph?

20     A      Because I told him it was a $200 million deal, and
21  that the contract should reflect that.

22     Q      Did you similarly tell Lisa Thiesfield that the
23  contract should reflect the amount of the deals that you had
24  done with Triumph?

25     A      I told Chris Stack to make sure that the documents

| | |
|---|---|
| 1 | were drawn in accordance with his language, and I told Lisa |
| 2 | to sit with Charlie Spadoni.  And I recall when Lisa |
| 3 | ultimately did sign a contract.  I asked her about the |
| 4 | contract, and her comment to me was that it was a bunch of |
| 5 | legal mumbo-jumbo, but she signed it because Charlie Spadoni |
| 6 | told her to. |
| 7 | MS. DANNEHY:  Let's take a short recess. |
| 8 | |
| 9 | (Recess:  1:13 to 1:47.) |
| 10 | |
| 11 | BY MS. DANNEHY: |
| 12 | Q    Mr. Silvester, I want to ask a couple of additional |
| 13 | questions regarding the investment with Triumph. |
| 14 | You have testified that when Lisa Thiesfield got |
| 15 | her first payment from Triumph that you reminded her that |
| 16 | life was a two-way street, and that you had assisted or |
| 17 | helped her to get that contract. |
| 18 | A    I did. |
| 19 | Q    Did she acknowledge that she understood that? |
| 20 | A    She did. |
| 21 | Q    Did she also say words to the effect that she |
| 22 | understood and she was grateful, expressed some gratitude to |
| 23 | you? |
| 24 | A    She did. |
| 25 | Q    Now, I also want to ask you a little bit about |

1    timing and knowledge.  And I apologize that I don't think I
2    made it clear about the time frame when I was asking these
3    questions before.
4            First, regarding Christopher Stack.  You testified
5    that he knew that you were soliciting the contracts or
6    contract for him and for Lisa in connection with the Triumph
7    investment; is that right?
8        A    Yes.
9        Q    And that is because he knew you were doing a $200
10   million investment and wanted him and Lisa paid as finders?
11       A    Correct.
12       Q    And you explained that to him in the course of some
13   of your conversations?
14       A    Yes.
15       Q    With respect to Ms. Thiesfield, was she aware after
16   the election that you were doing an investment with Triumph
17   Capital?
18       A    Yes.
19       Q    And she was aware also of the assistance that Fred
20   McCarthy and Charlie Spadoni had given you in the campaign?
21       A    Yes.
22       Q    And that's because she was your campaign manager?
23       A    Yes.
24       Q    So she was on top of how much money you were
25   raising and where it was coming from?

1       A     Yes.

2       Q     In addition -- at this time after the election, did

3   you have concerns about whether people in the treasurer's

4   office were going to have a job?

5       A     I did have concerns.

6       Q     Did you have a concern also although she wasn't now

7   in the treasurer's office, did you have a concern about

8   making sure that Lisa Thiesfield had some employment?

9       A     I did.

10      Q     Were you looking to various sources to try to take

11  care of people in the treasurer's officer, including Lisa

12  Thiesfield?

13      A     I was.

14      Q     Was one of those places that you were looking for

15  some opportunity for from Triumph Capital?

16      A     Yes.

17      Q     Did you tell Lisa Thiesfield that you were looking

18  to Triumph Capital for some opportunities for her and others?

19      A     I did.

20      Q     And you told her that during the same time frame

21  that you were making an investment with Triumph Capital?

22      A     I did.

23      Q     At some point, you did tell Lisa Thiesfield to go

24  sit with Charlie Spadoni?

25      A     Did.

1     Q     You believe that you directed her to Charlie

2     Spadoni to go and sit and get signed up with Charlie Spadoni

3     after you came back from Tortolla?

4     A     I believe so, yes.

5     Q     Were you clear after you came back from Tortolla

6     that Chris Stack had seen the contract and was satisfied with

7     the compensation arrangement?

8     A     Yes.

9     Q     Again, at some point, Lisa Thiesfield reported back

10    that the contract itself was legal mumbo-jumbo to her, but

11    she signed it because Charlie Spadoni told her it was okay?

12    A     Yes.

13    Q     You testified earlier, Mr. Silvester, that after

14    the election and after you left office, you went to work for

15    Park Strategies.

16    A     Yes.

17    Q     And Lisa Thiesfield went to work for Park

18    Strategies?

19    A     Yes.

20    Q     And she also at that time had her contract with

21    Triumph Capital?

22    A     Yes.

23    Q     When she was at Park Strategies with you, did you

24    see that she was doing any work for Triumph Capital?

25    A     I did not.

```
1        Q     Do you know whether Charlie Spadoni, Fred McCarthy,
2    or anyone from Triumph Capital ever called her to do some
3    work?
4        A     I'm not aware that they did.
5        Q     Was she working full time for Park Strategies with
6    you after you left office?
7        A     Yes.
8        Q     After this investigation, a Grand Jury
9    investigation started in this case, did you have some
10   discussions with Charlie Spadoni?
11       A     Yes.
12       Q     Let's talk a little bit about some of those
13   discussions.
14             I want to ask you if you can recall if you had some
15   discussions with Charlie Spadoni over Memorial Day weekend in
16   1999?
17       A     I do recall that.
18       Q     Did Charlie Spadoni come to your house on that
19   Saturday of Memorial Day weekend in 1999 to talk to you?
20       A     Yes.
21       Q     Did you and Charlie Spadoni go to a playground in
22   West Hartford to talk because you had family around the
23   house?
24       A     Yes.
25       Q     Did Charlie Spadoni tell you at that time that
```

1  Triumph had been served with a subpoena that asked for

2  documents about marketing and expenses related to the

3  Connecticut investment?

4      A    Yes.

5      Q    Did you learn in your discussions with Charlie

6  Spadoni at this playground that Triumph had hired an

7  attorney?

8      A    Yes.

9      Q    Did you learn the attorney's name at this time?

10     A    Yes.

11     Q    What is the attorney's name?

12     A    Attorney Popeo (phonetic).

13     Q    Did Charlie Spadoni report to you that Triumph's

14 attorney had said that the Stack and Lisa Thiesfield

15 contracts were not asked for by the subpoena, but that more

16 subpoenas were likely and they would probably be broader?

17     A    Yes.

18     Q    What did he say about disclosing the fact that

19 Triumph had gotten a subpoena to you?

20     A    He said that the requirement on the subpoena was

21 not to discuss the subpoena with anybody.  It would not be

22 binding between Charlie Spadoni and myself, because Charlie

23 Spadoni had acted for some time as my personal counsel, and

24 therefore he could disclose it to me.

25     Q    Did Charlie Spadoni express to you at this

```
 1    playground that he didn't think that he had done anything
 2    wrong?
 3         A    He did.
 4         Q    Did you tell Charlie Spadoni at this time that your
 5    problems were deeper than simply the Triumph investment?
 6         A    Yes.
 7         Q    Did you relate to him that Chris Stack had given
 8    you money through Peter Hirschl?
 9         A    Yes.
10         Q    Did he ask you if it was after you left office; if
11    you recall?
12         A    I believe he asked me when that happened.
13         Q    Did he also ask you if Lisa Thiesfield had given
14    you money?
15         A    He did.
16         Q    What did you say?
17         A    I told him that she had not given me any money
18    except for $5,000.  That was lower than what was expected to
19    be paid.
20         Q    Did he also advise you that you shouldn't talk to
21    your wife about all this investigation?
22         A    Yes.
23         Q    Did you express to Charlie Spadoni that you were
24    going to tell your wife what was going on?
25         A    Yes.
```

1    Q    And, in fact, Mr. Silvester, had you earlier before

2    Charlie Spadoni's Saturday visit talked to your wife about

3    what was happening?

4    A    Yes.

5    Q    Had you told her that you had been -- words to the

6    effect -- that you had been helpful to William Dibella, Lisa

7    Thiesfield, Christopher Stack, and George Gomes?

8    A    Amongst others.

9    Q    Did you tell her about the illegal campaign

10   contributions?

11   A    I did.

12   Q    Did you tell her about the Hirschl transactions?

13   A    I did?

14   Q    Did you ask Charlie Spadoni, though, to speak with

15   her on this Saturday?

16   A    I did.

17   Q    Did he?

18   A    Yes.

19   Q    What did he say to her?

20   A    He explained to her that the -- that there had been

21   a Grand Jury and a subpoena had been issued, and that I was

22   going to get a very good lawyer and we were going to do

23   whatever had to be done.

24   Q    Did he say anything about that, you know, it was

25   going to be a difficult time and she should be prepared?

```
1          A     Yes.

2          Q     Did your sister, Lisa Silvestri, also come to your

3     house on that Saturday?

4          A     Yes.

5          Q     Did Charlie Spadoni give her a similar speech?

6          A     Yes.

7          Q     Did you also talk to your sister in more detail

8     without Charlie Spadoni present?

9          A     I did.

10         Q     And your sister, Lisa Silvestri, is Peter Hirschl's

11    wife?

12         A     Yes.

13         Q     At some point over this Memorial Day weekend, did

14    Charlie Spadoni tell you that his attorney, Mr. Popeo was

15    putting a list together of lawyers of the right ilk, and that

16    a joint defense was going to be important in this case?

17         A     Yes.

18         Q     Did you also talk to Charlie Spadoni on that Sunday

19    of Memorial Day?

20         A     Yes.

21         Q     Did you go to his office?

22         A     Yes.

23         Q     Where is that?

24         A     CityPlace in Hartford.  I didn't go upstairs.  I

25    pulled up to the front door downstairs.
```

```
1          Q      He was at the curb?

2          A      Yes, waiting for me.

3          Q      What did you talk to Charlie Spadoni about on this

4     Sunday?

5          A      I told him I had spent the last 24 hours, in fact,

6     longer than that, thinking about the best course of action

7     under the circumstances, and that my inclination was to meet

8     with the FBI and tell them everything.

9          Q      Did you ask him to see the list at this time?

10         A      I was curious as to the list.

11         Q      The list being the list of lawyers?

12         A      Yes.

13         Q      Did you express to him that you wanted Lisa

14    Thiesfield to get a lawyer?

15         A      Yes.

16         Q      Did you ultimately drop Charlie Spadoni back at his

17    office?

18         A      Yes.

19         Q      Was this in the morning?

20         A      Yes, it was.

21         Q      What did you say to Charlie Spadoni when you

22    dropped him off?

23         A      I said, "Charlie, I'm going to go to jail and

24    there's no way around it."

25         Q      What was his reaction?
```

1       A      He seemed sad.

2       Q      Did he express to you anything at this time about

3   what it meant to cooperate?

4       A      Yes.

5       Q      What did he say?

6       A      He said, "If you cooperate, you will be convicted."

7       Q      Did he say where he was getting that from?

8       A      Mr. Popeo.

9       Q      On this day, and perhaps Monday, were you trying to

10  contact Lisa to have her meet with Charlie Spadoni and try to

11  hook up with getting a lawyer?

12      A      Yes.

13      Q      Did you learn later that she had met with Charlie

14  Spadoni either that Sunday or Monday about this?

15      A      Yes.

16      Q      In fact, either that Sunday or Monday afternoon of

17  Memorial Day, did you see somebody called Ed Daly?

18      A      I did.

19      Q      Who is he?

20      A      He's an attorney.  He's a former prosecutor.  He

21  was a prosecutor of Hartford years ago when my father was a

22  prosecutor.  He started a law firm in 1965, and he is still

23  in practice today.

24      Q      He's in practice -- he's your dad's partner?

25      A      Yes.

1       Q       Did you talk to Ed Daly about your legal problems?

2       A       Yes.   I talked to him for some time about my legal

3    problems.

4       Q       At the time, did Lisa Thiesfield live in the same

5    building as Ed Daly?

6       A       Yes.

7       Q       Did you see Lisa Thiesfield after you had seen Ed

8    Daly?

9       A       Yes.

10      Q       Did she tell you, in fact, that she had met with

11   Charlie Spadoni already?

12      A       Yes.

13      Q       What did she tell you about your situation?

14      A       She told me that I was in a lot of trouble, and

15   that I needed to get a lawyer.  And I don't recall anything

16   other than that.

17      Q       During this time period, the week of Memorial Day,

18   did Charlie Spadoni come to your house at least a couple of

19   times in the evening to see how you were doing?

20      A       Yes.

21      Q       One night on your porch, did you have a discussion

22   with Charlie Spadoni about the fact that you had on your

23   computer information about Lisa Thiesfield's retirement and

24   also a schedule of the monies that Stack was going to pay you

25   to Hirschl?

```
1          A      Yes.

2          Q      Did you tell Charlie Spadoni that you were planning

3   to or you had just reformatted the hard drive of your

4   computer to get rid of that information?

5          A      Yes.  I was concerned.  I was worried it would fall

6   in the wrong hands, and I erased the information from my

7   computer.

8          Q      Did Charlie Spadoni express to you that just

9   reformatting the computer like that wasn't good enough?

10         A      Yes.

11         Q      Did he tell you that he was advised by his attorney

12  that the best way to get rid of the stuff was to buy a

13  particular program to blow out the computer?

14         A      Yes.

15         Q      Did he mention a computer program that had catchy

16  name?

17         A      I believe he did, yes.

18         Q      And as you sit here today, you can't remember?

19         A      Right.

20         Q      Did he also tell you that his attorney said that

21  documents -- words to the effect -- of that documents for

22  which there was no business purpose and which could be made

23  to seem incriminating should be purged from the computer?

24         A      Yes.

25         Q      And at some later point, did Charlie Spadoni tell
```

1   you that he had used the program he had talked about to blow

2   out the computer?

3        A    Yes.

4        Q    Did you discuss with Charlie Spadoni certain

5   documents that you understood he had blown out or purged?

6        A    He suggested that I get rid of certain documents

7   that he had provided to me in connection with Park

8   Strategies.

9        Q    Let's talk about that to get a little background.

10           When you were working at Park Strategies,

11  Mr. Silvester, did you propose to Triumph Capital that

12  Triumph hire Park Strategies?

13       A    I did.

14       Q    Did Fred McCarthy have concerns about hiring Park

15  Strategies directly because you were a prominent part of Park

16  Strategies at that time?

17       A    Normally, he wouldn't have had that kind of

18  concern, but because there had been so many adverse newspaper

19  articles about me, the FBI, other types of accusations that

20  were being made, he had reservations about that.

21       Q    Was it proposed then that rather than hire Park

22  Strategies directly, that Triumph would hire Ben Andrews'

23  company and that then Ben Andrews would contract with Park

24  Strategies?

25       A    Yes.

1      Q    Was the plan that Triumph would pay Ben Andrews a
2    $15,000 monthly retainer, and that $12,000 of that would go
3    from Ben Andrews to Park Strategies?
4      A    Yes.
5      Q    Had there been documents drawn up, draft contracts
6    to this effect?
7      A    Yes, there were.
8      Q    And, in fact, you understand that there may, in
9    fact, have been an original draft document showing proposed
10   contract between Triumph and Park Strategies?
11     A    Correct.
12     Q    And from what you understand, it was Charlie
13   Spadoni who had these drafts on his computer?
14     A    Yes.
15     Q    Did he advise you to get rid of whatever drafts you
16   had about this arrangement?
17     A    Yes.
18     Q    Did he express that some of the documents that he
19   had purged were these documents showing a relationship
20   between Triumph, Park Strategies, and Ben Andrews?
21     A    He never told me what specific documents he had
22   purged.  I took it to mean that those documents were amongst
23   those that he purged because he told me to get rid of my
24   copies, which I had already done.  I threw them out.  They
25   had no value.

1       Q   Mr. Silvester, I want to turn now to investments

2   that you did with Thayer Capital Partners.

3           In November of 1998, did you make a $75 million

4   investment with a fund of Thayer Capital Partners?

5       A   I did.

6       Q   And Thayer Capital Partners is an private equity

7   fund that brought an investment to the State of Connecticut?

8       A   Yes.

9       Q   Were you aware in the late summer of 1998 that

10  Thayer Capital Partners had brought a proposed investment of

11  one of their funds to the state treasurer's office?

12      A   Yes.

13      Q   Did you learn that through Michael McDonald?

14      A   Yes, I believe I did.

15      Q   Did you have some discussions with Michael McDonald

16  about their investment in the late summer, fall of 1998?

17      A   I did.

18      Q   Was Michael McDonald satisfied that this would be a

19  financially good investment?

20      A   He was, as was I.

21      Q   Who is the chairman of Thayer Capital Partners?

22      A   Fred Malek.

23      Q   After the election, did you receive a call from

24  Christopher Burnham telling you that you should return Fred

25  Malek's calls?

```
1         A      Yes, I did.

2         Q      And at the same time that you received this call

3     from Burnham, were you trying to figure out a way to take

4     care of William Dibella?

5         A      I was.

6         Q      Can you tell us who William Dibella is?

7         A      He's an old friend, former president of the

8     Connecticut State Senate, Democrat, lobbyist.

9         Q      Was William Dibella in the state senate for a

10    number of years?

11        A      Yes.  Many years.  Over ten years.

12        Q      After he left the senate, did he become a fairly

13    influential lobbyist in the state?

14        A      Yes.

15        Q      During your campaign, had William Dibella -- you

16    mentioned he was also Democrat.  During your campaign, did

17    William Dibella, in fact, not support the Democratic campaign

18    for Denise Nappier?

19        A      That's correct.

20        Q      That was because he was --

21        A      He was an old friend of mine.

22        Q      He was showing you some allegiance by not

23    supporting the Democratic candidate?

24        A      Yes.

25        Q      Did he arrange for a business associate and friend
```

```
 1    of his Anthony Autorino to hold a fund-raiser for you at
 2    Mr. Autorino's home in Fenwick, Connecticut?
 3         A    He did.
 4         Q    Let's talk a little bit about Bill Dibella in the
 5    investment context.
 6              Had William Dibella in 1998 expected to receive a
 7    finder's fee in connection with a Paine Webber investment?
 8         A    He did.
 9         Q    Was Paine Webber investment in a private equity
10    fund that focused on real estate?
11         A    It was.
12         Q    Did you learn that the president of Paine Webber,
13    Joe Grano (phonetic) was not willing to pay William Dibella
14    in connection with this investment?
15         A    I did.
16         Q    How does William Dibella know Joe Grano?
17         A    They grew up together.
18         Q    In fact, originally, back in 1997, did William
19    Dibella make the introductions between you and Joe Grano?
20         A    He did.
21         Q    Did you develop a fairly good relationship with Joe
22    Grano?
23         A    I did.
24         Q    Because William Dibella made the original
25    introduction between you and Joe Grano, was that one of the
```

```
 1    reasons that he thought if Paine Webber did an investment

 2    deal with you, he should get paid?

 3        A     Yes.

 4        Q     In addition, was there a lunch in July of 1998 at

 5    Carbone's Restaurant that Bill Dibella attended where the

 6    Paine Webber investment was discussed?

 7        A     Yes.

 8        Q     Do you understand whether Dibella brought the

 9    parties together at that lunch?

10        A     He did.

11        Q     Did William Dibella in the fall of 1998, complain

12    to you that Joe Grano wasn't going to pay him on this Paine

13    Webber investment?

14        A     He did.

15        Q     Would complain be a good way to describe his

16    reaction to the fact that he wasn't getting paid?

17        A     He expressed concern.

18        Q     Did he express to you concern about his not getting

19    paid on more than one occasion?

20        A     Yes.

21        Q     Did he ask you, in fact, to do another investment

22    with Paine Webber after the election to get it done so that

23    maybe he could get paid in connection with that investment?

24        A     Yes.   There was another investment on the table

25    that had been brought to my attention by Mr. Grano which
```

1   Mr. Dibella was aware of which I believe Mr. Grano had agreed

2   to pay Mr. Dibella.

3       Q    That was with Sterling Investment?

4       A    Yes.

5       Q    Was Bill Dibella pushing for you to do the Sterling

6   deal simply so he could get paid something from Paine Webber?

7       A    Yes.

8       Q    You didn't do the Sterling investment.

9       A    Right.

10      Q    The due diligence was not completed before you left

11  office?

12      A    It was completed, but -- it was determined that it

13  was not something that I wanted to invest in at that time.

14      Q    In November of 1998, did you travel with Bill

15  Dibella to the Meadowlands in New Jersey to meet with Joe

16  Grano?

17      A    I did.

18      Q    Whose idea was it to go to the Meadowlands to go

19  see Joe Grano?

20      A    Mr. Dibella's.

21      Q    Was Joe Grano going to be at the races that night?

22      A    Yes.

23      Q    Was the purpose of the trip to the Meadowlands to

24  try to persuade Joe Grano to pay William Dibella in

25  connection with the Paine Webber real estate deal, as well as

1     for you to discuss with Joe Grano some --

2          A     -- future opportunities.

3          Q     Yes.

4          A     Yes.

5          Q     This is after the election that you make this trip

6     to the Meadowlands?

7          A     Yes.

8          Q     Based on a review of records, Mr. Silvester, is

9     your recollection refreshed that it was on November 10 of

10    1998 that you went to the Meadowlands?

11         A     Yes, it was.

12         Q     Did it become clear to you, Mr. Silvester, when you

13    went to the Meadowlands that Joe Grano wasn't in the mood to

14    discuss business?

15         A     Yes.

16         Q     Would it be Thayer to say that you had a brief

17    conversation about any business activities at that time?

18         A     Yes.  It was more of a social.

19         Q     Was Mr. Grano focused on the races?

20         A     Yes.  That's a fair and accurate description.

21         Q     At some point, though, when you were at the

22    Meadowlands, did Joe Grano step away from the table?

23         A     Yes.

24         Q     What did William Dibella express to you at that

25    time?

```
 1        A       He was concerned that the point wasn't being made
 2    that Paine Webber should evolve their position on its fee.
 3        Q       When you say "evolve their position" --
 4        A       Should pay him.
 5        Q       What did you tell Bill Dibella?
 6        A       I told him to relax and I would figure out a way to
 7    deal with it.
 8        Q       At some point, did William Dibella step away from
 9    the table also when you were down there?
10        A       Yes.
11        Q       Did you express to Joe Grano the same thing that
12    you would take care of William Dibella?
13        A       Yes.  I told him not to worry about it anymore.
14        Q       Mr. Silvester, did you feel that you needed to take
15    care of William Dibella because you felt he had been cheated
16    out of money on the Paine Webber deal, because he helped you
17    during your campaign and you owed him for that, and he was,
18    as you have said, a powerful Democrat that you needed for
19    future business and political relationships?
20        A       Yes.  I say that all that is accurate.  I felt he
21    was an old friend and he really deserved a fee from Paine
22    Webber, that it was clear that he was not going to get it,
23    and I wanted to try to make the situation right.
24        Q       I guess you've answered the next question, which
25    is, was it clear to you after this trip to the race track
```

```
1    that Joe Grano wasn't going to pay Bill Dibella on the Paine

2    Webber deal?

3         A    Yes.

4         Q    Did you, Mr. Silvester, use the Thayer Investment

5    as a way to take care of William Dibella?

6         A    I did.

7         Q    Did you call Fred Malek the next day, November 11

8    of 1998?

9         A    I did.

10        Q    And that was in response to Chris Burnham's request

11   to return the call?

12        A    Yes.

13        Q    Did you say to Fred Malek words to the effect of

14   that things looked good on the Connecticut deal, that you

15   were thinking about the $50 million range?

16        A    Yes.

17        Q    Did you also apologize to Mr. Malek in advance for

18   the legal hoops and the way Connecticut papers its deals?

19        A    Yes.

20        Q    Did you then tell him that you'd like him to talk

21   to William Dibella and use Dibella as a local representative?

22        A    I did.

23        Q    Did you tell him Dibella was a good businessman and

24   he would be helpful with the new state treasurer?

25        A    Yes.   I explained his political background as well.
```

```
1         Q    Did you tell or suggest to Fred Malek that Bill

2    Dibella could be helpful to the document process?

3         A    I don't think I did.

4         Q    You had expressed to Fred Malek that you apologized

5    about the document process.

6         A    Yes.

7         Q    But did you ever link the hiring of Bill Dibella as

8    a local representative with the documents?

9         A    No.

10        Q    Did Fred Malek say to you something to the effect

11   that he understood?

12        A    Yes.

13        Q    After you talked to Fred Malek, did you call

14   William Dibella on this day?

15        A    I did.

16        Q    Did you tell William Dibella that you were taking

17   care of the Grano problem?

18        A    Yes.

19        Q    Did you tell him that you were going to do an

20   investment with a fund called Thayer, and that he should

21   arrange to act as a local representative?

22        A    Yes.

23        Q    Did you tell him that Fred Malek was willing to use

24   him as such?

25        A    Yes.
```

1      Q     Did you have to describe to Bill Dibella who Fred
2    Malek was and what the Thayer Fund was?
3      A     Yes.
4      Q     Did you tell him words to the effect that he should
5    go sit with Fred Malek and work out a deal as a finder?
6      A     Yes.
7      Q     Did you tell him that you had given Malek heads-up
8    about William Dibella?
9      A     I did, that he should be expecting Bill's call.
10     Q     Did William Dibella ask you just one question in
11   response to all of this?
12     A     I'm sorry.  I don't follow the question.
13     Q     Did Bill Dibella ask you how he should get paid
14   after you told him about this opportunity?
15     A     Yes.  I told him he'd have to meet with Mr. Malek
16   and negotiate some sort of payment.
17     Q     Did you suggest to him what sort of payment?
18     A     Yes.  I told him he should be getting paid as much
19   a percent over time, or if he wanted to get it all paid up
20   front, he would have to work it out between him and
21   Mr. Malek.
22     Q     Did you tell Mr. Dibella that you were considering
23   doing the deal at $50 million in this conversation?
24     A     Yes.
25     Q     Did you learn later from William Dibella that he

1   had arranged to meet Fred Malek and had met Fred Malek in New

2   York?

3       A    I did.

4       Q    Did William Dibella tell you that Malek didn't want

5   to pay him a reasonable fee and that he expressed to Malek

6   that it wasn't worth us doing the deal at this level?

7       A    Yes.

8       Q    Were you, in your mind, rather alarmed at William

9   Dibella's blunt terms to Fred Malek?

10      A    Yes.

11      Q    Did you tell Bill Dibella not to be too forward and

12  cut a deal and get signed up?

13      A    Yes.

14      Q    Did you express to William Dibella your alarm at

15  the way he was talking to Fred Malek?

16      A    I think I said something to that effect.  I think I

17  cautioned him not to be so forward.

18      Q    After Bill Dibella got involved, did you learn that

19  he was going to be compensated a percentage of the deal?

20      A    Yes.

21      Q    Did he start then to try to persuade you to raise

22  the investment from 50 to 75 million?

23      A    He did.

24      Q    And that meant there would be more money for

25  William Dibella?

```
1          A      It did.

2          Q      Did William Dibella ever provide you any

3     substantive reason for wanting an increase?

4          A      No.

5          Q      Did you understand he wanted the increase to make

6     more money?

7          A      Yes.

8          Q      Did William Dibella ever ask you about the

9     investment process in Connecticut?

10         A      No.

11         Q      Did he ever ask you who in the treasurer's office

12    would be involved in a private equity deal?

13         A      No.

14         Q      Did William Dibella ever tell you that he was

15    assisting Thayer in the document process?

16         A      No.

17         Q      Did William Dibella ever inquire of you where

18    Connecticut stood with the document?

19         A      No.

20         Q      Did William Dibella ever inquire of you about terms

21    of the deal with Thayer Capital?

22         A      No.

23         Q      Did he ever ask you who Connecticut's attorneys

24    were on the deal?

25         A      No.
```

1      Q      With respect to the document process on a private

2   equity deal, Mr. Silvester, certain terms and conditions are

3   negotiated; is that fair?

4      A      Right.

5      Q      Based on your experience in the investment area,

6   you have a familiarity with the process.

7      A      I do.

8      Q      Does it require a specialized knowledge to deal

9   with a private equity closing?

10      A      Yes.

11      Q      Who are the people that you relied on to really be

12   involved in the document process and the terms of the deal?

13      A      Elizabeth Ward and myself and outside counsel.

14      Q      And in the case of Thayer, was the outside counsel

15   Leslie Davenport of Shipman & Goodwin?

16      A      Yes, I think it was.

17      Q      Did William Dibella ever say anything to you that

18   showed he had a knowledge of the document process in

19   Connecticut for closing on a private equity deal?

20      A      No.

21      Q      Did you travel to Washington, D.C. on November 23

22   and have lunch with Fred Malek at the Occidental Grill

23   (phonetic)?

24      A      I did.

25      Q      Was one of the main purposes of your lunch with

```
 1    Fred Malek to ensure that William Dibella got paid?

 2         A    It was.

 3         Q    I'm not at this point, Mr. Silvester, going to

 4    inquire of you what you talked about at that the lunch.

 5              Did you, however, sign the investment papers the

 6    following day after the --

 7         A    Soon after.

 8         Q    And you made the investment at 75 million?

 9         A    I believe so, yes.

10         Q    But for William Dibella, Mr. Silvester, would you

11    have done the investment with Thayer at a lower amount?

12         A    I would not have at 75 million.

13         Q    Maybe I didn't ask that very well.

14              Did you do the deal at 75 million because William

15    Dibella was involved?

16         A    Yes.

17         Q    Did you do the deal to ensure that William Dibella

18    -- at 75 to ensure that William Dibella got paid a certain

19    amount?

20         A    Yes.

21         Q    Would you have done the deal at a lower amount if

22    Bill Dibella wasn't involved?

23         A    Yes.

24         Q    Did you solicit the payment from Fred Malek as a

25    reward for doing the investment?
```

1          A     Yes.

2          Q     Were you influenced in doing the deal at the amount

3     of 75 million because Bill Dibella was getting paid?'

4          A     I was.

5          Q     And you discussed with Bill Dibella that you were

6     doing the Thayer investment and that he could get paid

7     because of it?

8          A     Yes.

9          Q     In that initial telephone conversation?

10         A     Yes.

11         Q     You also made it clear to Bill Dibella in that

12    original telephone conversation after you first talked to

13    Fred Malek that you were going to do the deal?

14         A     Yes.

15         Q     So it was clear to William Dibella that he didn't

16    have any work to do in that investment process?

17         A     That's right.

18         Q     Mr. Silvester, would it be fair to say that you had

19    personal interest in the Thayer investment?

20         A     Yes.

21         Q     And that personal interest was making sure that a

22    personal friend was enriched as a result of the investment?

23         A     Yes.

24         Q     And you never disclosed to anyone within the

25    treasurer's office that Bill Dibella was getting paid on the

1   Thayer investment?

2        A    I did not.

3        Q    Mr. Silvester, you would agree that based on this

4   decision-making that you deprived the citizens of your honest

5   services in making that investment.

6        A    I would agree.

7        Q    And that Bill Dibella schemed with you to deprive

8   the state of your honest services?

9        A    I would agree, as did Mr. Malek.

10       Q    Mr. Silvester, you never asked for a kickback from

11  Bill Dibella?

12       A    I did not.

13       Q    You wanted to take care of him, though, because of

14  the fact that you had gotten gypped out of another deal and

15  he was a political friend and political ally, so to speak?

16       A    Well, I think the politics is a little overstated.

17  I'm a personal friend.  I've known him since I was in

18  diapers.  Because of politics.

19       Q    Based on your activities with William Dibella and

20  the request that you made, Mr. Silvester, were the fees that

21  William Dibella received from Thayer bona fide fees paid in

22  the usual course of business?

23       A    No.

24       Q    Finally, I want to talk to you a little bit,

25  Mr. Silvester, about a golf outing in June of 1999 that you

1    talked with William Dibella about the investigation.

2              Did Dibella ask you about the investigation?

3        A    Yes.

4        Q    Did he ask you if there were any kickbacks?

5        A    Yes.

6        Q    Did you tell him that there were no kickbacks in

7    this case or this --

8        A    I told him there was no money back to me.

9        Q    And that wasn't true?

10       A    Correct.

11       Q    You warned Dibella that the feds would probably be

12   all over him when they saw his name in connection with the

13   investment?

14       A    Yes.  I suspected he might not like it.

15       Q    Did he express to you that all he did was convince

16   you to go from 50 to 75?

17       A    Yes.

18       Q    Did Dibella tell you at that time that he had seen

19   some notes in your briefcase that showed a range for the

20   deal?

21       A    Yes.

22       Q    Did he also tell you that he had made inquiries

23   with the new treasurer about her desire to lower some of the

24   commitments on deals you had made in your last fourth

25   quarter?

1       A       Yes.

2       Q       Did you ever see the contract between William

3    Dibella and Thayer?

4       A       Not at that time.

5       Q       The first time you saw it was during this

6    investigation after you started cooperating?

7       A       Yes.

8       Q       Finally, Mr. Silvester, I want to make it clear to

9    the Grand Jury, you continue to have a personal relationship

10   with Lisa Thiesfield?

11      A       I do.

12      Q       And Ms. Thiesfield is represented in connection

13   with this investigation?

14      A       She is.

15      Q       Once the Government learned of her representation

16   and the fact you continue to have a personal relationship

17   with her, did the Government advise you that it did not want

18   to know of the conversations that you had with Lisa

19   Thiesfield?

20      A       The Government told me not to see her.

21      Q       The Government told you not to see her.  Did the

22   Government also advise you, though, if you did see her we

23   didn't want to know what you two discussed?

24      A       Correct.

25      Q       Did we also make clear that at no time were we

```
 1    asking you to inquire of her anything about this
 2    investigation or asking -- that we were not asking you to get
 3    information from her in any way?
 4         A    That's accurate.
 5         Q    Mr. Silvester, is it fair to say that I have not
 6    asked you here today about all the information that you've
 7    provided to the Government?
 8         A    It's just the tip of the iceberg.
 9         Q    And you are aware of other illegal conduct that
10    you've talked to us about?
11         A    Yes.
12         Q    Is it also fair with respect to the investments
13    that we've discussed today, I haven't asked you everything,
14    all details about those that you've talked to us about?
15         A    That's accurate.
16         Q    There are other conversations and information
17    pertinent to Christopher Stack, Landmark, the investment with
18    Triumph and Thayer that we haven't discussed here.
19         A    That's accurate.
20              MS. DANNEHY:  What I'm going to ask now is if
21              I can excuse Mr. Silvester and talk to the
22              Grand Jury to see if they have any questions.
23
24                   (Witness excused.)
25
```

```
1                    (Examination adjourned: 2:32 p.m.)
2
3                    (Examination recommenced:  2:40 p.m.)
4
5                    PAUL J. SILVESTER, Witness, having been
6              previously sworn by the Grand Jury Foreperson,
7              was further examined and testified further
8              under oath:
9
10   BY MS. DANNEHY:
11        Q    Mr. Silvester, three follow-up questions.
12             The first is, Christopher Stack had made payments
13   of $230,000 to Peter Hirschl before this investigation
14   started.
15        A    Correct.
16        Q    That money never came into your pocket; is that
17   right?
18        A    Correct.
19        Q    Is it your understanding that Peter Hirschl has
20   forfeited that money to the government?
21        A    Yes.
22        Q    In addition, you testified about the $34,000 that
23   Mark Silvester picked up from Christopher Stack for you, and
24   a portion of that was to pay a debt to your father, and the
25   rest of it went into illegal campaign contributions.
```

```
 1        A     Correct.

 2        Q     And the only cash that you received directly from

 3   Christopher Stack was that $12,000?

 4        A     Correct.

 5        Q     And that was well before the investigation started

 6   spent?

 7        A     Yes.

 8        Q     In addition, you testified that you received a call

 9   from Chris Burnham to call Fred Malek.  Is Malek a very

10   prominent Republican figure?

11        A     Yes.

12        Q     Has he work under --

13        A     Richard Nixon.

14        Q     And also worked to raise money for the former

15   President Bush?

16        A     Every Republican presidential candidate.

17        Q     Is Christopher Burnham also a Republican?

18        A     He is.

19        Q     When Christopher Burnham called you, did he remind

20   you that Fred Malek was an influential Republican and you

21   don't not return his calls?

22        A     Yes.

23        Q     Finally, Mr. Silvester, since you've been

24   cooperating with the Government, and I'll define that as

25   since the first time you've come in and started talking to
```

1  the Government, have you had any discussions with William

2  Dibella?

3       A    No.

4       Q    Have you had any discussions with Ben Andrews?

5       A    No.

6       Q    Have you had any discussions with Charlie Spadoni?

7       A    No.

8       Q    Have you any discussions with Fred McCarthy?

9       A    No.

10       Q    Any discussions with Fred Malek?

11       A    No.

12       Q    And that was on the advice of your attorneys as

13  well as the advice of the Government?

14       A    Yes.

15            MS. DANNEHY:  Any other questions?  May the

16            witness be excused?

17            THE FOREPERSON:  Thank you.

18

19            (Witness excused.)

20

21            (Examination concluded:  2:43 p.m.)

22

23

24

25

1                            CERTIFICATE

2

3

4

5

6            I hereby certify that the foregoing 114 pages

7    are a complete and accurate computer-aided transcription of

8    my original stenotype notes taken of the Testimony of PAUL

9    SILVESTER, which was held in re: Grand Jury Investigation,

10   H-99-1, in Hartford, Connecticut, on June 13, 2000.

11

12

13

             Cheryl Poehls, Notary Public
14           Hartford County, Connecticut
             My commission expires:  March 31, 2003
15

16

17

18

19

20

21

22

23

24

25