FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  03/30/2001

Paul J. Silvester, date of birth: August 24, 1962, Social Security Number: 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, provided the following information:

Present during the various sessions were Attorneys Hubert Santos and/or Hope Seeley, representing Silvester. Assistant United States Attorneys, District of Connecticut, Nora Dannehy and Thomas Daily; and Special Agent, Internal Revenue Service, Criminal Investigation Division, Joseph McTague; and Special Agents, Federal Bureau of Investigation, Timothy Egan and Charles Urso were also present.

On October 5, 2000, Silvester was read the statement from the August 25, 2000, August 28, 2000, September 21, 2000 and September 25, 2000 meetings/conversations. Silvester concurred with the representations. Silvester then provided the following:

He stated that while he was going over, in his mind, the last meetings and the sequence of events, it prompted him to think about the question if Lisa Thiesfield ever intended to do any work. He reviewed the timing of the contracts and the unusual large up-front payment. Silvester stated he never read the Triumph consulting contract in its entirety. He believed Thiesfield or Christopher Stack would get additional money if they brought in business. Silvester has no knowledge if Thiesfield or Stack did any work or if the contract allowed for any additional money for additional referrals. Silvester knows Stack is aggressive in pursuing investment funds. Silvester does not recall any discussion with Stack, Charles Spadoni or Fred McCarthy to do any work. Silvester believes that Tri-Conn II (the CBO deal) would be very desirable and easy to sell. Silvester believes McCarthy was busy raising money in Europe. Because of international issues the deal had delays. Silvester has no knowledge of what McCarthy, Spadoni, Stack and Thiesfield did involving Tri-Conn II.

Silvester did remember a situation in February 1999, at a bar in Washington, D.C. across the street from Union Station. It was before a Republican Governors' Association meeting at the downstairs bar where he viewed Stack, Thiesfield and Spadoni speaking. It was during a happy hour and the bar was busy. He remembers the music being loud but there was not a band. He

---

Investigation on  Various  at  Hartford, Connecticut

File #  194A-NH-39127 -336                           Date dictated  03/29/2001

by  SA Charles E. Urso:tfr       URSOSUM

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of  Paul J. Silvester  , On Various , Page 2

overheard Spadoni say to Thiesfield and Stack something about Triumph and McCarthy and exciting. Silvester stated he was not a part of the conversation. He estimated he was two or three bar stools away. Silvester stated he really didn't want to hear and he didn't focus on the conversation because he wanted Park Strategies to be signed up by Triumph. He didn't hear Spadoni speak to Stack and Thiesfield about doing anything. The portion of the conversation he heard could have been as casual as Spadoni saying things are good for McCarthy in Europe. Silvester did not follow up with Spadoni, Thiesfield or Stack about the conversation. Silvester stated he sat at a table of ten at the association meeting. Others at the table included Spadoni, Thiesfield, Stack, Bob McKeon, Thomas Campbell, Wayne Berman, and his secretary, a Congressman from upstate New York and another individual from Park Strategies.

Silvester believes the Stack and Thiesfield contract are for $1,000,000 each and the contracts don't require additional work but he didn't have Thiesfield or Stack explain the terms. Silvester stated he pushed Spadoni to hook up Park Strategies. Silvester stated Thiesfield never said the contract required X,Y or Z.

Silvester explained the proposed arrangement between Triumph and Park Strategies. The contract was to be between Triumph and Ben Andrews for $15,000 per month with $12,000 flowing through to Park Strategies. Silvester would refer specific clients to Triumph to work off the retainer. Andrews had an existing relationship with Triumph. Andrews was aware that the flow through arrangement was to avoid bad publicity considering the newspaper accounts of Silvester.

Silvester stated he would usually speak with Elizabeth Ward about contractual issues like no-fault and draw down clauses. He would not ordinarily have acted on his own. He remembers going downstairs (at the Treasurer's office) to discuss some issue related to the Triumph contract but he is not sure of the issue. He doesn't remember having direct conversations with David Sturgess, the attorney at Updike, Kelly handling the matter for the State until the deal was ready for signing. Silvester stated it would have been standard procedure to include a no-fault clause. Silvester indicated the State could demand and the contract would have included, on a new product like Tri-Conn II, all the provisions for State protection because the State had all the bargaining power. Silvester remembers a contract clause to hire

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of  Paul J. Silvester  , On Various  , Page 3

and train minorities in the side letter. He stated all contracts have side letters to address particular items of interest. Other issues may include allowing State/Federal interest on bond handling. He cited an example where the State has issued bonds and a large payout was due. The State had lost a lot of money, it involved hundreds of millions of dollars. He believed Robinson and Cole was involved. Silvester stated side letters would include certain law issues like McBride. Joint and severable liability might be included but not involving funds like KFR or Hicks Muse. No-fault provisions are usually included especially when there is a majority position. Silvester may have taken the no-fault provision out of the Pioneer investment due to their persistence.

Silvester remembers a conversation he had with McCarthy and Spadoni. Triumph was the largest client of the State of Connecticut. Silvester thanked them for their campaign help. He stated it was not lost on him as the Treasurer how helpful they were and how hard they were working. Silvester told them he wanted to be thankful and Silvester understood they expected to do a lot of business with the State. It is the reason Silvester went to them for his campaign. Triumph had mutual respect for Silvester and they had immediate access to him. The fact that he was personal friends of Spadoni helped. The Tri-Conn II contract had to be dealt with quickly, like it was in the pipeline. Spadoni would go back to McCarthy and inform him of the conditions. Silvester did not have any direct conversations with McCarthy about the size or magnitude of the Tri-Conn II contract but he would have to be involved. Silvester remembers meeting with McCarthy to discuss the deal conceptually. Spadoni set up the meeting. Silvester is not sure if anyone else was present. McCarthy had a flip chart. Silvester indicated the proposal was fine and he would consider the size.

Silvester remembers a conversation he had with Spadoni at the Grant Room of the Treasurer's office before he went to Cape Cod after the election. Silvester brought up the idea to include Stack and Thiesfield in the deal and what he wanted done. They did the math on paper.

On November 1, 2000, Silvester stated he received an anonymous copy of the indictment postmarked from Coventry. He believes Hartford Courant reporter Jon Lender lives in Coventry. Silvester stated Lender called him at home about once a month but he refers him to his attorneys. Silvester stated during the Summer

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of  Paul J. Silvester  , On Various  , Page 4

of 1999, before he cooperated with the government, he told Lender that if and when he could talk, he would speak to him.

On December 14, 2000, Silvester remembered the contract he sent to Spadoni to model the Park Strategies/Triumph contract being Empire Furniture. Silvester was shown an April 1, 1999 Empire Furniture contract with Park Strategies, which he confirmed as the one he sent Spadoni. Silvester stated Wayne Berman wanted Park Strategies engagement letters to be on the stationery of the client companies, although he is not sure of the reason. Silvester remembered another time involving an Apollo client of Al D'Amato in which Jerome Wilson was involved. Spadoni was going to use the Empire Furniture contract as a model to hire Park Strategies. It was later changed to hire Ben Andrews.

Silvester provided the envelope in which he received a copy of the indictment. He received a call from Jon Lender asking for comment. He also received a communication represented as from Stan Twardy (in the form of an E-mail message) to stop libeling his client Christopher Burnham. It involved a group called Texans for Good Government. He is not sure what to make of the message and he didn't receive a call to comment.

Silvester stated he remembered a situation involving the handling of tax delinquencies in the Waterbury area. He stated Patrick Sullivan and Armando Paolino who are lobbyists, served clients involved in the deal. Silvester said there should have been a bid on the process, he wondered why it wasn't considered lobbying.

Silvester is familiar with U.S. District Court Judge Dominic Squatrito. Silvester remembers around 1993, Squatrito called Silvester while he (Silvester) worked at Advest. Silvester stated he was looking for funding for his wife's pasta company. He told Squatrito that he couldn't help him.

Silvester remembered that Spadoni had a friend that operated a software consulting business. Silvester believed the name was Peter Cimino d.b.a. Cimino Corporation or a company that used his initials.

Silvester recalled that Spadoni came over his house a number of times in May/June 1999, and debriefed him on his relationship with Triumph.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of __Paul J. Silvester__ , On __Various__ , Page __5__

Silvester would usually insert a general divorce clause in a contract unless there was a business reason to negotiate out. Specifically, when the insertion didn't benefit or if you get something in return. Silvester didn't include the divorce clause on the Triumph deal because he wanted to block Denise Nappier from being able to undo the contract.

On January 9, 2001, Silvester telephoned the writer to state he had information relating to Brendan Fox, a rumored candidate for the United States Attorney position in Connecticut. He was informed to speak to his attorneys and a meeting would be set.

On January 11, 2001, Silvester recalled the October 1998, meeting with the Connecticut Republican Party (CRP). He stated Brendan Fox was present for the meeting. Silvester stated it was clear what the meeting was about. Silvester believed he had an agreement with the CRP, although the percentage arrangement was not discussed, the conversation alluded to contribution numbers being written down. Silvester stated he brought Spadoni as his attorney. Silvester stated Jay Malcynsky called the shots on how the meeting was handled. Malcynsky wanted to give Silvester some amount of money and figure a way to get him some dollars possibly by going 50/50 with the Governor. Silvester indicated that there were problems how his advertisements were booked. Silvester stated the CRP position was that the television ads were not a problem. Silvester encouraged them to call the ad agency. Silvester stated he left the meeting thinking he had been hosed. He remembers discussing with Spadoni that he didn't get what he wanted.

Silvester stated a couple of days later they made a telephone call to the ad person, Rick Reed. Included in the conversation was Dave O'Leary, Brendan Fox, Jay Malcynsky, Patrick Sullivan and Silvester. The call did not change the CRP position.

Silvester stated on election night, November, 1998, Fox came to Silvester's party. Fox told Silvester he thought Silvester would pull it out. Silvester told Fox he lost the election. Silvester stated the conversation was friendly.

Silvester stated Fox called a couple days after the election. Fox made a small joke about the inauguration, he didn't exactly know what to say. Fox stated he lost sleep because he believes he is partially responsible for the loss. Silvester thought Fox was referring to the money issue with the CRP.

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of  Paul J. Silvester  , On Various  , Page 6

Silvester stated Fox changed the conversation by saying the reason for the call was about other State business.

Silvester stated during the period when Vincent Chase was being considered for Treasurer there was an issue to consider privatizing the second injury fund. Silvester stated it involved privatizing over $500,000,000 of injury claims. Swiss Insurance had just moved to the State with a nice State incentive. Silvester stated the Treasurer's office received a call from the Governor's office. There was a meeting with Fox, Chase and Silvester. Fox was Governor Rowland's Chief of Staff. Fox wanted to give the deal to the Hartford Insurance Group. Fox stated the Hartford gave the Governor political support and since Swiss had just received a good deal from the State it would not look good politically. Silvester stated Fox was told that the Hartford was not the lowest bidder. Fox wanted the deal flipped to the Hartford so the Governor's office wouldn't get any heat for the Swiss deal. Fox was told that the matter would be brought up with Christopher Burnham.

Silvester stated he discussed the deal with Burnham and Chase. No action was taken. During the call from the Governor to offer him the Treasurer job, he was asked if he would give the deal to the Hartford. Silvester stated after he became Treasurer he received more pressure to do the deal. He ultimately decided to nix the deal because it was not good for the State. The claims were a lot less than the bids.

Silvester remembers a landfill deal in Danbury involving an individual named Donnelly. He received venture fund money from Frank Borges. Donnelly had a process where they created pellets to be sold to generators. The idea was when landfills close the tipping fees would be increased. The venture was not doing well. There was a meeting with Fox, Donnelly, someone from the DEP and an individual named Cullenade. The Mayor of Danbury took a position that hurt the venture. Donnelly needed a loan modification from CDEA. Silvester read that Arthur Dietrick had called the Mayor of Danbury on behalf of Donnelly. The Mayor thought he was being bullied so he called the State Attorney General and the newspapers. Silvester stated he received a subpoena to testify about the situation. Silvester called Fox who indicated that the Governor's office was not involved.

Silvester stated during the 1996 Presidential election, Kemp came to Hartford. Dave O'Leary told Silvester he (O'Leary) needed to raise $50,000. O'Leary told Silvester he (Silvester)

FD-302a (Rev. 10-6-95)

194A-NH-39127

Continuation of FD-302 of  Paul J. Silvester , On Various , Page 7

needed to raise $10,000. Silvester raised most of the money through Advest people. He took the money to the Governor's office and gave it to Fox. Fox later gave Silvester an envelope and told him not to open it here, wait until later. Silvester opened the envelope and saw checks from the money he had received from Advest employees. Silvester believed Al Weintraub from the Republican National Committee didn't want the Advest money. Silvester stated he was not told why. He believes he threw out the checks.

On February 6, 2001, Silvester called the writer at home. Silvester wanted to speak about some witnesses on the Triumph matter. When Silvester was asked how he knew about witnesses he mentioned something about his attorneys. When told his attorneys did not know the identity of the witnesses, he said the witness names were on the street. Silvester was asked about his job in New York. He wanted to talk about Brendan Fox and an individual named Wortheim. Silvester was told a meeting would be scheduled and he should refer his thoughts to his attorneys. Silvester was asked if he was drinking which he acknowledged. He asked about a newspaper report of an FBI investigation in Bridgeport. It was joked about his attorneys arguing for his sentence to be teaching needy kids in the inner city.

On February 8, 2001, Silvester called the writer and he was told to call his attorneys to set up a meeting.

On February 23, 2001, Silvester called the writer two times. During the first call he was told to speak to his attorney and during the second call he just wanted to ask what the Agent thought about the Hugh Rodham situation.