```
              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
```

--------------------------------X

UNITED STATES OF AMERICA,

       V.                            Criminal No. 3:00 CR 217 (EEB)

TRIUMPH CAPITAL GROUP, INC.,
FREDERICK W. McCARTHY,
CHARLES B. SPADONI, LISA A.      September 12, 2005
THIESFIELD and BEN F. ANDREWS,

       Defendants.

--------------------------------X

### **Declaration of Russell M. Gioiella, Esq**.

      Russell M. Gioiella, a member of the firm of Litman, Asche & Gioiella, LLP, attorneys for defendant Charles E. Spadoni, declares under penalty of perjury:

      I make this Declaration in reply to the Government's response to my declaration of June 13, 2005, and in further support of Mr. Spadoni's pending motion for a new trial.

      In my June 13 declaration, we noted that at trial the defense was required to speculate as to why Silvester was not required to plead guilty to bribery in connection with Triumph. Now, with the disclosure by Silvester of what he and his lawyer actually told the Government prior to his plea, the mystery is solved. At long last, we have learned -- not from the Government but from Silvester himself -- that when Silvester first agreed to cooperate with the Government, his attorneys, and he, himself, told

the Government in effect that Mr. Spadoni did not bribe him. Indeed, according to Silvester, Mr. Spadoni specifically refused to "pay any finder or offer employment to anyone connected to [Silvester] in <u>exchange for the deal</u>."

In response to my declaration, the Government has <u>produced for the first time additional Brady material</u> in the form of Special Agent Urso's notes of the Hubert Santos proffer. Previously, the Government had not even admitted that such a proffer had occurred. In the face of the newly revealed facts, the Government has made a number of unavailing arguments, seeking to deny the undeniable:

First, the Government claims that the defense has not proven that what Mr. Silvester wrote in his notes which were transcribed by Mr. Santos in preparation for the attorney proffer accurately reflects what Mr. Santos and Mr. Silvester actually told Special Agent Urso at their proffers. However, to date, there has been no denial from the Government that this is the case. The Government has provided no affidavit from its own employee, Special Agent Urso, who was actually present, has not disclosed who else attended the proffer sessions and has taken no position on what was actually said. The Government simply refuses to tell anyone what the agents and prosecutors were told by Silvester and his lawyer.

Nor is there any reason to believe (especially in the absence of any denial by the Government or Mr. Santos) that Mr.

Santos would go to the trouble of having Mr. Silvester's notes typewritten in preparation for his proffer and then ignore the notes in making the proffer. As a careful lawyer, Mr. Santos would surely have been at pains to adhere precisely to what his client had told him so that any deal arrived at as a result of the attorney's proffer would not founder in the face of contradictory claims when Mr. Silvester was ultimately questioned.

As to Mr. Silvester's proffer, the Government has failed to rebut a direct allegation in my June 13, 2005 declaration in which I swore that Silvester told me that he had made a proffer to the Government in which he told the Government the same information that was included in his notes. This allegation remains unrebutted. [Although Mr. Silvester still declines to sign an affidavit, Mr. Silvester's attorney has confirmed that the proposed affidavit we prepared for him (Exhibit A to my June 13 declaration) is true. If the Government contests this, or if the Court wishes to hear it directly from Mr. Silvester, we request a hearing at which we will subpoena Mr. Silvester to testify under oath].

Rather than provide an affidavit from Urso denying what Mr. Silvester claims he and Mr. Santos said, the Government has finally disclosed Mr. Urso's notes of the Santos proffer session. Far from refuting the defense claim, these notes totally corroborate it.

Special Agent Urso's notes of the Santos proffer contain exculpatory statements which track Silvester's notes, and make it obvious that Mr. Santos followed these notes in his proffer. Set forth below is a side-by-side comparison of Mr. Santos' typewritten transcription of Paul Silvester's notes and Special Agent Urso's handwritten notes of the Santos proffer session:

| **Silvester's typewritten notes** | **Special Agent Urso's notes of proffer** |
|---|---|
| I <u>told Charlie to pay</u> a finder to <u>Stack and Thiesfield</u> and then I wanted Triumph to hire Elizabeth and Mike MacDonald also. He said he would take it up with Fred. | PS told CS to pay Stack and Lisa T. - fees<br>CS would not pay finder - employee MM - EW - |
| He came back and said they <u>would not pay any finder</u> or offer employment to anyone connected to me <u>in exchange for the deal</u>. Charlie said it would be quid pro quo and he could not advise his boss to agree to it. | CS told could [not] pay related to a deal - **[The note actually omits the word "not" but we do not believe that the Government will deny that this was a transcription error - i.e., Urso meant to write "could not pay..."].** |
| Charlie said that Fred was <u>sympathetic</u> to the situation of certain <u>staffers</u> and they would be as helpful as possible after I left office but that it would have to be arms length and make sense for Triumph. I said fine. | McCarthy sympathetic to staff -<br><br>arms length needed to make sense |
| A <u>week</u> or two <u>after</u> the <u>deal</u> closed Charlie indicated to me that he believed <u>Fred</u> was <u>favorably</u> disposed to hire <u>Lisa</u> and <u>Stack</u> as <u>consultants</u>. | Wk after deal McCarthy favorable to hire Stack/LT as consultants - |
| Sometime in January Stack met with Triumph and signed a consulting agreement as did Thiesfield. <u>Charlie</u> had arranged for <u>Elizabeth</u> to get an interview with some law firm and cancelled Mike MacDonald. He told me that the <u>ethics law prevented</u> Elizabeth or <u>Mike</u> going to work for Triumph. | CS made apt for EW -<br><br>MM had revolving door problem - |

5

| | |
|---|---|
| I <u>continually pressed</u> Fred and Charlie to hire <u>Park Strategies</u>. They told me that <u>eventually</u> they <u>would</u> but that they were not ready. Charlie said that they would like to <u>meet Wayne</u> to assess how helpful Park Strategies could be. There was a meeting with <u>Wayne Bevan</u>, me, Thiesfield, Charlie and Fred <u>in Boston</u> where I introduced Wayne to Charlie and Fred. <u>Contracts between Triumph and Park Strategies were drafted but never executed</u>. | PS - continually pushed hire Park Strat - eventually would but not ready - <br><br>FM wanted to meet WB to see how successful could be <br><br>Wayne B CS - others in Boston introduced - contracts with Triumph/Park Strategies drawn not signed. |

As the above comparison shows, Urso's proffer notes track Santos' transcription of Silvester's notes both in content and order, clearly showing that the notes were read, virtually, if not totally, verbatim to the Government. Thus, the Urso notes (previously concealed from the defense and the Court) prove that the Government heard from Mr. Santos, prior to any cooperation or plea agreement, the exculpatory information which was never provided to us, but which caused the Government to allow Mr. Silvester **not** to plead to bribery and to obtain a two-level guideline reduction as a result of **not** pleading to bribery on the Triumph deal.

It is inexcusable that it took the Government more than a year after our initial motion papers were filed alleging a <u>Brady</u> violation to finally produce the exculpatory information contained in the Urso notes which should have been produced long prior to

trial. This is especially disturbing given what we alleged in our reply papers filed in June 2004:

> The Court should view with extreme skepticism the Government's suggestion that merely because it did not speak with "Silvester himself" prior to the Proffer Agreement, it was not aware of Silvester's position with respect to Triumph.
>
> As shown in detail below, and in the accompanying affidavit of Charles B. Spadoni, the Government did not, in fact, buy a "pig in a poke." Rather, we have reason to believe that the Government was the beneficiary of a specific proffer prior to the Proffer Agreement made on behalf of Silvester by his attorney, Hubert Santos, Esq. **Clearly, since the decision was made to exclude Triumph as a bribery claim, the proffer received by the Government must have included a denial on behalf of Silvester that Triumph bribed Silvester** (Reply, p. 5) [Emphasis added].

We now know that both Santos' proffer and Silvester's proffer did include "a denial on behalf of Silvester that Triumph bribed Silvester." But for the fact that Silvester chose to provide information to us concerning his proffer, the Government would have succeeded in hiding this exculpatory information from the defense and the Court to this very day, even in the face of our specific allegation that it existed and the demand for its production.

Second, the Government seeks to confuse the issue by claiming that Urso's notes do not include the words "quid pro quo." Even in the unlikely event that Mr. Santos failed to use this phrase in his proffer, its absence does not make what Mr. Santos said any less exculpatory. The proffer is exculpatory even if all that was said is what is reflected in Urso's notes. According even to Special Agent Urso's notes, Mr. Spadoni told Mr. Silvester that Triumph could [not] pay anyone "related to a deal." Special Agent Urso's notes also contain the notation "arm's length" and "needed to make sense" referring to any employee/consulting deal with Stack and Thiesfield. The only possible inference to be drawn from this language was that any arrangement Triumph chose to make with Stack and Thiesfield after Silvester left office would have to be unrelated to any deal between Triumph and Connecticut, would be as a result of arm's length discussion and would have to make sense from Triumph's perspective.

Not only were the Santos proffer and the Silvester proffer significant for what Mr. Silvester and his counsel told the Government, they were also significant for what Mr. Silvester did <u>not</u> say. For example, absent from the proffer (and Urso's notes) is Silvester's conclusion (later expressed in his Grand Jury testimony and at trial) that as a result of Mr. Spadoni's telling him that Triumph "would work something out" with Thiesfield and Stack, Mr. Silvester believed that a deal would get done, and he

was motivated to increase the amount of Connecticut's investment with Triumph. Nowhere is this inculpatory interpretation by Silvester mentioned in the notes. Indeed, the notes refute any such nefarious understanding.

That the Government, itself, believed that the Santos/Silvester proffer negated a bribe in connection with Triumph is obvious from the Government's own conduct. Although Silvester was charged with and pleaded guilty to bribery in connection with three other deals, he was <u>not</u> charged with and did <u>not</u> plead guilty to bribery in connection with Triumph. We now know that this is due to the attorney's proffer and Silvester's own subsequent proffer.

Third, the Government claims, incredibly, that Mr. Silvester's notes were "not materially different" from what was disclosed in the 302's and his grand jury and trial testimony. This claim is absurd:

At trial Silvester testified (consistent with the 302's but <u>in</u>consistent with his proffer note) that Mr. Spadoni merely told him he could not pay a <u>finder's fee</u> "for legal reasons." Similarly, at trial and in the 302's, Mr. Spadoni is quoted as saying that he "would work something out with Lisa and Stack" (e.g. <u>see</u> p. 6 of Government Response) and "he'd sit with these folks and work it out" (Government Response, p. 10).

In stark contrast to the trial testimony, the proffer notes state that Mr. Spadoni told Silvester that Triumph "could not pay a finder's fee <u>or offer employment to anyone connected to Silvester in exchange for the deal</u>."

The proffer notes do <u>not</u> reflect that Mr. Spadoni told Silvester he would work something out; rather, according to the proffer, Mr. Spadoni told Mr. Silvester that Mr. McCarthy was "sympathetic" but that any arrangement would have to be at "arm's length" and "make sense" for Triumph.

And, of course, the proffer notes are also inconsistent with Silvester's trial testimony that there was a <u>quid pro quo</u>; i.e., that Silvester increased the investment in Triumph from $150 million to $200 million because Spadoni told him Triumph would work something out with Stack and Thiesfield. Indeed, there is nothing in the Silvester proffer notes -- or even in Urso's notes of the proffer -- which in any way mentions an increase from $150 to $200 million.

Fourth, the Government claims that Mr. Spadoni's statement to Silvester that he could not advise his boss to agree to a <u>quid pro quo</u> in connection with the State's investment with Triumph was actually "inculpatory," arguing that this statement shows that Mr. Spadoni knew that a <u>quid pro quo</u> would be wrong. Of course, Mr. Spadoni knew that a <u>quid pro quo</u> would be wrong, but this begs the question. The question is did Mr. Spadoni offer

Silvester a <u>quid</u> <u>pro</u> <u>quo</u>, i.e., did Mr. Spadoni and Mr. Silvester strike a deal which led Silvester to increase the State's investment in Triumph?  According to the words of the proffer, Mr. Spadoni told Silvester, who had just solicited a bribe, <u>not only that a quid pro quo would be wrong, but that he could not advise Mr. McCarthy to do it</u>, and that Triumph would not pay a finder or offer employment "in exchange for the deal."  Clearly, according to the proffer, Mr. Spadoni was flat out telling Silvester that Triumph would make no promises.  Triumph would hire Thiesfield and Stack only if it was an arm's length negotiation, only if it made sense from Triumph's perspective, and only after Silvester was out of office.

  Had the evidence of the proffer been introduced at trial, the Government might have argued that Mr. Spadoni did not mean what he said, but there can be no doubt that the evidence was material and exculpatory; the jury should have heard what Silvester initially claimed Mr. Spadoni <u>said</u>, even if the Government claimed he did not mean it.  Certainly, the defense was entitled to argue to the jury that if Mr. Spadoni was trying to bribe Silvester, he was going about it in a very peculiar way -- by telling Silvester that Triumph would not agree to pay any money or offer any employment in connection with the deal.

  Finally, the Government argues that the proffer did not contain <u>Brady</u> material or <u>Giglio</u> material because Mr. Spadoni must

11

have known what he, himself, said to Mr. Silvester. Assuming <u>arguendo</u> that this is true, what Mr. Spadoni did <u>not</u> know is that Silvester had actually <u>told the Government</u> what Mr. Spadoni said. There is a vast difference, for a defense lawyer cross-examining a hostile witness in front of a jury, between knowing what the Defendant claims happened and knowing what the <u>witness</u> said happened. The defense was entitled to rely on the Government's oft-trumpeted assertion that it was aware of its obligation under <u>Brady</u>, and to assume that if Mr. Silvester had ever provided exculpatory material to the Government, the Government would have provided it to us.

* * *

Most of the Government's 28-page unsworn Response is devoted to Silvester's trial testimony and to statements made by Silvester <u>after</u> the proffer sessions and before trial, much of which is inculpatory. It is not clear what the Government's point is. Even if Silvester had consistently inculpated Mr. Spadoni beginning the day after Mr. Santos' proffer or the day after his own proffer, the earlier exculpatory proffers would still be <u>Brady</u> and <u>Giglio</u> material. The jury was absolutely entitled to hear that, no matter what Silvester said later on, the very first proffer made on his behalf painted a different picture, one consistent only with innocence.

It is not for the Government to decide to withhold exculpatory information from the defense merely because the witness changed his story. We were entitled to use Mr. Santos' and Silvester's proffer to cross-examine Mr. Silvester to show that Mr. Spadoni expressly refused to make any agreements or promises in connection with the State's investment in Triumph and that the subsequent hiring of Thiesfield and Stack was motivated by a combination of its making sense to Triumph and sympathy for the individuals. We were also entitled to cross-examine Mr. Silvester by pointing out that his attorney did <u>not</u> tell the Government in the proffer that he believed Triumph would do a deal or that he was motivated by what Mr. Spadoni said to increase the State's investment from $150 million to $200 million.

<u>Conclusion</u>

The Court should grant Mr. Spadoni a new trial based on the undisputed facts, or, in the alternative, order an evidentiary hearing.

Dated:    New York, New York
          September 12, 2005

                                    _____
                                         Russell M. Gioiella