UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | NO. 3:00-CR-217(EBB) |
| | : | |
| | : | |
| CHARLES SPADONI | : | |

RULING ON DEFENDANT SPADONI'S MOTION FOR JUDGMENT OF ACQUITTAL
AND FOR A NEW TRIAL

INTRODUCTION

Pursuant to FED. R. CRIM. P. 29(a) Defendants Triumph Capital Group, Inc. ("Triumph Capital") and Charles Spadoni ("Spadoni") each moved for judgments of acquittal on all counts of the Superseding Indictment ("Indictment") at the close of the Government's evidence at trial. [Docs. No. 681 and 683]. The Government filed a response and the court heard oral argument on the motions. [Doc. No. 684; Tr. Vol. 14]. After the hearing, the court reserved decision and submitted the case to the jury. Following the jury's verdict, Defendants Spadoni and Triumph Capital ("the Triumph Defendants") filed a Motion for New Trial pursuant to FED. R. CRIM. P. 33 [Doc. No. 716].[1]

---

[1] While Defendants filed separate Rule 29 Motions, they adopted each other's memoranda of law in support of their respective motions, and incorporated all arguments made in their Rule 29 Motions in their joint motion for a new trial pursuant to Fed. R. Crim. Proc. 33. Judgment entered as to Triumph Capital on February 27, 2004, at which time its pending motions were withdrawn. No appeal was thereafter filed. Accordingly, this ruling substantively addresses the claims of Charles Spadoni only.

STATEMENT OF RELEVANT FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, Defendant's motions. The background of this case has been fully set forth in prior rulings and will not be repeated herein.

I.    The Indictment[2]

The Indictment principally alleges that Spadoni and Triumph Capital, together with Frederick McCarthy ("McCarthy"), Lisa A. Thiesfield ("Thiesfield"), Ben F. Andrews ("Andrews"), Paul J. Silvester ("Silvester") and Christopher Stack ("Stack"), were involved in a racketeering enterprise which endeavored to funnel monies to the "Silvester for State Treasurer" campaign in exchange for the investment of state pension assets, and agreed to pay bribes, rewards and gratuities in consideration for pension investments. The Indictment further alleges that the purpose of the racketeering activity was to enrich the Defendants and others through ongoing criminal activity; to conceal the defendants' participation in the criminal activity through obstruction of justice; and to conceal Silvester's participation in, and enrichment from, the criminal activity. That purpose was allegedly sought and accomplished by, among other things, corrupting the

---

[2] The court only addresses counts that are relevant to Spadoni.

2

Connecticut pension investment process through the solicitation and payment of bribes, rewards, and gratuities, all of which deprived the citizens of Connecticut of the State Treasurer's honest services.

Count One alleges that Triumph Capital and Spadoni, together with McCarthy, Thiesfield, Andrews, Silvester, Stack, and others, constituted a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, also known as "RICO," pursuant to 18 U.S.C. § 1962(c). Section 1962(c) makes it a crime to participate in the conduct of an enterprise's affairs through a pattern of certain violations of law known as "racketeering acts." The charged racketeering acts as to defendant Spadoni include two acts of state-law bribery: Act 2B for giving $25,000 to Thiesfield and financial support to the "Silvester for State Treasurer" Campaign in exchange for an investment of state pension assets in Triumph Capital's investment funds,[3] and Act 4B for offering, conferring or agreeing to confer benefits upon a public servant, namely, consulting contracts valued at approximately $2 million for Silvester's associates, Thiesfield and Stack, as consideration for Silvester's decision as a public servant to increase an investment of state pension assets with a Triumph investment fund. The third racketeering act charged, Act 5, is obstruction of justice, pursuant to 18 U.S.C. § 1503.

---

[3]The jury found this alleged racketeering act not proven.

Count Two, "RICO Conspiracy", charges defendants with conspiring to violate the federal racketeering laws under Section 1962(d) of Title 18 of the United States Code. The racketeering activity charged is the same racketeering activity as in Count One.

Count Nineteen charges McCarthy, Spadoni and Triumph Capital with violating 18 U.S.C. §§ 666(a)(2) and 2, by bribery in connection with programs involving federal funds in that they corruptly gave, offered or agreed to give things of value, namely consulting contracts valued at approximately two million dollars, to Christopher Stack and Lisa Thiesfield, with the intent to influence or reward Paul Silvester in connection with an increased investment of state pension assets in Triumph Connecticut-II.[4]

Counts Twenty through Twenty-three  charge that Spadoni, Triumph Capital, Thiesfield and McCarthy devised a scheme or artifice to defraud for the purpose of depriving the citizens of Connecticut of their intangible right to Silvester's honest services and, in furtherance of that scheme, knowingly caused the use of the mails or interstate wires, in violation of Sections 1343, 1346 and 2 of Title 18 of the United States Code. Specifically, the Indictment alleges that Silvester solicited, from McCarthy, Spadoni and Triumph Capital, consulting contracts for Thiesfield and Stack, in return for which Silvester used his

---

[4]This count also included the alleged campaign activity which the jury found not proved.

4

official position to benefit McCarthy, Spadoni and Triumph Capital through an increased investment of state pension assets with Triumph Connecticut-II and, in the execution of that scheme, Defendants caused interstate wires to be used.

Count Twenty-four charges that Spadoni and Triumph Capital obstructed justice, in violation of 18 U.S.C. § 1503, by knowingly and willfully deleting, overwriting, destroying or failing to produce to a federal grand jury records which were relevant to a grand jury investigation.

## II.  The Government's Case-in-Chief

The Government's case-in-chief consisted of voluminous documentary evidence, as well as testimony from, among others, Silvester who had pleaded guilty in a separate prosecution, Stack and Jeff Rovelli, an agent of the Federal Bureau of Investigation and a computer expert. Against this background, the court provides a brief overview of the evidence, and more specific factual details and relevant evidence are raised in the Ruling's substantive discussion with respect to the counts on which defendant Spadoni was convicted.

From January 6, 1995, to approximately October 11, 1996, Silvester was the Chief of Staff at the Office of the Connecticut State Treasurer.  Silvester then became the Deputy Treasurer through July 22, 1997, at which point he was appointed Treasurer

when the elected State Treasurer resigned. Silvester remained the Connecticut State Treasurer until he was defeated as the Republican candidate for that office in November 1998, and left office in January 1999. As early as March 1997, when Silvester was Deputy State Treasurer, he entered into an arrangement with Stack, whereby Stack was to pay Silvester a portion of the consultant fees that Stack received because of certain state pension investments.

Triumph Capital was an investment firm which managed millions of dollars of Connecticut's Retirement Plans and Trust Fund ("CRPTF") assets. Spadoni was the general counsel, and McCarthy was the chairman, of Triumph Capital. Thiesfield was an employee of the Connecticut State Treasurer's Office from in or around September, 1997, to May, 1998, at which time she became the campaign manager for the "Silvester for State Treasurer" Campaign.

As Treasurer, Silvester had unilateral authority to make decisions about the investments for CRPTF. Shortly after his election defeat, Silvester made an investment in a Triumph Capital fund, originally pledging $150,000,000 but later increasing the amount to $200,000,000. Silvester attributed his decision to increase the investment to his arrangement with Spadoni that Stack and Thiesfield would receive a point, or one percent, of the investment. The Stack and Thiesfield contracts were not general knowledge to other Triumph employees, and there was no evidence

6

that Stack or Thiesfield had performed any services under the contracts.  When grand jury subpoenas were issued in connection with the Government investigation into the Triumph Capital and State of Connecticut investments, Spadoni and Triumph Capital attempted to destroy computer evidence and conceal Triumph Capital's business dealings with Silvester, Stack and Thiesfield.

III. <u>The Jury's Verdict</u>

The jury unanimously found Triumph Capital and Spadoni guilty as to Count One, charging violations of the RICO statute; Count Two, charging RICO conspiracy; Count Nineteen, charging bribery concerning programs receiving federal funds; Counts Twenty through Twenty-three, charging wire fraud/theft of honest services; and Count Twenty-four, obstruction of justice.  As to Count One, the substantive RICO violation, the jury found that defendants committed two of the three alleged racketeering acts, Act 4B (state-law bribery) and Act 5 (obstruction of justice).  As to Count Two, the RICO Conspiracy violation, the jury found that defendants committed three of the five alleged racketeering acts, Acts 4A & 4B (state-law bribery) and Act 5 (obstruction of justice). The jury found Triumph Capital and Spadoni not guilty as to Count Fifteen, charging bribery concerning programs receiving federal funds; and Counts Sixteen and Seventeen, charging mail fraud/theft of honest services.

LEGAL ANALYSIS

I. STANDARD OF REVIEW

      A.  Judgment of Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that the Court, on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. CRIM. P. 29(a). A district court can enter a judgment of acquittal where the evidence is insufficient "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the Government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). *See also* United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). When considering a motion for a judgment of acquittal, "the court must be careful to avoid usurping the role of the jury." Id. at 129. The court must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact" in determining whether a reasonable mind might fairly conclude guilt beyond a reasonable doubt was established upon the evidence. Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)). A Rule 29 motion

8

does not give the trial court "an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. (internal quotation marks and citation omitted).

In addition, a jury is entitled to reach its verdict based "entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995) (citations omitted), and "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" Guadagna, 183 F.3d at 130 (quoting Holland v. United States, 348 U.S. 121, 139 (1954)). A defendant therefore "shoulders a heavy burden" in bringing a challenge to the weight of the evidence supporting a conviction. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and citation omitted).

B. New Trial

Alternatively, upon a defendant's motion, a "court may vacate any judgment and grant a new trial if the interest of justice so requires" pursuant to Rule 33 of the Federal Rules of Criminal Procedure. A district court has broad discretion to "set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). The Second Circuit has set forth the standard for courts to follow in deciding a Rule 33 motion:

> The ultimate test on a Rule 33 motion is whether letting a
> guilty verdict stand would be a manifest injustice. The trial

9

court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation....There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal citations and quotation marks omitted).

II.  DISCUSSION

A.  Counts Nineteen through Twenty-three and Racketeering Act 4B

Defendant Spadoni claims he is entitled to a judgment of acquittal or a new trial with regard to Counts Nineteen through Twenty-three, and Racketeering Act 4B, which all relate to Silvester's decision to increase the Triumph Connecticut-II investment from $150,000,000 to $200,000,000 and Triumph Capital and Spadoni's agreement to grant consulting contracts to Stack and Thiesfield. Defendant Spadoni argues that the Government failed to prove he was aware of Silvester's decision to increase the investment, or that Spadoni specifically agreed to pay money to Stack and Thiesfield in order to influence Silvester to increase the investment. Accordingly, Defendant argues that the Government failed to prove a bribe, in violation of 18 U.S.C. §666(a)(2) and 2 and the use of interstate wires in the execution of a scheme to defraud the citizens of Connecticut of Silvester's honest services

10

in violation of 18 U.S.C. §§ 1343, 1346 and 2.

The Second Circuit has clearly interpreted 18 U.S.C. §666, which prohibits giving public officials anything of value for or because of the recipient's conduct, to include "both past acts supporting a gratuity... and future acts necessary for a bribery." United States v. Crozier, 987 F.2d 893, 899 (2d Cir. 1993). _See also_ United States v. Alfisi, 308 F.3d 144, 149 (2d Cir. 2002) ("it is enough that the payment be a reward for a past official act or made in the hope of obtaining general good will in the payee's performance of official acts off in the future."). In addition, there is no requirement that a defendant know the precise degree to which a public official will act to enrich himself, so long as there is an understanding that the official will be rewarded in some way. _See_ United States v. Coyne, 4 F.3d 100, 111 (2d Cir. 1993).

In the case before us, even though Silvester testified at trial that he did not inform Spadoni that he was increasing the investment amount, Silvester and Spadoni did specifically discuss paying Stack and Thiesfield a finder's fee for the investment deal, despite the fact that neither Stack nor Thiesfield acted as a finder. Tr. Vol. 6 at 116-17, 161. According to Silvester's testimony, Spadoni assured Silvester, after consultation with co-defendant Frederick McCarthy, that they would work out the specifics with Stack and Thiesfield after Silvester was out of

11

office, which Silvester understood as meaning "they would sit down and work it out on terms similar to the economics that we had discussed." Id. at 162.  This tacit agreement influenced Silvester to increase the amount he invested in Triumph Capital so that Stack and Thiesfield would receive more money.  Id.  Further, Stack and Thiesfield did ultimately receive contracts from Triumph Capital outlining consulting arrangements, for which they were to receive the equivalent of one percentage point of the $200,000,000 deal. Tr. Vol. 4 at 45-55.

Stack testified at trial that he received a call from Silvester after the election, during which Silvester told Stack to expect a call from Spadoni.  In a later conversation, Silvester told Stack to call Spadoni.  Tr. Vol. 3 at 45-6.  Stack testified that he had never solicited work from Triumph Capital, and that Spadoni explained that he would be sending a draft contract that would reflect a consulting arrangement.  The Government also presented documentary evidence of the deal, including faxes sent from Triumph Capital to Stack's office on November 9, 1998, and computer records confirming that Spadoni accessed documents on his computer named "Stackcontract.doc" and "LAT[5] contract.doc" on November 10, 1998.  See Gov. Exhs. 18, 156.  Maryanne Leonard, the head receptionist of the law firm, LeBoeuf, Lamb, Greene, and

_____

[5]Silvester testified that Lisa Thiesfield established LAT, L.L.C. to receive payments under an earlier contract with Triumph Capital.  Tr. Vol. 5 at 126.

MacRae, also testified that Spadoni, McCarthy, Stack and others met at LeBoef's office in New York on November 11, 1998. After Stack signed the contract on that date, Triumph Capital never asked him to do anything under the contract until after they were under federal investigation. Tr. Vol. 3 at 48-60. Similar arrangements were made for Thiesfield. Tr. Vol. 7 at 214. Silvester executed the investment contract on November 13, 1998. Tr. Vol. 5 at 164.

Regardless of whether Spadoni and McCarthy knew of Silvester's intent to increase the investment, they agreed to pay Stack and Thiesfield the equivalent of finder's fees in an attempt to influence Silvester's decision to invest in Triumph Capital. Therefore, Spadoni's actions were clearly intended either to influence Silvester's future investment decisions and/or serve as a reward for previous investment decisions. Accordingly, the Government has met its burden of proving a quid pro quo as defined by § 666. This court therefore finds the evidence was sufficient to sustain a verdict finding Defendant Spadoni guilty of Count Nineteen and the related mail and wire fraud charges, Counts Twenty through Twenty-three and Racketeering Act 4B. Defendant's Motions for Judgment of Acquittal and a New Trial as to Counts 19, 20-23 and Racketeering Act 4B are denied.

B. Count Nineteen: Jurisdictional Challenge

Defendant also challenges Count Nineteen on the ground that the evidence adduced during the trial failed to satisfy the

13

jurisdictional requirement under 18 U.S.C. §666. Section 666(a)(2) makes bribery of officials of state entities that receive, in any one year, in excess of $ 10,000 in federal funds a federal crime. Defendant makes essentially the same argument Judge Nevas previously rejected when Triumph Capital and Spadoni challenged the sufficiency of the Indictment for failing to allege a threat to the integrity of federal programs. See United States v. Triumph Capital Group, Inc., 260 F. Supp. 2d 462 (D.Conn. 2002). Defendant now asserts that the evidence submitted at trial was insufficient to show that the charged bribery scheme posed a threat to the integrity or operation of a federal program, or that there was a connection between the bribe and federal funds.

The Supreme Court has recently clarified that 18 U.S.C. §666 does not require proof of a nexus between charged acts of bribery and federal funds. Sabri v. United States, 541 U.S. 600 (2004)(overturning United States v. Santopietro, 166 F.3d 88 (2d Cir. 1999)). Accordingly, contrary to Defendant's assertions, the Government was not required to prove a specific connection between Spadoni's bribe of Silvester and the federal funds that were affected by such bribe. However, the Government did provide testimony by Robert Kinnin, an employee of the State Comptroller's Office, who testified that the federal government provides money to the State of Connecticut for state employee salaries, wages, and retirement funds in the forms of grants. Tr. Vol. 2 at 7. Kinnin

testified that federal money flows directly into the State Treasurer's Office. Specifically, when federal grant money is used for the State Employees Retirement Fund, it is charged to the federal grant on the payroll system, which generates a check to the employee and a check to the employee's retirement fund for the amount of retirement contribution allocated. Id. at 8-12. Accordingly, Defendant's jurisdictional challenge to Count Nineteen fails.

### C. Obstruction of Justice: Count Twenty-four and Racketeering Act 5

Defendant Spadoni also urges this Court to grant him a new trial or acquit him of his conviction under 18 U.S.C. § 1503 (obstruction of justice). He argues that the Government did not produce evidence at trial that he disobeyed a subpoena or destroyed documents after the issuance of a subpoena calling for those documents or believing they would likely be ordered by the grand jury. In order to convict for obstruction of justice under § 1503, the Government must establish that, at the time alleged in the superseding indictment, the Defendant, with knowledge, or at least anticipation, of a pending judicial proceeding, committed an act with the specific intent to impede that proceeding. United States v. Schwarz, 283 F.3d 76, 105 (2d Cir. 2002).

This Court has previously held that to prove Spadoni had the specific intent to obstruct the grand jury, the Government must

15

offer evidence of conduct that, "in [Spadoni's] mind, has the 'natural and probable effect' of obstructing or interfering with [the grand jury]." United States v. Triumph Capital Group, Inc., 260 F. Supp. 2d 470, 475 (D.Conn. 2003)(citing Schwarz, 283 F.3d at 109; United States v. Aguilar, 515 U.S. 593, 599 (1995)).  In contradistinction to Defendant's argument, the Court finds that the Government met its burden.

At trial, the Government demonstrated that Spadoni had the requisite intent to obstruct justice as defined by Aguilar, since he was aware that his actions were likely to affect a pending judicial or grand jury proceeding. See Aguilar, 515 U.S. at 598. Special Agent Urso testified at trial that a grand jury subpoena was issued to Triumph Connecticut-II on May 22, 1999, requesting any records regarding dealings with employees of the State of Connecticut. Tr. Vol. 2 at 54. On July 13, 1999, another subpoena was issued to Triumph Capital, asking for information regarding contracts and/or agreements with Silvester, Thiesfield, Stack and others.  On September 28, 1999, after Silvester pleaded guilty, another subpoena was served on Triumph Capital requesting records and documents pertaining to dealings with Andrews, and consulting contracts executed by Triumph Capital.  On December 29, 1999, a subpoena was issued to Triumph Capital and or/any related Triumph Capital group asking for the computer systems used by Triumph Capital employees. Id. at 55-61.

16

The evidence the Government submitted at trial showed that Spadoni knew of the grand jury investigation as early as Memorial Day Weekend, 1999. Silvester testified that, on the Saturday before Memorial Day, Spadoni informed him that Triumph Capital had received a grand jury subpoena requesting marketing materials related to the placement of Connecticut money with Triumph. Tr. Vol. 5 at 177-179. Silvester testified that, when informing him of the subpoena, Spadoni said "they anticipated that there'd be additional subpoenas in the future," id., and that at some later point Spadoni said that an attorney in Boston had advised him to "get rid" of documents on his computer that the current subpoena was not asking for or that he did not need for business purposes. Id. at 179 - 181, 192, 194. Silvester also testified that Spadoni told him that the Boston attorney had recommended a computer program, "Destroy-It," that assists in the destruction of documents. Id. at 190. Spadoni also inquired as to whether Silvester possessed contracts that existed pertaining to Silvester's agreement with Andrews, and told Silvester to erase any related documents from his computer and throw away hard copies. Id. at 192, 193.

Robert Trevisani, former Vice President and Controller of Triumph Capital, testified that he discussed with Spadoni using a program called "CleanSweep" to hide documents, and in that conversation Spadoni recommended using the "Destroy-It" program.

Tr. Vol. 7 at 217.  Special Agent Jeff Rovelli of the FBI also
testified that he examined Spadoni's laptop computer which he used
at Triumph Capital, and located a program named "Destroy-It" which
had been installed on the laptop on June 21, 1999, less than a
month after the first subpoena was served.  Tr. Vol. 8 at 165-66;
Tr. Vol. 9 at 34.  Special Agent Rovelli also found that the
"Destoy-It" program had been run on several directories of
Spadoni's laptop, including the Triumph Capital file folder.
"Destroy-It" had also been run on December 28, 1999, on a file
folder named "LAT, LLC", the name of Thiesfield's company.  Rovelli
testified that data that had been on the laptop prior to May 31,
1999, including a file directory named "Silvester," were no longer
on the computer when it was obtained by subpoena in April, 2000.
Tr. Vol. 9 at 77-78.  All of the above-stated evidence is
sufficient for a reasonable jury to conclude that Spadoni knew his
actions were likely to affect the grand jury investigation and to
influence or obstruct the due administration of justice in
violation of 18 U.S.C. § 1503.  Defendant's motion with regard to
Count Twenty-four is therefore denied.

         D. RICO: Counts One and Two

    Defendant also seeks a judgment of acquittal or, in the
alternative, a new trial, with respect to his convictions on Counts
One and Two, RICO and RICO conspiracy.  In order to establish a

18

RICO violation, the Government must prove that the defendant was associated with or employed by an enterprise which affected interstate commerce, and that the defendant knowingly engaged in a pattern of racketeering activity with such enterprise. *See* 18 U.S.C. § 1962(c). Defendant asserts that the Government failed to prove an "essential pattern of racketeering activity" and an "enterprise" as required for a RICO conviction.

1. Enterprise

Defendant argues that the Government did not prove that the Triumph Defendants were part of an enterprise within the meaning of the RICO statute. 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §§ 1961(4). Defendant's RICO conviction was based, in part, on the finding that Defendants Spadoni and Triumph Capital, together with Silvester, Stack, and others, constituted an enterprise. Defendant acknowledges that an enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." In re Smithkline Beecham Clinical Lab., Lab. Test Billing Practices Litig. v. Smithkline Beecham Clinical Lab., 108 F. Supp. 2d 84, 94 (D. Conn. 1999)(quoting United States v. Turkette, 452 U.S. 576, 583 (1981). Yet he asserts that, even if an association-

19

in-fact enterprise existed between Silvester, Stack and others, the Government did not sufficiently prove Spadoni and Triumph Capital's involvement.

The Government submitted sufficient evidence that proved that Defendants Spadoni and Triumph Capital were involved with the Silvester-Stack enterprise. Indeed, the evidence showed Defendants operated with the common purpose to aid in corruption of a State official by paying Silvester's associates, Stack and Thiesfield, in return for an investment in Triumph Capital funds. *See* discussion, *supra,* Parts A-C. Contrary to Defendant's assertions, the Government has presented evidence sufficient to meet the "operation and management" test to establish liability under 18 U.S.C. §1962(c). *See* <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 174 (1993)(noting "an enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). The fact that McCarthy and Spadoni bribed Silvester in order to get him to invest in Triumph Capital, and sought to conceal such bribes, demonstrated that they exerted sufficient control over the enterprise to be considered part of the enterprise and sustain liability under RICO.

2. <u>Pattern of Racketeering</u>

Defendant claims that the Government failed to establish a continuous pattern of racketeering activity within the confines of

20

RICO.  In order to satisfy the "pattern" element of the RICO statute, the Government must prove that (1) the defendant committed at least two predicate acts of racketeering within ten years of one another; (2) that these racketeering predicates are related; and (3) that they reveal continued, or the threat of continued, racketeering activity. United States v. Diaz, 176 F.3d 52, 93 (2d Cir. 1999)(citing 18 U.S.C. § 1961(5)(1988); H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 236-39 (1989).  The Supreme Court has explained that continuity of racketeering activity, or its threat, can be proved in a variety of ways.

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.  Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.  Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.  Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.

H.J. Inc., *supra*, at 241-2 (citations omitted).

In this Circuit, "[t]o satisfy open-ended continuity, the [Government] need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." First Capital Asset Management v.

Satinwood, Inc., 385 F.3d 159, 180 (2d Cir. 2004).  "A closed-ended pattern of racketeering activity involves predicate acts extending over a substantial period of time...Notably [the Second Circuit] Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years." Id. at 181 (citations and quotation marks omitted.)  In analyzing the issue of continuity, the RICO allegations are evaluated with respect to each defendant individually.  Id. at 180; United States v. Indelicato, 865 F.2d 1370, 1384 (2d Cir. 1989)("We simply note that [a defendant's association with an organized crime group] may reveal the threat of continued racketeering activity and thereby help to establish that the defendant's own acts constitute a pattern within the meaning of RICO."); United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962 (c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise.").

The evidence revealed that Silvester and Stack had an illegal arrangement whereby Silvester would make investments of state funds with entities which agreed to pay finder's fees to Stack although he had not acted as such.  Stack, in turn, was to share those fees with Silvester after Silvester left office.  Tr. Vol. 5, at 87-88. The Government also submitted evidence that defendant Spadoni was involved in inherently unlawful acts, the charged predicate acts of bribery and obstruction of justice in connection with Silvester's

22

investment of state funds in a Triumph Capital fund.

In November, 1998, after Silvester's election defeat, Spadoni approached Silvester about a potential Triumph investment, Tr. Vol. 5 at 152, and Silvester, in turn, asked Spadoni to pay Stack and Thiesfield finders' fees for the state's investment. Id. at 158-59. Spadoni, after consultation with McCarthy, reported that they did not want to pay finders' fees but wanted to wait until Silvester was out of office and then work it out with Stack and Thiesfield. Id. at 162. As a result of that conversation, Silvester determined to increase the investment from $150 million to $200 million dollars to ensure increased payments to Stack and Thiesfield and executed the investment contract on November 12, 1998. Tr. Vol. 5 at 162-164.

Stack testified that he entered into a contract with Triumph Capital in the office of a New York law firm on November 11, 1998. Tr. Vol. 3 at 48-52. Analysis of Defendant's lap top computer showed the Stack and Thiesfield contracts were accessed on November 10, 1998. Tr. Vol. 10 (afternoon) at 67. Subsequently, Stack and Thiesfield received some payments pursuant to the purported consultant contracts under which they were to received one million dollars each over three years as Silvester had requested. Payments of $166,667 were made around January 12, 1999 to KCATS (Stack's company) and LAT, LLC (Thiesfield's company). A second installment was picked up by Thiesfield at Triumph's office in July, 1999. Tr.

<u>Vol. 7</u> at 211, 212; <u>Vol. 8</u> at 63.  There was no evidence of payment thereafter.

The Government also presented evidence that, after learning of the grand jury investigation into Silvester's activity and receipt of a subpoena by Triumph, Spadoni utilized a program called "Destroy-It!" which was installed on his lap top computer on June 21, 1999, to erase documents relevant to the investigation.  For example, back up tapes produced to the Government show that a Silvester directory which was in the computer on May 18, 1999, was no longer there on August 19, 1999.  <u>Tr. Vol. 7</u> at 61.  When the computer was received by the Government in April, 2000, the previously existing Silvester directory was no longer there.  <u>Tr. Vol. 9 </u>at 61.  Two link files, Stack contract.lnk and LAT contract.lnk, were written on November 10, 1998, but no such contracts were found on the computer.  <u>Id</u>. at 157.[6]

The evidence, however, does not support a finding of either an open-ended or a closed-ended pattern of racketeering activity.  Once Silvester left office in January, 1999, his availability for bribery in the discharge of his office ceased.  The bribery scheme, as in <u>First Capital Asset Management</u>, *supra*, was "inherently terminable" and "essentially came to its conclusion," <u>id</u>., at 180-

---

[6]Defendant's argument that obstruction of justice cannot serve as an act establishing continuity under RICO is rejected.  The Second Circuit has specifically referenced obstruction of justice as an inherently unlawful activity that can support a RICO conviction.  <u>United States v. Aulicino</u>, 44 F.3d 1102, 1111 (2d Cir. 1995).

181, at least by July, 1999, the last time payments were made under the consultant contracts. Spadoni's destruction of potentially incriminating documents pertinent to the bribery scheme prior to its seizure similarly was a finite act with no potential for repetition. An open-ended pattern of racketeering activity was not established.

Similarly, the evidence does not meet the standard for a closed-ended pattern of racketeering activity, i.e., past criminal activity extending over a substantial period of time. The earliest date that Spadoni related Triumph's willingness to work something out with Stack and Thiesfield was some date between November 3 and November 12, 1998, and his obstructive acts with respect to the computer could not continue beyond the date when the computer was delivered to the Government in April, 2000, at the most a seventeen-month period, some five months short of the two-year period referenced in First Capital Asset Management, *supra*, at 181.

## CONCLUSION

Having reviewed the trial transcript and the evidence presented, the Court finds that there was sufficient evidence at trial viewed in the light most favorable to the Government to support a verdict of guilty on Counts 19 through 24 of the Indictment as the jury so found. Thus, Defendant Spadoni's Motion for a Judgment of Acquittal [Doc. No. 681] on those counts is

25

denied.  The Motion is granted as to Counts 1 and 2.    Further, because Defendant Spadoni has failed to prove that the jury reached an erroneous result, or show any miscarriage of justice in his trial, this court declines to exercise its discretion under Federal Rules of Criminal Procedure 33 to grant a new trial on Counts 19 through 24.

Accordingly, Defendant's Motion For a New Trial [Doc. No. 716] is also DENIED.[7]

SO ORDERED.

_____

ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this ____ day of September, 2005.

---

[7]Defendant has also moved for a new trial alleging violation of Brady v. Maryland, 373 U.S. 53 (1963) and Giglio v. United States, 405 U.S. 150 (1972). These claims will be addressed in a separate ruling.