UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| Plaintiff : | |
| : | |
| v. : | NO. 3:00CR217(EBB) |
| : | |
| CHARLES SPADONI, : | |
| Defendant. : | |

RULING ON DEFENDANT'S MOTION FOR NEW TRIAL
BASED UPON ALLEGED VIOLATIONS OF
BRADY v. MARYLAND and GIGLIO v. UNITED STATES

**Introduction**

Pursuant to Fed. R. Crim. P. 29(a) Defendant Charles Spadoni ("Spadoni") moved for judgment of acquittal on all counts of the Superseding Indictment ("Indictment") at the close of evidence at trial. [Doc. No. 681]. The Government filed a response and the Court heard oral argument on the motion. [Doc. No. 684; Tr. Vol. 14]. After the hearing on the Motion, the Court reserved decision and submitted the case to the jury. Following the jury's verdict, Defendant Spadoni filed a Motion for New Trial [Doc. No. 716] pursuant to Fed. R. Crim. P. 33.[1] Subsequent to the Motion for New Trial, Spadoni and his counsel filed numerous replies and supplemental declarations in support of Defendant's Motion for New Trial, each alleging violations of Brady v. Maryland, 373 U.S. 53 (1963) and Giglio v. United States, 405 U.S. 150 (1972). [Doc. Nos.

---

[1] Defendants Spadoni and Triumph Capital filed separate Rule 29 Motions, but they adopted each other's memoranda of law in support of their respective motions, and incorporated all arguments made in their Rule 29 Motions in their joint motion for a new trial pursuant to Fed. R. Crim. P. 33. This ruling only addresses Defendant Spadoni.

865, 879, 880, 881, 886, 933 and 942]. The Court held oral argument on September 20, 2004 and October 14, 2005 to address Defendant's various Brady/Giglio allegations, and reserved judgment. This Court granted Defendant a judgment of acquittal as to Counts 1 and 2, denied a judgment of acquittal as to the remaining counts, and denied Defendant's Motion for New Trial, reserving decision on the Brady/Giglio claims. [Doc. Nos. 943 and 944]. For the reasons stated below, Defendant's Motion for New Trial [Doc. No. 716] with respect to alleged violations under Brady and Giglio are DENIED without an evidentiary hearing.

**Background**

Defendant Spadoni and his counsel filed numerous supplemental declarations and replies in support of a new trial on the grounds that the Government suppressed evidence containing exculpatory and impeachment information within the scope of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).

In his first series of supplemental filings [Doc. Nos. 865, 879, 880, 881 and 886], Defendant asserts that he was informed by Paul Silvester's ("Silvester") attorney, Hope Seeley, that she had engaged in specific negotiations with the Government with regard to the loss amount for which Silvester was to be held responsible. Defendant asserts, in essence, that the Government suppressed two key facts: that Silvester had an undisclosed agreement with the Government that his conduct related to Triumph Capital, namely the

2

consultant contracts providing Christopher Stack ("Stack") and Lisa Thiesfield ("Thiesfield") with compensation equal to a one percent finder's fee for Silvester's Triumph Capital investments, would not be used in calculating his offense level; and that Silvester never pleaded to bribery with regard to the Triumph Capital deals. Defendant argues that he could have used the existence of this alleged "deal" with the Government 1) to impeach Silvester at trial and 2) to argue that Silvester never admitted he was bribed with regard to Triumph Capital's consultancy contracts with Stack and Thiesfield, and therefore, that the Government misled the jury during summation by implying that Silvester had admitted as part of his plea agreement that the Stack and Thiesfield contracts were bribes.

In his second series of supplemental filings [Doc. Nos. 933 and 942], Defendant asserts that he has conclusive evidence that the Government failed to produce material exculpatory evidence under <u>Brady</u> and <u>Giglio</u>. Defendant's attorney alleges that Silvester advised him that, prior to the Indictment in this case, Silvester made notes in preparation for a proffer session with the United States and gave those notes to his attorney, Hubert Santos, who then met with the Government and relayed the substance of Silvester's notes. Silvester advised Defendant that he also met with the Government and relayed the information in his notes. Silvester's notes, Defendant argues, unequivocally exonerate

Defendant from any wrongdoing.  Defendant asserts that the newly revealed notes of FBI Agent Urso,[2] taken at the proffer session between the Government and Silvester's attorney, are in and of themselves Brady/Giglio material as they track exactly the presentation of exculpatory information in the notes Silvester prepared for his attorney for that proffer session, and were never produced to the Defendant.  Thus, Defendant argues, Silvester's notes and Urso's notes are conclusive proof that 1) Defendant rejected Silvester's request that Triumph pay Stack and Thiesfield in connection with Silvester's investment in Triumph and 2) Silvester expressly told the Government that he had not been bribed by Spadoni before the Indictment in this case, which explains why the Triumph deal was not charged as a bribe.

**Standard of Review**

The Government's duty of disclosure in a criminal prosecution is well established.  Under the Brady doctrine, the Government violates due process under the 14th Amendment of the Constitution if it suppresses evidence favorable to the accused when such evidence is material either to guilt or to punishment. United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) (citing Brady, 373 U.S. at 87).  Evidence favorable to the accused "includes not only evidence that tends to exculpate the accused, but also evidence

---

[2] The Government provided an excerpt from Special Agent Urso's notes as Attachment A to its Response to Declaration of Russell M. Gioiella, Esq. [Doc. No. 938].  Agent Urso's notes were taken during the proffer session between Attorney Santos and the Government.

that is useful to impeach the credibility of a government witness." In re United States (United States v. Coppa), 267 F.3d 132, 139 (2d Cir. 2001) (citing Giglio, 405 U.S. at 154).  To establish a Brady violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-282 (1999).

Materiality is established "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)), cert. denied, 126 S.Ct. 1080 (2006).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id.  The suppressed evidence is examined in light of the entire record. United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004) (citing United States v. Agurs, 427 U.S. 97, 112 (1976)).

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (citing Kyles v.

Whitley, 514 U.S. 419, 437 (1995) (internal quotation marks omitted)). However, the Government has no disclosure obligation "where the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [any exculpatory] evidence." United States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003) (internal citations and quotations omitted), cert. denied, 541 U.S. 956 (2004). Moreover, a "defendant must still prove that the Government, in fact, suppressed the evidence in question and that this evidence was material." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983). See also United States v. Brunshtein, 344 F.3d 91, 101 (2d Cir. 2003) (noting that "[a]n appellant seeking a new trial on the basis of an alleged Brady violation bears the burden of demonstrating both that the Government suppressed exculpatory information and that this information was material.")(citations omitted).

**Discussion**

Defendant's attorney alleges that Hope Seeley, Silvester's attorney, informed him that she engaged in specific negotiations with the Government regarding the calculation of the loss amount for Sentencing Guidelines purposes, and Defendant's attorney surmises therefore that the agreed upon loss amount did not include the Triumph transaction because the Government determined the transaction was not a bribe. See Declaration in Support of Motion

6

for New Trial at 5 [Doc. No. 865]. Defendant has not supported this Brady allegation with any new evidence in the record. Indeed, the only new evidence presented to the Court is the affidavit of Ms. Seeley, submitted by the *Government*, which states that "there were not 'specific negotiations' and the parties never agreed that only certain transactions would be included in calculating the loss amount for Guidelines purposes." United States' Response to Defendant Spadoni's Motion for New Trial ("U.S. Response"), Letter of Hope C. Seeley at 2 [Doc. No. 870, Att. A]. Defendant acknowledges that he was provided with Silvester's written plea agreement prior to trial. Declaration in Support of Motion for a New Trial at 4 [Doc. No. 865]. The Government disclosed the Proffer Agreement, the Plea Agreement, the Information, the grand jury testimony and interviews of Silvester and Stack. See U.S. Response [Doc. No. 870, Att. B, C, D and F] and United States' Sur-Reply to Defendant Spadoni's Motion for New Trial at 4 [Doc. No. 883]. While the Plea Agreement given to Defendant may not have contained a detailed breakdown of the guidelines calculations, Defendant could have pursued a line of questioning regarding the calculations during the cross-examination of Silvester. Whether or not Silvester himself understood the calculations, defense counsel could have asked Silvester to recount the number of illegal payments in which he was involved, which would have likely given a total over $2.25 million. Defense counsel could have then raised

7

the question in front of the jury as to why the guidelines range in the Plea Agreement did not match what would have been expected for a larger figure. Furthermore, Defendant's own Declaration to the Court [Doc. No. 880] states that he knew that Silvester's attorney, Hubert Santos, was to have met with the Government to make a proffer and discuss "dollar amounts," and that "the Government was claiming the amount was $5.2 million and that Mr. Santos would attempt to negotiate a reduced amount to reduce Silvester's sentence." [Id. at 1-2]. Defendant could have asked Silvester on cross examination what came out of Santos's meeting with the Government and what became of the $5.2 million figure.

The fact that Defendant had the Plea Agreement, Proffer Agreement, and Information in his possession convinces the Court that the Government satisfied its obligations under Brady and Giglio. See LeRoy, 687 F.2d at 619 ("The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.")(citations omitted). Because Defendant's decision not to inquire further into Silvester's Plea Agreement, and not to attempt to impeach Silvester based on the information he possessed was an informed one, not tainted by any suppression of government evidence, Defendant's Brady/Giglio claim regarding an alleged

"deal" lacks merit.

Similarly, the Court rejects Defendant's accusations of government misconduct with respect to Silvester's guilty plea and the application of the federal sentencing guidelines.  This Court is satisfied with the Government's explanation that the reason Silvester pleaded guilty only to having deprived the state of his honest services, rather than bribery, for the Stack and Thiesfield contracts, is due to the fact that the Government did not have evidence at the time of the Plea Agreement to confirm whether or not these were, in fact, criminal bribes.  Silvester's Plea Agreement on August 27, 1999 was based on "evidence currently available" to the Government. U.S. Response, Proffer Agreement at 2 [Doc. 870, Att. B].  It was not until after the Plea Agreement was finalized that Silvester, Stack and other cooperating witnesses provided the Government with detailed information regarding the timing of events related to the Triumph Capital deal, which revealed that the Stack and Thiesfield contracts did in fact constitute bribes under the relevant statutes.  The Defendant alleges that, because the Government claims it was unaware the Triumph deal involved bribery, "it follows closely that Mr. Santos must have denied that the Triumph investment involved a bribe ... and . . . [t]his denial . . . was crucial <u>Brady</u> information." <u>Sur Sur-Reply of Charles B. Spadoni in Further Support of His Motion for a New Trial</u> at 2. [Doc. No. 886].  This conclusion does not

9

follow closely, and indeed, Defendant has put forth no evidence in the record upon which such a conclusion could even be inferred.

Rather than presenting sworn evidence, Defendant's counsel has filed a declaration in support of the motion for new trial, which declaration includes a side-by-side comparison of the Silvester and Urso notes and, appended to that declaration, a proposed affidavit for Paul Silvester which, counsel represents, was edited and approved for use by Silvester.[3] The proposed affidavit represents that Silvester would testify in a <u>Brady</u> hearing, if subpoenaed, as follows: he provided handwritten notes to his attorneys reflecting nine (9) deals, including the Triumph deal; the notes were given to his counsel to use in a proffer session to arrange a cooperation and/or plea agreement with the Government in the summer of 1999; Santos advised him that during the proffer "he had conveyed to the Government the information [Silvester] provided" on each deal; and that, with regard to Triumph, "[Silvester] told the Government the same information that was included in my handwritten notes and which my attorney had advised them of previously." <u>See</u> <u>Declaration of Russell M. Gioiella, Esq.</u> Exh. A [Doc. No. 933]. Defendant asserts that a comparison between Silvester's handwritten notes, prepared for that proffer session, and the notes taken by FBI Special Agent Urso of Santos's presentation at that session "prove

---

[3]Defendant maintains that Silvester has edited and affirmed the content of the proposed affidavit, but would not execute the affidavit lest it adversely impact his own case. <u>See</u> <u>Declaration of Russell M. Gioiella, Esq.</u> [Doc. No. 933 at 2-3].

10

that the Government heard from Mr. Santos, prior to any cooperation or plea agreement, the exculpatory information which was never provided to us, but which caused the Government to allow Mr. Silvester <u>not</u> to plead to bribery and to obtain a two-level guideline reduction as a result of <u>not</u> pleading to bribery on the Triumph deal." <u>Declaration of Russell M. Gioiella, Esq.</u> [Doc. No. 942 at 6]. Defendant asserts that Urso's notes "track Santos' transcription[4] of Silvester's notes both in content and order, clearly showing that the notes were read, virtually, if not totally, verbatim to the Government," and prove the Government knew Silvester denied that Triumph bribed him. <u>Id.</u>

The "exculpatory information" to which defense counsel refers is presumably the following language in Silvester's notes:

> "I told Charlie to pay a finder to Stack and Thiesfield . . . . He said he would take it up with Fred [McCarthy]. He came back and said they would not pay any finder or offer employment to anyone connected to me in exchange for the deal. Charlie said it would be quid pro quo and he could not advise his boss to agree to it. Charlie said that Fred was sympathetic to the situation of certain staffers and they would be as helpful as possible after I left office but that it would have to be arms length and make sense for Triumph. I said fine."

<u>Id.</u>, Exh. A.

Urso's notes from the Santos proffer session state the following related to Triumph:

---

[4]Santos had Silvester's handwritten notes transcribed into typewritten form to use during the proffer. <u>See</u> <u>Declaration of Russell M. Gioiella, Esq.</u> at 1-2 [Doc. No. 933].

11

>     Triumph CT. CBO- Nov. 98- 200,000.00-PS told CS -told
>     pay Stack + Lisa T. -fees- CS would not pay finder-
>     Employee- MM-EW CS told could pay related to a deal.
>     McCarthy sympathetick [sic] to staff- arms length needed
>     to make sense- wk after deal  McCarthy favorably to hire
>     Stack/LT as consultants-hired before-CS made apt for EW-
>     MM had revolving door problem-

United States' Response to Declaration of Russell M. Gioiella, Esq. ("U.S. Second Response") at 16, Att. A.

In order to establish a Brady violation, Defendant has the burden of showing that material evidence was suppressed by the Government.  "In the context of the Brady requirement, any allegation of suppression boils down to an assessment of what the [Government] knows at trial in comparison to the knowledge held by the defense." United States v. Ruggiero, 472 F.2d 599, 604 (2d Cir. 1973), cert. denied, 412 U.S. 939 (1973).  Defendant has not shown that the Government ever had Silvester's notes or that the Government ever heard verbatim what was in those notes. Therefore, the notes could not have been suppressed by the Government. Defendant's attorney's declaration in which he states that Silvester told him he told the Government the same information that was in his notes is not sworn evidence. See Declaration of Russell M. Gioiella, Esq. at 2 [Doc. No. 933]. Agent Urso's proffer notes reflect what Santos said on behalf of Silvester, but there is no evidence in the record that Santos's statements reflected anything more than Santos paraphrasing Silvester's notes.[5]  Defendant asserts that the exculpatory nature of the Urso proffer notes is

---

[5] There is, for example, no affidavit from Silvester's attorneys attesting to what exactly they told the Government at the proffer session.

obvious: "CS would not pay finder . . . arms length needed to make sense," and that whether the actual phrase "quid pro quo" was used is immaterial because Defendant clearly stated his refusal to pay a bribe. The Government represented at oral argument that they did not have the Urso proffer notes prior to trial. A prosecutor has a duty to "learn of any favorable evidence known to others acting on the government's behalf in the case." Avellino, 136 F.3d at 255. However, a Brady claim is examined in light of all the evidence in the record. The Government argues, and this Court agrees, that the Urso notes are not materially different from the extensive discovery turned over by the Government prior to trial nor from Silvester's testimony at trial, and therefore there is no reasonable probability that, had the evidence been disclosed to Defendant, the outcome of the trial would have been different.

In every iteration of the events, including that detailed in Silvester's 302s and his grand jury testimony, Spadoni's initial response was to decline Silvester's request to pay finder's fees to Stack and Thiesfield. Even if the Court assumes Silvester told the government everything in his notes, in those very words, or that Santos read the notes verbatim during the proffer session, the Court does not consider such evidence material. Had Silvester told the Government, among other things, that "Charlie said it would be quid pro quo and he could not advise his boss to agree to it," the evidence at trial established that, notwithstanding an initial

13

refusal on Spadoni's part, he assured Silvester that they would work out the specifics of how Triumph could help Stack and Thiesfield after Silvester was out of office. Such specifics were worked out only a few days later, in November of 1998, prior to Silvester making the investment. Spadoni along with McCarthy, Stack and others met in New York on November 11, 1998, and executed Stack's consultant contract, providing him with payment equal to the one point finder's fee which Silvester had requested and Spadoni had refused. Spadoni's actions were clearly intended to either influence or reward Silvester for his investment in Triumph, and Silvester testified that he increased the investment in Triumph based on his tacit agreement with Spadoni. See Ruling on Defendant Spadoni's Motion for Judgment of Acquittal and for a New Trial at 10 - 13. [Doc. No. 943]. Thus, Silvester's testimony at a Brady hearing would be unavailing. United States v. Helmsley, 985 F.2d 1202, 1209-10 (2d Cir. 1993).

Furthermore, there was ample language in the documents disclosed to the Defendant that Silvester had admitted that the Stack and Thiesfield contracts were, in fact, bribes, allowing the Government to argue properly at trial that Silvester had accepted responsibility for these acts. For example, Silvester specifically admitted in his two-count Information that he had solicited, demanded, accepted and agreed to accept lucrative consulting contracts for Stack and Thiesfield with the intent to be influenced

14

and rewarded. U.S. Response, Information of Paul Silvester at 13-15 [Doc. No. 870, Att. D]. In an FBI Form 302 memorializing Silvester's interviews with the Government, Silvester stated that Spadoni told him Triumph couldn't pay Stack and Thiesfield as finders while Silvester was in office, due to legal reasons, but that they would be glad to sit with them once he was out of office. See e.g. Form 302 dated 7/12/2000, U.S. Second Response, Att. B at 14. Interview notes from Agents McTague and Urso disclosed by the Government also note that Silvester stated that Defendant told him a finder's fee wouldn't work for legal reasons, but that they would work something out. Silvester told the agents he increased his investment commitment because of the understanding about the deal regarding Stack and Thiesfield. See e.g. Interview notes of Agent Urso, U.S. Second Response, Att. C at 5-6 and Interview notes of Agent McTague, Id., Att. D at 7-8.

Additionally, Silvester met with the Government on five separate occasions to review both his grand jury testimony and the information in the Forms 302 and correct or augment his statements therein. His corrections and additions were memorialized in an additional Form 302, also disclosed to the defense before trial. He made no corrections to the sections pertaining to his post-election meetings with Spadoni. See Form 302 dated 4/20/2001, U.S. Second Response, Att. F at 17. Thus, Spadoni's Brady/Giglio claim is manifestly refuted by the record, and Defendant has failed to

15

provide this Court with concrete evidence justifying allegations of prosecutorial misconduct.

**Conclusion**

Defendant has failed to meet his burden and support his allegations of Brady and Giglio violations with evidence in the record. LeRoy, 687 F.2d at 618. No evidentiary hearing is required on a motion for a new trial "if the moving papers themselves disclose[] the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing." United States v. Helmsley, 985 F.2d 1202, 1209-10 (2d Cir. 1993). See also United States v. Colon-Munoz, 318 F.3d 348, 358-59 (holding that Defendant failed to make the prima facie showing necessary for an evidentiary hearing). Defendant's Brady/Giglio claim is therefore DENIED without an evidentiary hearing, and the Motion for New Trial [Doc. No. 716] based upon alleged violations of Brady v. Maryland and Giglio v. United States is DENIED.

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this ____ day of September, 2006.