

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*
*157 Church Street*                              *(203) 821-3700*
*P.O. Box 1824*                              *Fax (203) 773-5376*
*New Haven, Connecticut  06510*          *www.usdoj.gov/usao/ct*

July 29, 2004

**RECEIVED**

Hon. Ellen Bree Burns                                    **JUL 3 0 2004**
Senior United States District Judge
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510

Re: **United States v. Charles B. Spadoni, 3:00-CR-217 (EBB)**

Dear Judge Burns:

I write to alert the Court of United States v. Lenoci, 03-1481 (2d Cir. July 28, 2004), issued today by the United States Court of Appeals for the Second Circuit. A copy of the opinion, which discusses the opacity of the grouping rules of U.S.S.G. § 3D1.2(d), and which forwards a copy to the Sentencing Commission for its consideration, is attached for the Court's reference.

This case relates to the defendant's motion for a new trial based on alleged Brady/Giglio violations. More specifically, Lenoci relates to the defendant's argument at page 16 of his Reply [doc. #879] that it was "crystal clear" that the various bribes and mail/wire frauds to which Paul Silvester pleaded guilty should have been aggregated under § 3D1.2(d), and that the Government's failure to apply the Guidelines in the manner favored by the defendant gives rise to an inference that the Government must have been purposely manipulating Silvester's Guidelines stipulation. Lenoci also relates to the Government's argument at pages 4-5 of its Sur-Reply [doc. #883] that the bare fact of a defendant's disagreement with the Government's guidelines calculations, "without more, cannot give rise to an inference that the Government agreed to confer an unlawful benefit upon the cooperating witness."

Lenoci involved a cooperating witness who pleaded guilty to a two-count information charging him with bribery in violation of 18 U.S.C. § 666 (Count One) and mail fraud/theft of honest services in violation of 18 U.S.C. §§ 1341 and 1346 (Count Two). Each count involved a bribe of a different official–one the Mayor of Bridgeport, and the other a state development official. The principal issue on appeal was whether or not the offense conduct should be grouped, and if so, how. The Court ultimately did not decide the issue, finding that any error would have been harmless. That is, the defendant's total offense level would have been the same regardless of whether it adopted the defendant's position (that grouping would have been appropriate under § 3D1.2(d)) or the government's position (that no grouping was appropriate, given that different officials were bribed).

Of greatest relevance to the present case is the Court's description of the "ambiguities of § 3D1.2(d) that would have made resolution of the defendant's claim difficult." *Lenoci*, slip op. at 2. The Court observed, for example, that the "seemingly mandatory language" of § 3D1.2(d) which lists various guidelines "to be grouped," *id.* at 10, in fact leaves much open to interpretation. The Court identified three possible interpretations as to what must be grouped under § 3D1.2(d), finding that the first possibility was "likely" precluded by circuit precedent, *id.* at 11; that the second approach "makes intuitive sense" but has "little support in this Circuit," *id.* at 15; and that the third approach "has not met with universal agreement," *id.* at 15-16, and stands in tension with some circuit precedent, *id.* at 17. And even then, the Court acknowledged that these three possible interpretations "were not exhaustive." *Id.* at 16.

Of course, Lenoci and the present case involve different facts, which lead to different application of the grouping rules. For example, in Lenoci, the Government took the position that the defendant's bribery of two different officials in unrelated contexts did not warrant grouping because the harms were too distinct. In the present case, by contrast, each of Silvester's corrupt transactions involved the same victim–the state pension fund–and thus grouping is warranted. The Government has explained why the proffer and plea agreements correctly applied § 3D1.2(b) to effectuate this grouping, in light of the Government's then-lack of evidence as to whether the transactions charged as frauds constituted bribes as opposed to gratuities. Despite these factual differences, the Court's opinion in Lenoci clearly defeats any party's effort to magnify a simple disagreement over the proper application of § 3D1.2 into a claim of purposeful manipulation of the Guidelines.

Very truly yours,

JOHN H. DURHAM
ACTING UNITED STATES ATTORNEY

William J. Nardini
Assistant United States Attorney

Encl.

cc.    Russell Gioiella, Esq.
       Richard Brown, Esq.

1                 UNITED STATES COURT OF APPEALS

2                    FOR THE SECOND CIRCUIT

3                       _____

4                      August Term, 2003

5   (Argued: April 2, 2004                             Decided: July 28, 2004)

6                      Docket No. 03-1481

7                       _____

8                   UNITED STATES OF AMERICA,

9                                      *Appellee,*

10                       —v.—

11                      ALFRED LENOCI, SR.,

12                              *Defendant-Appellant.*

13                       _____

14   B e f o r e :

15      JACOBS, STRAUB, and B.D. PARKER, *Circuit Judges.*

16                     _____

17      Appeal from an order of the United States District Court for the District of Connecticut

18   (Janet Bond Arterton, *Judge*) convicting the defendant, after a guilty plea, of one count of bribery

19   in violation of 18 U.S.C. § 666(a)(2) and one count of executing a scheme to deprive another of

20   the intangible right of honest services in violation of 18 U.S.C. §§ 1341 and 1346.  On appeal,

21   the defendant contends that the District Court erred by failing to group his two counts of

1

1    conviction under § 3D1.2(c) or § 3D1.2(d) of the United States Sentencing Guidelines.  We find

2    meritless the defendant's claim that his counts should have been grouped under § 3D1.2(c).  As

3    for the defendant's claim that the District Court erroneously failed to group his convictions under

4    § 3D1.2(d), we decide the issue on the ground of harmless error.  We write, however, to describe

5    some of the ambiguities of § 3D1.2(d) that would have made resolution of the defendant's claim

6    difficult had his challenge demonstrated harmful error.  We also direct the Clerk of the Court to

7    forward a certified copy of this opinion to the Chairperson and Chief Counsel of the United

8    States Sentencing Commission.

9        Affirmed.

10    _____

11    IRA B. GRUDBERG, Jacobs, Grudberg, Belt & Dow, PC, New Haven, Connecticut
12    (Trisha Morris Porto, of counsel), *for Defendant-Appellant.*
13
14    RONALD S. APTER, Assistant United States Attorney for the District of
15    Connecticut, Hartford, Connecticut (Jeffrey A. Meyer, Assistant United States
16    Attorney, of counsel; Kevin J. O'Connor, United States Attorney for the District
17    of Connecticut, on the brief), *for Appellee.*
18
19    _____

20    STRAUB, *Circuit Judge:*

21        Defendant-Appellant Alfred Lenoci, Sr., ("Lenoci") appeals from an order of the United

22    States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) convicting the

23    defendant, after a guilty plea, of one count of bribery in violation of 18 U.S.C. § 666(a)(2)  and

24    one count of executing a scheme to deprive another of the intangible right of honest services in

25    violation of 18 U.S.C. §§ 1341 and 1346.  On appeal, Lenoci contends that the District Court

2

1    erred by failing to group his two counts of conviction under § 3D1.2(c) or § 3D1.2(d) of the

2    United States Sentencing Guidelines Manual ("U.S.S.G."). We find meritless the defendant's

3    claim that his counts should have been grouped under § 3D1.2(c). As for his claim that the

4    District Court erroneously failed to group his convictions under § 3D1.2(d), we decide the issue

5    on the ground of harmless error. We write, however, to describe some of the ambiguities of §

6    3D1.2(d) that would have made resolution of the defendant's claim difficult had his challenge

7    demonstrated harmful error. We also direct the Clerk of the Court to forward a certified copy of

8    this opinion to the Chairperson and Chief Counsel of the United States Sentencing Commission.[1]

9                                  **BACKGROUND**

10          The facts of this case are largely derived from the defendant's presentence report.

11   According to his presentence report, Lenoci, along with his son and brother, sought to become

12   the preferred real estate developer for certain tracts of land in Bridgeport, Connecticut. One of

13   these was a seventeen-acre parcel of land at the former site of the Father Panik Village low-

14   income housing project. To further his development plans at the site, Lenoci sought the support

15   and approval of Bridgeport's then-mayor, Joseph Ganim. Lenoci agreed to pay for a variety of

16   construction projects for the mayor's personal residence. In exchange, Ganim used his official

---

[1]Oral argument was heard in this case on April 2, 2004, nearly three months before the Supreme Court decided *Blakely v. Washington*, ___ U.S. ___, 2004 WL 1402697 (June 24, 2004). While we bring the grouping issues raised in this case to the attention of the United States Sentencing Commission, we recognize that in light of *Blakely*, the Commission may be presented with more pressing matters to which it must attend. In this case, the parties have not raised any *Blakely* issues, nor do we believe that any such issues are immediately apparent. However, out of an abundance of caution, we stay the issuance of the mandate in this case until further direction from the panel. *See, e.g., United States v. Penaranda*, Nos. 03-1055(L), 03-1062(L), 2004 WL 1551369 (2d Cir. July 12, 2004) (in banc).

1    position to advance Lenoci's efforts to develop the land; in particular, Ganim wrote a letter in

2    August 1999 to the Bridgeport Housing Authority to support Lenoci's request to enter into a long

3    term lease for the site.

4        Similarly, in late 1999, Lenoci sought to develop a fifty-acre parcel of land on the

5    Bridgeport waterfront known as Steel Point.  To secure the rights for development, Lenoci agreed

6    to pay the mayor's intermediary $1 for every square foot of commercial space in Bridgeport

7    developed in the future by Lenoci's company, including any development at the Steel Point site.

8    At a later meeting, Lenoci also agreed to raise funds for the mayor's anticipated campaign for

9    governor, in return for Ganim's support for the venture at Steel Point.

10        With respect to the Father Panik Village site, Lenoci also sought state development funds

11    to subsidize the proposed facility.  From June 1999 to October 2000, Lenoci provided Mark

12    Trinkley, a senior development manager at the State of Connecticut's Department of Economic

13    and Community Development, with approximately $35,000 worth of landscaping services, home

14    improvements, and other personal benefits.  These expenditures were made in exchange for

15    Trinkley's recommendation that $6.5 million in state development funds be directed to Lenoci's

16    company.

17        On October 19, 2001, Lenoci waived his right to a grand jury indictment and pled guilty

18    to a two-count information arising from his attempts to illegally advance real estate development

19    ventures in Bridgeport.  In Count One, the defendant was charged under 18 U.S.C. § 666 with

20    bribing Joseph Ganim.  In Count Two, Lenoci was charged under 18 U.S.C. §§ 1341 and 1346

21    with using the United States mails to execute a scheme to deprive the public of the honest

4

1    services of Mark Trinkley.

2         Pursuant to a written plea agreement, Lenoci and the government made several

3    stipulations concerning their view as to how Lenoci's sentence should be calculated under the

4    November 2000 sentencing guidelines. The parties agreed that the offense level for Count One

5    should be determined under U.S.S.G. § 2C1.1, entitled "Offering, Giving, Soliciting, or

6    Receiving a Bribe; Extortion under Color of Official Right." Under that guideline, the parties

7    agreed to a base offense level of 10 under § 2C1.1(a), plus an eight-level enhancement under §

8    2C1.1(b)(2)(B) because "the offense involved a payment for the purpose of influencing an

9    elected official or any official holding a high-level decision-making or sensitive position." Thus,

10   the parties calculated an offense level of 18 under Count One.

11        Similarly, the parties agreed that the offense level for Count Two should be determined

12   under U.S.S.G. § 2C1.7, which applies to "Fraud Involving Deprivation of the Intangible Right

13   to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with

14   Governmental Functions." Under that guideline, the parties agreed to a base offense level of 10

15   under § 2C1.7(a), plus a four-level enhancement under § 2C1.7(b)(1)(A) based upon the parties'

16   stipulation that the fraud concerning Mark Trinkley was valued at $35,000. *See also* U.S.S.G. §

17   2F1.1(b)(1)(E) (2000). Thus, the parties calculated an offense level of 14 under Count Two.

18        Importantly, however, the plea agreement did not stipulate whether Counts One and Two

19   should be "grouped." The complex grouping provisions in the guidelines describe the

20   calculation of a defendant's offense level in cases, like Lenoci's, which involve multiple counts

21   of conviction. *See* U.S.S.G. §§ 3D1.1 to 3D1.5. The defendant argued that his two counts

5

1    involved substantially the same harm and, therefore, should have been grouped under § 3D1.2(c)

2    or § 3D1.2(d).  The defendant contends that such a grouping would have led to a combined

3    offense level of 18.  With a three-level reduction for acceptance of responsibility, his adjusted

4    offense level would have been 15.

5         By contrast, the government argued that Lenoci's counts involved distinct transactions

6    and victims, such that grouping was inappropriate.  Under the government's analysis, if the

7    offenses were not grouped, Lenoci would have a combined offense level of 20, which, subject to

8    the three-level reduction for acceptance of responsibility, would have resulted in an adjusted

9    offense level of 17.  The day before sentencing, the defendant was made aware of an alternative

10   argument proposed by the government.  The government stated that even if the counts were

11   grouped as Lenoci argues they should be, the court should then apply a two-level upward

12   adjustment under § 2C1.1(b)(1), which states that "[i]f the offense involved more than one bribe

13   or extortion, increase by 2 levels."  With such an adjustment, the government argued, Lenoci's

14   adjusted offense level still would have been 17.  Thus, under the government's view, Lenoci's

15   offense level would have been the same regardless of the court's resolution of the § 3D1.2(d)

16   grouping issue, so that any error made by the District Court was harmless.

17        The Probation Office took the view that the offenses should be grouped under § 3D1.2(d)

18   but concurred with the government's alternative calculation, finding that the two-level upward

19   adjustment is appropriate.  The defendant took issue with both the Probation Office's

20   recommendation and the government's alternative calculation, claiming that the two-level

21   upward adjustment was not consistent with the parties' plea agreement.

6

1          At Lenoci's July 22, 2003 sentencing hearing, the District Court declined to group the

2    two counts. The court determined that the two counts did not involve the same aggregate harm:

3         Count One is driven by the fact of payment to influence an elected official [while]
4         Count Two is driven by the value of the benefits or loss, [such] that you don't have
5         the kind of aggregate value that is a predicate for this concept of grouping. . . . [A]t
6         the bottom line it is an endeavor to buy the influence of public officials, one is
7         elected, one is not elected, they're two different programs, and the difference of
8         officials, schemes, the official[s'] status, seems to me to fall outside what is
9         contemplated to be achieved by the grouping.
10
11   Thus, starting with the combined offense level of 20, the court applied a three-level reduction for

12   acceptance of responsibility, producing an adjusted offense level of 17. Having decided not to

13   group the counts, the court did not reach the government's alternative argument that a two-level

14   upward adjustment under § 2C1.1(b)(1) would have applied in any event.

15          The District Court then granted the government's motion for a downward departure under

16   § 5K1.1 based upon Lenoci's cooperation with the government in a large-scale investigation into

17   public corruption in Bridgeport. Had the court not applied the downward departure, Lenoci

18   would have been given a sentence in the range of 24-30 months of incarceration based on his

19   adjusted offense level of 17. However, because of the downward departure, Lenoci's sentence

20   was not rigidly dictated by the court's calculation of Lenoci's adjusted offense level. Rather,

21   having considered Lenoci's adjusted offense level in conjunction with the government's § 5K1.1

22   motion, the court exercised its discretion to principally sentence Lenoci to a term of

23   imprisonment of 12 months and 1 day on each count, to be served concurrently.[2] Lenoci filed a

---

[2]Because the court imposed a sentence that is not dictated by the sentencing guidelines, it is possible that the court would have imposed the same ultimate sentence, regardless of whether the court computed an adjusted offense level of 17 (as the government contends) or 15 (as Lenoci

1    timely notice of appeal on August 5, 2003.  On August 26, 2003, the District Court granted

2    Lenoci's request for continuation of release on bond pending the outcome of this appeal.

3    **DISCUSSION**

4        When examining district court determinations as to the sentencing guidelines, we review

5    factual findings for clear error and legal interpretations *de novo*.  *See United States v. Gordon*,

6    291 F.3d 181, 186 (2d Cir. 2002), *cert. denied*, 537 U.S. 1114 (2003); *United States v. Carboni*,

7    204 F.3d 39, 46 (2d Cir. 2000).  When applying the guidelines to the facts of this case, we give

8    "due deference" to the district court.  18 U.S.C. § 3742(e).

9        The key grouping provision for our purposes is subsection (d) of U.S.S.G. § 3D1.2,

10    entitled "Groups of Closely Related Counts."  It provides as follows:

11        § 3D1.2. Groups of Closely Related Counts
12
13        All counts involving substantially the same harm shall be grouped together into a
14        single Group. Counts involve substantially the same harm within the meaning of
15        this rule:
16
17        . . . .
18
19        (d)    When the offense level is determined largely on the basis of the total
20               amount of harm or loss, the quantity of a substance involved, or some
21               other measure of aggregate harm, or if the offense behavior is ongoing or
22               continuous in nature and the offense guideline is written to cover such
23               behavior.
24

---

contends).  When asked whether or not the court would have imposed the same ultimate
sentence, however, the court stated that it would be "inappropriate at this juncture to conclude
that a reimposed sentence would definitively remain unchanged."  Thus, we cannot and do not
avoid addressing Lenoci's appeal because of the court's downward departure.  *Cf. United States
v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) ("[G]uideline disputes that would not have affected
the ultimate sentence need not be adjudicated on appeal."), *cert. denied*, 124 S. Ct. 1039 (2004).

Offenses covered by the following guidelines are to be grouped under this
subsection:

§§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
§§2C1.1, 2C1.2, 2C1.7, 2C1.8;
§§2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
§§2E4.1, 2E5.1;
§§2G2.2, 2G2.4;
§2K2.1;
§§2L1.1, 2L2.1;
§2N3.1;
§2Q2.1;
§2R1.1;
§§2S1.1, 2S1.3;
§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

Specifically excluded from the operation of this subsection are:

all offenses in Chapter Two, Part A;
§§2B2.1, 2B2.3, 2B3.1, 2B3.2, 2B3.3;
§2C1.5;
§§2D2.1, 2D2.2, 2D2.3;
§§2E1.3, 2E1.4, 2E2.1;
§§2G1.1, 2G2.1;
§§2H1.1, 2H2.1, 2H4.1;
§§2L2.2, 2L2.5;
§§2M2.1, 2M2.3, 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.9;
§§2P1.1, 2P1.2, 2P1.3.

For multiple counts of offenses that are not listed, grouping under this
subsection may or may not be appropriate; a case-by-case determination
must be made based upon the facts of the case and the applicable
guidelines (including specific offense characteristics and other
adjustments) used to determine the offense level.

Exclusion of an offense from grouping under this subsection does not
necessarily preclude grouping under another subsection.

1    U.S.S.G. § 3D1.2.[3]

2         The guideline begins by stating the standard which governs grouping under this section.

3    Namely, "[a]ll counts involving substantially the same harm shall be grouped together . . . ." It

4    goes on to explain what this means in subsections (a), (b), (c), and (d).  Most important for our

5    purposes, subsection (d) provides certain circumstances where counts are deemed to involve

6    substantially the same harm.  It lists several guidelines and, using seemingly mandatory language,

7    provides that offenses covered by those guidelines are "to be grouped."  It then goes on to

8    provide another list of guidelines which are "[s]pecifically excluded from the operation of this

9    subsection."  Afterward, it states that offenses which fall under guidelines that are not listed

10   should be examined on a "case-by-case" basis.

11   I. The "To Be Grouped" Language of U.S.S.G. § 3D1.2(d)

12        A critical preliminary issue presented by U.S.S.G. § 3D1.2(d) is the meaning of its

13   seemingly mandatory provision that "[o]ffenses covered by the following guidelines *are to be*

14   *grouped*."  U.S.S.G. § 3D1.2(d) (emphasis added).  The list of offenses under subsection (d)

15   which are "to be grouped" is composed of rows of guideline sections from Chapter 2 of the

16   United States Sentencing Guidelines Manual.  Individual guidelines that fall under the same

17   "part" of Chapter 2 all contain the same alphabetical letter, appear on the same line, and are

18   separated from each other by commas.  Thus, for example, all of the guidelines in the second row

19   of the "to be grouped" list are from "part C" of Chapter 2, which addresses offenses that involve

_____

[3]We show here the current November 2003 version of the guideline, even though the parties' plea agreement contemplated use of the November 2000 version. The changes to the guideline during this period, however, are not pertinent to Lenoci's offenses.

10

1    public officials. Each row is separated from the other rows by semi-colons. Notably for our

2    purposes, §§ 2C1.1 and 2C1.7, the guidelines covering Lenoci's offenses, both appear in the

3    second line in the listing of "to be grouped" offenses. Thus, a question is raised as to whether,

4    contrary to the District Court's determination, the guidelines provide that Lenoci's offenses must

5    be grouped.

6         Unfortunately, the guidelines are not entirely clear as to what is "to be grouped" under §

7    3D1.2(d). Had we not the benefit of interpretive case law, the provision would suggest at least

8    three possible interpretations. We could:

9         (1) group all counts that fall under guidelines which appear anywhere in the "to be

10        grouped" list;

11        (2) group all counts that fall under guidelines that appear on the same line of the

12        list; or

13        (3) group all counts that fall under a particular guideline in the list (e.g., all counts

14        under § 2C1.1 are to be grouped together).

15        The first interpretation, namely, that we are to group all offenses in the "to be grouped"

16   list, has been rejected by most courts that have considered the issue and also poses practical

17   difficulties of aggregation. In our Circuit, this approach is likely precluded by our decision in

18   *United States v. Napoli*, 179 F.3d 1 (2d Cir. 1999), *cert. denied*, 528 U.S. 1162 (2000). *Napoli*

19   addressed whether or not fraud and money laundering counts should have been grouped under §

20   3D1.2(d). At the time, the applicable guidelines, § 2F1.1 (fraud) and § 2S1.1 (money

21   laundering), both appeared in the § 3D1.2(d) list of offenses which "are to be grouped under this

11

1    subsection." In a footnote in that case, we stated that we "reject the broad view that money

2    laundering and fraud counts can be grouped under subsection (d) simply because they both

3    appear on its list of counts 'to be grouped.'" *Id.* at 9 n.4. We pointed out that the list of counts

4    "to be grouped" under § 3D1.2(d) contains offenses, such as drug dealing and fraud, that measure

5    the harm they seek to punish in different ways (e.g., drug quantity versus amount of money).

6    "Because the guidelines for each of these offenses measure harm differently, it would be

7    impossible to use either guideline to determine an offense level based on the 'total' or

8    'aggregate' harm from both–as is required when counts are grouped under subsection (d)." *Id.*

9    Therefore, we concluded that the appearance of both guidelines on the "to be grouped" list was

10   not conclusive.

11        Furthermore, this first interpretation is contrary to case law in many other circuits where

12   grouping is not automatic simply because each count falls under a guideline in the "to be

13   grouped" list. *See United States v. Williams*, 154 F.3d 655, 657 (6th Cir. 1998), *cert. denied*, 525

14   U.S. 1113 (1999); *United States v. Taylor*, 984 F.2d 298, 303 (9th Cir. 1993); *United States v.*

15   *Seligsohn*, 981 F.2d 1418, 1425 (3d Cir. 1992), *cert. denied*, 513 U.S. 1119 (1995); *United States*

16   *v. Harper*, 972 F.2d 321, 322 (11th Cir. 1992); *United States v. Johnson*, 971 F.2d 562, 576 (10th

17   Cir. 1992). In addition, in several cases in this Circuit where we eventually concluded that

18   grouping is appropriate for counts that fall under different guidelines, we first engaged in an

19   analysis of whether the offenses were of the same general type and were otherwise suitable for

20   grouping. *See Gordon*, 291 F.3d at 192-93 (2d Cir. 2002); *United States v. Petrillo*, 237 F.3d

21   119, 124-25 (2d Cir. 2000); *United States v. Fitzgerald*, 232 F.3d 315, 319-20 (2d Cir. 2000). If

12

1    appearance on the list of counts to be grouped was conclusive and grouping automatic, the

2    careful analysis in those cases would have been unnecessary.

3        Lastly, this interpretation is not supported by Application Note 6 to § 3D1.2.[4]  The

4    application note states that "[c]ounts involving offenses to which different offense guidelines

5    apply are grouped together under subsection (d) if the offenses are of the same general type and

6    otherwise meet the criteria for grouping under this subsection."  This strongly suggests that the

7    grouping of counts that fall under different guidelines is not automatic merely because the counts

8    are covered by guidelines in the "to be grouped" list.

9        The second interpretation would automatically group counts that fall under guidelines that

10    appear on the same row of the list.  This makes intuitive sense because the offenses under

11    guidelines listed on the same row are generally similar, having been selected for inclusion in the

12    same part of Chapter 2.  In addition, the presentation of the list, which separates guidelines on the

13    same row with commas and uses semicolons to set these lines off from the rest, might suggest

14    that this clustering was intentional.  Furthermore, guidelines on the same row generally measure

15    harm in the same way, making it easier to aggregate harm for counts under guidelines on the

16    same line.

17        At least two circuit courts have been sympathetic to the view that courts should

18    automatically group counts covered by guidelines which appear on the same row of the "to be

---

[4]*See Stinson v. United States*, 508 U.S. 36, 45 (1993) (stating that "the guidelines are the
equivalent of legislative rules adopted by federal agencies" and "provided an agency's
interpretation of its own regulations does not violate the Constitution or a federal statute, it must
be given controlling weight unless it is plainly erroneous or inconsistent with the regulation")
(internal quotation marks omitted).

13

1    grouped" list. *See United States v. Zanghi*, 189 F.3d 71, 85 (1st Cir. 1999) (holding that

2    grouping is automatic for counts under guidelines § 2S1.1 and § 2S1.2, and while finding

3    uncertainty in the case law as to "whether it is imperative to group all offenses covered by

4    guidelines listed in paragraph 2 of § 3D1.2(d)," noting that such cases do not address grouping as

5    to "offenses covered by guidelines listed *in the same row* of that paragraph") (emphasis in

6    original), *cert. denied*, 528 U.S. 1097 (2000); *United States v. Emerson*, 128 F.3d 557, 564 n.1

7    (7th Cir. 1997) (stating that "[t]here is some question whether all of the offense sections listed

8    under §3D1.2(d) are to be grouped with each other, or if only those sections listed in the same

9    row are to be grouped together").

10            On the other hand, there is little in the language of the sentencing guidelines to support an

11    approach under which grouping is automatic for counts in the same row but not for those on

12    different rows. *Napoli*, at a minimum, provides no support for this line-by-line approach.

13    Although the offenses in *Napoli* involved guidelines listed on different rows, it did not

14    distinguish between offenses under different guidelines on different rows and offenses under

15    different guidelines on the same row. Furthermore, Application Note 6 to § 3D1.2 draws no

16    distinction as to grouping procedures on a line-by-line basis; rather, it seems to group offenses

17    under different guidelines the same way regardless of whether or not they are listed on the same

18    line. In addition, § 3D1.2(d) lists certain guidelines that are "[s]pecifically excluded from the

19    operation of this subsection." These listings have the same format as those which are "to be

20    grouped." This suggests that the physical layout of the guidelines on the page is largely just a

21    matter of visual clarity and alphabetical ordering, without legal significance. Given that some

14

1    rows contain only one guideline, it is particularly difficult to find that the placement of certain

2    guidelines on the same row is meant to signify a particular relationship among those guidelines.

3    In short, other than the guideline's aesthetic presentation, there is little support in this Circuit for

4    the view that the placement of certain guidelines on the same line has legal significance.

5         Under a third approach, only offenses covered by the same guideline must be grouped

6    when that common guideline appears in the "to be grouped" list. Thus, the guideline language

7    specifying that "[o]ffenses covered by the following guidelines are to be grouped under this

8    subsection" is read as applying to counts under individual guidelines, but not across guidelines.

9    If, for example, both of Lenoci's offenses were covered under § 2C1.1, a "to be grouped"

10   guideline, then, following this interpretation, both offenses would have to be grouped.

11        This third approach is consistent with Application Note 6 to § 3D1.2, which states that

12   "[c]ounts involving offenses to which *different* offense guidelines apply are grouped together

13   under subsection (d) if the offenses are of the same general type and otherwise meet the criteria

14   for grouping under this subsection." (emphasis added). By specifying a specific approach to take

15   when different guidelines on the list are involved, the application note implies that grouping is

16   automatic for counts covered by the same guideline. *See United States v. Buenrostro-Torres*, 24

17   F.3d 1173, 1175-76 (9th Cir. 1994) ("If the offenses at issue are covered by one of the listed

18   guidelines we do not analyze the facts of the particular case. Here, the offenses in Counts One

19   through Three are covered by § 2F1.1; Congress has determined that such offenses are

20   categorically groupable under § 3D1.2(d)."). Yet, as discussed further in the next section, the

21   view that we must group counts that fall under the same "to be grouped" guideline has not met

15

1    with universal agreement.

2         The preceding discussion shows that the plain language of the "to be grouped" provision

3    in § 3D1.2(d) is ambiguous.  While the application notes and interpretive case law may clarify

4    that language and perhaps foreclose certain interpretations, the range of interpretations available

5    has surely limited the value of the "to be grouped" language, which was likely intended to offer

6    straightforward guidance as to grouping in at least certain instances.

7         We also note that the three interpretations described here are not exhaustive, and we raise

8    a question as to whether mandatory grouping, under any of these interpretations, ought to be

9    limited based on whether the relevant offense level calculations primarily involve some measure

10   of harm that *can* be aggregated.  For as we discuss in the next section, in considering whether

11   Lenoci's offenses should be grouped, it is not clear how much weight we ought to give to the fact

12   that his harmful conduct cannot easily be aggregated under the guidelines.

13   II. AGGREGATION OF THE HARM FROM DEFENDANT'S CONDUCT

14        If the plain meaning of the "to be grouped" language failed to resolve the grouping

15   question presented here, we would turn next to the question of whether the counts here ought

16   nevertheless be grouped under the more general provisions of § 3D1.2(d).  The government

17   argues, *inter alia*, that grouping is inappropriate here because the offense levels associated with

18   each count are not "determined largely on the basis of the total amount of harm or loss . . . or

19   some other measure of aggregate harm."  U.S.S.G. § 3D1.2(d).  The offense level for Count One

20   was determined by the eight-level upward adjustment triggered by Ganim's status as an elected

21   official.  *See* U.S.S.G. § 2C1.1(b)(2)(B).  By contrast, the offense level for Count Two was

16

1    determined by the monetary amount paid to Trinkley.  *See* U.S.S.G. §§ 2C1.7(b)(1)(A),

2    2F1.1(b)(1)(E) (2000).  As the government correctly notes, the harm from these offenses cannot

3    easily be aggregated were they placed into the same group.

4           The difficulty presented by this challenge is that the relevant guidelines, §§ 2C1.1 and

5    2C1.7, while not identical, are virtually identical.  In fact, had both of Lenoci's counts been

6    deemed to fall under the same guideline, then under any of the three interpretations of the "to be

7    grouped" language discussed in the previous section, we would ordinarily have grouped them,

8    despite the difficulties in aggregation noted by the government.  If we were compelled by the

9    guidelines to group both of Lenoci's offenses had they fallen under the same guideline, then the

10   government's concern about aggregation is diminished somewhat.  Furthermore, one of the

11   purposes of the grouping provisions is to reduce the importance of the charging decision.  *See*

12   U.S.S.G., ch. 3 pt. D, intro. cmt. ¶ 4 (stating that the grouping rules serve "to limit the

13   significance of the formal charging decision and to prevent multiple punishment for substantially

14   identical offense conduct") (quoted in *United States v. Ahmad*, 202 F.3d 588, 591 (2d Cir.

15   2000)).  We should, therefore, be hesitant to find both: (1) that we must group counts that fall

16   under identical "to be grouped" guidelines but (2) that we need not group counts that fall under

17   *virtually* identical "to be grouped" guidelines.

18          There is, however, some precedent suggesting that grouping is not automatic even for

19   counts which fall under identical "to be grouped" guidelines.  The government cites *United*

20   *States v. McElroy*, 910 F.2d 1016, 1027 (2d Cir. 1990), where we held that the District Court did

21   not err when it declined to group counts of paying bribes with counts of receiving bribes, even

1    though they appear to have fallen under the same "to be grouped" guideline. In that case, we did

2    not require grouping because the counts "did not involve either the same property or the same

3    victim." *Id.* Based on *McElroy,* it would seem that grouping is not mandatory even for counts

4    under the same "to be grouped" guideline.

5         Even if *McElroy* was a case in which we failed to group counts in the same "to be

6    grouped" guideline, however, we must read it in light of subsequent case law. For example, in

7    *Napoli,* we explicitly disapproved of the same-victim requirement which led the *McElroy* court

8    not to group counts that fell under the same "to be grouped" guideline. *See Napoli,* 179 F.3d at

9    8-9. Furthermore, in *United States v. Gelzer,* 50 F.3d 1133, 1145 (2d Cir. 1995), we held that it

10   was clear error not to have grouped two firearms counts, both of which fell under § 2K2.1, a "to

11   be grouped" guideline. In that case, our analysis turned, perhaps exclusively, on the fact that the

12   relevant guideline appeared in the "to be grouped" list. The case at bar does not present a proper

13   occasion to resolve these issues, however, because we find, as discussed in Section IV, *infra,* that

14   if the District Court did err as to grouping under § 3D1.2(d), such error was harmless.

15   III. GROUPING UNDER § 3D1.2(c)

16        The defendant argues that if his counts are not grouped under § 3D1.2(d), they should be

17   grouped under § 3D1.2(c). Under § 3D1.2(c), counts involve substantially the same harm and

18   should be grouped "[w]hen one of the counts embodies conduct that is treated as a specific

19   offense characteristic in, or other adjustment to, the guideline applicable to another of the

20   counts." U.S.S.G. § 3D1.2(c). This provision is intended to prevent "double counting" of

21   "closely related" offense behavior. U.S.S.G. § 3D1.2(c), cmt. n.5. According to Lenoci, his

1    conviction under Count Two for honest services mail fraud requires that the public be deprived

2    of the intangible right to the honest services of a public official. Similarly, he notes, the eight-

3    level upward adjustment applied to his bribery offense charged in Count One because it

4    "involved a payment for the purpose of influencing an elected official or any official holding a

5    high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(2)(B). Thus, he claims

6    that the offense conduct in both Counts One and Two involves the influencing of public officials.

7        We find Lenoci's § 3D1.2(c) grouping argument to be without merit. Though both

8    counts of conviction contemplate corruption of a public official, the offense conduct in each

9    count against Lenoci involved different public officials. There was, therefore, no double

10   counting that would justify application of the § 3D1.2(c) grouping provision. *Cf. United States v.*

11   *Leung*, 360 F.3d 62, 69 (2d Cir. 2004) (finding error where the District Court failed to group an

12   obstruction of justice count with a passport fraud count that included an obstruction enhancement

13   where the enhancement was "based on the same obstructive behavior").

14   IV. HARMLESS ERROR

15       We need not resolve Lenoci's grouping challenge, however, because we find that even if

16   the District Court erroneously failed to group his counts of conviction under § 3D1.2(d), any

17   such error was harmless. *See United States v. Tropiano*, 50 F.3d 157, 162 (2d Cir. 1995) ("[W]e

18   will vacate a sentence and remand for resentencing because of a misapplication of the Guidelines

19   only if we determine that the error was not harmless."); *United States v. Thorn*, 317 F.3d 107,

20   126 (2d Cir.), *cert. denied*, 538 U.S. 1064 (2003). Even if the court should have grouped the two

21   counts in this case, Lenoci's offense level would have been the same. *See United States v. Sacco*,

19

1    899 F.2d 149, 151 (2d Cir. 1990) (holding that even where the government conceded that the

2    court erroneously failed to group two counts, the error was harmless because "the court's

3    grouping error made no difference in the sentence"). When Lenoci's counts were not grouped,

4    his combined offense level was calculated by the District Court as 17. Lenoci argues that his

5    offense level would have been 15 if the counts were grouped. We find, however, that even if the

6    counts were grouped, his total offense level would still have been 17; hence, any error was

7    harmless.

8         Were the two counts combined into one group under § 3D1.2(d), as Lenoci suggests they

9    should have been, the court would have applied § 3D1.3(b). Under that provision, "[w]hen the

10   counts involve offenses of the same general type to which different guidelines apply," as the

11   parties agree is the case here, we "apply the offense guideline that produces the highest offense

12   level." We determine the applicability of "specific offense characteristics or adjustments . . .

13   based upon the combined offense behavior taken as a whole." U.S.S.G. § 3D1.3, cmt. n.3.

14        Under this analysis, Lenoci's offense level under the § 2C1.1 bribery guideline would

15   have been 20. Eight levels would have been added to his base offense level of 10 because the

16   offense involved a payment for the purpose of influencing an elected official. *See* U.S.S.G. §

17   2C1.1(b)(2)(B). Importantly, however, we would add an additional two levels because when the

18   conduct is combined into one group, it triggers the applicability of a two-level upward

19   adjustment under § 2C1.1(b)(1). *See* U.S.S.G. § 2C1.1(b)(1) ("If the offense involved more than

20   one bribe or extortion, increase by 2 levels."). Having calculated an offense level of 20 under §

21   2C1.1, the court would then apply a three-level reduction for acceptance of responsibility,

20

1    making Lenoci's total offense level 17, the same level arrived at by the District Court when the

2    counts were not grouped.

3          Lenoci does not contest this analysis, as such, but argues instead that the government is

4    precluded by the plea agreement from arguing for the two-level upward adjustment under §

5    2C1.1(b)(1). The defendant states that, during plea bargaining, both parties were aware that

6    multiple bribes were involved as to both Ganim and Trinkley, such that the government could

7    have sought the upward adjustment regardless of the grouping decision. Yet, the plea agreement

8    made no mention of any two-level upward adjustment despite the parties' mutual knowledge that

9    several bribes were involved. Furthermore, Lenoci claims that he was not even aware of the

10   government's intention to raise the issue of the two-level enhancement until the day before

11   sentencing. Lenoci argues that the plea agreement must be interpreted according to his

12   reasonable expectation that such an enhancement would not be sought by the government. Thus,

13   under the defendant's analysis, the failure to group the counts was harmful error because, had the

14   court been persuaded by Lenoci's grouping argument, the government would have been

15   precluded from arguing for the multiple bribe enhancement. Lenoci concludes that, if he is right

16   as to grouping, the court would have respected the spirit of his plea agreement, yielding a total

17   offense level of 15.[5]

---

[5]If the court had come to the conclusion that the multiple bribe enhancement should be applied either on its own or at the suggestion of the Probation Office, such a determination would have been correct and would not have violated the plea agreement. The plea agreement specifically states that it is not binding on the court or the Probation Office and that the defendant does not have the "right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated."

21

1    "We review interpretations of plea agreements *de novo* and in accordance with principles

2    of contract law." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) (citing *United States*

3    *v. Padilla*, 186 F.3d 136, 139 (2d Cir. 1999)).  "A sentence imposed pursuant to a plea

4    agreement must follow the reasonable understandings and expectations of the defendant with

5    respect to the bargained-for sentence." *United States v. Palladino*, 347 F.3d 29, 33 (2d Cir.

6    2003) (internal quotation marks omitted).  "Because the government ordinarily has certain

7    awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in

8    favor of the defendant." *Riera*, 298 F.3d at 133 (internal quotation marks omitted); *Padilla*, 186

9    F.3d at 140.

10    We find that the plea agreement did not prevent the government from arguing for a two-

11    level upward adjustment under § 2C1.1(b)(1).  The plea agreement states, "[t]he defendant

12    acknowledges that no other promises, agreements, or conditions have been entered into other

13    than those set forth in this plea agreement, and none will be entered into unless set forth in

14    writing by all the parties."  Lenoci cannot cite any provision in the plea agreement which

15    precludes the government from arguing for the two-level upward adjustment, for there is no such

16    provision.  The fact that the government did not seek the multiple bribe enhancement in one

17    context does not preclude it from doing so in another, absent some agreement on the issue.

18    "[W]here—as here—the Government incorporates into the plea agreement an integration clause

19    expressly disavowing the existence of any understandings other than those set forth in the plea

20    agreement, a defendant may not rely on a purported implicit understanding in order to

21    demonstrate that the Government is in breach." *In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999).

22

1      Furthermore, the plea agreement states that "[i]n the event the Probation office or the

2    Court contemplates any sentencing calculations different from those stipulated by the parties, the

3    parties reserve the right to respond to any inquiries and make appropriate legal arguments

4    regarding the proposed alternate calculations." Although the government was apparently the first

5    party to propose the two-level enhancement for multiple bribes, it did so in response to the

6    recommendation in the presentence report that the counts be grouped. Because the grouping of

7    counts in the plea agreement was not an issue stipulated to by the parties, the government did not

8    violate the plea agreement by presenting an argument in the alternative for a two-level upward

9    adjustment.

10      Lenoci could anticipate that the general issue of grouping would be presented to the

11    District Court because his plea agreement and allocution acknowledge multiple instances of

12    criminal conduct. Indeed, Lenoci does not argue that the government was prohibited from

13    raising *some* grouping argument, only that it could not argue for the multiple bribe enhancement.

14    We find that the argument for the two-level multiple bribe enhancement was an extension of the

15    government's argument concerning the propriety of grouping and the methods by which grouping

16    should or should not be accomplished. Lenoci likely realized and, in any event, should have

17    realized that the government would present a grouping argument, and the multiple bribe

18    enhancement is simply a part of that argument.

19      Where, as here, the plea agreement stipulates that there were multiple bribes, it is obvious

20    that the enhancement would have been applicable. Thus, we conclude that, regardless of the

21    District Court's decision as to grouping under § 3D1.2(d), Lenoci's sentence would have been

23

1  the same.  We, therefore, find that if there had been any error as to the § 3D1.2(d) grouping

2  decision, it was harmless.

3                                    **CONCLUSION**

4          For the reasons stated, we hereby AFFIRM the judgment of the District Court and direct

5  the Clerk of the Court to forward a certified copy of this opinion to the Chairperson and Chief

6  Counsel of the United States Sentencing Commission.  Furthermore, in light of *Blakely v.*

7  *Washington,* ___ U.S. ___, 2004 WL 1402697 (June 24, 2004), the mandate in this case shall not

8  issue until further direction from the panel.