UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:00CR217 (EBB) |
| | : | |
| v. | : | |
| | : | October 23, 2006 |
| CHARLES B. SPADONI | : | |
| | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

## I. Introduction

The United States submits this Sentencing Memorandum in aid of the sentencing for

Charles B. Spadoni which is scheduled for Wednesday, October 25, 2006 at 10:00 a.m.  This

memorandum outlines the facts as found by the jury and explains why the calculation of the

defendant's sentencing range, as set forth in the PreSentence Report (PSR), is correct, addresses

certain arguments and claims raised in defendant's Sentencing Memorandum dated October 13,

2006 (Def. Sent. Mem.) and explains why various factors do not warrant either a departure from

the range specified by the guidelines, or a variance from the advisory guidelines range when

deciding upon the appropriate sentence in light of the factors outlined in 18 U.S.C. § 3553(a).

Charles Spadoni nowhere acknowledges the true extent of his conduct.  He takes

responsibility for his actions, noting that his conduct fell below the ethical standard that he had

set for himself.  Yet, he never admits to the conduct of which a jury found him guilty--bribery of

a Constitutional Officer of the State of Connecticut and Obstruction of Justice.  Throughout his

sentencing memorandum, the defendant attempts to portray himself at "the messenger," (Def.

Sent. Mem. at 4),  a mere  scrivener.  He fails to acknowledge that he was an attorney who had a

longstanding relationship with Silvester; that he, not McCarthy, met with Silvester and set the

terms of the bribe;  that he, when faced with grand jury subpoenas, used a program called

"Destroy-It" to get rid of documents on his computer with the intent to impede the grand jury investigation; and that he agreed to cooperate only after defendant McCarthy fired and stopped paying him.  Spadoni nowhere acknowledges that he corrupted the pension investment process of the State of Connecticut because he stood to make a lot of money on the deal.  The evidence introduced at trial showed that Spadoni took credit for the corrupt deal and received a $350,000 bonus in 1998, the year that the deal closed.  This Court should sentence Charles Spadoni within the sentencing guideline range as set forth in the PSR.

II.    **The Offense Conduct And Sentencing Guideline Range**

    **A.  The Jury's Verdict**

        **Bribery-Racketeering Act 4A, Count 19 And Theft of Honest Services-Counts 20-23**

The Government refers to this Court's September 16, 2005 Ruling on Defendant Spadoni's Motion for Judgment of Acquittal and For a New Trial [doc. # 943] and will assume the Court's familiarity with the facts found by the jury.  A jury found the defendant guilty of RICO (Count 1), RICO Conspiracy (Count 2), Bribery (Count 19), Theft of Honest Services Fraud (Counts 20-23) and Obstruction of Justice (Count 24).

As this Court noted, the Government's case-in-chief consisted of voluminous documentary evidence, as well as testimony from among others, Silvester, Stack and Special Agent Rovelli.  9/16/05 Ruling at 5.  As to the bribery conviction, essentially, the evidence at trial established that Paul Silvester received a call from defendant Spadoni shortly Silvester lost the 1998 election.  Spadoni told Silvester that he wanted to meet and discuss an investment.  5 Tr. at 151-52.  Once they met, Silvester was inclined to do a deal with Triumph because of the

past benefits Triumph had provided to him.  Id. at 151-52, 156-57.  Silvester then requested that

Spadoni arrange for Triumph to pay a "finders fee" to Stack and Thiesfield, in the amount of one

point  (i.e., one percentage point of the total contract).  Id. at 158-59.  Defendant Spadoni said

"he would discuss it with people in Boston."  Id. at 159.  Neither Stack nor Thiesfield, of course,

had actually been "finders."  Id.  Defendant Spadoni later told Silvester that he had discussed the

matter and "they did not want to pay the fee as a finder's fee; they wanted to wait until [Silvester]

was out of office and then sit down with those folks and work it out at that point."  Id. at 161.

Silvester understood Spadoni's statement to mean that, when he left office, "they would sit down

and work it out on terms similar to the economics that [Spadoni and Silvester] had discussed."

Id. at 162.

  Silvester explained that, as a result of Spadoni's assurance regarding the payments to

Stack and Thiesfield, he was "influenced" to increase the deal from $150 million to $200 million.

Id. at 162-63.  According to Silvester, he made the increase so that Stack and Thiesfield would

get more money, given that they were to be paid a percentage of the total investment.  Id. at 163.

Specifically, he explained that he understood, based on Spadoni's words, that Triumph would

give Silvester the benefit he requested: Triumph would sit with Stack and Thiesfield and work it

out on terms similar to the economics that Silvester discussed with Spadoni.  5 Tr. at 162.

Silvester testified how Spadoni built in a multiplier by agreeing to the request.  According to

Silvester, because Triumph agreed to pay a percentage of the total deal, the bigger the deal, the

more money would go to Silvester's associates.  Id. at 163.

  Christopher Stack testified that he received a call from Silvester a short time after the

election.  3 Tr. at 44.  Silvester told Stack to expect a call from Spadoni, and then in a later call

3

Silvester told Stack to call Spadoni.  Id. at 44-45.  Stack explained that, during the weekend following the election loss, "there were a flurry of calls both from Paul and several between myself and Charles Spadoni."  Id. at 45.

In the first call between Stack and Spadoni, Spadoni told Stack that it looked like they would be working together.  Id.  Stack had never solicited work from Triumph, but Spadoni simply explained that he would be sending "a draft contract that would reflect a consulting arrangement for Triumph Capital."  Id. at 45.  During that same period of time, Silvester instructed Stack to review the contract carefully and advised that Thiesfield would be getting an identical contract.  Id. at 46.  The contract, according to Stack, was straightforward and "didn't entail a lot of activity on my part."  Id. at 46.  Silvester told Stack that he was anxious to get the contract signed.  Id. at 47.

Stack remembered receiving a draft contract at his home fax machine.  Id. at 48.  He also recalled signing the contract on November 11, 1998–the Wednesday after the flurry of calls occurred–at the law offices of Laboeuf Lamb in New York.  Id. at 48, 50.  After Stack signed the contract, no one at Triumph ever asked him to do anything under the contract, until the federal investigation began.  Id. at 59-60.

Records from Triumph Capital confirm that a fax was sent from Triumph to Stack's fax machine on November 9, 1998 (Monday). See Gov. Ex. 18.  Similarly, the evidence seized from defendant Spadoni's computer confirmed that Spadoni accessed documents named "Stack contract.doc" and "LAT contract.doc" on November 10, 1998 (Tuesday).  See Gov. Ex. 156.  And the fact that Stack met with Spadoni and McCarthy and others at Laboeuf Lamb in New York on November 11, 1998 (Wednesday), was confirmed by Maryanne Leonard.  5 Tr. at 10-11.

4

**Obstruction of Justice-Racketeering Act 5 and Count 24**

In order to prove a violation of 18 U.S.C. § 1503, the Government must prove three elements: (1) that a grand jury proceeding was pending at the time alleged in the indictment; (2) that the defendant was aware that the proceeding was pending; and (3) that the defendant corruptly obstructed or impeded, or endeavored to obstruct or impede the proceeding.  See, e.g., United States v. Ruggiero, 934 F.2d 440, (450 (2d Cir. 1991); United States v. Capo, 791 F.2d 1054, 1070 (2d Cir. 1986), rev'd on reh'g en banc on other grounds, 817 F.2d 947 (1987) (leaving obstruction rulings undisturbed).  In this connection, "the government must offer evidence of conduct "that, in [Spadoni's] mind, has the 'natural and probable effect' of obstructing or interfering with [the grand jury]."  See Ruling on Mot. to Dismiss dated Apr. 18, 2003,  at 8 (citing United States v. Aguilar, 515 U.S.  593 (1995), and United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002)).   As this Court concluded, the evidence offered at trial was sufficient to prove each of the elements of obstruction of justice. 9/16/05 Ruling at 25.  Some of that evidence is set forth below.

With respect to the first element, Special Agent Urso testified that a grand jury proceeding was pending, and that a number of grand jury subpoenas had been issued.  See, e.g., 2 Tr. at 34, 40-42, 53-61, 88-90; Gov't Ex. 5, 6, 8, 9, 10 (grand jury subpoenas).

With respect to the second element, Paul Silvester testified that defendant Spadoni was aware of the pending grand jury proceeding.  Among other things, Silvester testified that on the Saturday of Memorial Day weekend 1999, Spadoni informed him that Triumph had received a grand jury subpoena calling for marketing materials related to the placement of the Connecticut money with Triumph.  5 Tr. at 177-78.

The Government also introduced evidence with respect to the third element: that the defendant corruptly endeavored to obstruct or impede the proceedings, that is, that he acted in a way that had the natural and probable effect of obstructing or interfering with the grand jury by deleting, overwriting, or failing to produce computer records that were relevant to the grand jury investigation. Silvester testified that over Memorial Day weekend 1999, Spadoni had informed him of the service of the first subpoena on Spadoni's firm, and that even if Triumph's contracts with Thiesfield and Stack were not covered by the first subpoena, "they anticipated that there'd be additional subpoenas in the future." 5 Tr. at 179. Spadoni reported that an attorney had advised him that "if there's things on your computer that aren't needed for business purposes or the subpoena is not asking for them, then to just get rid of it." Id. at 180-81. The lawyer recommended a computer program that assists in the destruction of documents. Id. at 190. Spadoni also wanted to know whether Silvester had copies of the contracts between Ben Andrews' firm and Park Strategies, for which Silvester was then working. Id. at 191. Spadoni "wanted that contract to disappear," and told Silvester that "if it was on [Silvester's] computer that it not be there anymore," "[o]r if there was a hard copy lying around, [that Silvester] throw it away." Id. at 192-93. A fellow Triumph employee, Robert Trevisani, also testified about a discussion with Spadoni regarding how documents can be destroyed from a computer. Trevisani suggested that "if we were trying to hide something, we could use a program like CleanSweep," to which Spadoni replied that "[t]he program that you needed would be Destroy-It!" 7 Tr. at 92.

Special Agent Jeff Rovelli of the Federal Bureau of Investigation testified that he examined a laptop computer assigned by Triumph Capital to defendant Spadoni. A program named "Destroy-It" had been installed on the laptop on June 21, 1999–less than a month after the

6

first subpoena was served–and that the program was designed to "overwrite and permanently delete files which are stored on a computer hard drive." 8 Tr. at 165. On June 23, 1999, the Destroy-It! program had been run in numerous directories of the laptop computer, including the Triumph and Fund of Funds folders. Destroy-It! had also been run on December 28, 1999, on two files in a folder named "LAT, LLC"–the name of Lisa Thiesfield's company. Agent Rovelli also testified that certain data which had been on the laptop prior to May 31, 1999–including a directory named "Silvester"–were no longer there by the time the laptop was obtained by subpoena in April 2000. 9 Tr. at 69-76. Other documents, named "LAT Contract" and "Stack Contract," had been accessed from the computer as early as November 10, 1998, and existed on floppy diskettes as late as December 31, 1999, and May 31, 1999, respectively. Neither of these files were on the computer when seized, and no floppy diskettes with those files were ever produced to the Government.

As this Court concluded, all the above stated evidence was sufficient for a reasonable jury to conclude that Spadoni knew his actions were likely to affect the grand jury investigation and to influence or obstruct the due administration of justice in violation of 18 U.S.C. § 1503. (9/16/05 Ruling at 18).

### B. The Sentencing Guidelines

Recently, the Supreme Court clarified the continuing role of the Sentencing Guidelines and the scope of the sentencing court's discretion in United States v. Booker, 543 U.S. 220 (2005). Booker makes clear that this Court must consider both the sentencing factors set forth in 18 U.S.C. Section 3553(a), and the Sentencing Guidelines in fashioning a reasonable sentence. Id. at 249. While the Sentencing Guidelines are no longer mandatory following Booker, they

must still be considered in determining the appropriate sentence.  Because the Guidelines reflect

the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a),

the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play

a central role in a sentencing court's § 3553(a) calculus.  The Second Circuit has recognized the

continuing relevance of the Sentencing Guidelines following <u>Booker</u> in determining an

appropriate sentence.  <u>See</u>  <u>United States v. Crosby</u>, 397 F.3d 103, 113-14 (2d Cir. 2005).

### The PSR Properly Calculated the Defendant's Guidelines Sentencing Range at 63-78 Months of Imprisonment

The government agrees with the PSR's calculation of the defendant's guideline range,

and contends that no downward departures or variances from the appropriate range are

appropriate.

As noted above, the jury found the defendant guilty of Racketeering (Count 1),

Racketeering Conspiracy (Count 2), Bribery (Count 19 ), Theft of Honest Services Fraud (Counts

20-23), and Obstruction of Justice (Count 24).  Pursuant to § 3D1.3(a), the offense level for

bribery, §2C1.1, is used to determine the offense level because it results in the highest level of

the counts of the Group.  The base level offense is 10, 2 levels are added for more than one bribe

under §2C1.1(b)(1), 12 levels are added under §2C1.1(b)(2)(A) because of the value of the

bribes, and 2 additional levels are added under §3C1.1 for obstruction of justice, resulting in an

adjusted offense level of 26.  An adjusted offense level of 26, with a criminal history category I,

results in a range of 63 to 78 months' imprisonment (sentencing table) and a fine range of

$12,500 to $1,000,000.00 (U.S.S.G. § 5E1.2(c)(3)).  <u>See</u> PSR ¶¶ 64-73, 104.

The defendant requests that the Court depart downward from the guideline range based

on the following: (1) the acquitted conduct should not be included in the guideline calculation, (2) charitable works, (3) extraordinary family circumstances (4) imperfect advice of counsel defense, and (5) collateral consequences suffered by the defendant, particularly the emotional pain already suffered by the defendant and his family.  In the alternative, the defendant asks the Court to impose a non-guideline sentence, arguing that a combination of factors pursuant to §3553(a) support a sentence below the advisory guideline range.  According to the defendant, those factors are: (1)  the treatment accorded numerous other individuals, charged and uncharged, (2)  factors unique to the defendant, including but not limited to the harm suffered by the defendant since the investigation commenced in approximately 2000, and (3) defendant's post-trial cooperation with the government.  The government addresses these arguments below.

**This Court May And Should Consider Acquitted Conduct In Determining the Advisory Guideline Range**

The defendant argues that the Probation Officer's computation of a total offense level of 26 (resulting in a guideline range of 68-73 months) is in error and that the correct offense level, before departures, is 24 (resulting in a guideline range 51-63 months).  See Def. Sent. Mem. at 40.  The defendant incorrectly asserts that "the discrepancy derives from the determination by the Probation Officer that Mr. Spadoni was guilty of the so-called campaign contribution bribes as to which he was acquitted at trial.  Id.  The inclusion of more than one bribe in the calculation is not based on the incorrect assumption that a jury found Spadoni guilty of the campaign contribution bribes; rather, the inclusion of more than one bribe is based on the well founded legal principle that, under certain circumstances, a sentencing court may take into consideration acquitted conduct if the government has proven the acquitted conduct by a preponderance of evidence at

trial.

The jury found Triumph Capital and Spadoni not guilty of Racketeering Act 2B and
Counts 15, 16, and 17 of the indictment.  Those counts charged the defendants with paying
Silvester bribes–namely, a sham $25,000 consulting contract to Lisa Thiesfield and $100,000 in
campaign contributions–in return for a state investment in the fund that became known as
Triumph Connecticut-II.

A sentencing court may take into consideration acquitted conduct if the government has
proved the acquitted conduct by a preponderance of the evidence and the defendant was
convicted of another crime at the same trial.  See U.S.S.G.§ 1B1.4; United States v. Watts, 519
U.S. 148, 154-57 (1997); United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 92-93 (2d
Cir. 1999).  Here, as outlined in the PSR, there is more than a preponderance of evidence by
which the Court can determine that the Thiesfield contract and the campaign contributions were
bribes.

The indictment charged that Spadoni bribed Paul Silvester, in the first instance, when
they agreed to circumvent Connecticut campaign financing laws by (1) contributing $100,000 to
the Connecticut Republican Party ("CRP"), knowing that the contributions would benefit
Silvester's campaign, and (2) giving Lisa Thiesfield a $25,000 "consulting" contract so that she
could leave state employment and work as Silvester's campaign manager.  These allegations
form the basis for the "first bribe" charges: Bribery, 18 U.S.C. § 666 (Count 15); Theft of Honest
Services, 18 U.S.C. §§ 1341 and 1346 (Counts 16 and 17); and Bribery, Conn. Gen. Stat. §§ 53a-
148 and 53a-8 (Racketeering Act 2).

At trial, the government recognized that the defendants' contributions to the CRP and

payment to Thiesfield fell within the context of campaign contributions or, given the defendants' characterization of the Thiesfield payment, at least a hybrid thereof. And, the Court instructed the jury regarding such payments according to the law, as first announced in McCormick v. United States, 500 U.S. 257 (1991), and as evolved through subsequent cases, even though McCormick involved a violation of the Hobbs Act whereas the charges here are bribery and theft of honest services.

In addressing McCormick's "explicit promise or undertaking" language, Justice Kennedy explained in a concurring opinion in Evans v. United States, 504 U.S. 255 (1992):

> The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

Thus, although McCormick spoke of an "explicit promise or undertaking" the court itself has made clear two important propositions: (1) that even in matters involving campaign contributions the agreement need not be expressed in a formal way and may be discerned from the parties' words and conduct, and (2) such matters are uniquely within the province of the trier of fact for its determination as to the existence of criminal intent.

Those courts of appeal that have analyzed McCormick-Evans have concluded, as did Justice Kennedy, that criminal liability rests not on expressed or formalized agreements, but rather on the trier of fact's determination of criminal intent as discerned through the parties' words and conduct. In fact, two circuits that have thoroughly examined the McCormick-Evans line of cases have adopted pattern jury instructions which do not incorporate the "explicit

promise or undertaking" language of McCormick.[1]  See 2A O'Malley, Federal Jury Practice and Instructions § 53.09 (5th Ed.).

Other circuits similarly interpret McCormick-Evans as requiring no express or formalized agreement among the parties.  The Court of Appeals for the Sixth Circuit first visited the issue in 1994 in United States v. Blandford, 33 F.3d 685, 696 (6th Cir. 1994).  After observing that some circuits had accepted the view that even after Evans, McCormick still imposed a heightened quid pro quo requirement in the campaign contribution context, the Sixth Circuit analyzed Evans more closely and concluded that McCormick's quid pro quo requirement "is satisfied by something short of a formalized and thoroughly articulated contractual agreement."  33 F.3d at 695.  The

---

[1]The Seventh Circuit's pattern instruction states the elements of the offense and then provides:

> acceptance by an elected official of a campaign contribution, by itself does not constitute extortion under color of official right, even if the person making the contribution has business pending before the official.  However, if a public official receives [or attempts to obtain] money or property, knowing [believing] that it is [would be] given in exchange for a specific requested exercise of his/her official power, he/she has commited extortion under color of official right, even if the money or property is [to be] given to the official in the form of a campaign contribution.

Similarly, the Ninth Circuit also states the elements of the offense and then instructs:

> The acceptance by a public official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.  However, if a public official demands or accepts [money] [property] [some valuable right] in exchange for a specific requested exercise of official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

O'Malley 2A Federal Jury Practice and Instructions § 53.09 (5th Ed.) (2002 Pocket Part).

court explained that Evans defined the term "explicit" as used in McCormick, as speaking "not to the form of the agreement between the payor and payee but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated." 33 F.3d at 696. The court concluded that "one thing we do know from Evans is that a Hobbs Act conviction for extortion under color of official right will be sustained in campaign contribution cases when the government establishes the existence of a quid pro quo as set forth in McCormick and informed by Evans." 33 F.3d at 697. In similar fashion, the Fourth Circuit Court of Appeals noted that the Evans modification of McCormick applies in campaign contribution cases as well. "In Evans, which required proof of a quid pro quo because it involved campaign contributions, the court held that 'the government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" United States v. Hairston, 46 F.3d 361, 365 (1995) (quoting Evans 504 U.S. at 268).

Viewed under that standard, there is ample proof from which a rational juror could conclude that the defendants bribed Paul Silvester by contributing $100,000 to the CRP and by providing Lisa Thiesfield with a $25,000 sham consulting contract.

In his testimony, Paul Silvester made it clear that the defendants' payments did far more than simply curry his generalized favor and goodwill. Rather, he stated that he had an implicit agreement with the defendants. 6 Tr. at 101. Silvester explained that there was no "explicit" agreement because "there doesn't have to be one." 6 Tr. at 88. He then explained exactly what he was obliged to do for the defendants and what it was that created that obligation:

> Q:     And how would that relationship, to your understanding, continue into the future?

13

A:     That when they needed to fund their next fund, that the state would be there to do the deal with them.

Q:     And what, Mr. Silvester, was Triumph's contribution to you that created that implicit understanding?

A:     Campaign contributions.

Q:     Which campaign contributions?

A:     To the Republican Party.

Q:     Of what amount?

A:     Roughly $100,000.

Q:     And you had told us earlier about the contract that Ms. Thiesfield had signed; is that correct?

A.     Yes.

Q:     Did that play a role in your understanding?

A:     Yes.

Q:     What was that, sir?

A:     Well, I was grateful that they hired her because she was someone who was close to me and she was loyal to the campaign and worked very hard.

6 Tr. at 104.

    In his testimony, Silvester also stated that the bribes paid by the defendants stood out even from other corrupt payments. When asked if Triumph was in the same category as the Keystone Fund, Silvester pointed out that Triumph paid far more money and the benefit to him therefore was more substantial. 6 Tr. at 110. In addition, Silvester testified that Triumph (and perhaps Stack who worked to raise money) was the largest of any contributor. 5 Tr. at 139.

    Perhaps most tellingly, when asked on cross-examination if it was true that Spadoni

"never asked you for anything in return," Silvester responded: "No. Not specifically. He asked me to do this deal." 6 Tr. at 79.

In addition, the testimony of Pedro Johnson, Robert Trevisani, and Richard Williams demonstrated that Thiesfield's May 1998 was a sham, designed to pay Thiesfield so that she could work as Silvester's campaign manager. That the defendants attempted to hide their support for Silvester in that way–as well as by making campaign contributions through straw contributors (such as Spadoni's elderly parents) –are all matters that prove, by a preponderance of the evidence, that, as Silvester testified, the defendants' campaign support was designed to corruptly influence him to provide Triumph with future investments.

The defendant also argues that, even if the campaign contributions and the $25,000 consulting contract qualify as a bribe, they were part of the same bribe as the Thiesfield and Stack contracts, since Connecticut made only one investment with Triumph. Def. Sent. Mem. at 46. In support of this claim, the defendant relies on United States v. Arshald, 239 F.3d 276 (2d Cir. 2001).

First, this argument overlooks certain fundamental facts. The indictment charged two separate bribes. Silvester testified that he was influenced to make an investment with Triumph immediately after his election defeat because of the campaign support. Thus, the campaign support influenced one action and Spadoni's agreement to pay 1% of the investment to Stack and Thiesfield influenced a second actions, the increase in the investment to $200 million. Finally, this Court specifically charged the jury based on the campaign contributions as one bribe and the consulting contracts as a second bribe. See Court's Instructions to the Jury.

Second, defendant's reliance on Arshald is misplaced. In Arshald, the Second Circuit

discussed the circumstances under which multiple payments may be said to constitute a single

bribe for purposes of the guidelines. The factors include whether 1) the payments were made to

influence a single action, 2) the pattern and amount of payments bear the hallmarks of

installment payments because they constituted partial payments of a fixed final sum, and 3) the

method for making each payment remains the same. Id., see also United States Soumano, 318

F.3d 135 (2d Cir. 2003). Here, the pattern and amount of the different bribe payments do not

bear the hallmark of installments payments. (An example of an installment payment is the

periodic payments under the $1 million consulting contracts). Indeed, the method for making the

two different bribe payments did not at all remain the same.

     The defendant's third argument in support of an adjusted offense level of 24, that neither

the "Government nor the Probation Office sought to charge McCarthy, Thiesfield or, for that

matter, Silvester with two levels for the campaign contributions bribe," is similarly misplaced.

See Def. Sent. Mem. at 47. A sentencing court may take into consideration acquitted conduct if

the government has proved the acquitted conduct by a preponderance of the evidence and the

defendant was convicted of another crime at the same trial. See supra at 10. The guidelines do

not require that all codefendants or coconspirators, who did not go to trial and plead guilty to

different charges, must have had the conduct specifically included in their guideline calculations.

For a discussion of how Silvester's plea agreement accounted for the Triumph transactions under

the fraud guidelines, the government respectfully refers the Court to the government's response

to the defendant's declaration in support of motion for new trial and this Court's September 7,

2006 Ruling [doc. #961]. With respect to Frederick McCarthy and Lisa Thiesfield, the defendant

simply ignores the fact that those two defendants pleaded guilty to gratuity violations of § 666,

whereas the defendant went to trial and was convicted of bribery and obstruction of justice.

There is no legal support for the argument that the Court should ignore conduct, established by a

preponderance of the evidence at trial, because the a codefendant pled guilty to a lesser offense.

**III.    Other Considerations Do Not Warrant Downward Departures That Yield a Lower Advisory Guideline Range, Nor Imposition of a Sentence that Varies from That Range**

    **A.    General Principles Do Not Favor Departures**

Departures from the sentencing range dictated by the guidelines are sanctioned only in

select cases.  As the Supreme Court has stated:

> Congress allows district courts to depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

Koon v. United States, 518 U.S. 81, 92 (1996) (quoting 18 U.S.C. § 3553(b)).  As the guidelines

provide, and as the Court in Koon explained, "'[t]he Commission intend[ed] the sentencing

courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the

conduct that each guideline describes,'" acknowledging that departures may be considered when

the conduct differs "significantly" from the norm.  Id. at 93 (quoting U.S.S.G. Ch. 1, Pt. A(4)(b)).

In Koon, the Court found that the Sentencing Commission had provided "considerable

guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors

as either encouraged or discouraged bases for departure." Id. at 94.  The Court thus

recommended that sentencing courts ask the following questions in determining whether a

departure is warranted:

      1) What features of this case potentially take it outside the Guidelines'
'heartland' and make of it a special, or unusual case?,
2) Has the Commission forbidden departures based on those features?,
3) If not, has the Commission encouraged departures based on those features?, and
4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95 (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993)

(Breyer, J.)).  The Court went on to advise that in the case where "the special factor is a

discouraged factor, or an encouraged factor already taken into account by the applicable

Guideline, the court should depart only if the factor is present to an exceptional degree or in

some other way makes the case different from the ordinary case where the factor is present." Id.

at 96.

### B.      Charles Spadoni Has Presented This Court With No Extraordinary Facts to Support Either A Downward Departure Or A Non-Guideline Sentence

In his effort to escape just punishment for his criminal conduct, Spadoni makes a series of

downward departure motions.  Specifically, Spadoni seeks a downward departure arguing that

the facts of the case take it outside the heartland because of his claimed vast civic and charitable

contributions, extraordinary family circumstances, reliance on imperfect advice of counsel and

collateral consequences.  See Def. Sent. Mem. at 48-57.  Spadoni has not demonstrated that any

of the factors upon which he relies is present in an unusual or exceptional way and, therefore, no

factor supports a departure under applicable Second Circuit precedent.  Each departure request

should be rejected on its own terms and in the aggregate.

Because Spadoni is the party seeking a departure, he bears the burden of showing, by a

preponderance of the evidence, that it should be granted.  See United States v. McDowell, 888

F.2d 285, 291 (3d Cir. 1989).  If granted, the departure must be a "reasonable" one.  United

18

States v. Alba, 933 F.2d 1117, 1123 (2d Cir. 1991).

**Civic And Charitable Contributions**

The Guidelines state that civic and charitable contributions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. See U.S.S.G. §5H1.11; United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996). Spadoni's claimed civic and charitable are therefore a "discouraged" basis for downward departure. As noted earlier, where the ground for a requested departure is "discouraged," the Supreme Court has directed that "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. at 96.

Departures based on good deeds require very unusual circumstances which are not present here. For many years, Spadoni enjoyed sufficient income and community status so that he had the opportunity to engage in certain charitable events and activities such involving the Boy Scouts, the YMCA, and his children's schools. There is nothing truly exceptional in contemporary American society for the well-to-do or politically connected to donate money or time to charitable causes. Most of the good works cited by Spadoni -– showing kindness and compassion for friends, family, and colleagues going through difficult times, and acting as a role model for others in their professional lives –- are what would be expected from anyone who claims to care about others, and particularly from those with Spadoni's stature in the community.

That family members and certain friends think highly of him as a person and as a professional does not distinguish him from most other white-collar criminals. See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out

19

of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").  The case law is rife with convicted felons who, other than their criminal conduct, appear to be compassionate and praiseworthy people.  The guidelines do not, however, authorize a downward departure merely because a defendant has shown kindness, even considerable kindness, to others or because he has had an otherwise successful career.  See generally United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir. 1994)(the sentencing court should compare the defendant to other defendants with community service backgrounds, not just to other bank robbers, to determine if defendant's record of civic involvement "stands out from the crowd"); United States v. Jordan, 130 F.Supp.2d 665, 672-73 (E.D. Pa. 2001) (denying a departure for a defendant convicted of money laundering, despite numerous letters detailing substantial charitable contributions, generosity to community members in need of food, and service as mentor for neighborhood youths; these acts, "while commendable, are not so exceptional or extraordinary for a person" like the defendant who owned a small business)

These decisions are grounded in the recognition that individuals with sufficient stature, ability and opportunity to commit white-collar type crimes are commonly involved in community service and charitable endeavors, and such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses.  Indeed, it is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to 'equalize punishments for white collar and blue collar crime,'" and courts have endeavored to implement that intention in sentencing.  United States v. Thurston, 358 F.3d 51, 80 (1st Cir. 2004) (reversing the district court's downward departure where the white-collar defendant's good

works, although "admirable," were insufficient to qualify as exceptional in light of, among other

things, his status as a prominent corporate executive with the means to make financial

contributions and engage in civic and charitable activities), vacated on other grounds, 125 S. Ct.

984 (2005); see also United States v. Wright, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding the

district court's denial of a downward departure where the defendant minister's good works,

although "profound," "substantial," and "sustained," were not so extraordinary as to justify a

downward departure).

**The Defendant Does Not Qualify For A Departure Based On Family Circumstances**

The guidelines state that "family ties and responsibilities and community ties are not

ordinarily relevant in determining whether a sentence should be outside the applicable guideline

range. See U.S.S.G. § 5H1.6. A departure may, however, be permissible if a "defendant's

familial responsibilities present extraordinary circumstances." United States v. Galante, 111 F.3d

1029, 1032 (2d Cir. 1997); United States v. Alba, 933 F.2d 1117 (2d Cir. 1991) (defendant

worked two jobs to support wife, two children, grandmother and a disabled grandfather who

relied on defendant for physical support). The Court has stated that the adverse effect on a

defendant's family from a defendant's imprisonment does not ordinarily warrant a downward

departure because "[d]isruption of the defendant's life, and the concomitant difficulties for those

who depend on the defendant, are inherent in the punishment of incarceration." United States v.

Tejeda, 146 F.3d 84, 87 (2d Cir. 1998) (per curiam) (quoting United States v. Johnson, 964 F.2d

124, 128 (2d Cir. 1992)). [2]

---

[2] The Second Circuit has reversed downward departures where the circumstances were not
extraordinary. See, e.g., United States v. Carrasco, 313 F.3d 750, 756-57 (2d Cir. 2002)
(reversing family-circumstance departure for defendant who had three children and an ill father

Here, the defendant argues for a sentence outside of the recommended range based on extraordinary family circumstances, citing his wife's health, his adult children's issues, and his elderly mother.  His argument fails to consider that he is not presently employed and apparently not providing financial support to any family members.  His wife is a cancer survivor who is employed and apparently has taken over the role of breadwinner in the home.  Def. Sent. Mem. at 10.  His children are college educated adults who are dealing successfully with their depression.  Although Spadoni asserts that his mother is elderly and infirm, there is no evidence that his mother lives with him or is dependent on him for financial support or for her daily needs.  Indeed, the defendant ignores that he had no problem using his elderly mother as a straw contributor for the campaign contributions, in violation of the law.

_____The defendant's family circumstances are extraordinary because of the support, both emotionally and financially, that the family has provided.  The defendant has been blessed with a loving and supportive family.  The facts simply do not support any basis for a downward departure.

### Reliance On Advice Of Counsel

The defendant seeks a departure based on his claim of reliance on imperfect advice of

---

for whom he should provide financial support; "being the father of three children is in no sense an exceptional circumstance" and financial support for the father was not unique because "in view of the 'considerable personal success' achieved by Carrasco's siblings"); United States v. Faria, 161 F.3d 761, 762-63 (2d Cir. 1998) (reversing family-circumstance departure for defendant who provided financial support to wife and three minor children; "although Faria pays child support, he no longer lives with his children, and his ex-wife earns approximately $40,000 per year," such that "we cannot conclude that Faria's family is uniquely dependent on the support it currently receives from him"); Tejeda, 146 F.3d at 87-88 (reversing family-circumstances departure for defendant with wife and two children; "the existence of a stable family (a wife and two children)--something that is by no means extraordinary--does not satisfy the 'exceptional hardship' criterion established by our precedents").

counsel with respect to his acts taken to obstruct justice. In support of this request, defendant relies on United States v. Bala, 236 F.3d 87 (2d Cir. 2001). Bala addressed whether a district court could consider imperfect entrapment as a ground for a downward departure. The Court, because of U.S.S.G. §5K2.12 which specifically addressed that under certain circumstances serious coercion or duress may provide a basis for a departure, concluded that "conduct by the government that does not give rise to an entrapment defense but is nonetheless 'aggressive encouragement of wrongdoing'" may be considered by a district court in deciding whether to depart downward. Id. at 92, citations omitted. Here, Spadoni was not forced or even coerced into obstructing justice. Moreover, the evidence does not establish that Spadoni even relied on advice of counsel in the traditional sense. Rather, the evidence established that the defendant, as general counsel of a corporation under investigation, conferred with the corporation's criminal defense counsel and then not simply took steps to destroy evidence on his computer but also counseled Silvester to do the same. In order to destroy evidence, Spadoni purchased a computer program and attempted to delete all traces of evidence relating to Silvester and Thiesfield. Simply because two lawyers confer about getting rid of documents in anticipation of subpoenas does not render the communications- –advice of counsel. A jury correctly rejected this argument, and the Court should do likewise.

### Collateral Consequences And Emotional Pain

The defendant argues that the collateral consequences, his lack of employment and loss of his law license, together with the emotional pain that he and his family have already suffered, provides a basis for a downward departure. First, that, as an attorney who is now convicted of multiple felonies, Spadoni will lose certain professional licenses is simply not extraordinary. It is

the reasonable result of his illegal conduct.  Second, Spadoni, after his conviction in July 2003,

chose to file motions for judgement of acquittal and new trial.  He chose to attack the prosecution

and make claims that the government had violated it obligations under <u>Brady</u> and <u>Giglio</u>.  His life

has been placed on hold because of his decision to fight the jury verdict.  While it is certainly his

right to raise all claims, this Court should not then depart downward because of circumstances

that the defendant has created based on his own actions and decisions.

### The Factors Set Forth Under § 3553(a) Do Not Provide A Basis For A Non-Guideline Sentence

The defendant next seeks a non-guideline sentence arguing that the Court should consider

his cooperation, the sentences given codefendants and other unique circumstances, which have

been discussed above.

### The Defendant's Cooperation Provides No Basis For A Non-Guideline Sentence

The Second Circuit recognized that cooperation is a factor under the broadly worded

provisions of §3553(a) which a Court may consider in determining a non-guideline sentence.

<u>United States v. Fernandez</u>, 443 F.3d 19, 33 (2d Cir. 2006).  However, in the instant case, in

assessing the defendant's post-conviction cooperation, this Court should consider the timing and

extent of it. Subsequent to the jury verdict of guilty and prior to McCarthy's and Thiesfield's

guilty pleas, the government reached out to Spadoni's lawyers to determine whether the

defendant was willing to cooperate.  The government did so based on its assessment of Paul

Silvester as a witness and the fact that Spadoni, unlike Silvester, could provide direct evidence of

McCarthy's actions and words.  As this Court is aware, Silvester had no direct communications

with McCarthy regarding the second bribe, the $1 million consulting contracts to Stack and

Thiesfield. There was no direct evidence to establish that at the time of the corrupt agreement, McCarthy understood the effect of the multiplier, that is agreeing to contracts equivalent of 1% of the investment. Silvester's discussions, including the information regarding the multiplier, were with Spadoni. The evidence against McCarthy regarding the fact that Silvester originally contemplated a lower investment amount was not as strong as the evidence against Spadoni. In addition, Silvester had been romantically involved with Lisa Thiesfield and likely would have a difficult time testifying against her at trial. Thus, because the evidence against McCarthy and Thiesfield was not as strong as that against Spadoni and Triumph Capital, the government inquired about whether Spadoni would agree to cooperate. Spadoni, who was still employed by Triumph and still being paid by Triumph, refused to cooperate.

Prior to his trial, on September 4, 2003, McCarthy entered a guilty plea to Count 19 of the indictment and admitted that he unlawfully rewarded Silvester by giving Stack and Thiesfield consulting contracts. Immediately after his guilty plea, McCarthy fired Spadoni and stopped paying him. It was only then that Spadoni agreed to cooperate with the government. In other words, Spadoni tried to play both sides to his benefit and lost. His cooperation does not reflect any sort of remorse or rehabilitation, and this Court should not sanction the conduct by giving him a benefit through a non-guideline sentence.

**A Guideline Sentence Will Not Result In Unwarranted Sentencing Disparities**

The defendant argues that the need to avoid unwarranted sentencing disparities among defendants with similar records, compels a non-guideline sentence in his case. According to the defendant, "This factor, more than any other, compels a non-Guideline sentence. It cannot seriously be argued that Frederick McCarthy's misconduct was less egregious or deserving of a

25

lesser punishment than Mr. Spadoni's."  Def. Sent. Mem. at 63.  This argument ignores that

Spadoni and McCarthy are simply not similarly situated.  The defendant went to trial and a jury

convicted him of Racketeering, Racketeering Conspiracy, Bribery, and Obstruction of Justice.

As a result, unlike McCarthy, the defendant is not entitled to acceptance of responsibility and,

based on the evidence against him, stands convicted of not just bribery but also obstruction of

justice.

    As noted above, based on the strength of the witnesses and evidence, the government

entered into a plea agreement with McCarthy.  That does not mean that this Court can now ignore

the jury's verdict and somehow use McCarthy's guideline range as a measuring stick of an

appropriate sentence for Spadoni.  The Court of Appeals for the Second Circuit has clearly held

that a "guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily

implicit in the verdict."  United States v. Hourihan, 66 F.3d 458, 465 (2d Cir. 1995) (quoting

United States v. Weston, 960 F.2d 212, 218 (1st Cir.1992)).  In Hourihan, the Court reversed a

district judge's effort to sentence a defendant based on the more lenient guideline for abusive

sexual contact, rather than for the more serious offense of which he had been

convicted–aggravated sexual abuse.  In light of Hourihan, there is no basis for accepting the

defense's remarkable request that "the verdict itself, does not override the Court's inherent

authority–indeed obligation–to insure fair and consistent sentencing."   Such arguments regarding

the sufficiency of evidence supporting a jury verdict are not properly considered at sentencing.

Instead, those questions are appropriate only in a motion for acquittal or new trial, or for appeal

which this Court has denied.[3]

Frederick McCarthy pleaded guilty to a gratuity violation of § 666, whereas the defendant went to trial and was convicted of bribery charges. In this respect, the defendant relies on United States v. Panduro, 152 F. Supp.2d 398 (S.D.N.Y. 2001), aff'd, 38 Fed.App. 36 (2d Cir. 2002), in support of the argument that his guidelines should be calculated using the gratuity section, U.S.S.G. § 2C1.2. Panduro addresses the possible manipulation of the guidelines through stipulation of drug quantities. Panduro does not address the situation here, in which a defendant is convicted after trial of an offense (bribery), and the Government subsequently enters a guilty plea with a codefendant (McCarthy) to a lesser offense (giving a gratuity, in violation of 18 U.S.C. § 666), based on the assessment of the evidence against that codefendant. There is no legal support for the argument that the Court can or should ignore the jury's verdict because the a codefendant pled guilty to a lesser offense

Finally, the defendant, general counsel and vice-president of Triumph Capital, obstructed justice. McCarthy was not involved in the defendant's decision to obstruct justice. At the time that Spadoni destroyed documents and advised Silvester to do the same, Spadoni was a well-

---

[3] The jury was given the option of finding that the consulting contracts were gratuities, rather than bribes to Paul Silvester. Count 19, which charges a violation of § 666(a)(2), alleges that the defendants corruptly gave $2 million in consulting contracts to Christopher Stack and Lisa Thiesfield in connection with an increased investment of state pension assets in Triumph Connecticut-II. The Court specifically instructed the jury that "for purposes of Count 19, you can find this third element satisfied if you find that the defendant under consideration intended to influence *or reward* Silvester's decision to increase the investment in Triumph Connecticut-II." (Emphasis added.) In other words, Count 19 permitted conviction upon finding of *either* a bribery or a gratuity theory. If the jury had returned a guilty verdict only on Count 19, then it might be open to discussion whether they had concluded that the defendant's actions constituted a gratuity as opposed to a bribe. However, the jury also returned a verdict of guilty on racketeering act , which charged bribery.

educated individual, having graduated from the University of Virginia Law School. He had worked for many years at large, respected law firms and been involved in complex corporate transactions. He was not some young, naive individual who did not appreciate the consequences of his actions. He made a conscious decision to obstruct the grand jury proceeding.

In arguing that the need to avoid unwarranted sentencing disparities among defendants compels a non-guideline sentence, the defendant fails to consider Ben Andrews. Andrews, like Spadoni, went to trial and was convicted. Andrews, like Spadoni, had direct communications with Silvester about the corrupt transactions. Spadoni obstructed the grand jury process; Andrews lied to agents and to the Court during his testimony. To the extent there are parallels between codefendants, both in their actions and the strength of the evidence, it is between Spadoni and Andrews, not McCarthy.

## IV. <u>Conclusion</u>

This Court must fashion a sentence for a defendant that promotes respect for the law. The sentence in this case must reflect the seriousness of the offenses committed by Spadoni, as well as provide a message both specifically to him and generally to all public officials and business executives who have the opportunity and/or are thinking of violating the public trust and abusing the system to enhance their own wealth and reputation. Spadoni's criminal conduct was not born out of any economic necessity, deprived upbringing or lack of formal education and opportunity. It was born of greed and power. Spadoni could have refused Silvester's request to pay a bribe. Spadoni could have advised McCarthy that a better course was to allow the new state treasurer to evaluate Triumph Capital and any proposed investments on the merits. He did not. He abused his role as a lawyer licensed in the State of Connecticut and he corrupted the

28

State of Connecticut's Pension Investments.  The government urges this Court to sentence the

defendant to that period of incarceration called for under the guidelines.

Respectfully Submitted

JOHN H. DURHAM
ACTING UNITED STATES ATTORNEY


NORA R. DANNEHY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. Ct01942
450 Main Street, Rm. 328
Hartford, CT 06103
nora.dannehy@usdoj.gov
Tel:     (860) 947-1101
Fax:     (860) 240-3291


WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct16012
157 Church Street
New Haven, CT 06510
william.nardini@usdoj.gov
Tel:     (203) 821-3748
Fax:     (203) 773-5378

CERTIFICATION OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing Sentencing Memorandum was sent via facsimile on October 23, 2006 to:

Russell Gioiella, Esquire              Richard R. Brown, Esq
Richard M. Asche, Esquire           Brown, Pandiris & Scott, LLP
Litman, Asche & Gioiella, LLP      100 Pearl Street, Suite 100
45 Broadway Atrium                    Hartford, CT 06103
New York, NY 10006

Raymond Lopez
Senior United States Probation Officer
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

_____
NORA R. DANNEHY
ASSISTANT UNITED STATES ATTORNEY