UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO. 3:00CR217(EBB) |
| CHARLES P. SPADONI | : |

RULING ON MOTION TO DISMISS INDICTMENT OR FOR FULL FILE DISCOVERY AND AN EVIDENTIARY HEARING

Charles P. Spadoni ("Spadoni"), a defendant in this multi-defendant public-corruption case, was tried and found guilty on July 16, 2003 of racketeering and racketeering conspiracy, bribery, wire fraud/theft of honest services and obstruction of justice. He was sentenced on October 25, 2006 to three-years incarceration and five-years supervised release. He appealed his sentence and conviction. On September 28, 2008, the Second Circuit reversed and remanded for a new trial on the racketeering, racketeering conspiracy, bribery and wire fraud charges,[1] affirmed his conviction on the obstruction of justice count and remanded that count for resentencing. Thereafter, Spadoni and the government both filed petitions for rehearing. Their petitions were denied in November 2008. After the petitions were denied and the mandate was issued,[2] Spadoni filed the pending motion to dismiss the indictment or for full file discovery and an evidentiary hearing [doc. # 1015] on the grounds that the government failed to disclose other Brady material prior to trial and that failure warrants the extraordinary relief he seeks.

---

[1] The government has advised that it will not re-try those counts.

[2] Almost one year after the mandate was issued, Spadoni filed a motion in the Court of Appeals to recall the mandate on the grounds that the government "perpetrated a fraud on the Court." His motion was summarily denied.

For the following reasons, the Court finds no merit to Spadoni's claims and thus denies his motion. Spadoni's resentencing, which has been held in abeyance pending this ruling, will be scheduled forthwith.

## STANDARD

A district court may dismiss an indictment either "on the ground of outrageous government conduct if the conduct amounts to a due process violation," United States v. Chapman, 524 F.3d 1073, 1084 (9th Cir. 2008), or under its supervisory power if warranted by the government's pervasive and repetitive misconduct. Cf United States v. Hogan, 712 F.2d 757, 761-62 (2d Cir. 1983). A defendant's due process rights are violated when the government fails to disclose evidence materially favorable to the accused. in violation of Brady. Youngblood v. West Virginia, 547 U.S. 867 (2006).

There are three elements of a Brady violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the government; and (3) prejudice ensued. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Thus, to establish the alleged Brady violation, Spadoni must demonstrate that there is evidence of an agreement or understanding that was not disclosed to him prior to trial; that such evidence was impeaching or exculpatory; and that such evidence was material.

## DISCUSSION[3]

On appeal, Spadoni challenged the sufficiency of the evidence of his intent to offer a bribe and claimed that the government unlawfully suppressed material impeachment and exculpatory

---

[3]The facts and procedural history of this case have been fully set forth in numerous rulings and will not be repeated herein.

evidence. The Second Circuit agreed in part and held that the non-disclosure violated Brady and Giglio.[4] Spadoni now says that after the remand, Paul Silvester ("Silvester"), the government's key witness, contacted Spadoni's counsel and told him about additional exculpatory and impeachment evidence that the government failed to disclose prior to Spadoni's trial. Specifically, that: (1) Silvester had an agreement with the government which provided that, in exchange for Silvester's full cooperation and guilty plea, the government would not investigate or prosecute his sister, Lisa Silvestri ("Silvestri"); (2) the government conferred tangible benefits on Silvester such as excusing multiple violations of his cooperation agreement; and (3) the government refused Silvester's request for mental health counseling so that it would not have to disclose his therapist's notes from counseling sessions. Spadoni maintains that the government's failure to disclose this evidence coupled with the Brady violations found by the Second Circuit

---

[4]The evidence that the Second Circuit found was unconstitutionally suppressed consisted of handwritten notes that the FBI case agent took at an initial proffer meeting with Silvester's attorney. At that meeting, Silvester's attorney, in an attempt to convince the government to offer Silvester a cooperation agreement, related Silvester's account of his criminal activity, which Silvester had set forth in his handwritten notes. In those notes, Silvester related a conversation he had with Spadoni in which Spadoni told Silvester that Triumph could not pay any finder's fee or offer employment to anyone in exchange for an investment with Triumph because that would be a "quid pro quo," but that Triumph was sympathetic to the situation and would be as helpful as possible after Silvester left office as long as it was at "arms length" and "made sense for Triumph." The government disclosed the agent's report of that interview which contained some of the details of that conversation, but did not mention that Spadoni used the words "quid pro quo." The Second Circuit found that the content of Silvester's notes supported an alternative version of the conversation between Silvester and Spadoni that was at odds with the government's theory of the case and was directly relevant to the intent element of the bribery-related charges. United States v. Triumph Capital Group, Inc., 544 F.3d 149, 162 (2d Cir. 2008). The court found that, if the notes had been disclosed to Spadoni, he could have used them to support his version of the conversation and to contradict Silvester's trial testimony and thus concluded that there was a reasonable probability that the jury would have harbored a reasonable doubt about Spadoni's guilt.

3

reveals a persistent pattern of deliberate misconduct that caused him prejudice and undermines the integrity of his conviction and the indictment.

In opposition, the government maintains that Spadoni's claims are without substance, are factually unsupported and speculative. It contends that the only promises it made to Silvester were fully disclosed.

Even assuming Spadoni can establish the second and third elements of a Brady violation – that the alleged undisclosed agreement or understanding was impeaching or exculpatory and was material – he has failed to establish the first element: that there was such an agreement between Silvester and the government as alleged. And Spadoni's other alleged Brady violations are equally unavailing.

    A.    <u>The Alleged Undisclosed Agreement Between the Government & Silvester</u>

The "substantial and highly credible evidence" Spadoni offers in support of his allegation that the government agreed or promised Silvester that it would not investigate or prosecute Silvestri if he fully cooperated, consists of unsigned and unsworn "declarations" of Silvester and Silvestri that were drafted by Spadoni's counsel and assertedly confirmed by Silvester and Silvestri.[5]

Silvester states in his declaration that, because he was concerned that the government's investigation could implicate his brother, Mark Silvester ("Mark Silvester") and his brother-in-law, Peter Hirschl ("Hirschl") and ensnare his sister (who was also Hirschl's wife), Lisa Silvestri, he instructed his attorney, prior to his initial proffer meeting, to advise the government that he

---

[5] Spadoni submits an affidavit from his attorney stating that he believes Silvester's assertions and that both Silvester and Silvestri affirmed to him that their declarations were accurate and that they would testify to their contents if they were subpoenaed.

4

would only agree to cooperate if there was a global resolution of all the potential issues concerning his relatives.  As a result of this, Silvester maintains that he and the government reached an agreement whereby the government would not pursue or prosecute Silvestri in exchange for Silvester's full cooperation.

According to Silvester, the existence of this agreement is reflected in the fact that the government's unjustified interest in Silvestri's records, which Silvester believed was part of its effort to pressure him to cooperate, came to an end right after he signed the cooperation agreement.  Silvester further maintains that the existence of this tacit agreement was subsequently confirmed by the government during a routine witness meeting he had with the prosecutors that took place about three years after his guilty plea.  The meeting was at the facility where Silvester was being detained and occurred after Hirschl pleaded guilty, but before he was sentenced. During the meeting, Silvester asserts that he urged the prosecutor to agree to probation for Hirschl rather than incarceration, but the prosecutor informed him that the government would be seeking incarceration and then said to him words to the effect of "don't be greedy about Peter, we didn't go after your sister."  Silvester maintains that this remark did not surprise him because it reflected the understanding that his cooperation achieved the global resolution he sought in exchange for his cooperation.  Spadoni argues that the prosecutor's statement is an express admission that proves the existence of the alleged tacit agreement.

Spadoni also relies on Silvestri's unsworn and unsigned declaration in which she states that after the FBI executed a search warrant at the law office she shared with Hirschl, she believed that the government was threatening her and implying that its investigation could grow to include her as a witness and she was concerned that the government would force her to testify in the grand jury against Silvester.  She says that Silvester told her that he wanted to cooperate with the

5

government, but that he would only do so if he was confident that his cooperation would resolve the government's interest in his family members, including her. Silvestri states that it was clear to her that one factor in Silvester's decision to cooperate was a promise to him from the government that it would force her to testify and incriminate Silvester unless Silvester agreed to cooperate.

To corroborate Silvestri's statements, Spadoni relies on a timeline he constructs using the billing records of Silvester and Silvestri's attorneys, which purport to show frequent communications between them during the period in question. He also cites a fax from Silvestri's lawyer regarding plea negotiations between Hirschl and the government that mentions the possibility that the government might include a non-prosecution promise for Silvestri in exchange for Hirschl's guilty plea, as well as a note indicating that within forty-eight hours of Silvester's initial proffer, the prosecutor said she had no interest in pursuing Silvestri or Silvester's father. Spadoni maintains that this timeline and the content of those documents is strong evidence that the reversal in the government's interest in Silvestri was not a result of Hirschl's plea negotiations, but was because of the tacit agreement it had made with Silvester.

In response, the government denies the existence of any agreement, promise or understanding between it and Silvester whereby it would not investigate or prosecute Silvestri if he agreed to fully cooperate. It maintains that all of the sworn statements in this case contradict Spadoni's unsworn evidence and conclusively demonstrate that no such agreement existed. The government further asserts that Spadoni has not proffered a sufficient basis to warrant an evidentiary hearing on his claims.

Not only has the government submitted reliable and credible evidence refuting Spadoni's claim, Spadoni's submission is a far cry from what Spadoni characterizes as "substantial and highly credible evidence" that demonstrates the existence of the agreement he relies on to support

the asserted "flagrant" Brady violation.

Specifically, at the time of his guilty plea in September 1999, Silvester made statements under penalty of perjury that directly contradict the statements he now makes in his unsworn "declaration." As the record demonstrates, Silvester previously affirmed, in writing in his plea and cooperation agreements[6] and verbally on the record and under oath at his guilty plea hearing, that no promises other than those disclosed in his written agreements had been made to induce his guilty plea. This fact was confirmed at the time by Silvester's attorney, Hubert Santos ("Santos"), as well as the prosecutor, AUSA Nora Dannehy ("Dannehy"), who both assured the court that this was also their understanding. Santos reconfirms this in a sworn affidavit he provided in connection with the instant motion. In that affidavit, Santos states that "[n]othing has transpired from the date of [Silvester's] plea that causes [him] to reconsider his response" to the court regarding the absence of any other promises and agreements. Silvester's sworn statements carry a strong presumption of verity that has not been overcome by his unsworn declaration and present a formidable barrier to Spadoni's Brady claim. E.g., Blackledge v. Allison, 431 U.S. 63, 74 (1977); United States v. Lumpkin, 192 F.3d 280, 287 (2d Cir. 1999).

Further, the fact that Silvester's unsworn assertion of his belief in the existence of an undisclosed agreement with the government is directly contradicted by his prior sworn statements renders his unsworn recantation of those statements unreliable and not worthy of belief. See Haourai v. United States, 510 F.3d 350, 354 (2d Cir. 2007) (noting that without the possibility of a penalty for perjury, a convicted co-conspirator has nothing to lose by submitting an unsworn

---

[6]Both Silvester's plea agreement and cooperation agreement provide that "no other promises, agreements, or conditions have been entered into other than those set forth [herein], and none will be entered into unless set forth in writing, signed by all the parties."

7

recantation of his prior sworn statement in an attempt to free a defendant who aided him in his criminal scheme and thus his unsworn statement does not contradict his prior sworn testimony). Indeed, Silvester's post-conviction, unsworn recantation submitted on behalf of Spadoni, "a defendant who aided him in his criminal scheme" is inherently suspect. United States v. Gonzales, 970 F.2d 1095, 1100-01 (2d Cir. 1992).

In further support of the government's claim that it did not expressly make or tacitly imply that it would not investigate or prosecute Silvestri, Santos states in his affidavit that, before Silvester's plea, Silvester was always accompanied by someone from [his office] whenever he met with the government." A fair reading of this assertion is that Santos or someone from his office would have known about the alleged agreement if it existed. Notably, neither Santos or anyone from his office has confirmed Silvester's belief that the alleged non-prosecution agreement or promise was ever made by the government.

To the contrary, Hope Seeley ("Seeley"), a member of Santos's firm who actively participated in Silvester's defense, denies the existence of the alleged agreement. In her affidavit, she states without equivocation that "there was no agreement or understanding, tacit or otherwise, that the government would not prosecute or investigate Lisa Silvestri in return for Mr. Silvester's guilty plea and/or cooperation." Spadoni offers nothing to contradict or challenge this conclusive assertion by Silvester's attorney that the alleged agreement did not exist.

Likewise, the government submits an affidavit from Silvestri's attorney, Shelly Sadin ("Sadin"), who also confirms that no such promise or agreement regarding Silvestri was ever made or implied. Also, contrary to Spadoni's argument that certain documents from Sadin's file support Silvester's assertion of such an agreement, Sadin avers in her sworn statement that, after reviewing her case file and the documents Spadoni relies on, she disagrees with Spadoni's

8

characterization of them as reflecting communications between her and the government regarding its investigation or prosecution of Silvestri. According to Sadin, the documents from her file which Spadoni relies on merely "reflect internal communications about whether such a [non-prosecution] agreement might be sought" as part of Hirschl's plea agreement. She unequivocally states that she does "not recall, and [does] not understand any of [those] documents to reflect, an agreement between the government and [her] office that if Mr. Silvester pled guilty or cooperated with the government, the government would not prosecute Ms. Silvestri."

In addition, the FBI case agent, Charles Urso ("Urso"), equivocally states, under penalty of perjury, "there was no agreement or understanding, tacit or otherwise, that the government would not prosecute or investigate Lisa Silvestri in return for Mr. Silvester's guilty plea and/or cooperation."

And most significantly, AUSA Dannhey states in her sworn affidavit that she "never had an agreement or understanding, tacit or otherwise - whether directly with Paul Silvester, through Paul Silvester's attorneys, or through or with anyone else - not to prosecute or investigate Lisa Silvestri in return for Silvester's guilty plea and/or cooperation."

Not only is Silvester's claim of such a non-prosecution agreement contradicted by his own prior sworn statements, the sworn statements of two of Silvester's attorneys as well as Silvestri's attorney, Silvester's declaration is totally bereft of factual assertions. It merely sets forth his subjective beliefs and speculation supported by inadmissible hearsay. Indeed, his declaration makes only one factual assertion – he says that before the first proffer meeting between Santos and the government, which Silvester did not attend, Silvester instructed Santos to tell the government that he would only agree to cooperate if there was a global resolution relating to all his family members. But Silvester does not indicate whether he knows if Santos actually

conveyed his demand to the government. Silvester merely has no reason to believe that his counsel failed to relay his position to the government. Interestingly, Silvester does not actually allege, as a factual matter, that the government expressly promised or agreed not to investigate or prosecute Silvestri in exchange for his cooperation.

Nonetheless, even if Silvester subjectively believed or expected leniency in exchange for his cooperation, a general or hopeful expectation is not enough to create an agreement or understanding that triggers a Giglio obligation. Collier v. Davis, 301 F.3d 843, 849 (7th Cir. 2002). And Silvester's nebulous expectation of help from the government does not constitute Brady material. See United States v. Nixon, 881 F.2d 1305, 1311 (5th Cir. 1989). Further, under Giglio, an understanding is created when the government, during an interview or interrogation of a witness, makes certain statements that contain an implication that the government would reward the cooperation of the witness. Giglio v. United States, 405 U.S. 150, 154 (1972). No such statements that contain that type of implication are alleged here.

Moreover, Silvestri's declaration contains the same paucity of factual assertions as Silvester's and likewise contains only her suspected beliefs, fears and speculation. For example, she only "believed that the USAO was threatening [her] and implying that their investigation could grow to include [her] as a witness." But Silvestri does not attribute any of her fears or beliefs to anything the USAO said or did. Indeed, her subjective fears were not shared by her attorney. According to Sadin's affidavit, Silvestri was never a target of the grand jury's investigation.

While Silvestri's declaration relates conversations she had with Silvester, she does not claim that Silvester ever told her that he had a tacit or express agreement with or promise from the government that it would not go after her. She merely states that she believed Silvester's decision

to cooperate was informed, in part, "by a promise [he] had from the prosecutors that the USAO would force [her] to testify to incriminate [Silvester] unless [he] agreed to cooperate with the government." She provides no factual underpinning for that belief. And although she states that "[p]rosecutors said that they would indict her and then give [her] immunity" she does not identify the prosecutor who allegedly made the statement or the person to whom it was made.

Equally unavailing is Spadoni's claim that AUSA Dannehy acknowledged the existence of the alleged agreement at a meeting with Silvester in 2002, just before Hirschl's sentencing, when, in response to Silvester's request for leniency for Hirschl, she supposedly said "don't be greedy about Peter, we didn't go after your sister." Putting aside the fact that Silvester's recollection of Dannehy's statement was not made under penalty of perjury and thus lacks credibility, it is directly contradicted by the sworn statements of the three other individuals who were at the meeting – Dannehy, Seeley and Urso, all of whom say that Dannehy did not make that statement.

Specifically, AUSA Dannehy states in her affidavit that while she has " a vague recollection of visiting Paul Silvester in prison . . . [she has] no recollection of specifically what [she] said during the visits, including no recollection of saying 'don't be greedy about Peter, we didn't go after your sister' . . . [but she] never intended to convey to Paul Silvester anything about a 'tacit deal struck years earlier' because there was no deal, tacit or otherwise, not to investigate or prosecute Lisa Silvestri in return for, or as a favor for, Paul Silvester's plea and/or cooperation."

Seeley affirms that she was also present at the 2002 meeting with Silvester and corroborates AUSA Dannehy's recollection. Seeley expressly states that, although she does "not recall specifically what was said during [that] visit" she does "not recall Ms. Dannehy saying to Mr. Silvester, 'don't be greedy about Peter, we didn't go after your sister' or words to that effect."

This is also Agent Urso's recollection of that prison meeting. In his affidavit he

11

remembers the prison visit with Silvester, but does "not recall specifically what was said during the visit, and [does] not recall Ms. Dannehy saying to Mr. Silvester, 'don't be greedy about Peter, we didn't go after your sister."

Finally, the Court finds no merit to Spadoni's claim that the existence of the alleged tacit agreement can be implied from the fact that the government never investigated or prosecuted Silvestri. As AUSA Dannehy explains under oath, "the decision not to further investigate or prosecute Lisa Silvestri was made based on the evidence and not made in return for Paul Silvester's plea and/or cooperation, much less as a favor to him."

In sum, the total lack of credible, reliable and non-speculative evidentiary support for Spadoni's claims, contrasted with the government's overwhelming sworn evidence directly contradicting Silvester's allegations and Spadoni's arguments, leads to the inevitable conclusion that Spadoni has failed to establish either an inference that the agreement described by Silvester existed or even the existence of a disputed factual issue as to whether or not such an agreement or understanding existed. United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987) (determining whether there is a genuine issue of material fact to warrant a hearing depends on the sufficiency of factual allegations – "any generalities , conclusory assertions and hearsay statements do not suffice [to warrant a hearing] because none of these would be admissible at a hearing"). While it is true that the existence of an agreement or understanding is a factual issue, the Court's assessment of Spadoni's evidentiary showing does not establish that he is in a position to establish his claim of a Brady violation by competent evidence. See Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007). In other words, on the basis of Spadoni's proffer, further inquiry, either by way of an evidentiary hearing or further discovery, is not warranted. See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (holding that no hearing was required where the parties'

proffers established that it would not offer any reasonable chance of altering the Court's view of the facts); United States v. Helmsley, 985 F.2d 1202, 1209-10 (2d Cir. 1993) (noting that a hearing is not required if the moving papers themselves disclose inadequacies in defendant's claim and that an opportunity to present live testimony would be unavailing).

The Court has considered all of Spadoni's other claims and arguments in support of his contention that such an agreement existed and finds them to be equally without merit.

B.  Other Alleged Brady Violations

Spadoni also initially asserted that the government failed to disclose at least two instances when it excused violations by Silvester of the duties he owed as a cooperator and in so doing violated Brady. According to Spadoni, those violations consisted of two instances when Silvester contacted Lisa Thiesfield, another witness in the case and a co-defendant of Spadoni, when he was prohibited from communicating with her as well as the government's suppression of information regarding Silvester's need for, and desire to obtain, mental health counseling in 2001 and 2003.

Both of these alleged Brady violations are, however, contradicted by the facts and display an almost reckless lack of understanding and knowledge of the pretrial proceedings in this case. Indeed, after the government painstakingly explained and set forth precisely when and where in the pre-trial discovery provided by the government that this Brady material was fully disclosed, Spadoni abandoned these claims.

C. Breach of Proffer Agreement

Spadoni also claims that dismissal of the indictment is a proper sanction for the government's alleged breach of his post-conviction proffer agreement. According to Spadoni, the government, in the opposition brief it filed in the Second Circuit in response to Spadoni's *pro se* motion to recall the mandate, the government, in a footnote, referred to statements Spadoni had

made during a proffer session and in so doing violated the government's assurance in the proffer agreement that any statements he made "would not be offered against him in any federal criminal case brought against [him] in the District of Connecticut, . . . ."

Contrary to Spadoni's claim, the government did not offer Spadoni's statements against him, but did so to defend against Spadoni's accusation that the government committed a fraud on the Court of Appeals by making deliberate and deceptive mis-statements in its brief. The circumstances which caused the government to use those statements are fully and accurately set forth in the government's response to Spadoni's motion to dismiss and will not be repeated herein. Suffice it to say, the circumstances described by the government make it clear that it was necessary, indeed compelled, to disclose the information that Spadoni had provided in his proffer to correct the record and to avoid any suggestion that the government was attempting to hide certain facts that were potentially unfavorable to it. In these circumstances, it is apparent that the statements were actually used by the government against itself, not against Spadoni, and thus there was no violation of the proffer agreement.

## CONCLUSION

Spadoni has not proffered substantial and credible allegations of misconduct by the government and thus his motion for full file review, an evidentiary hearing and dismissal of the indictment [doc. # 1015] is without merit and is DENIED. Indeed, the Court finds Spadoni's assertions that the government engaged in flagrant misconduct throughout this case to be specious, uninformed and frivolous.

SO ORDERED.

_____/s/_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this 24th day of June, 2011.